# UNITED STATES DISTRICT COURT
### ——————— District of Kansas ———————

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                      Case No.  **16-CR-10141-EFM**

CURTIS WAYNE ALLEN, *et al.*,

        Defendants.

---

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF IMPEACHMENT EVIDENCE ABOUT THE CONFIDENTIAL HUMAN SOURCE AND UNDERCOVER AGENTS
### (Re.:  Doc.  206)

---

APPEARS NOW the United States of America—by and through Thomas E. Beall, United States Attorney for the District of Kansas; Anthony W. Mattivi, Assistant United States Attorney for the District; David P. Cora, Trial Attorney, Counterterrorism Section of DOJ's National Security Division; Risa Berkower, Trial Attorney, Criminal Section of DOJ's Civil Rights Division; and Danielle Tarin, Attorney, Law and Policy Section of DOJ's National Security Division—and responds to the defendants' Motion to Compel Production of Impeachment Evidence About the Confidential Human Source (CHS) and Undercover Employees (UCEs) (Mot., ECF No. 206).

## I.    INTRODUCTION

### A.  <u>The Events of the Investigation</u>

On or about February 2016, a CHS working under the supervision of FBI agents in Western Kansas encountered defendant Patrick Stein and learned from Stein that he wanted to attack Somali-Muslim immigrants in their homes, places of worship, and as they went about their daily business.  The CHS reported this to the FBI, which tasked him to gather evidence and record conversations with Stein and his co-defendants about plans to commit crimes of violence.  The CHS continued meeting with the defendants throughout the spring, summer, and early fall of 2016. Recorded conversations documented the defendants' burgeoning plan to attack the Somali-Muslim immigrant community with weapons and explosives.  The defendants, individually and as a group, reached out to other persons in the community to enlist them in this plan.  Several of these recruitment conversations were recorded by the CHS.  The CHS was directed by FBI Special Agents, who debriefed him, paid him, and instructed him on how to make these recordings.

In the fall of 2016, the FBI, through the information presented by the CHS of the defendants' plan, decided to introduce a UCE (an FBI agent working undercover) who would pose as a black market arms dealer with access to explosives.  After a discussion among the defendants that included the CHS (and was recorded by him), the group decided that Stein would meet with the UCE on the group's behalf and try to obtain weapons and explosives to advance the conspiracy.

Stein met with the UCE twice in person.  At these meetings, Stein, also in the presence of the CHS and other UCEs, explained that the defendants had manufactured some homemade explosives and that they wanted to obtain a bomb to blow up an apartment complex in Garden City, Kansas, which housed a Somali-Muslim community and its mosque.  After the second in-

person meeting, Stein drove with the UCEs to show them the group's target.  The UCEs recorded all meetings with Stein.  In addition, Stein communicated several times with the UCE via text message.

On October 14, 2016, Stein delivered 300 pounds of urea fertilizer to the UCE with the intent that it be used in constructing a bomb for the defendants to use at the target apartment complex.  Stein was arrested at the end of this meeting, and defendant Wright was arrested several hours later; defendant Allen had days before been taken into custody for a domestic-violence charge.  On October 19, 2016, all three defendants were charged with a conspiracy to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a.

## B.  Ongoing Discovery Relating to the CHS and UCE

The government has committed to extensive disclosure in this case, including discovery concerning the CHS and, to a lesser degree, the UCEs.  The government has provided approximately 70 electronic audio and/or video records of this case, the bulk of which were provided by May 2017.  These records included telephone recordings made by the CHS, recordings of online group Zello discussions made by the CHS, and face-to-face consensual recordings made by the CHS and by the UCE.  The language recorded has been English.  The government has also been providing transcripts of these recordings as they have been produced by the FBI, which continues to produce and finalize transcripts.  Many of the recordings are several hours long.

With regard to the CHS, throughout this investigation, and through the present time, FBI case agents documented the information provided by the CHS in FD-1023 and/or FD-302 memoranda.  These reports, both those related to Allen-Stein-Wright meetings, and other meetings, have also been produced.  In addition, the government provided all emails and text

communications between the CHS and the FBI handling agents to the defense.  KC-7542690 1A #140, Ser. 392.

Information regarding the FBI payments to the CHS has been produced.  The defense has requested, and the government will produce, the actual receipts of those payments.  Employment records of the CHS—for a period of employment that ended before the CHS started cooperating with the FBI—have been produced as well.

On November 16, 2016, as part of its discovery, the government provided copies of the recorded calls made by the CHS to the defendants.  At the same time, the government provided some transcripts and related FBI-302 reports.  In addition, the government provided to the defense FD-1023 reports documenting the FBI handling agents debriefing of the CHS's after interaction with the defendants and other targets.

