# UNITED STATES DISTRICT COURT
## District of Kansas

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      v.                      Case No.  **16-CR-10141-03-EFM**

**CURTIS WAYNE ALLEN *et al*.,**

      **Defendants.**

## GOVERNMENT'S OPPOSITION TO DEFENSE MOTION IN LIMINE RE: FORT RILEY BOMB TEST
(Re: Dkt. 292)

APPEARS NOW the United States of America, by and through Stephen McAllister, United States Attorney for the District of Kansas; Anthony W. Mattivi, Assistant United States Attorney for the District; and Risa Berkower and Mary J. Hahn, Trial Attorneys, Criminal Section of DOJ's Civil Rights Division, and respectfully offers the following opposition to the defendants' motion to exclude evidence and testimony related to the FBI's test-bombing (the Fort Riley bomb test, or the "test shot"), which will be offered to demonstrate the destructive power of the bomb that the defendants sought to have a third-party make for them.  The government also respectfully incorporates its prior briefing and argument on this issue.  (Dkt. No. 226.)

This Court previously excluded, solely on Rule 403 grounds, a videotaped recording of the

test-bombing (referred to sometimes as a "test shot"). Although the government does not have a transcript of this hearing, undersigned counsel recalls that that this Court's exclusion ruling expressly applied only to the video itself, because of the video's "sensational impact," and expressly did *not* apply to the "accompanying report" describing the test shot.

The test shot report and related evidence are highly probative to the charged counts, as they provide critical information to lay jurors who have no experience in their everyday lives that would help them understand the destructive power of the bomb that the defendants sought to purchase. The non-video evidence relating to the test shot is appropriate and admissible because it accurately portrays the destructive power of the bomb at the center of the charged conspiracy and therefore is not unduly prejudicial. Where, as here, the government's bomb expert used a well-established methodology and chose the most conservative estimates for constructing the test bomb, and where the proffered evidence lacks any unduly sensational attributes, the government should be permitted to provide the jury with the best evidence of the bomb's destructive power.

I.  **BACKGROUND**

   A.  **Contested Exhibits**

The remaining exhibits that are subject to the defense Motion to Exclude are:

   Exhibit No. 161:    Notes regarding two fertilizers used in explosives ("Notes Regarding ANFO and UNi")

   Exhibit No. 165:    Chain of custody report[1]

   Exhibit No. 166:    Diagrams demonstrating quantitative data related to the test

   Exhibit 167d:       Dr. Jason Barrow's bench notes

   Exhibit 169:        FBI Report regarding the test shot ("FBI Range Test of a 300 lb.

---

[1] Exhibit 165 is a chain of custody/case report for all of the items sent to the FBI laboratory, most of which is unrelated to the test.

>Large Vehicle Bomb, Lab. No. 2016-03429-13, which includes photographs and diagrams related to the test")[2]

### B. Test Shot Methodology[3]

The government's bomb expert, Doctor Jason Barrow, wrote a report, which has previously been filed as Doc. 167-2, in which he described the methodology he used to set up and carry out his test-bombing. He based his test on evidence showing that defendant Stein had delivered to an undercover agent posing as a bombmaker 300 pounds of the fertilizer urea for the to the bombmaker to use to make a bomb. Before urea can be used in a bomb, it must go through a process called nitration, which turns it into urea nitrate, an explosive material. Thus, Dr. Barrow's first step was to determine how much urea nitrate would result from nitrating 300 pounds of urea. An FBI chemist calculated that 300 pounds of urea could produce up to 635 pounds of urea nitrate. However, to ensure that the test bombing would be as conservative as possible, and that there could be no risk of overstating the power of the actual bomb the defendants attempted to have made for them, the chemist also calculated the *minimum* yield of urea nitrate that could result from nitration of 300 pounds of urea, and Dr. Barrow based his test on the destructive effects of that minimum amount (355 pounds of urea nitrate).

As Dr. Barrow explained in his report, urea nitrate is not commercially available, and he therefore used a comparable explosive, ammonia nitrate fuel oil (ANFO), which has similar class characteristics to urea nitrate. Dr. Barrow used an amount of ANFO calculated to create the same destructive effects as 355 pounds of urea nitrate. As Dr. Barrow noted in his report, the military

---

[2] The defendants also moved to exclude Exhibit 167e, which consists of photographs and documents associated with an unrelated report about a detonator.

[3] This information is based on Dr. Barrow's report, which was previously filed at Docket Entry 167-2.

and explosives industries routinely rely on similar substitutions, known as the "relative effectiveness factor" (RE factor), to determine the relative destructive effects of certain explosives. The explosive material equivalency calculations allow experts to determine, among other things, safe evacuation distances during bomb threats, design parameters for blast-resistant structures, and net explosive weights that can be safely contained in an explosive storage container. For example, if the military has an explosive storage container designed to withstand the destructive effects of 100 pounds of TNT, the military can calculate how many pounds of some other explosive material, such as ANFO or urea nitrate, would generate the same level of destructive effects as the 100 pounds of TNT and thus can be safely stored in that container.

