# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        *Plaintiff,*

  vs.                                                                  Case No. 16-10141-01-EFM

CURTIS WAYNE ALLEN,

PATRICK EUGENE STEIN,

GAVIN WAYNE WRIGHT,

        *Defendants.*

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Curtis Allen's motion to exclude from trial all evidence obtained and any information derived from the second search and seizure of his Facebook account. Defendants Patrick Stein and Gavin Wright joined this motion. On March 22, 2018, the Court held a hearing on the motion. After reading the briefs, considering the evidence, and questioning counsel during oral arguments, the Court denied Allen's Motion to Suppress Second Facebook Warrant (Doc. 296). As stated on the record, the purpose of this memorandum is to further explain the ruling made by the Court during that hearing.

## I.  Factual and Procedural Background

The Federal Bureau of Investigation ("FBI") began its investigation in this case in February of 2016.  The investigation ended on October 14, 2016, when FBI agents arrested Defendant Stein.  Defendant Wright was arrested a short time later, and Defendant Allen had been detained on unrelated domestic violence charges three days earlier.  Defendants were all members of a militia group called "the Crusaders."

According to the Government, the FBI learned that each of the Defendants had a Facebook account, and that they used their accounts to make anti-Muslim and anti-government postings, as well as to periodically communicate with each other.  Defendants' Facebook Username and Entity IDs were confirmed using publicly-available internet searches.  The FBI sent Facebook, Inc. preservation letters for Defendants' Facebook accounts at some point in October of 2016.

### A.  The First Facebook Warrant

On November 22, 2016, FBI agent Tracey Jenkins submitted a warrant application to a federal magistrate judge in the District of Kansas seeking a warrant for records from Defendants' Facebook accounts.  The application included a 57-paragraph affidavit that identified the crime under investigation as a conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a, and provided a detailed account of the allegations against Defendants.

Paragraph 33 of the affidavit generally described Defendants' usage of Facebook in connection with the plot:

> Multiple sources have indicated the primary methods the Crusaders used to coordinate and communicate with members was through Facebook, Facebook Messenger and the conference call app.  The Crusaders created closed (non-public) Facebook pages for the group which could only be accessed by members.  In addition, Facebook Messenger was routinely used to communicate between individual members and for group conversations led by the Crusaders.

Chief U.S. Magistrate Judge James O'Hara signed the warrant (the "first Facebook warrant") on November 22, 2016 and required its execution by December 6, 2016.

Attachment A to the first Facebook warrant listed three Facebook accounts to be searched. These accounts were identified by entity display name, entity username, and entity ID. Target Account 1 was for the account with Facebook display name Curtis Allen, username Curtis.allen.102. Target Account 2 was for the account with Facebook display name Gavin Wright, username gavin.wright.792. And Target Account 3 was for the account with Facebook display name Patrick Stein, username Pstein69.

Attachment B to the first Facebook warrant on its face authorized a search only for "fruits, evidence and instrumentalities of violations of Possession of a Firearm by a person who has previously been convicted of a crime of Domestic Violence in violation of 18 U.S.C. § 922(g)(9)." Neither the warrant nor its attachments referenced the crime listed in the affidavit, conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a.

After executing the warrant, the Government obtained approximately 28,000 pages of Facebook records from Defendants' Facebook accounts.

**B.      The First Motion to Suppress and the Second Facebook Warrant**

On January 11, 2018, Defendants filed a motion to suppress the first Facebook warrant. Defendants argued that all proceeds of the first Facebook warrant must be suppressed because the Government committed multiple Fourth Amendment violations. Defendants' predominant argument was that the affidavit failed to establish probable cause. Although the affidavit focused on conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a, the warrant authorized permission to search for evidence of a different crime—illegal firearm possession, in violation of 18 U.S.C. § 922(g)(9). Thus, the affidavit did not establish a "fair probability" that

evidence of the crime listed in the warrant would be found in the Facebook accounts.  Additionally, Defendants argued that the affidavit accompanying the warrant lacked probable cause because it failed to establish a sufficient nexus between the crime under investigation and the defendants' use of Facebook.  Defendants further argued that the issuing magistrate did not assess the " 'veracity' and 'basis of knowledge' of persons supplying hearsay information" to determine probable cause.[1]

In addition to probable cause, Defendants argued that the warrant was overbroad, that the seizure exceeded the scope of the warrant, and that the magistrate judge lacked jurisdiction to issue the warrant.  Defendants claimed that these defects rendered the warrant constitutionally invalid, that no good-faith exception applied because it was so lacking in indicia of probable cause as to render official belief in its existence unreasonable, and that suppression of the evidence was required.

