# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       *Plaintiff,*

  vs.

CURTIS WAYNE ALLEN,

PATRICK EUGENE STEIN,

GAVIN WAYNE WRIGHT,

      *Defendants.*

Case No. 16-10141-EFM-01, 02, 03

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Curtis Wayne Allen's motion for new trial pursuant to Fed. R. Crim. P. 33(a). Defendants Patrick Stein and Gavin Wright joined this motion. The Court has read the briefs, reviewed the record and transcripts, and considered the evidence submitted by the parties.[1] For the following reasons, the Court denies Defendants' Motion for New Trial (Doc. 404).

## I.      Factual and Procedural Background

This case was initiated after a grand jury returned an indictment on October 19, 2016, charging Defendants with one count of conspiracy to use a weapon of mass destruction, in violation

---

[1] The Court has decided that oral argument will not materially assist in the determination of this motion.

of 18 U.S.C. § 2332a.  Defendants were later indicted on one count of civil rights conspiracy, in violation of 18 U.S.C. § 241.  In addition, Defendant Stein was charged with two weapons-related charges, in violation of 18 U.S.C. § 924(c), and Defendant Wright was charged with lying to the FBI to obstruct its investigation into this matter, in violation of 18 U.S.C. § 1001.

Due to the complexity of this case, and the seriousness of the charges, the Court conducted numerous pretrial hearings to check on the status of the case, and to ensure that the parties were still prepared to go to trial on the scheduled date of March 26, 2018.  Over the course of these hearings, the Court explained the procedures that would be employed at Defendants' trial.  The Court instructed the parties that it would be utilizing a new method to present electronic evidence to the jury during deliberations.  To help jurors during deliberations, the Court announced that it would be using the Jury Evidence Recording System ("JERS") at Defendants' trial.  While other Courts in this District have used JERS for trials, this would be the first time it was set to be utilized at the Wichita Courthouse.  The Court also discussed the jury selection procedure it would use in this trial (which is the same procedure the Court has always used), including the selection and designation of alternate jurors.  The parties did not formally object to any of these procedures.

Defendants' trial began on March 26, 2018.  After hearing several weeks of evidence, the case was ready for submission to the jury at approximately 3:00 p.m. on April 17, 2018.  At that time, the Court announced the names of the alternate jurors.  As explained in detail below, Defendants objected to the Court's dismissal of one of the alternates (J.B.), because they had been operating under the belief that J.B. was a juror, not an alternate.  The Court acknowledged that both parties believed J.B. was a member of the jury, but overruled Defendants' objection.  The 12 jurors designated by the Court returned to the jury room to begin deliberations, and J.B. was excused as an alternate.

Shortly before 5:00, the jury called the Court's law clerk with a question. The law clerk relayed the question to the Court. The parties were notified that the jury had a question, and a hearing was conducted on the record. Because the jury had not submitted a written question, the clerk was asked to explain what the jury had asked during the phone call. He explained that the jury had essentially asked how they could tell what dates the audio clips they were listening to on JERS were recorded, since they did not have access to the transcripts anymore.

The Government argued that the jurors should be supplied with dates that correspond with the audio exhibits. Defense counsel asserted that the jury was now "asking for additional factual information" that was not in evidence, and objected to the "record being reopened" to supplement it with the dates of the audio recordings.[2] Counsel argued: "[i]t's information that the Government could have included in the evidence and did not. And because they're asking for additional factual information that would help them make sense and sort through the evidence, we would object to basically the record being reopened and that being provided to them."[3] The Government countered that, during the trial, it had elicited the specific dates tied to each audio exhibit.[4]

It was then pointed out that many of the audio recordings the jurors were listening to included the dates of the recordings in the exhibit description on JERS. Meaning, the jurors already had access to most of the dates, they just had not yet noticed it. The Court overruled Defendants' objection, and provided the jury with a written instruction, which stated:

> Some of your audio files have date indications in their JERS name. To the extent that they do not, we cannot provide any additional information at this stage.

---

[2] Doc. 394, pp. 3–4.

[3] Doc. 394, pp. 3–4.

[4] Doc. 394, p. 5.

The written instruction was delivered to the jury around 5:20 p.m., and shortly thereafter the jurors were released for the evening.

The following day, on April 18, the jury resumed deliberations and reached the verdicts before 1:30 p.m. The jury found Defendants guilty of one count of conspiracy to use a weapon of mass destruction, and one count of civil rights conspiracy. In addition, Defendant Wright was convicted of one count of lying to the FBI to obstruct its investigation into this matter.[5]

On May 2, 2018, Defendants filed the present motion for new trial.

## II. Legal Standard

Fed. R. Crim. P. 33(a) states that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "A motion for a new trial is not regarded with favor and is only issued with great caution."[6] The decision whether to grant a motion for new trial is within the sound discretion of the district court.[7]

## III. Discussion

Defendants raise two arguments. First, Defendants argue that the interest of justice requires a new trial because the jury was presented with essential facts in the exhibit descriptions on JERS, that were not in evidence, but affected the jury's verdict. Second, Defendants argue that a new trial is necessary because the Court's designation of the alternate jurors violated Rule 24 and its own pronounced procedure relied on by all parties. The Court will address each argument in turn.

---

[5] On April 10, 2018, at the close of the Government's evidence, the Court entered a judgment of acquittal in relation to the two weapons-related charges that Defendant Stein had been charged with.

[6] *United States v. Herrera*, 481 F.3d 1266, 1270–71 (10th Cir. 2007) (citation omitted).

[7] *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009).

## A.      Defendants' Challenges to the JERS System

Defendants' first argument in favor of a new trial attacks the JERS system utilized by the Court during jury deliberations.  Defendants argue that the JERS exhibit descriptions infected the jury deliberations on facts essential to the jury's verdict.  According to Defendants, the descriptions on JERS: (1) included non-record dates of certain audio clips; and (2) tied certain handwritten documents to Stein when his handwriting had never been identified by a witness.  Additionally, Defendants assert that the JERS document itself called Defendants "terrorists" despite the fact that the use of that term at trial had been tightly prescribed following limine motions.  Defendants contend that the jurors' exposure to extraneous information requires a new trial.

"The Tenth Circuit has developed two competing standards for determining the impact of exposure to extraneous material on a jury."[8]  "Under the first approach, a new trial is warranted when the aggrieved party shows that there is the *slightest possibility* that the exposure affected the verdict."[9]  But under the second standard, a court will *presume prejudice* and grant a new trial unless the Government can show that the exposure was harmless.[10]  The difference between these conflicting approaches primarily lies in assignment of the burden of proof.  The Tenth Circuit has "repeatedly declined to resolve this conflict in cases where its resolution would make no difference in the outcome."[11]

---

[8] *United States v. Schwartz*, 702 F. App'x 748, 753 (10th Cir. 2017) (citing *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1241 (10th Cir. 2000)).

[9] *Id.* (citing *Smith*, 214 F.3d at 1241) (emphasis in original).

[10] *Id.* (citing *Smith*, 214 F.3d at 1241).

[11] *Id.* (citing *United States v. Muessig*, 427 F.3d 856, 865 (10th Cir. 2005); *Smith*, 214 F.3d at 1242)).

This case does not present the opportunity to resolve the conflict.  Under either standard, the jury's exposure to extraneous information during deliberation was harmless, and a new trial is not required.[12]  To assess whether exposure to extraneous information was harmless, the Court must "review[] the entire record, analyz[e] the substance of the extrinsic evidence, and compar[e] it to that information of which the jurors were properly aware."[13]  The trial judge is uniquely qualified to assess the prejudicial effect of extraneous information, since the trial judge has the advantages of close observation of the jurors and the evidence, as well as an intimate familiarity with the issues at trial.[14]

1.      *Overview and facts relating to JERS*

JERS is a system used to present electronic evidence to the jury; it allows deliberating jurors to view the admitted evidence electronically on a large, flat screen in the deliberation room.[15] There are two components to JERS: (1) the JERS application software, which is a program installed on the District of Kansas server; and (2) the JERS workstation, which is a large, touch-

---

[12] *Muessig*, 427 F.3d at 865 ("[W]e need not resolve these different approaches in this appeal" because "[u]nder either standard, we find that the exposure here was harmless."); *see also United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988) ("Due process does not require a new trial every time a juror has been placed in a potentially compromising situation.") (quotation omitted); *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) ("The harmless error rules adopted by this court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial.").

[13] *Hornung*, 848 F.2d at 1045 (quotation marks omitted).

[14] *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992) (citations omitted); *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir. 1980) ("Whether a motion for mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury.").

