## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

---

**UNITED STATES OF AMERICA**,

*Plaintiff,*

v.                                                    Case No. **6:16-cr-10141-01 EFM**

**CURTIS WAYNE ALLEN**,

*Defendant.*

---

### DEFENDANT CURTIS WAYNE ALLEN'S SENTENCING MEMORANDUM

---

Curtis W. Allen respectfully asks this Court to impose a sentence of ten years imprisonment for each count, to run concurrently, followed by a ten-year term of supervised release. Mr. Allen filed separately his objection to the PSR. Should the Court grant those objections, Mr. Allen's guideline range would be 108 to 135 months, and the requested ten-year sentence falls within that range. Should the Court reject those objections, the range increases from 9 to 11 years to life in prison.[1] Thus, he alternatively asks for a below-guideline variance to ten years. The reasons for a lesser sentence include:

- Mr. Allen is much less culpable than his co-defendant Mr. Stein;

- Mr. Allen is a military veteran who served his country with honor and distinction;

- First Lieutenant Allen answered the call to war and served in combat in Iraq;

---

[1] The PSR calculates an adjusted offense level of 48 and criminal history category of VI.

- Mr. Allen returned from Iraq a changed man, bearing the unseen scars of war;

- Trauma and moral injuries suffered in Iraq contributed to the bravado of Mr. Allen's statements recorded by a paid FBI informant, his conspiratorial conduct, and his susceptibility to being influenced by others;

- Mr. Allen's misguided patriotism was inflamed by the rhetoric of the 2016 political climate and the influence of the Russian information warfare campaign against the American people; and

- Mr. Allen is a low risk to reoffend upon release due to his age and lack of criminal history.

This is really a civil rights case, as the language of Count 2 best captures the criminal conduct of Mr. Allen determined by the jury. The conspiracies here were not consummated or otherwise involved an actual victim, loss, or injury. The statutory maximum punishment for Count 2 is ten years, or 120 months. Considering the § 3553(a) factors, and the nature and circumstances of the offense and the history and characteristics of Mr. Allen as detailed below, a term of imprisonment for ten years, followed by ten years of supervised release, is fair and just sentence.

## I.  Mr. Allen is much less culpable for these crimes than his codefendant, Mr. Stein, and deserves less punishment.

The Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when determining a sentence.[2] The Court may also compare Mr. Allen to

---

[2] 18 U.S.C. § 3553(a)(6).

his two co-defendants, and Mr. Stein in particular, when determining the appropriate sentence.[3] When compared, Mr. Allen is much less culpable for these crimes than Mr. Stein.

All three defendants shared a common theory of defense on the two conspiracy counts—that the FBI created the conspiracy by directing the defendants' conduct and then sought to criminalize what otherwise would have been constitutionally protected speech and conduct. From the verdict, we know the jury found otherwise. The Court refused an entrapment instruction, but may still consider for a variance that Mr. Allen had little formed predisposition to commit these offenses before meeting the FBI's paid informant, Dan Day, and then subject to the influence of Day and Mr. Stein.

This timeline of events demonstrates how this investigation evolved:

| | |
|---|---|
| October 9, 2015 | Following a recruitment period, FBI Field Office in Garden City, Kansas officially opened Dan Day as a Confidential Human Source under the name "Minuteman." |
| December 7, 2015 | FBI opened a full domestic terrorism investigation focused on Jason Crick of Kansas III% for "militia extremism" based largely on Dan Day's reporting. |
| February 13, 2016 | Dan Day identified Patrick Stein as an associate of Jason Crick. |
| March 13, 2016 | Curtis Allen became friends with Dan Day on Facebook.[4] |

---

[3] *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("It follows that a district court may also properly account for unwarranted disparities between codefendants who are similarly situated, and that the district court may compare defendants when deciding a sentence.").

[4] The following is cut/pasted from the voluminous Facebook search warrant return for Mr. Allen:

| | |
|---|---|
| April 21, 2016 | FBI initiated a full investigation into Patrick Stein because it deemed him to be a "radicalizer/recruiter" of "militia extremism." |
| June 14, 2016 | Meeting at Brody Benson's farm called by Patrick Stein. First time Dan Day wore a "body wire" to record conversations. |
| August 17, 2016 | FBI initiated a full investigation into Curtis Allen for "militia extremism" because it considered him to be a "radicalizer/recruiter." And because his militia group, Kansas Security Forces, was "deemed a domestic political advocate organization, the investigation of Curtis Allen has been deemed a Sensitive Investigative Matter." |
| August 22, 2016 | FBI initiated a full investigation into Gavin Wright for "militia extremism." |
| October 11, 2016 | Curtis Allen was arrested in Liberal, Kansas. |
| October 14, 2016 | Patrick Stein was arrested in Dodge City, Kansas. Gavin Wright was arrested in Liberal, Kansas. |

This was not a case where a concerned citizen learned of threatening speech or conduct, reported it to the FBI, and then agreed to become a Confidential Human Source. Rather, the FBI recruited Dan Day to infiltrate militia groups in western Kansas at least five months before he met any of the defendants. The FBI's first mission for Mr. Day was to infiltrate the Kansas III% militia, and it opened a formal investigation of its leader, Jason Crick, based largely on Mr. Day's intelligence gathering. The evidence at trial never adequately explained why in 2015 the FBI felt compelled to recruit a Confidential Human Source in Garden City

---

**Time** 2016-03-13 04:24:08 UTC
**Story** Curtis Allen and Dan Day are now friends.

to gather intelligence on his fellow citizens who appeared to be engaged in only constitutionally protected conduct and speech.

There was scant evidence that Mr. Allen, a distinguished combat veteran with no felony convictions on his record, had the predisposition to commit these crimes. The government's arguments during the instruction conference about predisposition about the defendants' state of mind and conduct *prior* to them being targets of FBI investigation, and meeting Mr. Day in particular, solely pertained to Mr. Stein.

Mr. Allen was much more concerned with being a prepper and with his militia, the Kansas Security Forces.[5] It was not until after Mr. Allen became involved with Mr. Stein and Mr. Day that there was evidence of conspiratorial thinking and conduct. The evidence was also clear that Mr. Day and Mr. Stein were a closer group of two, while Mr. Allen and Mr. Wright were more distant from them.

Mr. Day met Mr. Stein first amongst the group, and then he joined the Kansas Security Forces Group. Mr. Day testified that Mr. Stein was much more "radical" than any member of the militia or than his co-defendants. By far the greatest volume of the government's evidence pertained to Mr. Stein and his comments were the most incendiary.

Often, Mr. Day and Mr. Stein would talk between themselves that Mr. Allen was not committed to their conspiratorial plot and would not actually do anything.[6]

---

[5] *See, e.g*, Def. Exs. 912-a – 912-k.

[6] Def. Ex. 969. During a phone call on May 13, 2016, they said:
    Stein: You know, at least uh, I'm uh, not uh, like our Commander, you know."