On December 2, 2016, the government produced additional FBI-302 reports.

On January 18, 2017, the government proposed releasing CHS information without restriction and providing UCE material in a pixilated form.  The UCE material would be available in an unredacted form at the U.S. Attorney's Office or provided for review at the jail by the incarcerated defendants.  *Giglio* information would be presented before trial.

On May 11, 2017, the government provided additional draft transcripts of CHS and UCE recordings to the defendants.

On August 17, 2017, the government followed up by providing four undercover recordings of the defendants recorded by the CHS that it had inadvertently failed to provide earlier.

On October 4, 2017, the government provided a list of FBI payments to the CHS.  The defense was also presented with 19 contact reports, documenting reports of contact between the FBI and the CHS.  These reports documented a wide range of information, from reports of

suspicious activity related to the CHS (someone trying to get into his house) to operational concerns (discussion on how to operate a recorder) to personal problems of the CHS or his family (reports of seeking counseling).  The government also provided additional FD-1023 reports, which related to contacts CHS had with other subjects of investigation, not the defendants.

On January 11, 2018, the government agreed to provide what the defense described as "validation and suitability reports" as they pertained specifically to the CHS, but told the defense it would not provide general policies about the agency's use of CHSs.  The government also agreed to re-review the FBI files and provide the defense with copies of all documentation, contracts, memoranda, and agreements concerning the CHS, to the extent that they had not previously been disclosed.  The government further informed the defense that, on one occasion, the FBI paid for a meal at a fast-food restaurant for the CHS's family, informed the defense that the CHS had applied for Social Security benefits, and that the FBI had confirmed CHS's status with FBI to a private lawyer working for the CHS in connection with the CHS's application for benefits.

## II.    ARGUMENTS AND AUTHORITIES

### A.    Defense Requests

The defense "seeks information related to the credibility of the CHS, UCEs, and other government agents who recruited, handled, directed and supervised them."  Mot., ECF No. 206, at 4.  It then lists several categories of information:[1]

> a.  The FBI's written protocols, guidelines, and manuals pertaining to the identification, recruitment, use and supervision of the CHS, any other guidelines or manuals used by the USAO or assigned FBI agents who

---

[1] These numberings follow the defense motion.

supervised the CHS, and the AG's Guidelines regarding the use of CHSs generally that apply to this particular CHS.

b. The CHS's tax returns for 2015-2016.

c. Information relating to the UCEs who will testify at trial including 3.1 their identity and other identifying information; 3.2 adverse impeachment information from employment or personnel files; 3.3 notes taken by or about the UCEs regarding their undercover operations, witness interviews, or other actions that might reflect discrepancies, biases or conflicts; 3.4 any mental health, medical issues, drug use, prescribed or otherwise, that may affect the UCE's memory or perception; and 3.5 *Giglio* information that affects the credibility of law enforcement witnesses, with assurance that the prosecution as made diligent inquiry.

### B. <u>Legal Requirements</u>

The government's obligations regarding the materials it must produce and when such production must occur are established by the U.S. Constitution, statute, the Federal and Local Rules of Criminal Procedure, and case law.  *See*, *e.g.*, 18 U.S.C. §§ 3500, 3505(b); Fed. R. Crim. P. 12, 12.1, 12.2, 12.3, 16, 26.2, 46(j); *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).  Under *Brady*, prosecutors have a duty to disclose any information in the possession of the prosecution team that is favorable to the defense and material either to guilt or to punishment.  *Brady*, 373 U.S. at 88.  Information favorable to the defense includes evidence that "would tend to exculpate [the defendant] or reduce the penalty."  *Id.* at 87.  It also includes evidence regarding the reliability or credibility of a witness.  *See Giglio*, 405 U.S. at 154–55.

Prosecutors also have an obligation to search for and disclose any written or recorded statement of a witness called by the government to testify at a criminal proceeding, which relates to the subject matter as to which the witness has testified.  *See* Jencks Act, 18 U.S.C. § 3500; Fed. R. Crim. P. 26.2.  A defendant is further entitled to documents, objects, and reports of examination that are material to preparing the defense.  Fed. R. Crim. P. 16(a)(1)(E)(i), (1)(F)(iii).