To calculate the amount of ANFO that would produce the equivalent power of a 355-pound charge of urea nitrate, Dr. Barrow used this well-established methodology of relative effectiveness factor and calculated that 300 pounds of ANFO would have the same destructive power as 355 pounds of urea nitrate. To reach this conclusion, Dr. Barrow relied on published data documenting the relative effectiveness factors of urea nitrate and ammonium nitrate. To confirm his conclusion, Dr. Barrow relied on data sets collected by the Department of Defense (DoD) and a "blast effects calculator" that uses the RE factors. Dr. Barrow used the DoD blast effects calculator to compare the expected levels of damage from a 300-pound ANFO bomb and a 353-pound urea nitrate bomb and confirmed that they are equivalent. For example, the DoD effects calculator shows that a vehicle within 55 feet of a 300-pound ANFO bomb and its equivalent 353-pound urea nitrate bomb would both be completely destroyed. The comparative results are identical throughout the chart, thus confirming the reliability of Dr. Barrow's methodology. *See* (Exhibit 1, attached, for a chart

showing the equivalent destructive effects.)[4]

## II. ARGUMENT

Evidence relating to the test bombing is highly probative in this case because the jurors – who will be asked to determine, among other things, whether the defendants' intended bombing involved the use of a weapon of mass destruction and whether it would have interfered with the housing rights of intended victims – will have no experiences from everyday life to help them understand the explosive power that fertilizer could produce. Explosives can have effects ranging from mere sparks, such as those from harmless firecrackers, to the devastating and destructive effects that brought down the Murrah Building in Oklahoma City. And the need for Dr. Barrow's information is ever more important where, as here, the explosive at issue is made from a seemingly harmless substance (such as fertilizer), rather than from a more commonly known explosive (such as TNT).

At the motions hearing, the Court excluded, on the basis that it was too sensational, a visually arresting video of the test bombing, which had audio and was shot at various angles and speeds. The remaining exhibits (the report, still photographs, diagrams, and charts) at issue here simply will not elicit the same visual or auditory response. They will, however, ensure that the jury has a full understanding of the explosive effects of the bomb that these defendants' intended to detonate. This evidence is directly relevant to proving Count 1, for which the government must prove that the defendants conspired to use a weapon of mass destruction, and Count 2, for which the government must prove that the defendants intended injure, intimidate, and/or interfere the

---

[4] Dr. Barrow included a third column to show that using equivalency numbers that are even below the lowest equivalency numbers for urea nitrate would not cause an appreciable difference in the results.

residents in their enjoyment of their housing rights.[5] This evidence would also rebut one of the defendants' primary defenses, which relies on their claim that all of their talk about killing Muslims and destroying the apartment complex was mere bravado. Providing the jury with a full understanding of the substantial power of the bomb that the defendants conspired to have built would allow the jury to decide whether the conspirators really meant to carry through on their threats. Thus, this evidence is highly probative.

Moreover, the evidence does not present a risk of undue prejudice. Dr. Barrow took great pains to ensure that the test shot would demonstrate the *minimum* explosive power that could have resulted from the materials that defendant Stein provided to the undercover bombmaker. Thus, the *actual* explosive effect of the bomb the defendants wanted to use would have been at least as great, if not much greater, than the explosion depicted in the photographs, notes and report.

The defense asks, in essence, that the government be left with only verbal testimony to describe the bomb's explosive effects. *See* (Def. Mot. In Limine re: Fort Riley Bomb Test, at 5.) But the rules of evidence do not call for the exclusion of evidence simply because the evidence is visual and effective. In this case, the evidence that the defendants seek to exclude offers the best representation of the bomb's explosive power, by letting the jurors see the bomb's impact through photographs and diagrams. Notably, the defense has not challenged Dr. Barrow's science or the using RE factors as a reliable methodology, likely because his methods are widely accepted within

---

[5] Courts routinely admit photographs, even when such photographs reveal gruesome details, where the photograph is relevant to proving the government's case. *See, e.g.*, *United States v. Bullis*, 139 Fed. App'x 893, No. 96-4354, 1998 WL 171328, at ** 7-8 (4th Cir. 1998) (per curiam) (holding "admission of gruesome and shocking photographs not to be unfairly prejudicial" where relevant to proving an element of the offense); *United States v. Naranjo*, 710 F.2d 1465, 1468-69 (10th Cir. 1983) (in case involving victim shot in the face, admitting photograph showing "the position of the victim on the bed, the entry wound at the right upper lip, and a great deal of blood on the pillow, bedsheets, and the victim's face"). Here, the evidence is far less inflammatory – the photos and diagrams simply record damage to objects, not to people.

6

the military and explosives industry. The defendants are left suggesting that the test is inadequate because it used certain specific components (such as blasting caps, C4, and other parts) that were not recovered from the defendants' possession. This argument is entirely unpersuasive, as the defendants provided the explosive material (the urea) to the undercover bombmaker with no limitations on what type of detonator or bomb components he should use. Additionally, evidence at trial will reveal that the defendants specifically sought to purchase blasting caps and C4 from the undercover agent for use in other bombs they were making on their own.

### III.  Conclusion

The government respectfully requests that this Court deny the defendant's motion to exclude evidence relating to the test-bombing conducted by the FBI.

Respectfully submitted,

Stephen R. McAllister
United States Attorney

*Anthony W. Mattivi*
ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

*Risa Berkower*
RISA BERKOWER
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Telephone: (202) 305-0150
Risa.Berkower@usdoj.gov

*Mary J. Hahn*
MARY J. HAHN
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-0921
Mary.Hahn@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the __15th__ day of March 2018, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*Mary J. Hahn*
Mary J. Hahn