After reviewing Defendants' first motion to suppress, and "acknowledging the validity of the questions raised by it, on January 14, 2018 the FBI sent Facebook a new preservation letter" for Defendants' Facebook accounts.  Three days later, the Government sought a new search warrant for Defendants' Facebook accounts.  FBI Special Agent Amy Kuhn submitted the probable cause affidavit in support of the new warrant.

Magistrate Judge O'Hara signed the warrant on January 17, 2018 (the "second Facebook warrant").  In Attachment A, the "information to be seized" was limited to "fruits, evidence, and instrumentalities" of violations of 18 U.S.C. § 2332a (conspiracy to use a weapon of mass destruction), thus fixing the error contained in the first warrant.  However, the second Facebook

---

[1] *See Illinois v. Gates*, 462 U.S. 213, 238–39 (1983).

warrant contained a new, and rather unfortunate error.  It authorized the Government to conduct the search on or before January 31, *2016*—despite the fact that it was issued in January of 2018.

On January 18, 2018, the day after the warrant was signed, Special Agent Kuhn served the second Facebook warrant on Facebook.  After several follow-up attempts, Facebook finally responded with the information sought by the warrant on February 21, 2018.

On that same day, this Court granted Defendants' motion to suppress the first Facebook warrant, reasoning that the original warrant did not specify the correct statute for which there was probable cause to conduct a search.  The Court specified that the proceeds of the first Facebook warrant would be suppressed, and reserved the right for Defendants to file a second motion to suppress once the proceeds of the second warrant were obtained.  Without ruling on the issue, the Court also noted that Paragraph 33 in the first affidavit was "thin," but "probably a sufficient probable cause showing for the search."  Additionally, the Court ordered the Government to produce to Defendants a red-line copy of the first and second affidavit, because it was not known at the time whether the second affidavit contained proceeds obtained from the first search.   And, because of the unique nature of this search, the Court deferred ruling on the other issues raised by Defendants, as the Court would be better suited to rule on them in conjunction with the second motion to suppress.

## C.    The Second Motion to Suppress

Defendants filed a motion to suppress the second Facebook warrant on March 12, 2018 (Doc. 296).  In the motion, Defendants argued that all proceeds from the second Facebook warrant must also be suppressed.  The Court held a hearing on the motion on March 22, 2018.  At the hearing, the Government admitted it did not produce a red-line affidavit to highlight the discrepancies between the first and second affidavits.  However, the Government explained that

the first and second affidavits were made on two different forms.  Thus, it was impossible to highlight discrepancies line-by-line—every line was different.  To remedy this, the Government wrote a lengthy email with an itemized list of the differences between the two affidavits, and in what paragraphs these changes were made.

Defendants identified three substantive differences between the first and second search warrants:

> (1) While the first warrant included no temporal limitations to the information that Facebook had to disclose, the second warrant limited the required disclosures to "the time period of January 1, 2016 through the present;"

> (2) While the first warrant required the disclosure of "[a]ll photos and videos uploaded by that User ID and all photos and videos uploaded by any user that have that user tagged in them," the second warrant added, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

> (3) The second warrant added an additional paragraph to the original list of 16 paragraphs of information to be disclosed by Facebook: "[a]ll information concerning material that was deleted or removed from the account, including the date of the removal/deletion, the information that was removed/deleted, and the IP log, including the IP address, for the user who removed/deleted that material.

Additionally, Defendants pointed out that the second affidavit "bolstered" the nexus between the crimes charged and Defendants' use of Facebook.  Because this was an effort to "cure" potential probable cause deficiencies, the Court specifically excised this portion of the second affidavit in ruling on whether the Government had probable cause to search the Facebook accounts.

At the hearing, the Court denied Defendants' motion for the reasons explained in this Order.