[15] U.S. Dist. Ct., Dist. of Kan., Jury Evidence Recording System (JERS), http://ksd.uscourts.gov/index.php/guideline-order/jury-evidence-recording-system-jers/ (last visited July 16, 2018). The U.S. District Court for the Western District of North Carolina created JERS.  In this case, the Court used the most recent update—JERS version 4.1, which was released in October 2017.  For further information, including video tutorials and user guides, see the Western District of North Carolina's webpage discussing JERS, which can be accessed at http://www2.ncwd.circ4.dcn/sites/jers/Pages/default.aspx (last visited July 16, 2018).

screen television that is brought into the jury room once they are ready to begin deliberating.[16]  As a result, there are two distinct interfaces for two types of end users.  There is a "private," form-based interface that is only accessible by District of Kansas personnel.  This interface, known as the "courtroom client," allows the Court to create a "trial" on JERS, and to upload, review, manage, and eventually release the parties' exhibits to be viewed by the jury during deliberations.

When the Court "releases" the exhibits, they will be accessible on the JERS workstation.  The JERS workstation is essentially a large, touch-screen television in the jury room that contains a "public," menu-driven interface that is only accessible by the jurors.[17]  This interface, known as the "JuryViewer client" performs just a single function.  The admitted exhibits for each party are displayed in a list, and the jurors can select an exhibit and it will be displayed on the screen.  In the case of audio and video exhibits, the recording will be played on the screen and through the speakers.

In this case, counsel was directed to read the JERS instructions on the District of Kansas website prior to trial.  The instructions specified that the parties must submit to the Court a data storage device, such as a USB, DVD, or CD, containing all of their electronic exhibits by a certain deadline.  Each file/exhibit must be titled using the following naming convention:

- <exhibit number>-<exhibit part>_<exhibit description>.<file extension>.

---

[16] Jurors are able to access all of the admitted electronic evidence, such as electronic copies of documents, digital photographs, as well as audio and video files on the JERS workstation.  They do not have access to any exhibits that were not admitted into evidence.

[17] The U.S. District Court for the Western District of North Carolina has also created a "tutorial" video that is used to teach jurors how to use JERS.  This video highlights every feature and capability that the jurors have access to in the program.  In the video, the creators created a hypothetical trial and exhibits to demonstrate the features.  However, it otherwise accurately depicts the JERS interface as it was used by the jurors in this case.  The video can be viewed at http://www2.ncwd.circ4.dcn/sites/jers/Pages/Downloads.aspx by clicking the "Videos" tab and selecting "JERS_Tutorial_High."

For example:

- 1_2010 Financial Statement.pdf

- 2-a_Store Surveillance Footage.wmv

- 2-b_Phone Call Recording.mp3

- 201-a_Store Surveillance Footage 2.mpg.

The JERS instructions then specify, in bold, that "[a]ll exhibits shall be described using neutral and non-adversarial terms."

In accordance with these instructions, the parties submitted their exhibits on a data storage device prior to trial. After the Court received the data storage devices, the files were uploaded onto JERS. To do so, the courtroom deputy created a new "trial" on JERS on the courtroom client, by entering the case number, courtroom where the trial was assigned, trial start date, and by entering a description for the case.[18] At this point, when the exhibits were uploaded onto JERS, they were only accessible by the Court on the courtroom client. This allows the Court to preview the exhibits to ensure that audio and video files could be seen and/or heard, electronic copies of documents were readable, etc.

The parties were also instructed to submit formal exhibit lists prior to trial. However, it has since become clear that the exhibit descriptions on the exhibits lists did not match the descriptions provided on the JERS exhibits. For example, the Government played 60 audio clips from Government's Exhibit 15 during trial. On the Government's exhibit list filed with the Court, the description for Exhibit 15 provides: "1D16, audio recording."[19] But the Exhibit's description

[18] In this case, the description used for Defendants' trial on the JERS courtroom client was "Terrorist/Bomber case."

[19] Doc. 334-1, p. 2.

on JERS, as seen by the jury, reads: "Consensual recording between Dan Day, Gavin Wright, Patrick Stein and Curtis Allen on 882016."[20]

Due to the nature of the conspiracy charges, many of the Government's exhibits were audio recordings of conversations between an FBI confidential human source and Defendants. The FBI completed verified transcripts of these conversations. When the Government played audio clips during trial, the corresponding FBI transcript displayed on screens in the jury box, thus allowing the jurors to read along with the audio clips as it was being played.[21]

At the close of evidence, the Court's law clerk met with the parties to go through their exhibit lists exhibit-by-exhibit to ensure that there was no disagreement about the exhibits that were admitted into evidence. After the parties all agreed that the Court's record of which exhibits were admitted was true and correct, the law clerk prepared the JERS exhibits to be released to the jury. On the courtroom client, the law clerk checked the "release" box next to each exhibit that had been admitted during trial. When the jury was ready to begin deliberating, the JERS workstation was brought into the jury room. At that point, the law clerk "released" the exhibits on the courtroom client, so the exhibits were accessible on the JERS workstation and the JuryViewer client.

Shortly after the jury began deliberating, the jury called the Court's law clerk to ask how they could view the dates of the audio clips on JERS, since they were not provided with the

---

[20] Doc. 404-1, pp. 3–5. Again, all of the exhibits were presented to the Court as data files saved on data storage devices. Under the JERS naming convention, Exhibit 15AA was saved as: "15-AA_Consensual recording between Dan Day, Gavin Wright, Patrick Stein and Curtis Allen on 882016.wmv." Thus, after the Court uploaded this particular file onto JERS, and after it was released to the jury, it appeared on the JuryViewer client on the JERS workstation as Exhibit 15AA, with the description: "Consensual recording between Dan Day, Gavin Wright, Patrick Stein and Curtis Allen on 882016."

[21] It is not clear whether all, some, or none of the transcripts included the date that the clip was captured. But the transcripts were not provided to the jury during deliberations; they were only used to aid the jury during trial.

transcripts during deliberations. Over Defendants' objection, the Court instructed the jury that: "[s]ome of your audio files have date indications in their JERS name." Defendants then requested that the Court provide a list of the JERS exhibit descriptions to the parties, so they could understand what the jury was able to see on the JERS workstation. On the JERS courtroom client, the Court generated an automated report with the JERS exhibits and the corresponding descriptions and provided that report to the parties.[22]

### 2. The JERS descriptions do not warrant a new trial

Before the Court addresses the substance of Defendants' current arguments, it first addresses whether Defendants have timely presented their JERS objections. The Court concludes that Defendants' objection to the descriptions of the Government's exhibits in JERS was untimely.[23] The Government has stated that "[c]omplete copies of all of these electronic exhibits, including their file names, were provided to the defense prior to trial."[24] The Government provided counsel for each defendant with an exact copy of the exhibits provided to the Court to be loaded into JERS on a flash drive on March 15, 2018. Defendants do not dispute that defense counsel was provided with a flashdrive containing the Government's exhibits.[25] Yet, Defendants did not object to the JERS file names until after the case had been submitted to the jury.

---

[22] Doc. 404-1.

[23] *See United States v. Jones*, 2015 WL 4132004, at *2–3 (W.D.N.C. 2015) (concluding that the defendant's objection to the descriptions in the Government's exhibit list on JERS was untimely because the defendant had the Government's exhibit list in his possession weeks before the trial began).

[24] Doc. 416, p. 19.

[25] The parties were made aware via the JERS instructions that the electronic files they submitted to the Court had to be saved under the naming convention: <exhibit number>-<exhibit part>_<*exhibit description*>.<file extension>." Both parties submitted their flash drives to the Court with their files saved in this format. Thus, the Government's flash drive contained all of the exhibits as well as the exhibit descriptions based off of the JERS naming convention.
Defendants argue that they were not aware that the "file name information" was going to the jury as part of the JERS exhibits. This argument is not credible. Based on a rudimentary understanding of the concept of JERS—

-10-

Regardless, as addressed below, the Court has assessed the "possibility of prejudice" to Defendants by "reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware."[26] In so doing, the Court concludes that the descriptions of the Government's exhibits in JERS were not prejudicial and they were consistent with the testimony that was elicited during trial regarding the exhibits. The Court will address each challenged category—descriptions with dates, descriptions of physical exhibits, and the trial description—below.

a.      JERS exhibit descriptions containing dates

Of the three categories of allegedly impermissible descriptions, the Court begins by addressing the JERS exhibits that contained dates in the descriptions. Defendants argue that the JERS list included dates for some exhibit recordings, such as Government's Exhibit 15, even though no sponsoring witness testified as to the date for that recording or the clips from that recording. Because this information was provided to the jury during deliberations by way of the JERS exhibit list without having been admitted into evidence, Defendants argue, the information is necessarily extrinsic or extraneous information.

According to Defendants, the Court's instruction to the jury during deliberations that it may consider the dates of recordings as indicated next to their respective JERS exhibit description requires that a new trial be granted because there is more than a slight possibility that the jury's

---

that jurors use it in the jury room to navigate the electronic evidence—the fact that a neutral exhibit description must be provided in the file name necessarily implies that the jury will be able to see that exhibit description during deliberations. It could not have been a surprise to Defendants that the electronic evidence available on JERS would be accessed by the jury by selecting the electronic file name. Defendants were therefore aware that exhibit descriptions were going to be included for the electronic files used on JERS. Accordingly, Defendants had plenty of opportunity to object and/or request to review the descriptions that would be shown to the jury.