For example, on October 5, 2016, after Mr. Stein first met with the UCEs, the group had a meeting in Sublette. After the meeting, Mr. Stein and Mr. Day stayed behind and spoke outside, which was recorded on a body wire worn by Mr. Day.[7] During this conversation they again discussed how Mr. Allen wouldn't "get anything done" because he was "too cautious."[8]

After Mr. Day received a FBI phone to record his calls, the phone records show he had more than one call per day with Mr. Stein for 54 days; he had only six calls total with Mr. Allen.[9]

Mr. Stein was the only one who met with the FBI UCEs, which he did three times; Mr. Allen refused to do so. Mr. Stein was the only one to communicate with the UCEs by messaging; Mr. Allen had none.

Mr. Allen was largely insignificant to this plot moving forward, which was demonstrated when he was arrested on October 11, 2016. Had Mr. Allen been the critical piece to the plot moving forward, his incapacitation by arrest would have stalled the plot from proceeding. It did not. Rather, Mr. Stein was undeterred and declared immediately that he and Mr. Day would charge forward.

---

CHS:  Yeah. (chuckles) Yeah.
Stein: Sit on your fuckin' nuts and type, type big, but do nothin'.

[7] Clips of this recording were admitted into evidence as Gov. Ex. 129.

[8] Def. Ex. 970.

[9] *See* Def. Ex. 952. This summary table shows that between August 21, 2016 and October 13, 2016 (54 days) there were 62 calls with Mr. Stein, 6 calls with Mr. Allen, and 3 calls with Mr. Wright.

On October 12 – the day after Mr. Allen was arrested – Mr. Stein met with the UCEs. The UCE ("Brian") asked Mr. Stein regarding Mr. Allen:[10]

> UCE 5276:   So he's out of the picture then?
> Stein:        Well, yeah. Uh, …

UCE "Brian" also testified that even though Mr. Allen was "out of the picture," Mr. Stein was still determined to go forward.

On a phone call later that day, Mr. Stein recounted his meeting with the UCE to Mr. Day. Regarding Mr. Allen being under arrest, Mr. Stein told Mr. Day, "I told him, you and I, we're going to continue … not to let this, I guess, slow anything down."[11]

The comparison between co-defendants, tried together, and convicted of the same charges, presents the Court with the best vantage point to decide their individual culpability compared to each other. Likewise, because they were tried together and will be sentenced together, the Court has ample evidence before it to compare Mr. Allen with Mr. Stein.[12] The evidence is overwhelming that Mr. Allen is less culpable than Mr. Stein and he deserves less punishment.

---

[10] Gov. Ex. 21-l.

[11] Def. Ex. 971.

[12] *See, e.g., United States v. Rodriguez-Lopez*, 276 Fed.Appx. 802, 809 n. 4 (10th Cir. 2008) ("It is permissible for a district court to consider unwarranted disparities between co-defendants. … However, we have little information about the other couriers to whom Rodriguez-Lopez compares himself. He concedes that only two of them were sentenced prior to his sentencing.").

## II.   Mr. Allen is a military veteran who served his country with honor and distinction.

### A.   Mr. Allen honorably served as a United States Marine.

On August 7, 1984, at 17, Mr. Allen signed an enlistment contract to join the United States Marine Corps as part of the delayed entry program.[13] His parents, Jamie and Fred Allen, had to sign his enlistment contract because Mr. Allen was not yet of age to legally joined the military:



Notably, when Mr. Allen enlisted in the Marines, he had to report his medical history.[14] He stated he had no memory loss.

Mr. Allen graduated from Ashland High School in Ashland, Kansas on May 19, 1985.[15] Less than two months later, he left Kansas for San Diego, California.[16] He arrived at the Marine Corps Recruiting Depot on July 30, 1985 – seven days after his 18th birthday. For the next 12 weeks, he received instruction on military history and customs, endured rigorous physical training, learned firearms and

---

[13] Def. Ex. 959-a.

[14] Def. Ex. 959-b.

[15] Def. Ex. 966-a.

[16] Def. Ex. 959-d.

combat survival skills, and passed the grueling 54-hour field event known as the "Crucible." After he persevered through all of that instruction and challenges, Mr. Allen earned the title of United States Marine.

In the Marines, Mr. Allen served as a ground surveillance, sensor operator. On July 29, 1988, he was awarded the Good Conduct Medal because he had no disciplinary marks his first three years in the Marines.[17] He also earned the Navy and Marine Corps Sea Service Deployment Ribbon; a service award given after either: 90 consecutive days at sea or two periods of at least 80 days within a 12-month period.

He achieved the rank of Corporal (E-4), his highest rank in the Marines, on February 1, 1989.[18] Mr. Allen served in the Marine Corps from July 30, 1985 until he received an Honorable discharge on July 29, 1989.[19]

## B. After a gap in service, Mr. Allen enlisted in the Army National Guard.

After being out of military service for almost six years, Mr. Allen signed a contract on July 20, 1995, to reenlist with the U.S. Army National Guard (ARNG) for three years.[20] Because he left the Marines as a Corporal (E-4), he entered the ARNG at the same paygrade as an E-4. He trained and served with the ARNG for

---

[17] Def. Ex. 959-c.

[18] Def. Ex. 959-e.

[19] Def. Ex. 959-f.

[20] Def. Ex. 960-a.

three years, was promoted twice, to reach his highest enlisted rank as a Staff Sergeant (E-6).[21]

### C.    Mr. Allen earned a commission and served as an Officer in the U.S. Army National Guard.

Staff Sergeant Allen proved his value to the ARNG and moved up the ranks. On June 14, 1998, he began Officer Candidate School (OCS).[22] His term of enlisted service having expired, Staff Sergeant Allen received an Honorable Discharge on August 28, 1998.[23]

The next day, on August 29, 1998, Mr. Allen graduated from OCS.[24] He was in Salina, Kansas and signed the "Oath of Office" to become an Officer in the ARNG.[25] He became a Second Lieutenant (O-1), assigned to the branch of Field Artillery as a Fire Direction Officer.[26]

Second Lieutenant Allen attended the U.S. Army Field Artillery School at Fort Sill, Oklahoma from May 24, 1999 to October 14, 1999.[27] There he became qualified as a Platoon Leader, Fire Direction Officer, and Company Fire Support

---

[21] Def. Ex. 960-i at 2.

[22] Def. Ex. 960-f at 1.

[23] Def. Ex. 960-i at 1.

[24] Def. Ex. 960-b.

[25] Def. Ex. 960-c.

[26] Def. Ex. 960-d.

[27] Def. Ex. 960-e.

Officer. The jurors met the Commander for this course – Colonel John Haithcock, U.S. Army (Retired). Colonel Haithcock testified that he forgot Mr. Allen from the course held almost 20 years ago, which meant to him that Mr. Allen was not a disciplinary problem during his five months at Field Artillery School.