Where defendants request wide-ranging discovery without establishing the relevance and materiality of the information sought, courts have consistently held that the government need not engage in a fishing expedition on behalf of a defendant.  *See United States v. Nixon*, 418 U.S. 683, 700 (1974).  The government is "not require[d] . . . to divulge every possible shred of evidence that could conceivably benefit the defendant."  *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir.), *cert. denied*, 516 U.S. 905 (1995).  Under Rule 16, the government must make available to the defendant any requested items that are "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  For the defendant to show materiality under this rule, there must be "'some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant to significantly alter the quantum of proof in his favor.'"  *United States v. Scott*, 7 F.3d 1046 (10th Cir. 1993) (unpublished) (quoting *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975)).  That is, "'evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'"  *United States v. King*, 928 F. Supp. 1059, 1062 (D. Kan. 1996) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)) (internal quotation marks and citation omitted).

The defense claims that the guidelines it seeks will be useful to develop bias evidence against the CHS or UCEs.  Mot. at 3.  The defense also claims that "[w]hether the CHS and the

agents followed or complied with policy, or how the policy impacted their undercover actions and plans, may be fertile grounds for impeachment against the CHS and the agents who handled him. Or may lead to impeachment material against those witnesses." *Id.* at 9.

A court may allow inquiry into specific instances of witness conduct on cross-examination to attack the witness's character for truthfulness or untruthfulness. Fed. R. Evid. 608(b). But evidence of specific unrelated instances of the witness's prior misconduct may be used to impeach "only to the extent the misconduct reflects on the witness's character for truthfulness." *United States v. Beltran–Garcia*, 338 F. App'x 765, 770 (10th Cir. 2009) (unpublished). And although questions aimed at "revealing bias" are a permissible basis of impeachment evidence, *United States v. DeSoto,* 950 F.2d 626, 623 (10th Cir. 1991), "[a]t common law, bias describes the relationship between a witness and a party which might cause the witness to slant his testimony for or against the party." *United States v. Baldridge*, 559 F.3d 1126, 1135 (10th Cir. 2009).

Trial judges retain "wide discretion in determining [admissibility]" because "weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403." *United States v. Abel,* 469 U.S. 45, 54 (1984). Thus, although defense counsel receives wide latitude when cross-examining a witness about bias, "the scope of cross-examination is within the trial court's sound discretion." *United States v. Haro*, 573 F.2d 661, 667 (10th Cir. 1978). The trial court may impose reasonable limits on cross-examinations based on concerns about marginal relevance or confusion. *DeSoto,* 950 F.2d at 629; *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). When specific instances of a witness's conduct are probative of the witness's character for truthfulness or untruthfulness, a court may allow that evidence on cross-examination, Fed. R. Evid. 608(b), and "[q]uestions properly directed at revealing bias" are

a permissible basis of impeachment evidence, *DeSoto,* 950 F.2d at 623.  But evidence of specific unrelated instances of a witness's prior misconduct may be used to impeach "only to the extent [that] the misconduct reflects on the witness's character for truthfulness." *Beltran–Garcia*, 338 F. App'x at 770.  Moreover, the "weighing [of] any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403." *Abel*, 469 U.S. at 54.  Ultimately, trial judges have "wide discretion" to impose reasonable limits on cross-examination based on their concerns about marginal relevance or confusion. *Id.*; *Van Arsdall*, 475 U.S. at 679; *DeSoto*, 950 F.2d at 629.

### C. Argument

#### 1. CHS Discovery

The government will identify to the defense general guidelines of the Department of Justice, which are publically available, and will produce FBI guidelines that are publically available in redacted form.  To the extent it has not done so already, the government is producing receipts for all payments to the CHS.  It is also producing all documents required by policy specific to the operation of this CHS, which dealt with the CHS, in whatever form and whatever their title is.  These include supervisory reviews of the CHS's activities, any additional debriefing reports, contracts with the CHS regarding his activities, and admonishments given to the CHS.  Because the government is providing all documents particular to the CHS, this Court should deny any additional disclosure.

In the present case, the defendants have made no showing that internal operating manuals of the law enforcement agency that have not been shown to or discussed with the witness can in any way lead to bias evidence.  The government has provided substantial discovery on the CHS related to his interactions with the defendants, all his communications with law enforcement, and

all his admissions about his family and personal life.  This provides the defense with ample basis for cross-examining the CHS about his conduct during this investigation.  The defense has presented no argument or facts from which this Court can conclude that the defense's demand for copies of the FBI's internal policies and procedures is anything more than an attempt to engage in the kind of generalized fishing expedition frowned upon by case law.