**D.**     **Clarification of the Court's Rulings Made at the First Suppression Hearing**

Before addressing the merits, the Court must clarify its prior ruling.  During the first suppression hearing, the Court recognized that the search and seizure conducted pursuant to the

first Facebook warrant was not valid.  In explaining this conclusion, the Court definitively identified just one error—the warrant identified the information to be seized by the government as evidence of a firearms violation (18 U.S.C. § 922(g)(9)), rather than the crime identified in the affidavit—conspiracy to use a weapon of mass destruction (18 U.S.C. § 2332a).[2]  The Government explained that the erroneous reference to the firearms violation was simply due to an inadvertent cutting-and-pasting or typographical error, but conceded that it was an "actual deficiency" in the first Facebook warrant.[3]

The Court agreed that the typographical error was a "technical" deficiency in the warrant itself, which also led to the seizure exceeding the scope of the warrant. To clarify, this error does not amount to a Fourth Amendment violation.[4]  At most, a warrant that lists the wrong crime to be investigated, has technically violated Fed. R. Crim. P. 41(c)(1), which provides that a warrant may be issued for "evidence of a crime."  And because the warrant identified the information to be seized by the government as evidence of a firearms violation, instead of conspiracy to use a weapon

---

[2] The Court granted Defendants' first motion to suppress because the Government conceded that the typographical error was "an actual deficiency" in the first Facebook warrant, and the Government had already obtained a second warrant.  In essence, the Government voluntarily agreed to exclude the proceeds of the first search from evidence, and would only rely on proceeds of the second search (even if much, if not all, of the records were identical). However, it was not clear at the time whether the Government made any changes to the affidavit or warrant aside from fixing the typographical error. Thus, the Court granted the first motion to suppress narrowly, and deferred ruling on the remaining issues Defendants raised.  The Court addressed these issues at the second suppression hearing.

[3] Doc. 218, p. 8.

[4] See United States v. Sebreros-Castro, 508 F. App'x 804, 807 (10th Cir. 2013) (quoting Groh v. Ramirez, 540 U.S. 551, 558 (2004)) (concluding that an arrest warrant based on a search warrant template was merely a "technical mistake" because the warrant otherwise complied with the Fourth Amendment's requirements for a valid arrest warrant); Groh, 540 U.S. at 558 (distinguishing between "a mere technical mistake or typographical error" and a warrant that "did not describe the items to be seized at all") (emphasis in original); United States v. Johnson, 690 F.2d 60, 65 n.3 (3d Cir. 1982) ("[T]he warrant and the affidavit contain a 'typographical error' in that there is no Chapter 4752 of the state code, although there is a Section 4752 which sets forth the designated crime.  We attach no significance to this [minor irregularity]."); United States v. Blocker, 2016 WL 3281018, at *6 n.4 (N.D. Ga. 2016) (rejecting defendant's argument that the warrant was defective for citing to the wrong code sections because the facts demonstrated that there was probable cause to believe that evidence of a federal offense would be located at defendant's residence, and the affidavit stated the correct statutes on multiple occasions).

of mass destruction, the seizure of those Facebook records exceeded the scope of the warrant. But that does not necessarily implicate the Fourth Amendment, so long as the Government would have been authorized to seize such evidence but for the warrant's typographical error.

## II.      Discussion

Unlike traditional physical evidence (such as contraband located in a suspect's house), Facebook records exist indefinitely on Facebook's servers, and are therefore capable of being reproduced over and over again. Thus, shortly after Defendants moved to suppress the Facebook records obtained from the first Facebook warrant, the Government sought to "cure" some of its deficiencies by obtaining a second Facebook warrant. Defendants artfully termed this process the "do-over doctrine."[5] "[T]o permit the government to 're-seize' the identical evidence already in its possession after flagrantly violating the Fourth Amendment," Defendants asserted, "would render the exclusionary rule meaningless."[6] Accordingly, Defendants argued that all Facebook records obtained from the second Facebook warrant must be suppressed.

## A.      The Exclusionary Rule

"The exclusionary rule bars the prosecution from using, in its case-in-chief, evidence obtained in violation of the Fourth Amendment."[7] But "suppression is not an automatic consequence of a Fourth Amendment violation."[8] Rather, application of the rule is context-

---

[5] *See* Doc. 237, p. 1.

[6] Doc. 296, pp. 11–12.

[7] *United States v. Esquivel-Rios*, 786 F.3d 1299, 1306 (10th Cir. 2015) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)).

[8] *Herring*, 555 U.S. at 137.

dependent.[9]   The Court's analysis is guided by several well-established principles.  First, the exclusionary rule's "major thrust is a deterrent one," and serves as "a principal mode of discouraging lawless police conduct."[10]  The U.S. Supreme Court has stated that suppression is justified only if it will result in "appreciable deterrence."[11]

Second, "if exclusion of evidence . . . is to have any deterrent effect . . . it must alter the behavior of individual law enforcement officers or the policies of their departments."[12]  Thus, the Court must evaluate the police misconduct to determine whether exclusion would further the deterrence rationale.[13]  "Traditionally, exclusion was reserved for *willful* violations of Fourth Amendment rights."[14]  "In *Herring*, the Supreme Court clarified that abuses that give rise to the exclusionary rule are narrow, and most typically involve flagrant police misconduct."[15]

Third, the Court must balance the benefits of deterrence against the costs of excluding reliable evidence.[16]  "To the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the substantial social costs exacted by the exclusionary rule."[17]  To trigger the exclusionary rule, the "police conduct must be

---

[9] *Esquivel-Rios*, 786 F.3d at 1306.