[26] *Hornung*, 848 F.2d at 1045 (quotation marks omitted).

consideration of the unadmitted factual information, which was essential to a guilty verdict as to each offense, affected the verdicts.

At the outset, the Court presumes the jurors read the JERS descriptions as the Court directed them to. But even so, the record shows that Defendants were not prejudiced. Contrary to Defendants' assertions, almost none of the JERS exhibits of audio clips contained "essential facts not in evidence." All but one of the descriptions included dates that were corroborated by supporting testimony. And, regarding the exhibit that did technically contain extraneous information—based on the record, that information was harmless.

Although the only example provided by Defendants was Exhibit 15, the Court has identified all of the Government Exhibits of audio and/or visual recordings in which the corresponding JERS description contained the dates of the recordings. After addressing Exhibit 15, the Court will address each of the additional exhibits in turn.

i.       Government's Exhibit 15

Defendants identify a single exhibit—Government's Exhibit 15—as an example of an exhibit that had an improper description in JERS. Exhibit 15 was a series of 60 clips from an audio recording made by Dan Day during a meeting with Allen, Stein, and Wright on August 8, 2016. The Exhibit's description on JERS, as seen by the jury, reads: "Consensual recording between Dan Day, Gavin Wright, Patrick Stein and Curtis Allen on 882016."

The Court admitted Exhibit 15 into evidence in the morning on March 29, 2018. That afternoon marked the first time a clip from Exhibit 15 was played. The Government began by asking Dan Day about the first meeting that Day attended at G&G Home Center in Liberal,

Kansas.[27]  The Government then asked Day about the second time he went to G&G.  Day testified that Allen, Stein, and Wright were all present at the second meeting he attended at G&G, and that the group used a computer in the office to identify potential targets using GoogleEarth during that meeting.  According to Day's testimony, Defendants would pull up targets in Garden City, such as the Somalian mosque, and the apartment building, and they would drop a pin and type "cockroach"—a derogatory term used by Defendants to describe Muslims.  The Government then played Exhibit 15z to the jury, as evidence of Defendants using GoogleEarth to drop "cockroach pins" on potential targets.  During this conversation, the Government did not elicit testimony from Dan Day that this meeting occurred on August 8, 2016.

However, on April 3rd, Allen's counsel began questioning Dan Day about "planning meetings" that were only attended by Day, Allen, Stein, and Wright.  Counsel asked specifically about a meeting at G&G on August 8th of 2016.  Day testified that the date of August 8th "sounds correct."  Later, Allen's counsel asked if Day remembered a meeting at G&G with Patrick Slattery.  Day answered affirmatively.  Defense counsel then clarified that "[t]he meeting after that is the one I want to talk about."  When Day indicated that he could not remember what was said at that meeting, Allen's counsel stated, in front of the jury: "I'm going to play 942a," and that "these are clips from the same conversation that the Government has already introduced a number of clips from."

The Government objected, and due to proximity to the lunch hour, the jury was dismissed for their lunch recess.  Over the lunch hour, Defense Exhibit 942 was admitted into evidence.  Although Allen's counsel did not play any clips from Exhibit 942 to the jury, it was admitted into

---

[27] On April 11, Special Agent Amy Kuhn testified that this first meeting occurred on July 31, 2016.

evidence and presented to the jury during deliberations on JERS.  Defense Exhibit 942 was saved on JERS as "1D16_2016-08-08."

Thus, it does not appear that the description on JERS for Government's Exhibit 15 provided the jurors with any extraneous or intrinsic information.  Government's Exhibit 15 was identified as an audio recording of the second meeting at G&G.  The description on JERS was: "[c]onsensual recording between Dan Day, Gavin Wright, Patrick Stein and Curtis Allen on 882016."  Dan Day, when questioned by Allen's counsel about the second meeting at G&G, stated that August 8th, 2016 "sound[ed] correct" as the date that meeting occurred.

Even if Day's testimony was not sufficient to tie Exhibit 15 to August 8th, the description on JERS was harmless.  Allen's counsel introduced into evidence five clips from the August 8th meeting.  The description on JERS for these clips also included the date: "1D16_2016-08-08."  Some of these clips were duplicates of clips introduced by the Government in the 15-series.  Defendants cannot argue that they were prejudiced by the Government's description on JERS which included the date of the recordings when defense counsel's own clips from that same conversation also included the same date—August 8, 2016.  Accordingly, Defendants were not prejudiced by the description for the Government's Exhibit 15 in JERS.

### ii.     Government's Exhibit 17

The Court now turns to the exhibits that the Court has independently identified.  First, the description on JERS for Government's Exhibit 17 did not contain extraneous information.  The description provided: "[c]onsensual recording intercepted 9182016 between Dan Day Curtis Allen Gavin Wright Patrick Stein."  On April 2, 2018, the Government asked Dan Day about a meeting at G&G on September 11, 2016.  Day testified that he met with Defendants at G&G on September 11, but he was unable to record at that meeting.  Day testified about the September 11 meeting for

about ten minutes.  Then, the Government asked him: "[n]ow, about a week after this meeting you just described, did you go to another meeting at a Subway truck stop in Sublette, Kansas?"  Day testified that he did, and that it was recorded.  The Government then played Exhibit 17a for the jury.  Thus, while Dan Day did not technically testify that the meeting was on September 11, "about a week later" is indirect evidence that the meeting occurred on September 18.  Thus, the description on JERS did not contain extraneous information.

### iii.  Government Exhibits 18, 19, 21, and 49

Next, the Court turns to the description on JERS for Government's Exhibits 18, 19, 21, and 49.  After reviewing the record, none of these exhibits contained extraneous information; although the evidence tying Exhibit 18 to September 25, 2016 was indirect.  On April 4, 2018, FBI Under Cover Employee ("UCE") "Brian" testified that he and other UCEs recorded three meetings in which they met in person with Stein.  These recordings were introduced into evidence as Government's Exhibits 18, 19, 21, and 49.  For some unknown reason, Exhibit 18 was an audio recording of the first meeting, but Exhibit 21 was an audio recording of the second meeting, while Exhibit 19 was an audio recording of the third meeting.  Exhibit 49 was an audio and video recording of the second meeting.

On JERS, the description for Exhibit 18 provided: "[c]onsensual monitoring of [five UCEs] Dan Day Patrick Stein on 09252016."  The description for Exhibit 21 provided: "[c]onsensual audio recording on 10122016 between Patrick Stein [and five UCEs]."  The description for Exhibit 49 provided: "[c]onsensual Video recording on 10122016 between Patrick Stein [and five UCEs]."  And the description for Exhibit 19 provided: "[c]onsensual audio recording on 10142016 between Patrick Stein [and five UCEs]."

During trial, on April 4, 2018, UCE Brian testified that he recorded three meetings in which he met with Stein in person. Counsel for the Government asked UCE Brian if his first meeting with Stein occurred on September 25, 2016. UCE Brian could not recall the exact date, but testified that the first meeting took place in September of 2016. In addition to Stein, Dan Day was also present at this meeting. An audio recording of the first meeting was introduced as Government's Exhibit 18.

The next day of trial, UCE Brian testified that he scheduled a second in-person meeting with Stein while communicating via a web-based messaging application. UCE Brian testified that on October 11, 2016, he arranged to meet with Stein at 5:00 p.m. on October 12th. UCE Brian briefly explained what happened at the October 12 meeting. The Government then played clips from Exhibit 21 and 49 to corroborate UCE Brian's testimony regarding that meeting.

After the lunch recess, UCE Brian was asked about a meeting that he had with Stein on October 14, 2016. UCE Brian testified that Stein delivered bags of fertilizer to the UCEs at a McDonald's, and that the meeting was recorded. The Government then played Exhibit 19—the audio recording of the meeting—for the jury.

In comparing the JERS description to the information of which the jurors were properly aware, the Court concludes that the descriptions for Exhibits 19, 21, and 49 did not contain extraneous information. The jurors were made aware through UCE Brian's testimony that Exhibit 21 was an audio recording of a meeting that took place on October 12, 2016, and that Exhibit 49 was an audio and video recording of part of that same meeting. Likewise, the jurors were made aware through UCE Brian's testimony that Exhibit 19 was a recording of a meeting that took place on October 14, 2016. In other words, a sponsoring witness testified as to the date for the clips made for Exhibits 19, 21, and 49.