After September 11, 2001, newly-promoted First Lieutenant (O-2) Allen had the occasion to put his training into action. He was mobilized to duty and served as the Officer in Charge of the Airport Security detachments of Garden City and Dodge City, Kansas.[28] In this mission, he supervised 12 soldiers at three airports and the flying public. He also served as a liaison between airport managers, local law enforcement, and ARNG soldiers. His Senior Rater commended his maturity and performance, while also noting that First Lieutenant Allen needed to complete his courses at community college to receive his bachelor's degree – a requirement to promote to Captain (O-3).[29]

In January 2002, Lieutenant Allen was awarded the Army Commendation Medal for his performance as the Officer in Charge of the Airport Security detachment. In the recommendation for the award,[30] his Commander wrote:

---

[28] Def. Ex. 960-f at 9-10.

[29] *Id*. at 10.

[30] Def. Ex. 960-g at 1.

> LT Allen answered the call of the President and the Governor to protect the property and lives of the citizens of Kansas and helped rebuild the public confidence in air travel.  He supervised 12 soldiers in three airports that covered a large portion of Southwest  Kansas. No Accidents or major incidents occurred during his tenure as OIC.

Following the mission in Southwest Kansas, First Lieutenant Allen was responsible for mobilizing, validating, and deploying his platoon to support Operation Enduring Freedom. In 2002, his platoon deployed to Wurzburg, Germany, where he served as a platoon leader in an infantry company and was responsible for the care, welfare, and readiness of his soldiers.[31]

Following his return from Germany, First Lieutenant Allen was again mobilized with his platoon – this time to Fort Riley, Kansas for a force protection mission under Operation Noble Eagle. Lieutenant Allen and his platoon were at Fort Riley for almost a year. His Battalion Commander's evaluation of his performance noted that he had "excellent leadership potential that has not been fully realized" and "excellent technical and tactical knowledge."[32] The Commander also noted that he "must complete his bachelor degree before being considered for promotion."[33]

After the mission in Fort Riley in late 2003, First Lieutenant Allen had served in the military for 19 years, with more than a five-year gap in service after

---

[31] Def. Ex. 960-f at 11-12.

[32] *Id*. at 13-14.

[33] *Id*. at 14.

the Marine Corps. He had 12 years of credited service for military retirement purposes, with 8 remaining to be eligible for retirement.[34] His military record showed that he was an exceptional officer when it came to technical knowledge and tactics, military customs and courtesies, and mission capability. However, for several reporting cycles it was noted that he needed to develop as a leader to "think several moves ahead and anticipate potential problems." He also needed to earn his bachelor's degree in order to promote to Captain. Without the degree and promotion, Army regulations regarding high-year tenure would not permit him to remain as a First Lieutenant to continue in service and potentially reach retirement eligibility as an officer.

But in 2003, America was at war, and despite not yet being promotion eligible, First Lieutenant Allen answered the call of service again. This deployment was to the warzone, as part of Operation Iraqi Freedom. Iraq would change the trajectory not only of his military career, but his entire life.

## III.   First Lieutenant Allen answered the call to war and served in combat in Iraq.

A soldier's experience in a combat zone depends largely on the time and place in which they serve. First Lieutenant Allen served in Iraq from December 11, 2004 to on or about November 27, 2005[35] – some of the bloodiest time of the conflict. As one American journalist later described the stability of Iraq around that time, "[t]he

---

[34] Def. Ex. 960-j.

[35] Def. Ex. 960-i at 6; Def. Ex. 960-j.

disintegration of the country had been underway for a long time; in a sense it had begun years before the Americans crossed the Kuwaiti border in March 2003. But by 2006 it was happening with alarming speed, and with all the signs of being irreversible."[36]

Lieutenant Allen spent the first six months in Iraq at Camp Anaconda at Balad Air Base, which was north of Baghdad and south of the city of Tikrit. This is the area of the country where, "[b]y late 2005, the war was settling into the area in and around Baghdad."[37] Balad is located in the middle of the "hot, dusty towns of the Tigris-River Valley north of Baghdad, an area that was never welcoming for reporters and that grew increasingly difficult for civilian or military travel in the fall of 2003 and after."[38] Balad Air Base was located here:



---

[36] George Packer, THE ASSASSINS' GATE: AMERICA IN IRAQ 458 (2006).

[37] Thomas E. Ricks, FIASCO: THE AMERICAN MILITARY ADVENTURE IN IRAQ 426 (2007).

[38] *Id.* at 233.

Camp Anaconda was located in the middle of the "Sunni Triangle," the area in the heart of the country that was later described as "the triangle of death,"[39] shown here:



At Camp Anaconda, Lieutenant Allen found himself in the middle of the storm. Camp Anaconda was also known as "Rocket City," or "the most attacked base in the country."[40] Mortar attacks happened frequently, where incoming rounds were heard only for a split-second before they would explode on the ground.

Lieutenant Allen spent the first six months on daily patrols "outside the wire." His primary mission was to deliver parts and maintain radar equipment as a reconnaissance officer throughout northern Iraq. Events occurred that he would

---

[39] Packer, at 327.

[40] http://www.military.com/video/operations-and-strategy/iraqi-war/mortar-attack-on-camp-anaconda/660489651001.

later described to the VA as the cause of his sleepless nights: images of rocket attacks, explosions, and death.

After six months, Lieutenant Allen transferred to Camp Victory in Baghdad to serve as the Division Liaison Officer for Task Force Liberty to Multi-National Corps-Iraq. This job merited the review of his senior officers in his Officer Evaluation Report (OER) during his time in Iraq.

During the trial, the jury heard from Major Phillip Rumley, U.S. Army National Guard (Retired), who traveled from Poughkeepsie, New York to Wichita to testify as a witness. Major Rumley served with Lieutenant Allen in Iraq and was his Rater on his OER. Regarding Lieutenant Allen, Major Rumley noted that "[a]mong his notable accomplishments was his responsibility to brief Task Force Liberty's daily Battle Update Assessment to the Corps Commander and his ability to effectively facilitate the flow of information and operational support across the boundaries with US and Coalition Forces Divisions."[41] After returning from Iraq, Task Force Liberty reported the following about the "battle updates" of the kind Lieutenant Allen participated in and assessed to the Corps Commander:[42]

---

[41] Def. Ex. 960-f at 18.

[42] https://www.slideshare.net/rgoldenb/the-42nd-infantry-division-and-task-force-liberty-in-iraq-2005




# Task Force Liberty
## Counterinsurgency Operations



- 279 terrorists killed
- 65 high value terrorists captured
- Nearly 2,000 detained
- More than 400 caches destroyed
- 1,770 joint Iraqi and US combat raids or cordon and searches
- More than 4,500 joint patrols
- Nearly half of all IED attacks discovered before detonation

In the OER, Major Rumley called Lieutenant Allen "a consummate professional with unlimited potential."[43] His Senior Rater, Colonel Mario Costagliola, said in the OER that, "[b]ecause 1LT Allen continually monitored Division current operations and future operations he was able to give Corps a detailed operating picture of TF Liberty."[44]

But the Army's reports only tell a small fraction of the story. Bullet points of accomplishments and statements of conduct cannot substitute for the life experience

---

[43] Def. Ex. 960-f at 18.