At the same time, the defendants' discovery demand must be weighed against the FBI's interest in maintaining the confidentiality of its operating guidelines.  *Roviaro v. United States*, 353 U.S. 53 (1957); *see United States v. Burton*, 81 F. Supp. 3d 1229, 1256 (D.N.M. 2015) (speculation that agent violated FBI's recording and reporting policies for CIs is insufficient basis for the court to compel discovery in criminal case).  The government is aware of its disclosure obligation concerning the CHS's role in this case, and, to the extent any such information exists that has not yet been disclosed, the government will re-review its files and provide it in short order. These obligations specific to the CHS, however, do not entitle the defense to the disclosure of internal FBI policies governing how the FBI deals with targets and CIs across every investigation. *Id*.

Vague assertions that internal FBI protocols "may be fertile," with no citation to authority, let alone facts that show the materiality of these documents, are simply insufficient to support compelled production of the sensitive law-enforcement protocols the defendants seek.  Authority within the District of Kansas undermines the defendants' argument that any disclosure obligation exists to produce these materials.  In *United States v. Sanchez*, 866 F. Supp. 1542, 1549 (D. Kan. 1994), the defense sought compelled production of, *inter alia*, "all manuals, whether denominated as training manuals, instructional manuals, standard operating procedure manuals, directives, policies or guidelines utilized by the Kansas Highway Patrol . . . ."  In denying the defense motion

10

to compel this information, the district court observed there was no "showing that [the defendant] is entitled to such information," even though the defense had broadly based its argument on Federal Rule of Criminal Procedure 16 and *Brady*. *Id*. at 1548-49. The district court denied the defense motion to compel, finding the request was overbroad and that there was an insufficient showing of relevancy to support the request for compelled production of internal law enforcement operating protocols. *See id*.

In *United States v. Norita*, 708 F. Supp. 2d 1043 (D. N. Mar. I. 2010), the District Court for the Northern Mariana Islands likewise denied a similar defense request to produce internal law enforcement manuals. The district court concluded that discovery of law enforcement manuals were not "material" within the meaning of Federal Rule of Criminal Procedure 16, reversing an earlier order to the contrary as "clearly erroneous." *Id*. at 1053-54. The court concluded that conclusory assertions that the manuals would assist in cross-examining agents and confidential informants were insufficient to demonstrate the materiality of the information. *Id*. at 1054.

As in *Sanchez* and *Norita*, the defendants' request here is vague and overbroad, seeking irrelevant material that the government is not required to disclose. Additionally, compelled disclosure of sensitive internal operating protocols jeopardizes future investigations. The defendants present their request as narrowly tailored to "the policy and guidelines applicable to this particular CHS, not all other FBI investigations." Mot. at 9. But the government at large has not created individualized protocols pertaining only to the CHS in this case that do not necessarily sweep in protocols relating to CHSs in other investigations. As noted above, the government understands its obligations to concerning information relating to the CHS's role in this case. The defense requests, however, seeks vastly more information, including a broad set of internal operating protocols that relate "to the identification, recruitment, use, and supervision," *id*. at 5, of

any CHS in any FBI investigation across the United States, in addition to any local protocols utilized in this case.  Absent any facts that support the materiality of these documents to the defense, other than vague claims that they "may be fertile grounds for impeachment" or lead to such, this Court should find compelled production inappropriate under the circumstances.  *See also Burton*, 81 F. Supp. 3d at 1256 ("Although Folse contends that Fancher may have violated the FBI's recording and reporting policies for CIs and targets, he has offered no evidence to support his contentions.  This speculation—mere hopeful wishing—is an insufficient basis for the court to compel discovery in a criminal case. Without a more compelling reason for this information, the Court is reluctant to order the disclosure of internal policies of how the FBI deals with its targets and CIs for the world to see.").

    In any event, the requested relief of compelled production is inappropriate.  Instead, if the defendants have made a sufficient showing that the requested internal operating protocols are relevant and material to their preparation—which the United States does not concede—the appropriate outcome is for this Court to inspect the internal operating protocols *in camera*.  For example, in *United States v. Clark*, No. 14-CR-20130-02-JAR (unpublished), the court ordered *in camera* review of ATF field manuals relating to the targeting of suspects and use of informants in so-called "phony stash house robbery cases" based on authority in other districts that such targeting policies may be relevant to the issue of selective prosecution.  *See United States v. Clark*, 2016 U.S. Dist. LEXIS 55531, at *5, n.11 (D. Kan. Apr. 25, 2016) (citing selective prosecution cases). Here, the defendants seek generalized impeachment matter, and there is no assertion of selective

prosecution.  The narrow basis for ordering *in camera* review recognized in *Clark* is, therefore, inapplicable.  Accordingly, the defendants' motion to compel should be denied.