[10] *Terry v. Ohio*, 392 U.S. 1, 12 (1968) (internal citations omitted).

[11] *United States v. Janis*, 428 U.S. 433, 454 (1976).

[12] *United States v. Leon*, 468 U.S. 897, 918 (1984).

[13] *Esquivel-Rios*, 786 F.3d at 1306.

[14] *Id.* (citing *Leon*, 468 U.S. at 919) (emphasis in original).

[15] *United States v. Stevahn*, 313 F. App'x 138, 143 (10th Cir. 2009).

[16] *Esquivel-Rios*, 786 F.3d at 1306 (citing *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. at 906–07).

[17] *Id.* (quoting *Illinois v. Krull*, 480 U.S. 340, 352–53 (1987)) (alteration omitted).

sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[18]

Finally, technical violations of Fed. R. Crim. P. 41 do not always rise to the level of Fourth Amendment violations.  A technical violation of Rule 41 does not result in suppression of evidence unless the defendant can also show "prejudice in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed" or "evidence of intentional and deliberate disregard of a provision in the rule."[19]

**B.    The Proceeds of the Second Facebook Warrant do not Require Suppression**

*1.    The Government did not violate the Fourth Amendment during the first search*

At the second suppression hearing, the Court concluded that suppression of proceeds from the second Facebook warrant was not justified based on the context of this case.  Despite the Government's ill-advised attempt to bolster probable cause in the second affidavit, the first affidavit still contained a sufficient discussion of the nexus between the crime under investigation and Defendants' Facebook usage.  Although Paragraph 33 in the first affidavit is lean, it does say that the Crusaders (of which Defendants were members) used Facebook and Facebook Messenger to communicate, and that they created closed Facebook pages which could only be accessed by members.  Additionally, Attachment A to the first Facebook warrant listed three Facebook accounts to be searched, which were particularly identified by their display names, usernames, and entity IDs.  Based on this specific identification, it can be reasonably inferred that the Government

---

[18] *Herring*, 555 U.S. at 144.

[19] *United States v. Griffin*, 501 F. App'x 751, 756 (10th Cir. 2012) (quoting *United States v. Rome*, 809 F.2d 665, 669 (10th Cir. 1987)).

had actual knowledge of the Defendants' Facebook accounts.[20]  Thus, the first probable cause affidavit was sufficient.

The Court also rejected Defendants' argument that the first Facebook warrant was overbroad.  Defendants' argument largely focused on the broad categories of information requested from each Facebook account, which required Facebook to disclose almost every piece of information from each account.  However, a warrant may describe the items to be seized in broad or generic terms—so long as the "description is as specific as the circumstances and the nature of the activity under investigation permit."[21]  "In other words, whether a search warrant is sufficiently particular depends in part on the nature of the crimes being investigated."[22]  Warrants relating to complex criminal schemes may be deemed legally sufficient even though they are less particular than warrants pertaining to more straightforward criminal matters.[23]

Indeed, the complex and comprehensive nature of the criminal conspiracy implicated in this case "makes it difficult to list with great particularity the precise items desired to be seized which evidence such activity."[24]  True, Attachment B to the first Facebook warrant used broad and generic terms, such as "all records of Facebook searches performed by account," and it did not include any temporal limitations to the information that Facebook had to disclose.  The warrant

---

[20] *See United States v. Ventresca*, 380 U.S. 102, 108–09 (1965) (providing that courts should apply a common sense interpretation of an affidavit in support of the application for a warrant, rather than a more technical reading, when determining whether the affidavit is sufficient to set out probable cause); *United States v. Hargus*, 128 F.3d 1358, 1361–62 (10th Cir. 1997).

[21] *United States v. Cooper*, 654 F.3d 1104, 1126 (10th Cir. 2011).

[22] *Id.* at 1127.