Although UCE Brian could not recall the exact date of the first meeting, the evidence was sufficient to establish that the first meeting took place on September 25. First, UCE Brian testified that the first meeting took place in September of 2016. UCE Brian then testified that he communicated with Stein over a web-based application on September 27, sometime "after" his first in-person meeting with Stein.[28] Second, Dan Day testified about his knowledge of the meeting with the UCEs during trial on April 4, 2018. When asked whether a meeting was set up on September 25, 2016, for Stein to meet with the UCEs, Day testified that "sounds like the right date." Shortly thereafter, Day was asked: "on September 25th when you were driving out to the meeting place, you actually got lost?" Day answered: "I made a wrong turn, yes." Thus, the jury was presented with evidence that the first meeting between Stein and the UCEs took place on September 25, 2016. Accordingly, the inclusion of "09252016" in the JERS description for Exhibit 18 was not extraneous.

iv.     Government's Exhibit 22

On JERS, the description for Government's Exhibit 22 provided: "[c]onsensual monitoring of Dan Day Patrick Stein Curtis Allen Trish Burch Nathan Spooner Daniel Reeves on 07092016." On March 29 and on April 3, 2018, Dan Day testified about a meeting at Trish Burch's house, attended by Day, Allen, Stein, Trish Burch, and Daniel Reever. On April 3, Day testified that this meeting took place on July 9, 2016. Accordingly, the JERS description which included "07092016" did not contain extraneous information, and regardless, was harmless.

---

[28] These text conversations were introduced as Government's Exhibits 109a and 109b, which UCE Brian testified were transcripts of conversations that took place on September 27 after his first in-person meeting with Stein.

### v.     Government's Exhibit 24

Next, the description on JERS for Government's Exhibit 24 did not contain extraneous information.  The JERS description for Exhibit 24 provided: "[c]onsensual monitoring of Dan Day, Gavin Wright, Patrick Slattery and Curtis Allen on 07312016."  As explained in more detail above, Dan Day was asked extensively about his meetings with Defendants at G&G Homes.  Day testified that the first meeting was attended by Allen, Wright, and an individual named Patrick Slattery, but Stein was not present, and no planning occurred.  Although Day was not asked about the date of the first meeting, the jury heard subsequent testimony regarding this date.  On April 11, 2018, Wright's counsel asked Special Agent Amy Kuhn about Defendant's Exhibit 1127.  Agent Kuhn testified that Exhibit 1127 was the first six pages of the transcript the FBI prepared for the meeting at G&G on July 31, 2016.  The JERS description for Defendant's Exhibit 1127 provides: "FBI Verified Transcript 1D15 re 7-31-2016 Meeting at G & G Homes.pdf."

Thus, the Government's description on JERS for Exhibit 24, which contained the numerals "07312016" did not contain any extraneous information.  Moreover, Defendants have not been prejudiced because Defendant's Exhibit 1127, a transcript from the same meeting, also contained the date "7-31-2016."

### vi.     Government's Exhibits 127 and 130

Next, the description on JERS for Government's Exhibits 127 and 130 did not contain extraneous information.  The description for Exhibit 127 provided: "[c]onsensual monitoring of Dan Day 09022016."  And the description for Exhibit 130 provided: "[c]onsensual monitoring of Dan Day 09012016."  On March 29, 2018, the Government asked Dan Day about a meeting on September 2, 2016 at G&G.  Dan Day testified that he recorded that meeting, and the Government proceeded to play Exhibit 127—the recording he made.

During trial, on April 2, 2018, Day was questioned about how he prepared for the September 2 meeting at G&G. Specifically, Day testified that he recorded a phone call with Stein the "day before this meeting at G&G." The Government then introduced Exhibit 130, which was a recording of his phone call with Stein while he was at the FBI office in Garden City. In other words, Day testified that Exhibit 130 was recorded one day prior to September 2—meaning it was recorded on September 1. Moreover, on April 10, a duplicate recording was introduced into evidence by Defendant Allen as Defendant's Exhibit 944. The description provided by Allen on JERS for Exhibit 944 provided: "1D60_2016-09-01."

Accordingly, the dates contained on JERS for Government's Exhibits 127 and 130 were not extraneous information. And the description for Defendant Allen's Exhibit 944 contained the same date in the description on JERS, so Defendants would not have been prejudiced by Government's Exhibit 130 regardless.

### vii.    Government's Exhibits 287 and 288

Next, the description on JERS for Government's Exhibits 287 and 288 did not contain extraneous information. The descriptions for Exhibits 287 and 288 both contained "20161011" on JERS. During trial, there was evidence and testimony that Defendant Allen was arrested on October 11, 2016. On April 4, 2018, the Government asked Day about phone calls he had with Wright "shortly after Curtis Allen's arrest." Day remembered those phone calls, and the recordings were introduced as Government's Exhibits 287 and 288. On April 5, Wright's counsel introduced Defendant's Exhibits 1107 and 1108, which were the same recordings offered by the Government. On JERS, Exhibits 1107 and 1108 are titled "Phone Call Clip . . . - Dan Day and Gavin Wright 10-11-2016.mp3."

Accordingly, Government's Exhibits 287 and 288 did not contain extraneous information in their descriptions on JERS.  Dan Day's testimony established that those recordings were made on October 11, 2016, and Defendant's own exhibits contained the date "10-11-2016" in the description, so the dates in the Government's Exhibits did not prejudice Defendants.

### viii.    Government's Exhibit 16

Finally, the description on JERS for Government's Exhibit 16 technically contained extraneous information, but it did not prejudice Defendants.  The description for Exhibit 16 provided: "[c]onsensual monitoring of Dan Day Curtis Allen Gavin Wright Patrick Stein on 8142016."  As explained above, there was evidence presented to the jury that the first meeting at G&G took place on July 31, 2016, and the second meeting took place on August 8, 2016.  During trial, on March 29, 2018, the Government was questioning Dan Day about the second meeting, where the group was using GoogleEarth to place "cockroach pins."  After finishing a line of questioning, the Government transitioned: "[s]o let's talk now about the next meeting you went to at G&G."  The Government then asked Day: "[d]id you go to a meeting on August *4th* of 2016 there?"  Day testified that he did go to a meeting then, and that he recorded it.  The Government then played clips from Exhibit 16.

In reviewing the record, it appears that the Government's reference to August 4, 2016 may have been an inadvertent error.  The first meeting took place on July 31, the second meeting took place on August 8, so the third meeting could not have taken place on August 4.  Technically, the description on JERS for Exhibit 16 is therefore extraneous information because there is no evidence that the recording was made on August 14, 2016.

However, the inclusion of "8142016" in the description was harmless.  The evidence clearly establishes that Exhibit 16 was a recording made during the third meeting at G&G.  The

exact date of that meeting was not particularly relevant. Furthermore, at the second meeting, Defendants discussed possible targets, while at the third meeting Defendants discussed how to buy equipment needed to make explosives. The exact sequence of these meetings does not appear to be particularly relevant in determining whether Defendants formed the requisite intent necessary to engage in a conspiracy to use a weapon of mass destruction. Accordingly, the inclusion of "8142016" in the description for Exhibit 16 did not prejudice Defendants.

     b.  JERS exhibit descriptions of handwritten notes

    Defendants next argue that the description in JERS for certain physical exhibits were unduly prejudicial. First, Defendants point to Government's Exhibit 32. In the exhibit list provided to defense counsel and the Court prior to trial, Exhibit 32 is described as "Physical item 1B116, notes." But on JERS, Exhibit 32 was described as "Stein notes & Communication Codes PHYSICAL." Defendants argue that no witness ever identified Stein's handwriting at trial, so the Government should not have been permitted to argue that these hand-written notes were written by Stein.

    The Government argues that the JERS description was harmless, because the witness through whose testimony that exhibit was admitted into evidence testified that these items were found in Stein's house or in his truck. The Court agrees. On March 28, 2018, Special Agent Schmidt testified that he conducted a search on Stein's truck subsequent to his arrest. Special Agent Schmidt testified that many notebooks and portfolios containing various notes, codes, and pictures were seized from Stein's truck. The physical notebooks and portfolios, as well as the notes and pictures contained within, were admitted at trial subject to Defendants' standing objection to lack of foundation, hearsay, and relevance. Specifically, Defendants argued that these exhibits could only be provisionally admitted, as Special Agent Schmidt could not, and did not,

verify that the notes were written by Stein. The Court "provisionally" admitted these exhibits on the basis that they were seized from Stein's truck, but precluded the Government from arguing that they were written by Stein.

Exhibit 32 was one of the handwritten notes found in Stein's truck when he was arrested. The evidence was introduced subject to Defendants' standing objection to lack of foundation, hearsay, and relevance. But the JERS description for Exhibit 32 was not prejudicial to Defendants. "Stein notes & Communication Codes PHYSICAL" does not contain extraneous information, nor does it violate the Court's order prohibiting the Government from arguing that the handwritten notes were written by Stein. Special Agent Schmidt's testimony established that the notes were seized from Stein's truck, and the JERS description is therefore a harmless description of the contents of Exhibit 32. Thus, Exhibit 32's description merely says "Stein notes;" it does not say that the notes were "*Stein's* notes," (possessive pronoun) or otherwise imply that they were written by Stein.