[44] *Id.*

of being on the ground in a war zone. The comforts of daily life in American do not travel with American soldiers to the theater of combat. As described by Staff Sergeant Parker Gyokeres about his living conditions at Tallil Air Base in southern Iraq:

> I know a number of you have been curious about what it's like over here, so we are going to take a small mental voyage. First off, we are going to prepare our living area. Go to your vacuum, open the canister, and pour it all over you, your bed, clothing, and your personal effects. Now roll in it until it's in your eyes, nose, ears, hair, and . . . well, you get the picture. You know it's just perfect when you slap your chest and cough from the dust cloud you kicked up. And, no, there is no escape, trust me. You just get used to it.

> O.K., pitch a tent in your driveway, and mark off an area inside it along one wall about six feet by eight (including your bed). Now pack everything you need to live for four months—without Wal-Mart—and move in. Tear down the three walls of your tent seen from the street and you have about as much privacy as I have.[45]

Lieutenant Allen served and performed exceptionally in Iraq. Like many other Americans though, he returned from Iraq bearing unseen scars of his experience. The time at war changed his course, from a productive, progressing military officer, to the man who awaits sentencing before this Court.

## IV.   Mr. Allen returned from Iraq a changed man, bearing the unseen scars of war.

Following Iraq, Lieutenant Allen did not have to attend annual training or drills with his ARNG unit in Kansas until September 2006.[46] He completed a

---

[45] *Soldiers' Stories: Dispatches from Iraq*, THE NEW YORKER (June 12, 2006).

[46] Def. Ex. 960-f at 20.

required "reintegration training" from the Army.[47] In August 2006, his Commander

and Senior Rater gave him the "Best Qualified" promotion potential – the highest

mark on an Army OER[48] – and wrote:

> c. COMMENT ON PERFORMANCE/POTENTIAL
> 1LT Allen is a valuable asset to the Battalion.  He is an enthusiastic officer with a
> "can do" attitude.  After returning from a deployement, 1LT Allen became proactive in
> assisting ETAB in reconstituting and getting involved with the Battalion.  1LT Allen
> has unlimited potential and will become an invaluable asset to the Kansas Army
> National Guard.

But his military career soon fell apart. By the following year, in 2007,

Lieutenant Allen was "on profile" and unable to complete the Army Physical Fitness

Test.[49] He could not perform drills with his unit "due to medical conditions."[50] He

was declared "AWOL," or absent without leave. He "missed all drills from April

2007 to August 2007."[51]

Mr. Allen was selected for promotion to Captain (O-3) in February 2006,

condition upon him receiving his bachelor's degree.[52] He was extended to November

10, 2007, to complete his degree.[53] He never did, so he was not eligible for

---

[47] *Id.*

[48] *Id.*

[49] *Id.* at 22.

[50] *Id.*

[51] *Id.*

[52] Def. Ex. 960-h.

[53] *Id.*

promotion. Mr. Allen's downward spiral in his military career culminated with the ARNG separating Lieutenant Allen from military service on December 8, 2008.[54]

There is no OER in Lieutenant Allen's service record after the reporting period that ended in August 2007, so it is unknown why the ARNG waited until December 2008 to separate him from service if he had been AWOL, as they claimed, for more than a year. Although the basis for separation was "absence without leave for 3 months,"[55] the characterization of discharge was Honorable.[56] Notably, the separation occurred "without personal notice" to Mr. Allen, but the separation form was mailed to his last known address. The form said, "Soldier not available for signature."[57]

At the time of his separation, Mr. Allen had over 21 years of service for military pay, but 15 years and 7 days of credible service for retired pay.[58] Mr. Allen fell several years short of the 20 years required to earn a full military retirement.

In 2007 – the same time the ARNG declared Mr. Allen to be "AWOL" – Mr. Allen walked into the outpatient clinic at the Robert J. Dole Veterans' Affairs Medical Center in Wichita for a mental health evaluation. He went to the VA mental health clinic for depression and anxiety. The progress note from the Clinical

---

[54] Def. Ex. 960-i at 7.

[55] National Guard Regulation 635-100, ¶ 5.a(4).

[56] Def. Ex. 960-i at 7.

[57] *Id.*

[58] Def. Ex. 960-j.

Social Worker who did the evaluation on July 27, 2007 paints the picture of a man struggling to cope with life after war.[59] The provider noted that Mr. Allen was very depressed and "cannot seem to control the worry of his failing life":

```
anxiety.  Pt. says that he is very depressed and cannot seem to control the
worry of his failing life.  Pt. says that he has received little to no help from
the VA in regards to his military injuries and social needs.  Pt. says that he
```

The provider further noted that Mr. Allen said that since returning from Iraq "his whole life is failing now, and he cannot seem to do anything to stop it."

```
ex-girlfriend due to "her stalking him".  Pt. says that his whole life is
failing now, and he cannot seem to do anything to stop it.  Pt. says that since
```

Mr. Allen had significant, daily sleep disruptions:

```
Pt. states that he has significant sleep disruptions everyday.
```

The provider noted that Mr. Allen was experiencing "excessive anxiety and worry every day in which he finds it impossible to control the anxiety and worry." This worry "causes him to feel restless, keyed up, and on edge almost every minute of every day."

```
finds it impossible to control the anxiety and worry.  Pt. states that this
worry causes him to feel restless, keyed up, and on edge almost every minute of
every day.  Pt. says presented an irritable and angry presentation throughout
```

---

[59] Def. Ex. 961-b at 3-4.

Mr. Allen was a patient of the VA, off and on, from 2006 until his arrest by Liberal police in October 2016. His medical records with the VA show that the mental health symptoms and distress that led him to the clinic in July 2007 were never resolved. In one revealing intake interview at the VA's Post-Traumatic Stress Disorder clinic on November 26, 2007, Mr. Allen described to the provider what he experienced in Iraq:[60]

```
Mr. Allen reported experiences while in combat which were traumatic.  Some of
the major traumatic experiences he had while in the military were:  He
dismounted from his Humvee and a round hit the vehicle next to his head.  He
also observed a number of dead people.  He stated that a car-bomb hit a wall
near them and blew up, and he observed a large pail of water with a man's face
floating in it.  He also indicated that on an occasion when he was standing on a
runway, a rocket hit nearby, and the force of the blast knocked him down.
```

In this evaluation at the VA, like many to follow, Mr. Allen complained of sleep disturbances, mood problems, depression, and concentration and memory problems. He stated the duration of his symptoms started "since return from Iraq a year ago." In 2007, he was diagnosed with recurrent major depressive disorder.[61]

In October 2010, the VA diagnosed Mr. Allen as suffering from post-traumatic stress disorder (PTSD) due to the trauma exposure in Iraq.[62] The VA had

---

[60] Def. Ex. 961-c at 2.

[61] Def. Ex. 961-b at 9.