Regarding the CHS's federal tax returns for 2015 and 2016, the government does not have these documents.  *United States v. Erickson*, 561 F.3d 1150, 1164 (10th Cir. 2009); *United States v. Gardner*, 244 F.3d 784, 788 (10th Cir. 2001) (lost evidence not in possession of government). Because of this, they are not materials the government is required to produce to the defense.

2.    <strong><u>UCE Discovery</u></strong>

Regarding material sought from the UCEs in this case, the government objects to producing the true identity of its testifying UCE(s).  The government has been more than generous in its production of material regarding the present case.  Indeed, in an effort to provide transparency to the defense, the government has produced nearly the entire FBI case file.  However, given the substantial safety and security concerns relating to the UCEs, the government will fulfill its discovery obligations for these witnesses in a manner closer to that required by the discovery rules. "In noncapital cases . . . there is no constitutional right to the pretrial disclosure of witnesses." *United States v. Russell*, 109 F.3d 1503, 1510 (10th Cir. 1997).  Here, the United States intends to request that UCEs be permitted to testify in light disguise – in a manner calculated to preserve their continued utility in active investigations – under an appropriately tailored protective order. *See*, *e.g.*, *United States v. Avila*, 2017 U.S. Dist. LEXIS 63841, at *3, 2017 WL 1519384 (D. Colo. Apr. 27, 2017) (unpublished) (agreeing with suggestion of the parties to enter protective order prior to trial concerning testifying UCE's identity).  To the extent that any *Giglio* material exists for the testifying UCE(s), the government is in the process of obtaining it and will disclose it promptly.  Because the government has complied, and will continue to comply, with applicable

discovery requirements concerning any testifying UCEs, the defendants' motion for further discovery should be denied.

Because the defendants' have not demonstrated the government's obligation to disclose the identities of testifying UCEs, or even the defendants' need for disclosure in light of the information they have been provided to prepare for trial, their request for compelled disclosure of the identity of testifying UCEs should be denied. *See United States v. Rivas*, 26 F. Supp. 3d 1082, 1106-1107 (D.N.M. 2014) ("The prosecution's obligation to disclose evidence under *Brady v. Maryland* can vary depending on the phase of the criminal proceedings and the evidence at issue."); *Avila*, 2017 U.S. Dist. LEXIS 63841, at *5 (denying request for additional information concerning UCEs because the defendant had not met its "burden of demonstrating the need for disclosure"); *United States v. Tarango*, 760 F. Supp. 2d at 1168 (refusing to order disclosure of a testifying confidential informant). Moreover, the government anticipates filing a motion *in limine* outlining the law-enforcement reasons for maintaining the confidentiality of these witnesses' identities within the next few weeks. *Roviaro,* 353 U.S. at 62; *see* Fed. R. Crim. P. 16(d) ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte.").

Finally, the defendants seek "adverse or impeachment material from their employment and personnel files at the FBI or other government agencies." Mot. at 5. The government understands its duty "to disclose evidence in its possession that is both exculpatory and material either to guilt or punishment." *United States v. Jackson*, 850 F. Supp. 1481, 1501 (D. Kan. 1994) (citation omitted). The government has diligently sought to comply with its obligations by providing a vast swath of discovery, as detailed above, and is in the process of seeking any *Giglio* material for the

testifying UCEs.  Any discoverable material will be disclosed promptly.  But, as noted in a case cited by the defendants, Mot. at 5 n.8, the government need not turn over "the personnel files of testifying officers" merely upon a defense demand.  *See United States v. Henthorn*, 931 F.2d 29, 31 (9th Cir. 1991).  Rather, the government may examine requested files to determine whether "they contain information that is or may be material to the defendant's case."  *Id*.  As the government is in the process of this review, and will continue to produce discoverable information promptly, there is simply nothing more required at this time.  *See United States v. Williams*, 576 F.3d 1149, 1163 (10th Cir. 2009) (denying defense discovery request for complete internal affairs files of testifying government witness).

## III.    CONCLUSION

For all these reasons, the government respectfully requests that the Court deny the defense Motion To Compel Production Of Impeachment Evidence About The Confidential Human Source And Undercover Employee Agents.

Respectfully submitted,

THOMAS E. BEALL
United States Attorney

*AW Mattivi*

ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

*David P. Cora*

DAVID P. CORA
Trial Attorney

Counterterrorism Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 514-7259
David.Cora@usdoj.gov

*Risa Berkower*

RISA BERKOWER
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0150
Risa.Berkower@usdoj.gov

*Danielle Tarin*

DANIELLE TARIN
Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 532-4493
Danielle.Tarin@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the __22nd__ day of January 2018, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*AW Mattivi*

Anthony W. Mattivi