[23] *Id.*

[24] *United States v. Janus Indus.*, 48 F.3d 1548, 1554 (10th Cir. 1995); *Hargus*, 128 F.3d at 1362 ("[W]e are satisfied that [the warrant] is sufficiently limited and specific, in view of the nature of this extended conspiracy and other crimes for which he was being investigated . . . .").

was limited, however, to "fruits, evidence and instrumentalities of violations of" a specific crime.[25] And the very nature of the crime under investigation—conspiracy to use a weapon of mass destruction—permits a broader search of Facebook communications and activities.[26]  Accordingly, the first Facebook warrant was not overbroad, and the records obtained were not fruit of the poisonous tree.

Next, the magistrate judge had jurisdiction to issue the first Facebook warrant.  This conclusion does not require much discussion.  The issuing magistrate had territorial jurisdiction over the underlying offense, and therefore had jurisdiction to issue the warrant.[27]  The fact that the search warrant inadvertently listed the wrong crime did not deprive the magistrate judge of jurisdiction.

Thus, the only deficiency with the first Facebook warrant was the simple fact that Attachment A identified the information to be seized by the Government as evidence of a firearms violation, instead of the crime for which there was probable cause to search—conspiracy to use a weapon of mass destruction.  As explained above, this inadvertent error, by itself, does not amount to a Fourth Amendment violation—flagrant or otherwise. Even if it could be considered a constitutional violation, this error is not the type that would invoke the exclusionary rule.  "[I]t is the duty of an issuing magistrate to ensure that a warrant corresponds to the content of the

---

[25] Although the specific crime listed on the warrant was a firearms violation, it is clear that the warrant meant to refer to conspiracy to use a weapon of mass destruction.  Regardless, the warrant was still limited to search for evidence relating to a specific crime, and it did not authorize on its face a search for every record associated with the Facebook accounts.

[26] *See United States v. Potts*, 586 F.3d 823, 833 (10th Cir. 2009) (citation omitted) (acknowledging that the Tenth Circuit utilizes a "somewhat forgiving stance" in analyzing particularity challenges to search warrants involving computers).

[27] *See* 18 U.S.C.  2711(3); Fed. R. Crim. P. 41(b)(3); *United States v. Barber*, 184 F. Supp. 3d 1013, 1017–18 (D. Kan. 2016).

supporting affidavit."[28]   The exclusionary rule, however, is designed to deter future police misconduct; it was never meant to "punish the errors of [issuing] judges and magistrates."[29]   The Supreme Court has found no reason to believe judges ignore the Fourth Amendment or "that exclusion of evidence seized pursuant to a warrant would have a significant deterrent effect on [them]."[30]   Thus, the single violation identified by the Court is not sufficient to trigger the exclusionary rule.

> 2. *Because the Government already had probable cause to search, and did not use, or need to use, proceeds of the first search to request the second Facebook warrant, the proceeds of the second search are not poisonous fruit, and suppression is not justified*

Nevertheless, Defendants cite *United States v. Cioffi*,[31] in arguing that the Government should not be permitted to violate the Fourth Amendment and then use the evidence obtained to better draft a subsequent search warrant.   In *Cioffi*, the Government obtained a search warrant for every email in the defendant's Google email account, without limiting the emails to be seized to those containing evidence of the crimes charged.[32]   During an "initial look" at the account, the Government isolated a November 23, 2006 email that the defendant sent to himself, which the Government intended to introduce into evidence at trial.[33]   In response, the defendant moved to suppress the email, arguing that the warrant was "invalid on its face because it failed to describe

---

[28] *United States v. Ramirez*, 63 F.3d 937, 941 (10th Cir. 1995).

[29] *Leon*, 468 U.S. at 916.

[30] *Arizona v. Evans*, 514 U.S. 1, 11 (1995).

[31] 668 F. Supp. 2d 385 (E.D.N.Y. 2009).

[32] *Id.* at 388–89.

[33] *Id.* at 389.

-13-

with particularity the materials that would be the proper subject of a search," and that "such a warrant is unreasonably broad and therefore unconstitutional."[34]

The District Court agreed that the Government's search of the entire email account was unconstitutionally overbroad.[35]   However, the Government invoked the inevitable discovery doctrine, arguing that the November 23 email should not be suppressed because the evidence could lawfully be obtained through another, more particularized warrant.[36]

The Court rejected the Government's argument, stating:

> There is little doubt that the government could now obtain a warrant authorizing a search that would yield the November 23rd email, and that the email would still be found on Google's server.  Nevertheless, the government's timing still presents a problem: Having seen the November 23rd email, the government is now in a position to obtain a warrant with perfect particularity.  There is, in other words, no way to purge the taint of its unconstitutionally overbroad search.[37]

Reasoning that "[n]o court has ever endorsed the view that it would allow the government to retroactively *cure* a Fourth Amendment violation," the *Cioffi* Court suppressed the November 23rd email.[38]

*Cioffi* is distinguishable from the case at bar, however.   In *Cioffi*, the Government discovered the November 23rd email during the course of an unconstitutionally overbroad search of defendant's entire email account.  Of course the Government in that case could "cure" the first warrant's lack of particularity by obtaining a second, valid warrant for the November 23rd email.