Second, Defendants point to Government's Exhibit 44. In the exhibit list provided to defense counsel and the Court prior to trial, Exhibit 44 is described as "Physical item 1B112, notes." But on JERS, Exhibit 44 was described as "Notes on Possible Targets PHYSICAL." Exhibit 44 also contained pictures and some handwritten notes. Specifically, it contained a handwritten address with the designation "mosque" above it. The JERS description is consistent with the evidence that the defendants spent considerable time considering various targets, including mosques. The Government was not permitted to argue that Stein wrote this note, but it was permitted to argue that he had, in his truck, a note with an address to a mosque. The description is not worded to suggest that Stein wrote the notes or otherwise contain any extraneous information and therefore did not prejudice Defendants.

c.      The Court's internal description of case on JERS

Defendants next argue that the description on JERS for the case itself was prejudicial.  In preparation for Defendants' trial, the Court created a new folder, or "trial," on JERS for the parties' exhibits.  The description the Court entered for Defendants' trial on JERS was "Terrorist/Bomber case."  Defendants now argue that this description was prejudicial and should not have been shown to the jury.

However, the jury did not actually see the phrase "Terrorist/Bomber case" at any point during trial or during deliberations.  Defendants were only made aware of the title after the Court provided the parties with an internal report from JERS with a list of the exhibits that had been released to the jury on JERS.  The report contained the following caption:

United States District Court
District of Kansas
Exhibits Log: 16-10141
Terrorist/Bomber case, 3/19/2018.[29]

Defendants' argument assumes that the jurors could also see the title/case caption, but that is not the case.  Indeed, during deliberations, the Government asked the Court to provide the parties with a screenshot of what a juror would actually see when JERS is accessed in the deliberations room. The Court then provided the parties with a screenshot of the JuryViewer client exactly as it appeared to the jurors when they had access to the JERS workstation.  The screenshot shows that the case caption is not present anywhere on the screen.

Nevertheless, Defendants' claim that "the parties cannot be sure by the single screen-shot what additional information the jurors could access on the JERS system."  The Court understands

---

[29] This report was not provided to the jurors.

-23-

Defendants' concern, as Defendants have no familiarity with the JERS workstation or the JuryViewer client. But unlike the parties, the Court has full access to JERS and all of its features and capabilities. Having reviewed the JERS workstation that was used by the jurors in this case, the Court takes judicial notice of the fact that the title "Terrorist/Bomber case" was not displayed to the jurors.[30] The title is simply a tool for the Court to identify a particular trial on the JERS courtroom client. The title is not displayed on the JuryViewer client.[31] And although the title appeared on the JERS exhibits report presented to the parties, it was not shown to the jurors. Accordingly, Defendants were not prejudiced by the case caption on JERS.[32]

### 3. Conclusion

In sum, the Court agrees that the jury's verdict was based upon the evidence developed at trial, and not upon extraneous information that snuck its way into the jury room. All but one of the exhibit descriptions on JERS did not include any extraneous information. The one exhibit that may have contained extraneous information—Government's Exhibit 16—was harmless. When

---

[30] *See* Fed. R. Evid. 201(b)(2) (establishing that the Court may judicially notice a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also In re Branch*, 2016 WL 4543770, at *3 (E.D.N.C. 2016); *United States v. Fields*, 6 F.R.D. 203, 205 (D.D.C. 1946).

[31] A video demonstration of the JuryViewer client can be viewed at http://www2.ncwd.circ4.dcn/sites/jers/Pages/Downloads.aspx by clicking the "Videos" tab and selecting "JERS_Tutorial_High." Although the video depicts a fictional case, the video is an accurate representation of the JuryViewer client and it shows all the features that the jurors in this case had access to.

[32] Defendants would not have been prejudiced by the title even if it was displayed while the jury was deliberating. Although the Court limited the mention of "terrorist" and "terrorism" during trial, there was still a plethora of evidence introduced regarding the fact that the FBI was investigating Defendants for domestic terrorism charges. In fact, the Second Superseding Indictment charged Wright with giving a false statement to the FBI "in an investigation of an offense *involving domestic terrorism* as defined in Title 18, United States Code, Section 2331 . . . ." Doc. 89 (emphasis added). Because of that charge, the jury instructions contained four references to a "domestic terrorism offense." Doc. 384, pp. 20, 24. Thus, the reference to this case being a "terrorist" case was information that had already been presented to the jury numerous times.

considering Exhibit 16's description in context with the testimony and evidence presented at trial, it was harmless and simply did not prejudice Defendants.

In their Reply, Defendants assert that "the parties heavily disputed the sequence of events as they related to whether and when the defendants' formed an intent to enter into an agreement to commit the alleged acts."[33] However, the Court does not agree with this characterization. Most, if not all, of the audio recordings were introduced without any dispute as to the date. The Court is aware of some dispute during trial as to the *participants* that were present in one of the recordings; but the Court is not aware of a dispute as to the *dates* the recordings were made. Accordingly, the fact that the JERS descriptions may have technically contained extraneous information in one instance did not prejudice Defendants.

Moreover, the "most common means of demonstrating the harmlessness of an extraneous contact is to show the existence of 'overwhelming evidence of [the] defendant's guilt.' "[34] The Court, having presided over Defendants' trial, viewed all the evidence, and reviewed the transcripts, is confident that there was overwhelming evidence of Defendants' guilt in this case. The Court's conclusion is supported by the fact that, despite the trial lasting over five weeks and including more than 1,000 exhibits, the jury did not need much time to deliberate. In fact, the jury took less than eight hours to reach the verdicts. The Court is confident that this was because the Government overwhelmingly proved its case; not because some of the exhibits on JERS contained

---

[33] Doc. 422, p. 8.

[34] *United States v. Davis*, 60 F.3d 1479, 1485 (10th Cir. 1995) (quoting *Hornung*, 848 F.2d at 1045); *see also United States v. Chanthadara*, 230 F.3d 1237, 1251 (10th Cir. 2000) ("[T]he prejudice presumed . . . may be proven harmless if the government can establish there was overwhelming evidence of the defendant's guilt.").

dates in the descriptions. Accordingly, the JERS descriptions did not prejudice Defendants, and a new trial is not warranted on this basis.

**B.     Jury Selection Challenges**

Defendants next argue that a new trial is warranted because the Court's designation of the alternate jurors violated Fed. R. Crim. P. 24 and the Court's own pronounced procedure relied on by the parties. Before addressing Defendants' arguments, the Court will provide some background information on jury selection procedures in the federal courts. Additionally, the Court will address its chosen method of jury selection procedure, how that procedure was explained to the parties prior to trial, and the facts surrounding jury selection in this case.

     *1.     Jury Selection Background*

        a.     Methods of jury selection in federal courts

Although there is some variation, federal courts typically use one of two basic methods for jury selection: the "jury box" system or the "struck jury" system.[35] Under the "jury box" system, 12 prospective jurors are seated and subjected to voir dire.[36] The Government then begins to exercise challenges—for cause and peremptory—on the panel of 12.[37] When a juror is struck, a new juror is brought in to replace the excused juror.[38] The defendant then follows a similar

---

[35] *United States v. Delgado*, 350 F.3d 520, 523 n.1 (6th Cir. 2003).

[36] *United States v. Esparza-Gonzalez*, 422 F.3d 897, 899 n.3 (9th Cir. 2005).

[37] *See* Wayne R. LaFave, 6 Criminal Procedure § 22.3(d) (4th ed. 2017); *Delgado*, 350 F.3d at 523 n.1.

[38] Wayne R. LaFave, 6 Criminal Procedure § 22.3(d).

procedure with this group and tenders a jury of 12 back to the Government.[39]  The parties continue

on in this manner until both parties have exhausted their challenges.[40]

The other common method for jury selection is known as the "struck jury" system.  Under

the "struck jury" system, a venire panel members are examined and challenged for cause by both

sides.[41]  The size of the panel is 12, plus the number of alternates, plus the number peremptory

strikes allowed all parties.[42]  Venirepersons excused for cause are replaced on the venire, and the

examination of replacements continues until a panel of qualified venirepersons is presented.[43]

After the panel has been examined and challenged for cause, the parties exercise their peremptory

challenges until both parties have exhausted their strikes.[44]  At this time, the size of the panel is

12, plus the number of alternates.

There are two primary methods of selecting alternate jurors under the "struck jury" method.

First, after the venire has been narrowed down to 12 plus the number of alternates, some courts

will choose to use a random draw to select the alternate jurors.[45]  Second, some courts will assign

each venireperson a number.  After the parties exercise their peremptory challenges, the petit jury

of 12 is empaneled in numerical order beginning with the remaining juror with the lowest juror

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *See Delgado*, 350 F.3d at 525–26 (concluding that defendants were not prejudiced by district court's method of selecting alternates by random draw).

number until 12 jurors are seated.[46]  Those remaining with the highest juror numbers are the alternates, again assigned in numerical order.[47]

###### b.    This Court's Jury Selection Procedure

The Court has always used the "struck jury" system for jury selection, in which the last jurors who are "called to the box," and "survive to the jury," become the alternate jurors.  The phrases "called to the box"[48] and "survive to the jury" refer to the two phases of the "struck jury" system.  In the first phase, a venire panel is seated so that counsel may question the venirepersons and they may be struck for cause.[49]  Under the "struck jury" method, the size of the venire panel must always equal 12, plus the number of alternates, plus the number of peremptory strikes allowed—which typically results in a 32-person venire panel.[50]  To account for panel members being struck, there are more potential jurors summoned to the courtroom for jury selection than are initially seated on the venire panel.