[62] Def. Ex. 961-d at 4.

previously denied a claim for PTSD in 2008. He did not begin to receive a 50%

disability for PTSD from the VA until February 2014.[63]

   When he joined the Marines in 1985, Mr. Allen reported he had no memory

issues. But after Iraq, Mr. Allen had persistent memory loss. He often complained

about it to the VA. During a visit to the VA on May 5, 2011, Lula Harris (then

Haubenstein) accompanied Mr. Allen to his appointment and corroborated his

symptoms. She told the VA provider:[64]

```
Ms. Haubenstein completed an ADL checklist indicating the veteran could perform
all activities with verbal reminders alone. He "always" had problems with sleep,
including nightmare, restless motor activity, and apnea. He always denied
problems and was easily upset. He typically woke up moody and confused, as if
not fully awake and aware. He "usually" forgot the date, misplaced items, forgot
to pay bills or eat, forgot conversations or information he read. He
"sometimes" got lost driving, forgot to turn things off, forgot to bathe, forgot
major events, misunderstood comments, was unable to initiate conversation or
respond to questions, or made little sense. He sometimes was physically violent,
showed poor judgment, was very suspicious, or had trouble taking medications.
```

   But in that same appointment with the VA, Mr. Allen also began to express a

bias towards Muslims. He told the provider that he was "disappointed in the US

and his military experience."[65] He also claimed, "Muslim physicians at the VA had

attempted to give veterans copies of the Koran."[66]

---

[63] Def. Ex. 961-a.

[64] Def. Ex. 961-e at 3.

[65] *Id.* at 5.

[66] *Id.*

In the immediate aftermath of September 11, 2001, Mr. Allen was trusted to, in the words of the award recommendation for the Army Commendation Medal: "answer[ed] the call of the President and the Government to protect the property and lives of the citizens of the State of Kansas." While in Iraq, he was trusted to brief the Corps Commander on the "battle update assessment" and facilitate information flow between US and coalition forces. After Iraq, he spiraled downward with little sense of himself.

## V.    Trauma and moral injuries suffered in Iraq contributed to the bravado of Mr. Allen's statements recorded by a paid FBI informant and his conspiratorial conduct.

Mr. Allen underwent a psychological evaluation by Dr. Ernest Boswell, Ph.D., for this case. The first evaluation occurred in March 2017;[67]  the second occurred in May 2018, after the trial.[68]

### A.    Mr. Allen's recitation to Dr. Boswell in 2017 of the traumatic experiences from Iraq corroborate what he told the VA in 2007.

Mr. Allen now suffers from memory problems. However, during his evaluation at Sedgwick County Jail on May 15, 2017, Mr. Allen recounted to Dr. Boswell his military history that aligned with his military service records and his initial mental health evaluations at the VA that occurred ten years prior in 2007.

For example, his description to Dr. Boswell what he experienced in Iraq was the same as what he told the VA: vehicle explosions, rocket attacks, and seeing

---

[67] *See* Def. Ex. 962-a (Dr. Boswell's Psychological Report of May 15, 2017).

[68] *See* Def. Ex. 962-b (Dr. Boswell's Addendum Report of August 27, 2018).

what appeared to be a human face in a bucket of water after an explosion.[69] But he also revealed details where he saw Iraqi children injured and killed after an IED explosion. At that point in the evaluation, Dr. Boswell observed that Mr. Allen "became tearful and stopped the interview for a brief period of time." Dr. Boswell found "the expressed affect was spontaneous, fluid and authentic."[70]

### B. Dr. Boswell concurred with the VA that Mr. Allen suffers from post-traumatic stress disorder (PTSD).

Dr. Boswell diagnosed Mr. Allen as suffering from PTSD. He made this diagnosis after his first evaluation in 2017,[71] and again in 2018.[72] We wanted to confirm this diagnosis, since the VA did not approve disability compensation to Mr. Allen until 2014.[73] As Dr. Boswell also explained, the delay in this diagnosis by the VA may be explained because the criterion for this diagnosis changed in 2013.[74]

---

[69] Compare Def. Ex. 961-c at 2 and Def. Ex. 962-a at 7-8.

[70] Def. Ex. 962-a at 8.

[71] Def. Ex. 962-a at 19-20.

[72] Def. Ex. 962-b at 4.

[73] The government noted in a letter responding to defendant's PSR objections that "the documentation is far from clear about whether the defendant is presently suffering from PTSD," inferring that Mr. Allen may have been cured of this disorder after the VA granted the disability in 2014.

[74] Def. Ex. 962-a at 20. This issue was also explained in the PSR at ¶ 106. Also, the government noted in a letter responding to defendant's PSR objections that Mr. Allen "denied the intense fear/horror/helplessness, which are typically required for a PTSD diagnosis." The government's statement is incorrect. This is the criterion that Dr. Boswell explained was deleted in 2013.

More important here, Dr. Boswell explained the impact of PTSD on this case. He found that, "[o]ver time, the symptoms of PTSD gradually, but steadily eroded his ability to function. As his limited coping failed, he became more withdrawn and hostile. … In an effort to protect himself, Mr. Allen projected an image of invincibility to those around him."[75]

Here, the jury heard hundreds of clips of recorded conversations between Mr. Allen and the co-defendants, recorded by a paid FBI informant. The image and profile described by Dr. Boswell is completely consistent with the bravado Mr. Allen exuded in these recordings. Notably, Dr. Boswell never listened to a single audio recording from the evidence so he was unaware of the content of the Mr. Allen's statements to the FBI paid informant when he conducted his evaluation.

### C. From combat, Mr. Allen suffers from "moral injury" that he dealt with by denial and projection onto others.

Dr. Boswell defined "moral injury" as "a psychological construct to explain how exposure to trauma can alter the moral compass of an individual."[76] He explains how one prominent psychologist argues that the trauma from moral injury "can change the underlying character of the individual."[77] This insight is particularly accurate to Mr. Allen.

---

[75] *Id.* at 24.

[76] *Id.* at 25.

[77] *Id.*

As demonstrated by the military history and records, Mr. Allen's military career and personal life changed when he returned from Iraq. He was not the same officer and person as he was before he deployed. Dr. Boswell explained, "Mr. Allen has attempted to deal with his PTSD and moral injury via denial and projection. He denies that he was impacted by combat trauma and projects his own negative feelings and views on others."[78]

McKay Selph was Mr. Allen's former employer at Alder security systems where Mr. Allen worked after he moved to Liberal. He worked for Alder until 2016. Mr. Selph would frequently travel with Mr. Allen and be on the road selling alarm systems. Mr. Selph describes how, "probably 2 dozen times where we would be sleeping in the same room and he would be yelling and cussing at enemies in his sleep. … I also remember a handful of times that he would be weeping and crying and wake himself up from that as well. I know that he saw things that have affected his mind."[79]

Again, this helps explain why Mr. Allen felt an urgency to defend himself against persons he deemed as a threat, however misguided his subjective beliefs may have been. Mr. Allen was in denial about the depths of his own disorder and instead blamed his negative feelings on a class of persons, Muslims and refugees, who he viewed as outsiders and threats to his community.