---

[34] *Id.* (internal brackets omitted).

[35] *Id.* at 386.

[36] *Id.* at 397.

[37] *Id.* at 398.

[38] *Id.* at 399.

But *only* because the Government gained knowledge of the email's existence and its contents during a general rummaging through defendant's entire email account.

Here, however, the Government did not use knowledge gleaned from illegally-obtained evidence to conduct a second, lawful search for the same evidence.  To be fair, the Government skirted dangerously close to that line by (1) bolstering the nexus between the crimes charged and Defendants' use of Facebook in the second affidavit; and (2) limiting the second Facebook search to the time period of January 1, 2016 through the present.  Upon review, however, the Court concluded that the first affidavit sufficiently established probable cause to search the Facebook accounts, and that the first Facebook search warrant was not overbroad.[39]  Thus, unlike in *Cioffi*, the Government did not need to "purge the taint of" an unconstitutionally overbroad search, or a search not based upon probable cause.  There was no taint here.  The Government had probable cause to search the first time, and the Government conducted its first search within the confines of the Fourth Amendment.

### 3.    The second search did not violate the Fourth Amendment

Finally, Defendants argued that all evidence obtained from the second Facebook warrant must be suppressed because the Government conducted a *de facto* warrantless search.  Defendants pointed out that the second Facebook warrant was obtained on January 17, *2018*, yet the face of the warrant authorized the Government to search the accounts on or before January 31, *2016*.  Even if this was merely a scrivener's error, and should have read "January 31, 2018," the search was not

---

[39] Although the Court technically ruled that the first Facebook warrant was overbroad, this was only because the search warrant inadvertently authorized a search for evidence of a firearms violation instead of the conspiracy charge.  In all other aspects, the first Facebook warrant was sufficiently particular.  The Government did not conduct a general, exploratory rummaging of Defendants' Facebook accounts beyond what it would have been authorized to do but for the warrant's typographical error.

completed until February 21, 2018.  Thus, Defendants argued, the Government conducted a *de facto* warrantless search in violation of the Fourth Amendment and Rule 41.

The Court disagrees.  First, the use of "2016" was clearly an inadvertent scrivener's error, and no reasonable officer would have assumed that the search warrant had been expired for nearly two years.  Second, the FBI served the second Facebook warrant the very next day after it was signed, and then followed up several times with Facebook to try to expedite its response.  Facebook finally responded with the information sought by the warrant on February 21, 2018.  The fact that Facebook did not timely respond does not change the fact that the Government timely executed the warrant.[40]  Even if the Government had violated Rule 41's timing requirements, however, suppression would not be appropriate.[41]

### III.   Conclusion

The context of this case dictates that suppression of the second Facebook warrant's proceeds is not warranted.  In both searches of Defendants' Facebook accounts, the Court found only a single technical violation—the first search warrant inadvertently authorized a search for information related to a firearms violation.  Despite this violation, both searches were supported by probable cause, and neither of the Facebook search warrants violated the Fourth Amendment's particularity requirement.

---

[40] *See* Fed. R. Crim. P. 41(e)(2)(A) (requiring execution within 14 days of the magistrate judge granting the warrant).

[41] *See United States v. Sims*, 428 F.3d 945, 955 (10th Cir. 2005) ("The Fourth Amendment does not specify that search warrants contain expiration dates.").

The "abuses that give rise to the exclusionary rule are narrow, and most typically involve flagrant police misconduct."[42]  The FBI's conduct in this case does not rise to that level.  Thus, the police conduct was not "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[43]  And even though the proceeds of the first Facebook search were suppressed, the Government did not rely on illegally-obtained evidence to fix its mistake.  Accordingly, the Government—in this narrow set of circumstances—was permitted to obtain a second warrant to "cure" a deficiency in the first.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Suppress Second Facebook Warrant (Doc. 296) is hereby **DENIED.**

**IT IS SO ORDERED.**

Dated this 10th day of April, 2018.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[42] *Stevahn*, 313 F. App'x at 143.

[43] *Herring*, 555 U.S. at 144.