---

[46] *See, e.g.*, *United States v. Lighty*, 2016 WL 8669911, at *10 (D. Md. 2016).

[47] *Id.*; *see also United States v. Love*, 134 F.3d 595, 601 (4th Cir. 1998) (opining that "the last six persons placed on the jury of eighteen should have been" designated as alternates, rather than choosing the alternates "by lot," because Rule 24 requires that alternate jurors replace regular jurors "in the order in which they are called").

This is the method this Court uses to select alternate jurors.  It appears that some courts will actually place the jurors in numerical order (assigned in the order of being called to the venire panel) when they are seated in the jury box, with the alternates at the end.  This Court does not necessarily *seat* the jurors in the jury box numerically, but the Court *designates* the actual jurors as the 12 with the lowest juror numbers, and the remaining being the alternates.

[48] On occasion, the Court will alternatively use the phrase "summoned to the process."  The phrases are interchangeable and share the same meaning.

[49] Wayne R. LaFave, 6 Criminal Procedure § 22.3(d); *Delgado*, 350 F.3d at 523 n.1.

[50] Usually, the Court will begin jury selection by seating a panel of 32 (12 jurors plus two alternates plus 18 peremptories), and exactly 32 chairs will be placed in the courtroom for the panel to sit in.  In this sub-section, the Court will explain its normal process under this assumption, so as to identify any changes in the jury selection procedure that occurred during Defendants' trial.

For illustrative purposes, the Court will assume that 40 are summoned for jury selection (as is typical in this Court).[51] The 40 potential jurors are then seated in the courtroom gallery. The clerk will then randomly sort the potential jurors' names and print out a list in which the potential jurors have been assigned a juror number from 1–40. The courtroom deputy will then call out the names of Jurors Nos. 1–32, in numerical order, until the venire panel has been satisfied. The order in which panel members are called and seated on the venire panel is the order in which they have been "called to the box." As the venirepersons' names are called, each is directed to a specific seat in the courtroom well. The seating arrangement is reflected on the Court's seating chart, copies of which are distributed to counsel before "the process" begins.[52]

When a venireperson is struck for cause, or otherwise excused, a replacement must be "called to the box" so 32 panel members are always seated on the panel. After the first panel member is struck, the courtroom deputy will call Juror No. 33, and instruct the replacement to sit in the seat vacated by the excused panel member. The courtroom deputy will then cross out the excused juror's name on the seating chart, and handwrite Juror No. 33's name in the same box.[53] In that instance, the entire remaining panel does <u>not</u> shift seats to place Juror No. 33 at the end; Juror No. 33 simply sits in the vacated seat. This process is repeated until the venire panel has been passed for cause.

---

[51] Usually, approximately 40 potential jurors are summoned for the jury selection process. After Jurors Nos. 1–32 are called to the venire panel, the remaining jurors (Jurors Nos. 33+) are necessary to serve as potential replacements panel members struck for cause.

[52] The seating chart is a printed document with 32 numbered boxes, in which the names of Jurors Nos. 1–32 have been typed.

[53] When a venireperson is excused, their name is crossed out in pen on the Court's official seating chart. The courtroom deputy will then handwrite the name (but not juror number) of the replacement panel member in the same box, just below the crossed-out name.

Once the entire panel has passed for cause, jury selection enters the second phase. In the second phase, the parties exercise their allotted peremptory strikes on the venire panel as it exists in its current state. The parties exercise their peremptory challenges by passing the "updated"[54] seating chart between the parties in a pre-determined order. After the parties exercise their allotted peremptory challenges, there will only be 12 jurors, plus the pre-determined number of alternates remaining (two in this example). The remaining 14 panel members are those who "survived to the jury." The courtroom deputy then calls out the names of the jurors who "survived the process," and were not struck by the parties during peremptory challenges. The surviving jurors are then reseated in the jury box in the same order they were sitting in during jury selection.[55] The jurors that were struck are excused.

The alternates, then, are the last jurors "called to the box" who "survived to the jury." Thus, the jurors with the highest *juror number*—not to be confused with *seat* number—are the alternates. Because, of course, those jurors were the last called to "the box," or the venire panel. The Court utilizes this process so that, when the parties are exercising their peremptory challenges, the last two "called to the box" will be the alternates.

---

[54] The Court does not print out a new seating chart to reflect the venire panel as it exists after for-cause challenges have been exercised. Rather, the Court uses the seating chart that has names crossed-out and handwritten names on it. The parties are individually responsible for keeping track of the order in which the replacement panel members are "called to the box."

[55] The Court seats the jurors according to this method, as opposed to seating them according to juror number, so the jurors themselves are not immediately aware whether they are an alternate or an actual juror. The theory behind this is that it will cause the alternates to remain attentive, believing that they may be an actual juror. As the Court explained on November 16, 2017: "my practice is that the alternates are the *last two jurors summoned to the box*, which aren't always—in fact they're seldom—jurors 13 and 14 because [of] strike challenges."

### c. How the Court's jury selection procedure was explained to the parties

The Court's method for selecting alternates was first explained to the parties at a pretrial hearing held on November 16, 2017. There, the Court announced its intention to impanel 12 jurors and four alternates—two more alternates than usual. The Court explained that the Government would be provided with nine total peremptory challenges and the defense would be provided with five peremptory challenges per Defendant. Thus, the Court provided the Government with one more peremptory challenge than required, and Defendants were provided with three more than required.[56]

After the Government questioned how the extra peremptory challenges would be used, the Court responded that it did not intend to have a separate process for selecting alternates and that the parties could use all of their respective peremptory challenges on the entire panel. The Court explained:

> Well, the way I seat a jury, I don't tell them who the alternates are until the end of the trial. And my practice is that the alternates are the *last two jurors summoned to the box*, which aren't always—in fact they're seldom—jurors 13 and 14 because [of] strike challenges. Now, you'd have to sort of figure out how that's going to work with our new revised jury process here. But in any event, I don't tell them who the alternates are until the end of trial, and I just qualify a panel of 14 when I seat a criminal jury. So I don't make any distinction between the alternate selection and the juror selection.[57]

After further discussing peremptory strikes, the Court again explained:

> Well, I mean, you'll only know who [the alternates] are after the panel's selected because if I give you additional peremptories for alternates, it's still one process. We don't pick 12 jurors and then alternates. We'll pick probably a panel of 16, and

---

[56] *See* Fed. R. Crim. P. 24(b)(2), (c)(4)(B).

[57] Doc. 410, p. 6.

of those 16 the *last four who were called to the process* are the ones who will become the alternates, although they won't be announced until the end of trial.[58]

And once again for good measure, the Court reiterated that "ultimately it will be the last four who are summoned in our process" who will be the alternates.[59] This should have made it clear that the alternates would not be the last jurors seated in the juror box.

On March 5, 2018, the Court held a pretrial hearing and explained the jury selection procedure in detail, as follows. Due to the serious nature of the charges, the Court decided to summon far more jurors than usual for criminal trials. Then, on March 20 and 21 the parties would be permitted to conduct voir dire and exercise for-cause challenges on the summoned jurors. Those prospective jurors who are passed for cause will be brought back into the courtroom on March 22. At that point, the clerk will randomly select 40 jurors who will be seated. Because everyone sitting there will have already passed for cause, the parties will proceed to exercise their peremptory challenges on paper in the courtroom. "And then at the conclusion of that process," the Court explained, "we will have our 16 jurors." The Court then explained:

> It's my practice that the last four panel members who are called—in this case four— who are called to the box and who survive to the jury become the alternates. I don't inform them who the alternates are until at the conclusion of all evidence and closing arguments. But the alternates will be the last four who are seated in the box in the order in which they're seated. So that's how I envision the juror selection process will go the week of March 19th.[60]

---

[58] Doc. 410, p. 7.

[59] Doc. 410, p. 8.

[60] Doc. 411, p. 3.

d.     Jury Selection in Defendants' Trial

On March 20–21, 2018, the Court summoned approximately 140 potential jurors.[61]  The parties questioned the potential jurors in three separate venire panels and exercised for-cause challenges.  Approximately 100 prospective jurors were passed for cause.  Of these 100, the Court randomly selected 60 jurors who were instructed to return on March 22.

On March 22, the 60 prospective jurors were brought into the back of the courtroom.  To accommodate 40 venirepersons, exactly 40 seats were placed in the well of the courtroom.[62]  The clerk randomly sorted the 60 names and printed out a numbered list.[63]  The Court then created a seating chart with 40 numbered boxes, and the names of Jurors Nos. 1–40 typed in the corresponding box, and distributed copies to counsel.  At this point, the Court began calling Jurors Nos. 1–40 "to the box" in order.  They were directed to their assigned seats on the venire panel based on the seating chart.  The 20 prospective jurors that were not selected for the venire panel were instructed to remain seated in the courtroom gallery.