---

[78] *Id.*

[79] Def. Ex. 967-c.

>    **D.    Mr. Allen carried home from war that Muslims were the "enemy" and this misguided belief was exacerbated by his news consumption.**

The culmination of PTSD and combat-induced moral injury have a direct correlation to the crimes. The most salient findings of Dr. Boswell's report are that "the combination of underlying paranoia and military service in Iraq interacted to form the basis of obsessive preoccupation with individuals of middle eastern descent and those of Muslim faith."[80] Dr. Boswell also concluded:

> descent and those of Muslim faith. Mr. Allen was angry over the enemy's use of IED's to wound and kill American personnel as well as civilians, including children. His interaction with Iraqi's also reinforced his belief that middle eastern people had little care or concern about their own race. His distorted beliefs and views were magnified to by the increased news coverage of the war in Iraq and Afghanistan. Mr. Allen became obsessed with immigrants and ultimately came to believe immigrants of Muslin faith were a threat to him and the United States. His thinking was fragmented and clouded by perceived conspiracy.

This explains, in part, why in 2016 Mr. Allen was so paranoid about the threat he perceived Muslims in western Kansas posed to him and the United States. In Iraq, Muslims were the enemy, who used improvised explosive devices to kill Americans, civilians, and children. After he returned from combat, he projected his view of the enemy onto all persons of the Muslim faith.

After he returned home from the war, his negative and hostile view of Muslims was magnified by his consumption of the news. In other words, he reinforced his view of Muslims as the enemy by the news he watched or read on

---

[80] Def. Ex. 962-a at 26.

social media. This was greatly exacerbated in 2016 due to the political climate and his unwitting exposure to a social media propaganda operation by Russians. We ask the Court also consider a lesser sentence to account because Mr. Allen's "distorted beliefs and views" were formed due to psychological injuries he suffered while serving his country at war.

### E.      Mr. Allen needs mental health treatment.

Dr. Boswell opined, "incarceration alone will not effectively bring about positive mental health changes in Mr. Allen."[81] In both reports, Dr. Boswell described treatment recommendations that included individual counseling, group therapy, cognitive behavioral therapy, and medication.

The Bureau of Prisons is not capable of providing Mr. Allen the treatment he needs to cope with the psychological injuries he suffered during his time at war.[82] And the Court may consider to the extent to which Mr. Allen's combat-induced PTSD and moral injury led him to paranoia and distorted beliefs of a perceived threat posed by Muslims that led him to commit these crimes.[83] The experience and the punishment he will receive will also have a significant impact on Mr. Allen.

---

[81] *Id.* at 27.

[82] Office of the Inspector General, U.S. Department of Justice, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* at ii (July 2017) ("Mental health staff do not always document inmates' mental disorders, leaving the BOP unable to accurately determine the number of inmates with mental illness and ensure that it is providing appropriate care to them.").

[83] *DeRusse*, 859 F.3d at 1238 ("While the court was indeed concerned that Defendant would continue to receive the mental health treatment he required, the court's primary consideration was the extent to which Defendant's mental illnesses led to the delusional thinking that caused him to commit such an out-of-character

In imposing a sentence, the Court must also consider the need for the sentence imposed to provide Mr. Allen with needed "medical care, or other correctional treatment in the most effective manner."[84] We will ask the Court to consider treatment opportunities outside of prison as part of a condition of supervised release to ensure Mr. Allen is given the best chance to rejoin the community in a healthy and productive manner.

## VI. Mr. Allen's misguided patriotism was inflamed by the rhetoric of the 2016 political climate and the influence of the Russian information warfare campaign against the American people.

### A. Mr. Allen's individual characteristics made him vulnerable to being incensed by Russian propaganda.

Dr. Boswell's evaluation concluded that Mr. Allen's "distorted beliefs" about Muslims were borne from his experience in Iraq and that they were exacerbated by his news consumption.[85] Prior to 2016, Mr. Allen already had a paranoiac sense of the threat that he believed Muslims posed to the country, and western Kansas. Mr. Allen's perceived himself as a patriot who needed to protect his community.

The conspiracies took place during a time of a charged political climate in the United States leading to the 2016 Presidential election. This climate intensified Mr. Allen's beliefs and opinions. His views were also heavily influenced by his social media consumption, Facebook in particular.

---

crime. … We see no error, much less clear error, in the district court's evaluation of the role Defendant's mental illness played in the offense… .").

[84] 18 U.S.C. § 3553(a)(2)(D).

[85] Def. Ex. 962-a at 26.

Since the jury reached a verdict, we have learned more about what was also

happening on Facebook in 2016 – Russian operatives waged a cyber, information

warfare campaign that specifically targeted Americans who were individually

vulnerable to incitement on political themes and issues of consequence to this case.

After the jury reached its verdict, the *Kansas City Star* specifically reported that

Russian Facebook propaganda may have inspired Mr. Allen in these crimes,[86] and

other media outlets reported how Russians fake Facebook campaign lured real

Americans to take action.[87] We have definitive proof that the Russians' false

propaganda invaded Mr. Allen's Facebook account.

Also, in May 2018, the Center for the Study of Hate & Extremism at

California State University, San Bernardino, published an academic study[88] that

looked at the rise of hate crimes in the United States in the last few years. It

described how "Russian operatives were engaged in a massive plot to divide people

across intergroup and political lines via social media."[89]

The California State University study reviewed crime statistics, and

considered the Russian operatives' conduct as a factor in the rise of hate crimes. It

---

[86] Judy Thomas, *Russian Facebook posts may have inspired militia in Kansas bombing plot, expert says*, KANSAS CITY STAR (June 10, 2018).

[87] Kate Conger and Charlie Savage, *How Fake Influence Campaigns on Facebook Lured Real People*, NY TIMES (Aug. 2, 2018).

[88] Def. Ex. 964. *Report to the Nation: Hate Crimes Rise in U.S. Cities and Counties in Time of Division & Foreign Interference*, Center for the Study of Hate & Extremism, California State University, San Bernardino (May 2018).

[89] *Id.* at 3.

stated that, "[w]hile we cannot determine what direct quantitative impact, if any, these had, it is noteworthy that hate crimes not only generally rose, but also showed spikes against various groups referenced in these ads during certain periods of increased Russian Facebook ad purchases."[90] These "various groups" were the same groups targeted in the conspiracies, and the civil rights conspiracy (Count 2) in particular.

### B.   Russian propaganda was found on Mr. Allen's Facebook account.

We know for certain that the three defendants were exposed to, "liked," and shared on Facebook ads and information disseminated by the Russians in 2016. We also know that Facebook was an instrumental communication tool used by the Kansas Security Forces militia.

On February 16, 2018, U.S. Department of Justice Special Counsel Robert S. Mueller, III, filed a grand jury indictment in the U.S. District Court for the District of Columbia charging thirteen Russian nationals and three Russian companies with several crimes, including a conspiracy to defraud the United States.[91] The indictment describes in detail how Russian operatives posed as U.S. persons, created false U.S. personas, and operated social media pages and groups that were

---

[90] *Id.* at 16.