---

[61] Prior to trial, 600 juror questionnaires were sent to potential jurors, in order to determine whether any jurors should be struck for cause based on their beliefs or ability to attend the lengthy trial.  The Court received 572 responses.  That number was narrowed down to 403 after 169 were excused for cause due to age, infirmity, having moved, etc.  Of the 403 remaining, 207 indicated a hardship and were excused as agreed upon by the parties.  Of the 196 that did not have a hardship, the Court summoned approximately 140 for jury selection.

[62] A panel of 40 was necessary for Defendants' trial to allow the parties to fully exercise their peremptory challenges.  It accounts for 12 jurors, plus 4 alternates, plus the number of Government peremptory challenges (9), plus the total number of defense peremptory challenges (15).

[63] In this case, the list generated by the Court ordered the jurors from 1–60: K.M.; R.V.; T.C.; J.L.; B.L.; K.C.; S.S.; T.J.; J.B.; R.P.; G.H.; D.D.; D.R.; D.H.; A.E.; T.R.; D.S.; B.S.; S.M.; J.R.; P.S.; J.S.; J.C.; D.S.; A.R.; H.W.; R.S.; M.G.; S.P.; S.B.; K.C.; D.W.; D.S.; A.B.; J.C.; M.M.; N.K.; A.G.; G.M.; T.E.; J.B.; S.S.; A.T.; R.M.; J.K.; M.W.; W.J.; K.B.; G.W.; M.W.; M.Y.; L.W.; K.D.; L.V.; M.W.; D.L.; M.B.; J.L.; T.P.; and G.D.
    Thus, K.M. was Juror No. 1, and G.D. was Juror No. 60, as reflected on the Court's list.  Counsel did not receive a copy of this list.  Rather, they were provided with a list of the 60 jurors ordered alphabetically.  However, the juror numbers should have become apparent as the names were called in order from 1–40 (and later 41 and 42).

After the venire panel was seated, the Court noted that each of the venirepersons had already filled out a questionnaire and had been individually examined and passed for cause by counsel. The Court then asked the panel members if they had discovered any reasons they had not disclosed previously that would not allow them to adhere to the lengthy trial schedule. First, H.W. (Juror No. 26) explained that she had a caretaker problem, and she was subsequently excused. The courtroom deputy then called J.B. (Juror No. 41) as a replacement; J.B. was instructed to sit in the seat that H.W. had been occupying. Second, A.E. (Juror No. 15) explained that he had to have post-surgery rehabilitation during the trial, and he was also excused. The courtroom deputy called S.S. as a replacement; S.S. was instructed to sit in the seat that A.E. had been occupying.

On the Court's official seating chart, the courtroom deputy crossed out the names of the excused venirepersons, H.W. and A.E., and handwrote their replacements' names in the boxes. Thus, J.B.'s name was handwritten in box 26 underneath H.W.'s crossed-out name. And S.S.'s name was handwritten in box 15 underneath A.E.'s crossed-out name.

Because there were no additional conflicts, the Court directed the parties to exercise their peremptory challenges. During this phase, the parties would pass the Court's official seating chart (with the handwritten revisions) back-and-forth in a pre-determined order until each parties' allotted peremptory challenges had been exercised. At the conclusion of these strikes, 16 jurors remained, including J.B.

The courtroom deputy then called the 16 remaining jurors' names to announce that they had been selected to serve on the jury. But the courtroom deputy only called the names of 15 jurors. An attorney for the Government immediately identified the discrepancy and called it to the Court's attention. After re-checking the seating chart, the courtroom deputy noted that one of the jurors was inadvertently skipped. The courtroom deputy then explained that J.B. "is also a juror,"

and should have been included in the list of the 16 jurors called. The courtroom deputy then re-seated the remaining 16 jurors. The jurors were seated in the jury box in the order they were sitting in the venire panel; they were not arranged in the jury box numerically according to their juror number.[64] The jury was sworn, and the trial commenced.

During trial, J.C. (Juror No. 23) was excused due to a family emergency. Thus, 15 impaneled jurors sat through the entire trial, through closing arguments and instructions, which took place on April 17. Before the jurors were excused to deliberate, the Court read the list of three juror names who were alternates—A.G. (Juror No. 38), T.E. (Juror No. 40), and J.B. (Juror No. 41). The parties immediately requested a sidebar conference to express their confusion. Defense counsel notified the Court that they had been operating under the belief that J.B. (Juror No. 41) was an actual juror, and that N.K. (Juror No. 37) was the third alternate.

Defense counsel explained that their understanding was that the four alternates were D.S. (Juror No. 33), N.K. (Juror No. 37), A.G. (Juror No. 38), and T.E. (Juror No. 40). Thus, when J.C. was excused mid-trial, defense counsel was of the belief that D.S. became a regular juror. The Court explained that D.S. was never an alternate juror:

> We had a numbered list, and so on the list there were 40 numbered in order, and I've recorded the numbers by which they were seated here. [J.B.] was also originally called in to replace someone. You recall we had a couple people from [the] initial list of 40, a couple of people who I don't remember now what the reason was, but I seated 40, two of them said they couldn't continue, and so I replaced them with people further down the list from those 40. [J.B.] was 41. That's why he's the last alternate.[65]

---

[64] *See supra* n. 55.

[65] Doc. 394, p.10.

The Court acknowledged that both parties believed J.B. was a member of the jury, but overruled Defendants' objection. N.K. served as a juror for deliberations while the Court excused J.B. as an alternate.

## 2. Defendants' Arguments

Defendants now assert that the Court's jury selection procedure was impermissible and a new trial is therefore warranted. Essentially, Defendants believe that J.B. should have been considered a juror and N.K. should have been an alternate. Jury selection procedures, including the method of exercising peremptory challenges, are traditionally left to the discretion of the district court.[66] "In criminal trials, that discretion is circumscribed by Rule 24 of the Federal Rules of Criminal Procedure."[67] Accordingly, the Court must decide whether Defendants were "denied any right for which Rule 24 provides."[68]

Defendants first argue that the Court violated Rule 24(c), which allows alternates to replace jurors who are "unable to perform or who are disqualified from performing their duties." According to Defendants, J.B. was a juror, and N.K. was an alternate. Thus, Defendants argue, the Court erred by dismissing J.B. without first finding that he was "unable to perform," or "disqualified from performing" his duties as a juror.[69]

---

[66] *United States v. Morris*, 623 F.2d 145, 151 (10th Cir. 1980); *see also Delgado*, 350 F.3d at 524.

[67] *Delgado*, 350 F.3d at 524.

[68] *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000). As the U.S. Supreme Court explained in *Martinez-Salazar*, the right to peremptory challenges are "auxiliary" to the Sixth Amendment right to an impartial jury; they are not themselves guaranteed by the Constitution. *See id.* at 311. In federal criminal trials, the right to peremptory challenges are secured and governed by Rule 24. *Id.* at 311–12.

[69] *Cf. United States v. Baccari*, 489 F.2d 274, 275 (10th Cir. 1973) ("Recall of the alternate juror without the defendants' consent would have been improper and grounds for a new trial.").

However, Defendants are only able to reach this conclusion based upon a mistaken understanding of the Court's jury selection procedure. Defendants contend that "called to the box" must be understood to be the final 16 jurors who "survive to the jury" following the exercise of peremptory challenges.[70] Under this belief, Defendants argue that the order in which the jurors are seated in the jury box determines which members become the alternates.

This is not the procedure used for Defendants' trial, nor has the Court ever used such a procedure. Here, jury selection began when Jurors Nos. 1 through 40 were seated, in order, in the 40 chairs in the courtroom well. These were the first 40 "called to the box." Two jurors were then replaced because of newly-discovered conflicts. Relevant here, Juror No. 26 was replaced by J.B. (Juror No. 41). Although J.B. sat in the 26th seat, and his name was handwritten on the official seating chart in box 26, he was the 41st name "called to the box." After A.E. (Juror No. 15) was replaced by S.S. (the 42nd name "called to the box"), the parties exercised their peremptory challenges until just 16 panel members remained. Of the 16 who "survived to the jury," the last four called *to the venire panel* were N.K. (Juror No. 37), A.G. (Juror No. 38), T.E. (Juror No. 40), and J.B. (Juror No. 41). Under this procedure, J.B. (Juror No. 41), was always the fourth alternate.[71] J.B. was never a juror. Accordingly, the Court did not dismiss a juror without cause when it dismissed J.B.

The fact that J.B. was the 16th (and final) name called when the courtroom deputy announced the names of the 16 that survived to the jury is of no consequence. Defendants argue

---

[70] Doc. 422, p. 16.