[91] Def. Ex. 963 (*United States v. Internet Research Agency LLC, et. al.*, No. 18-cr-00032-DLF ("IRA indictment") (Doc. 1) (Dist. D.C. filed Feb. 16, 2018)).

designed to attract U.S. audiences.[92] Their goal was to "sow political discord in the U.S. political system."[93]

Besides the criminal case filed by the Department of Justice, the U.S. Congress also conducted an extensive investigation about the Russian operatives' activities. On May 10, 2018, the U.S. House of Representatives, Permanent Select Committee on Intelligence released[94] to the public thousands of Facebook advertisements created and purchased by the Russian operatives.[95] These advertisements presented messages, themes, and relevant events.

For example, on October 19, 2015, or less than two weeks after the FBI officially made Dan Day a Confidential Human Source to infiltrate militia groups in western Kansas, and four months before he met any of the defendants, the Russians created an anti-Hillary Clinton, pro-Second Amendment advertisement with its

---

[92] *Id.* at ¶ 4.

[93] *Id.* at ¶ 6.

[94] Press Release, Rep. Adam Schiff (D-CA), *Schiff Statement of Release of Facebook Advertisements* (May 10, 2018), *available at* https://democrats-intelligence.house.gov/news/documentsingle.aspx?DocumentID=379 (last visited Oct. 25, 2018).

[95] These ads can be viewed and downloaded at the following web address: *Exploring Russia's Effort to Sow Discord Online: The Internet Research Agency and Advertisements*, *available at* https://democrats-intelligence.house.gov/social-media-content/ (last visited Oct. 25, 2018).

Facebook group "Being Patriotic."[96] This advertisement was published on the Facebook "News Feed" for U.S. desktop computers and mobile devices.[97]

As another example, on June 6, 2016, or eight days before the government alleged the conspiracy began with the meeting at Brody Benson's farm,[98] the Russian operatives created an anti-Muslim advertisement[99] from its Facebook account "Stop A.I"[100] which was published on "News Feed" on U.S. desktop and mobile devices. Later that same month, on June 22, 2016, the Russian operatives used their Facebook group "Secured Borders"[101] to publish this advertisement on Facebook "News Feed" of U.S. desktop and mobile devices that presents an anti-immigrant message:[102]

---

[96] Def. Ex. 963 at ¶ 54.

[97] Def. Ex. 965-a. The House of Representatives, Permanent Select Committee on Intelligence release categorized the ads by quarter and month. This particular add can be found in the 2015, Quarter 4 link on the website, *supra*, note 94. It was marked as P(1)0002410 and P(1)0002411.

[98] On April 9, 2018, the Court granted the government's motion (D.E. 360) to amend the beginning date of the conspiracies from "approximately February 2016" to June 14, 2016. *See also* D.E. 89.

[99] Def. Ex. 965-b.

[100] Def. Ex. 963 at ¶ 47.a.

[101] Def. Ex. 963 at ¶¶ 34, 43.b.

[102] Def. Ex. 965-c.



Facebook has also acknowledged the Russian operatives used its website to engage in covert operations. On September 6, 2017, Facebook posted the results of its internal review into the activities of the Russian operatives. It concluded that between June of 2015 and May 2017, a time-period that includes the entire conspiracies, roughly 3,000 advertisements, connected to about 470 inauthentic accounts and pages, had been purchased in violation of Facebook policies.[103]

Again, many themes in the messaging, advertisements, and posts created and published by the Russian operatives were central to the underlying

---

[103] Alex Stamos, Chief Security Officer, An Update on Information Operations on Facebook (Sept. 6, 2017), *available at* https://newsroom.fb.com/news/2017/09/information-operations-update/ (last visited August 4, 2018).

motivations, speech, and state of mind of the defendants. Mr. Allen, Stein, and Wright unwittingly and unknowingly fell prey to the Russians' covert operation.

The government served two rounds of search warrants on Facebook to produce the content of the defendants' Facebook profiles and accounts.[104] The information returned by Facebook does not show what advertisements or News Feed stories were displayed or visible to the defendants or what advertisements or News Feed stories the defendants viewed, or read while logged into their Facebook accounts. Instead, we can see what the user did to interact with Facebook (share, like, post, etc.) and other users' direct interactions with the defendants (tagging them in posts, sharing their posts, posting on the defendants' timelines, etc.). But we cannot see all of the content that appeared through the account when the user logged on to Facebook.

The three defendants were Facebook "friends" with each other, and with the paid FBI informant, Mr. Day. On various occasions, all three defendants' Facebook accounts shared, liked, or posted content from groups determined by Special Counsel Mueller or the U.S. Congress as having been created by Russian operatives. Their accounts also show activity from other groups or sites that were known to share content from the Russian defendants, such as: America's Freedom

---

[104] D.E. 209-1, search warrant issued on November 22, 2016. The second search warrant (D.E. 218-1) was issued on January 17, 2018, after the defense motion to suppress exposed the legal defects of the first warrant application.

Fighters; Nation in Distress; The Voice of the People; Dean James III%; Cold Dead Hands; and Mad World News.[105]

Some examples:

- On February 16, 2016, Mr. Stein shared a photo[106] from the "Heart of Texas"[107] Facebook group;

- On March 15, 2016, Mr. Allen "liked" America's Freedom Fighters;[108]

- On October 5, 2016, Mr. Wright shared a photo "meme" on Facebook that was created by Facebook group "Being Patriotic."[109]:

---

[105] *See, e.g.*, Natalie Martinez, Media Matters for America, *Racist Russian propaganda is still going viral on conservative Facebook pages* (Apr. 19, 2018), *available at* https://www.mediamatters.org/blog/2018/04/19/racist-russian-propaganda-still-going-viral-conservative-facebook-pages/220001 (last visited Oct. 25, 2018).

[106] The Facebook account shows the following:

> **Time** 2016-02-16 13:05:58 UTC
> **Type** Shares
> **Summary** Patrick Stein shared Heart of Texas's photo.
> **Object Id** S:_I1246038255:10208873951906512

[107] Def. Ex. 963 at ¶ 34. The "Heart of Texas" was also identified by the House Permanent Select Committee on Intelligence as created by the Russian operatives surreptitiously and as if they were U.S. persons.

[108] The Facebook account shows the following:

> **Time** 2016-03-15 20:20:11 UTC
> **Type** Likes
> **Summary** Curtis Allen likes America's Freedom Fighters.
> **Object Id** S:_I100008098391565:1681702338776363:0

[109] Def. Ex. 963 at ¶ 54. The "Being Patriotic" group was also identified by the House Permanent Select Committee on Intelligence as having been created by the Russian operatives surreptitiously and as if they were U.S. persons.