[71] And, of course, N.K. (Juror No. 37) was always the first alternate. Under Rule 24(c)(2)(B), "[a]lternate jurors replace jurors in the same sequence in which the alternates were selected." Thus, when J.C. (Juror No. 23) was excused due to a family emergency during trial, N.K.—the first alternate—replaced J.C. as a juror. *See Love*, 134 F.3d at 601–02.

that, it was at this instance that J.B. became an alternate. It is certainly ironic that the courtroom deputy initially overlooked J.B., thereby only identifying 15 jurors before the mistake was realized and J.B.'s name was finally announced. But the order in which the courtroom deputy announces the names of the panel members that will be serving on the jury has no bearing whatsoever on how the alternates are selected. Innocently enough, the courtroom deputy does this simply to let the 40 panel members that are sitting in the courtroom knew whether they were struck during peremptory challenges or whether they will be serving on the jury. Nothing more, nothing less. In reality, under the Court's announced procedure, J.B. became an alternate the instant that the final peremptory challenge was exercised. At that moment, the 12 jurors and the 4 alternates were defined. The last four that were "summoned to the process" or "called to the box" were the alternates, and the remaining 12 were the jurors. And here, of the final 16, J.B. was the very last "called to the box," or summoned to partake in the jury selection process, thereby making him the fourth alternate.

Accordingly, the Court did not fail to follow its own stated procedure, thereby frustrating Defendants' right to intelligently exercise peremptory challenges. The Court followed its own stated procedure, in the same manner that it always had. Defendants simply misunderstood (or forgot).

Next, Defendants argue that the Court's jury selection procedure of using the "struck jury" method, under which the last four "called to the box" and "survive to the jury" become the alternates, is a per se violation of Rule 24(c)(4).[72] Defendants assert that (1) the Court failed to

---

[72] As the Court understands it, Defendants raise this argument in their Motion for New Trial (Doc. 404). However, in the Reply, Defendants explain that "the defense does not quarrel with the Court's procedure for the selection of alternate jurors, rather, the defense argues the Court failed to follow its own procedure, in violation of Rule 24." Regardless, the Court will still address the argument as it was raised in Defendants' motion.

designate for the parties which jurors in the final pool of 40 were the prospective alternates; and (2) failed to permit the parties to exercise peremptory challenges against only the alternates. Under Rule 24(c)(4)(B), each side is entitled to two additional peremptory challenges when three or four alternates are impaneled. "These additional challenges may be used only to remove alternate jurors."[73] Thus, Defendants argue, to comply with the Rule, a pool of prospective alternates must be identified in order for the parties to abide by Rule 24's mandate that the parties' additional peremptory challenge(s) be used only to strike an alternate.

Defendants, however, failed to object to the Court's procedure prior to jury selection. Even though Defendants have misunderstood some aspects of the Court's jury selection procedure, the Court explained at the November 16, 2017 hearing that "I don't make a distinction between the alternate selection and the juror selection" when the parties are exercising their peremptory challenges.[74] At that point, the Government suggested that, under Rule 24(c)(4), the extra peremptory challenges each side is granted may only be exercised against alternate jurors.

> Well, I mean, you'll only know who [the alternates] are after the panel's selected because if I give you additional peremptories for alternates, it's still one process. We don't pick 12 jurors and then alternates. We'll pick probably a panel of 16, and of those 16 the last four who were called to the process are the ones who will become the alternates, although they won't be announced until the end of trial.[75]

The Court then explained that the additional strikes against alternates are just "mix[ed] . . . into the whole selection process." After this was explained to the parties, the Government stated that it did not have an objection to the Court's announced method of jury and alternate selection.

---

[73] Fed. R. Crim. P. 24(c)(4).

[74] Tr. 11/17/17 Excerpt at 6.

[75] Tr. 11/17/17 Excerpt at 7.

At that point, the Court pointed out that Defendant Stein's counsel, Mr. Pratt, looked troubled.[76] However, Mr. Pratt responded: "I do think that that's reasonable, if we're doing it as one panel." None of the other defense attorneys spoke up or voiced any concern about the procedure.

It was not until, at the end of trial, when the 12 jurors and the three remaining alternates were announced, that defense counsel voiced any objections to the Court's jury selection procedures. As stated by the U.S. Supreme Court, the provisions of the Federal Rules of Criminal Procedure are "presumptively waivable."[77] "Federal courts have limited authority to correct errors forfeited at trial because they were not timely raised."[78] This encourages parties to timely raise objections, so the district court has the opportunity to resolve any claimed errors before they affect the outcome of the trial.[79] "It also prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor."[80] Accordingly, Defendants waived any objection to the Court's method of selecting alternates under Rule 24(c)(4).[81]

Regardless, Defendants were not prejudiced by the Court's jury selection procedure. Rule 24 provides that "[a]lternate jurors must have the same qualifications and be selected and sworn

---

[76] To which counsel candidly responded, "I'm always troubled, Your Honor."

[77] *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995).

[78] *United States v. Turrietta*, 696 F.3d 972, 976 (10th Cir. 2012) (citations omitted).

[79] *Id.* (citing *Puckett v. United States*, 556 U.S. 129, 134 (2009)).

[80] *Id.* (quoting *Puckett*, 556 U.S. at 134) (quotation marks altered and omitted).

[81] *See United States v. Silber*, 456 F. App'x 559, 560–61 (6th Cir. 2012) (holding that defendant "waived any objection [under Rule 24(c)(4)] to the blind draw system when he agreed to it before jury selection").

in the same manner as any other juror."[82]  "Alternate jurors replace jurors in the same sequence in which the alternates were selected," and once becoming a juror they have the same authority as the other jurors.[83]

In non-capital cases, the Government is entitled to six peremptory challenges and the defendant or defendants jointly are entitled to 10 peremptory challenges.[84]  "The court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly."[85]  When four alternates are impaneled, each side is entitled to two additional peremptory challenges.[86]  "These additional challenges may be used only to remove alternate jurors."[87]

The Court granted Defendants additional peremptory challenges under Rule 24(b), which allowed Defendants to remove the jurors perceived to be most objectionable and thereby leave a panel of 16 acceptable jurors.  And "this was not a case where defendants were forced by the jury selection procedure to strike blindly, without knowing whether persons had even a remote possibility of hearing the evidence or deliberating."[88]  As the procedure was explained to Defendants, they should have known that every venireperson against whom they did not exercise a peremptory challenge, and thereby left "in the box," would hear the trial evidence.  Of those, the

---

[82] Fed. R. Crim. P. 24(c)(2)(A).

[83] Fed. R. Crim. P. 24(c)(2)(B).

[84] Fed. R. Crim. P. 24(b)(2).

[85] Fed. R. Crim. P. 24.

[86] Fed. R. Crim. P. 24(c)(4)(B).

[87] Fed. R. Crim. P. 24(c)(4).

[88] *Love*, 134 F.3d at 602.

Court explained that the last four that had been called "to the box" would be the alternates.  Thus, Defendants were made aware that, while exercising peremptory challenges, the last four at any given time were the alternates.  Although the parties apparently misunderstood this process, the Court cannot discern how Defendants were "denied any right for which Rule 24 provides."[89]

<h2 style="text-align:center">IV.    Conclusion</h2>

For the reasons stated above, neither of Defendants' arguments are meritorious.  The interest of justice does not require a new trial because the jury was not presented with essential facts during deliberations, not in evidence, that affected the jury's verdict.  Second, the Court's method of jury selection did not deny Defendants any right for which Rule 24 provides.

**IT IS THEREFORE ORDERED** that Defendants' Motion for New Trial (Doc. 404) is hereby **DENIED.**

**IT IS SO ORDERED.**

Dated this 20th day of July, 2018.

_Eric F. Melgren_
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[89] *Martinez-Salazar*, 528 U.S. at 313.  The only technical Rule 24 violation that may exist under the Court's jury selection procedure is the Court does not have a safeguard in place to ensure that the parties may *only* exercise the additional peremptory challenges allotted under Fed. R. Crim. P. 24(c)(4) against alternates.  However, it can be inferred that, with each "side" being entitled to two additional peremptory challenges, and knowing that four alternates would remain, each side must exercise exactly two peremptory challenges on the last eight venirepersons "called to the box."  Interestingly, the parties complied with that exactly.  The last eight panel members called were Jurors Nos. 35–42.  Of those eight, the Government struck S.S. (Juror No. 42) and M.M. (Juror No. 36).  And Defendants collectively, as "a side," struck G.M. (Juror No. 39) and J.C. (Juror No. 35).  Regardless, the fact that the Court does not have a safeguard in place to ensure that the parties may only exercise the additional 24(c)(4) challenges against alternates did not affect Defendants' "substantial rights."  *See, e.g.*, *United States v. Gonzalez-Melendez*, 594 F.3d 28, 33–34 (1st Cir. 2010); *United States v. Hamed*, 259 F. App'x 377, 378–79 (2d Cir. 2008); *Love*, 134 F.3d at 601.