Linked Media File: linked_media/status_updates_1252935294738258.jpg

**Posted** 2016-10-05 13:07:14 UTC
**Status**
**Mobile** false

- On October 9, 2016, Mr. Stein "liked"[110] the Facebook group "United Muslims of America."[111]

**C.  The unusual confluence of facts and circumstances created a perfect storm of events that led to this conviction but will never repeat.**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes

---

[110] The Facebook account shows the following:

**Time** 2016-10-09 02:13:56 UTC
**Type** Likes
**Summary** Patrick Stein likes United Muslims of America.
**Object Id** S:_I1246038255:10210943752370230:13

[111] Def. Ex. 963 at ¶¶ 34, 53. The "United Muslims of America" was a group the House Permanent Select Committee on Intelligence identified as having been created by the Russian operatives surreptitiously and as if they were U.S. persons.

38

magnify, the crime and the punishment to ensue."[112] That explains why prior to determining the appropriate sentence, the Court must consider "the nature and circumstances of the offense and the unique history and characteristics of the defendant."[113]

These facts present the Court with both unique circumstances of the offense and unique characteristics of Mr. Allen. He returned from Iraq and struggled to cope with the PTSD he suffers from after being at war. He carried distorted views from Iraq that Muslims were the enemy. As a distinguished military veteran, he had a misguided sense of patriotism that it was his duty to protect the community from what he perceived to be a threat.

These feelings and views spring from the underlying PTSD. It made him susceptible to the influence of the news and information on social media that he consumed. He was particularly vulnerable to the social media onslaught by Russian operatives that included in 2016 themes and messages that stoked the flames on issues related to this case. These crimes occurred during a time of high political intensity in 2016. In short, it was a perfect storm of facts and circumstances.

---

[112] *Koon v. United States*, 518 U.S. 81, 113 (1996); *see also United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38 (2007)).

[113] 18 U.S.C. § 3553(a)(1); *see also Gall*, 552 U.S. at 49–50 ("after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a). … He must make an individualized assessment based on the facts presented.").

Mr. Allen now knows of the confluence of the events that led to his conviction. This perfect storm is so unusual, it will not repeated. We ask the Court to consider it as a basis for a lesser sentence for Mr. Allen.

**VII.   Mr. Allen is a low risk to reoffend upon release due to his age and lack of criminal history.**

Mr. Allen is 51 years old. With a sentence of 10 years, he will be nearing 60 by the time he is released to supervision. He has no prior felony convictions. He should be in criminal history category I rather than the inflated CHC VI based on the terrorism enhancement.

In December 2017, the U.S. Sentencing Commission published a study that looked at the effects of aging on recidivism.[114] It concluded that age and criminal history make a significant difference about the risk a person poses to reoffend when released from prison.[115]

The study looked at the cases of 25,431 offenders.[116] It concluded that, "older offenders were substantially less likely than younger offenders to recidivate following release."[117] For offenders in criminal history category I, like Mr. Allen, "the rearrest rate ranged from 53.0 percent for offenders younger than 30 at the

---

[114] U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017) *available at* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (last visited Oct. 26, 2018).

[115] *Id.* at 3.

[116] *Id.* at 2.

[117] *Id.* at 3.

time of release to 11.3 percent for offenders age 60 or older.[118] If the Court gives the sentence we recommend, Mr. Allen will be nearing the age of 60 upon release.

Finally, for older persons who do reoffend upon release, the severity of their crimes are less serious. The study found that older offenders who recidivate do so less frequency and "had less serious recidivism offenses on average."[119]

## VIII.   Supervised Release

We ask the Court to consider a ten-year term of supervised release.[120] The Court must consider the needs for medical care when it determines a sentence.[121] Dr. Boswell recommends that Mr. Allen be provided a structured treatment plan for PTSD. Imposing a mental health treatment condition as a condition of supervised release is appropriate here.

BOP offers no "relevant training or rehabilitation programs" for terrorism related crimes.[122] For these offenses, there is a risk of further "radicalization" while in prison.[123] Outside of prison, Mr. Allen has rehabilitative potential and can succeed on supervised release.

---

[118] *Id.*

[119] *Id.* at 30.

[120] Mr. Allen is eligible for a supervised release term for life. 18 U.S.C. 3583(j); USSG § 5D1.2(b)(1).

[121] 18 U.S.C. § 3553(a)(2)(D).

[122] *United States v. Jumaev*, No. 12-CR-00033-JLK, 2018 WL 3490886, at *43 (D. Colo. July 18, 2018).

[123] *Id.* at *41 ("Prison systems throughout the world have been and continue to be breeding grounds for radicalism, recruiting grounds for extremist movements, and

First, the records from Sedgwick County jail show that he has had no disciplinary infractions since he was booked into that facility on October 17, 2016.[124] Mr. Allen also has family support. At the sentencing hearing, the Court will hear from Mr. Allen's twin brother, Kevin, who will describe his relationship with his brother and his willingness to support him upon his release.[125] Kevin Allen's wife, Ruth, also offers her support.[126] Mr. Allen has one daughter, Brittny,[127] who will be "eternally broken" if Mr. Allen is sentenced to life in prison.[128]

The Court can have confidence that when Mr. Allen reenters the community, he will do so with both the judicial supervision and resources to succeed.[129] Mr. Allen would be a sexagenarian for the majority of the time on supervision. He can comply with conditions, as he has demonstrated by his graduation from Marine

---

facilities for the planning and training of radical activities.") (internal citations omitted).

[124] We received the records by subpoena on August 13, 2018. We do not offer them as an exhibit to prove a negative, but instead represent that our review of the records show no disciplinary infractions.

[125] Def. Exs. 968-d, 968-e.

[126] Def. Ex. 967-b.

[127] Def. Exs. 968-a – 968-c.

[128] Def. Ex. 967-a.

[129] *Johnson v. United States*, 529 U.S. 694, 708–09 (2000) ("The congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty.").

Corps recruit training and ARNG's Officer Candidate School. He can succeed on supervision and being a positive and productive member of his community.

## IX.   Conclusion

The Court must determine the sentence that is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing set forth by Congress.[130] Mr. Allen presents a compelling case for a lesser sentence. We ask this Court to impose a sentence of 10 years imprisonment[131] for both counts of conviction, to be served concurrently, and for 10 years of supervised release.

Respectfully submitted,

s/ Melody Brannon
MELODY BRANNON, #17612
Federal Public Defender for the
District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Email: melody_brannon@fd.org

s/ Rich Federico
RICH FEDERICO, #22111
Assistant Federal Public Defender
Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Email:rich_federico@fd.org

---

[130] 18 U.S.C. §3553(a).

[131] This sentence will be afforded the presumption of reasonableness if the Court arrives at the sentencing range and guideline calculations we argue are appropriate. *See Rita v. United States*, 551 U.S. 338, 347 (2007).

## **CERTIFICATE OF SERVICE**

I certify that on October 29, 2018, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of this electronic filing to all interested parties.

s/ Melody Brannon
MELODY BRANNON, #17612

s/ Rich Federico
RICH FEDERICO, #22111