# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        *Plaintiff,*

vs.

        Case No. 16-10141-EFM

CURTIS WAYNE ALLEN, et al.,

        *Defendants.*

## MEMORANDUM AND ORDER

Defendants Curtis Allen, Gavin Wright, and Patrick Stein (collectively, "Defendants") were convicted by a jury of conspiracy to use a weapon of mass destruction, conspiracy to interfere with civil rights, and Wright was convicted on an additional count of obstruction of justice. Defendants filed a number of objections to the United States Probation Office's Second Amended Presentence Investigation Report ("PSR"). All three Defendants objected to the PSR's base offense level calculation, to the application of a terrorism enhancement, and to a special condition of post-release supervision. Allen and Stein objected to the application of a hate crime enhancement. Stein objected to an enhancement for being an organizer of the conspiracy. And Wright objected to an enhancement for obstruction of justice. Defendants also filed a motion to exclude the Government's submission of approximately 20 victim impact statement videos.

Finally, Allen filed a motion to strike a Reply brief filed by the Government, and Stein filed a motion to join Allen's request.

For the following reasons, Defendants' objections to the base offense level calculation are overruled. Allen and Stein's objections to the hate crime enhancement are overruled. Defendants' objections to the terrorism enhancement are overruled. Stein's objection to the organizer enhancement is sustained. Wright's objection to the obstruction of justice enhancement is overruled. Defendants' objections to the special conditions of supervision are sustained. Additionally, Defendants' Objection and Motion to Exclude "Victim" Impact Statements (Doc. 457.) is denied. Finally Defendant Curtis Wayne Allen's Motion to Strike Government's Reply (Doc. 475) is denied on the merits, and Stein's Motion to Join (Doc. 476) Allen's Motion is denied as moot.

## I.    Factual and Procedural Background

In October 2016, following an extensive investigation, the Federal Bureau of Investigation ("FBI") arrested Defendants for their involvement in a plot to detonate multiple explosives at an apartment complex ("Mary Street Apartments") in Garden City, Kansas. The FBI's investigation began in late 2015, with the assistance of an undercover informant, Dan Day. Day had been invited to participate in a militia, and while attending the militia's meetings became concerned with the direction of the group's plans. Day took those concerns to the local FBI office. The FBI instructed Day to continue meeting with the militia and to monitor what the FBI considered a possible threat to public safety. In February 2016, Day met Stein at one of the militia's meetings. Stein expressed strong anti-Muslim views to Day, referring to Somali-Muslims as "cockroaches" and to himself as the "exterminator." Eventually, Stein recruited Day into a separate militia, the Kansas Security Force ("KSF"), where Day was introduced to Allen and Wright. Over the next several months,

Defendants and other members of the KSF frequently discussed targeting members of the Somali-Muslim community with violence, including the residents of the Mary Street Apartments.

In June 2016, shortly after the mass shooting at the Pulse nightclub in Orlando, Florida, Stein initiated a KSF meeting. Prior to the meeting, Stein stated that following the nightclub shooting a "switch flipped" and he had gone into "organization mode" planning an attack against Muslims. Stein also expressed frustration at the government's response to the attack. Stein stated he was "sick and tired of seeing our own f*cking people get slaughtered by our own f*cking government" and that he was "more convinced than ever" that the government and law enforcement would do nothing to curtail Muslims from entering the United States, and that the group would need to take matters into their own hands. At the meeting—which Day captured for the FBI on an audio-recording device—Stein blamed the federal government for what he perceived to be the Muslim problem. Stein stated, "[t]he f*ckin' cockroaches in this country have got to go. Period. . . . They are the f*cking problem in this country right now. They are the threat that we have in the country right now. . . . They're bringing them in by the f*ckin' plane load every god damn day. That god d*mn n*gger in the f*ckin' White House is making sure of it."

The group held two more recruitment meetings with members of KSF in July 2016. Stein called these meetings together, Allen participated at both meetings, and Wright participated only in the second meeting. The purpose of these meetings was to determine which KSF members would be willing to participate in an attack against Muslims, and to brainstorm possible targets and methods of attack. Allen told the other members of KSF that the group was planning a preemptive strike to kill Muslims, and it was likely the participants would go to prison for life for their actions. None of the other KSF members ultimately decided to join Defendants.

Defendants and Day then began meeting at Wright's business, G&G Mobile Home Sales ("G&G"), in Liberal, Kansas. Over the course of several meetings, the group continued to brainstorm possible targets and methods of attack. In addition to targeting Somali-Muslims directly, the group considered targeting landlords who rented to Muslims, churches that were sympathetic to Somali-Muslims, and local government officials that the group blamed for bringing Muslims into the area. Eventually, the group decided to detonate multiple explosives at the Mary Street Apartments; to inflict maximum casualties, the group planned to detonate the bombs during the apartment's mosque's prayer time. Defendants also decided they would manufacture their own explosives at G&G, and each member of the conspiracy was charged with acquiring materials to be used for that purpose.

While the group continued to meet and plan, Allen suggested the group draft a manifesto explaining the group's reasons for the attack. Defendants discussed the contents of the manifesto on multiple occasions. Allen stated that the manifesto should "trigger [] like-minded people across the nation to f*cking stand up and start doing the same thing we're doing . . . [against] Muslims and [the] Government." Stein stated that the manifesto should warn the government to stop bringing Muslims into the country and to reinstate its national borders. Defendants discussed the most effective time and method of distributing the manifesto to reach the largest possible audience. Allen agreed to begin drafting the manifesto.

Now that Defendants had selected a target and were attempting to manufacture explosives, the FBI had Day introduce the group to an FBI undercover employee ("UCE"), who was posing as a black-market weapons dealer who could sell explosives to the group. Day introduced the idea to Defendants during a meeting at G&G on September 2, 2016. The group decided they would try

to acquire several materials from the UCE, including electronic blasting caps, C-4, and other smaller explosives.

About two weeks later, Wright and Allen informed the group that they had successfully manufactured and tested a small homemade explosive. The group considered canceling the meeting with the UCE and completing their plan to bomb the Mary Street Apartments with homemade explosives. Ultimately, the group decided to pursue both options. Stein and Day would meet with the UCE to determine the feasibility of acquiring explosives from the UCE, and Allen and Wright would continue to manufacture explosives at G&G. Stein and Day met with the UCE on September 25, and they were scheduled to meet again on October 12.

The day before Stein and Day's second meeting with the UCE, Allen's girlfriend, Lula Harris, reported Allen to the local police for domestic violence. Harris also informed the police that she had witnessed Allen and Wright manufacturing explosives at G&G. The police stopped and detained Allen and Wright as they were leaving G&G; Allen was taken into custody but Wright was released. The police then secured G&G in anticipation of executing a search warrant on the premises.

The following day, Wright went to the police station to find out why he had been denied access to his business. While there, Wright agreed to interview with agents from the FBI and the Kansas Bureau of Investigation. During this interview, Wright denied any knowledge that Allen was manufacturing explosives at G&G, or that any explosives were located at G&G. Wright also stated that he was not a member of any militia, that Allen had never invited Wright to a KSF meeting, and that Wright had provided the FBI with everything he knew about Allen.

That same day, Stein and Day met with the UCE as planned, and the parties agreed that Stein would provide the UCE with 300 pounds of fertilizer and cash, and in exchange the UCE

would construct an explosive for Defendants.  When Stein attempted to deliver the fertilizer to the UCE two days later, the FBI arrested him.

The FBI executed search warrants on G&G, Stein and Wright's home, Stein's vehicle, and two commercial storage units.  In addition to finding a variety of incriminating evidence, including materials and instructions for making explosives, the FBI found an unfinished draft of Defendants' manifesto at G&G.  Although each Defendant participated in discussing the manifesto's message, all evidence indicated that Allen composed this draft.  The unfinished manifesto was addressed to "the U.S. govt and [] the American people."  The manifesto stated that "with this document we are going to attempt a forced wake up call.  American people, you have to wake up while there still might be time to stop our govt from totally selling this country out."  The manifesto then listed a series of grievances against the government, including "not enforcing our borders" and "illegally bringing in Muslims by the thousands."  The document concluded by urging government officials and private citizens to act to save the country and warning that their families and businesses would be in danger if they continued to "sell out this country."

After a lengthy trial, a jury convicted all three Defendants of conspiracy to use a weapon of mass destruction and conspiracy to interfere with their intended victims' civil rights.  Wright was also convicted of obstruction of justice for lying to the FBI during his voluntary interview.  At this Court's instruction, the United States Probation Office prepared the PSR,[1] to which Defendants have filed a number of objections.  Additionally, the Government has submitted

_____

[1] The Probation Office filed its original PSR on October 26, 2018.  Without the Court's foreknowledge, the Probation Office then filed an Amended PSR on November 13, 2018.  This version, although supposedly containing no substantive changes, altered the PSR's paragraph numbers.  The Court informed the parties that the Court would use the original PSR at the hearing on the sentencing objections and ordered the Probation Office to submit a Second Amended PSR that returned the paragraph numbers to be consistent with the original PSR.  To clarify, all references to the "PSR" in this opinion refer to the Second Amended PSR.

approximately 20 short videos from residents of the Mary Street Apartments giving victim impact statements for the Court's consideration in sentencing, and Defendants have filed a Motion to exclude those videos.

On November 19, 2018, the Court conducted a hearing on Defendants' objections to the PSR and Motion to exclude the victim impact statements submitted by the Government. During argument on Defendants' objection to a terrorism enhancement, the Government cited caselaw not contained in any of their briefs. The Court ordered the Government to file their additional authorities with the Court, and provided Defendants a week to file responsive briefing. After the Government filed its authorities and Defendants filed their response, the Government filed a Reply brief with more than 500 pages of attached materials. Allen and Stein filed motions requesting that the Court strike the Government's Reply.

## II.     Discussion

### A.     Base Offense Level

Defendants dispute the PSR's conclusion that U.S.S.G. § 2K1.4 is the correct guideline in determining Defendants' base offense level. To determine which guideline to apply, the Court undergoes a three-step process: "(1) identify the charge from the indictment and jury instructions, (2) find the substantive offense in the guidelines' statutory index, and (3) find the applicable guideline range."[2] Often times the statutory index references more than one guideline for a particular statute, and in those circumstances the Court must " 'use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted.' "[3] To

---

[2] *United States v. Pawelski*, 651 F. App'x 750, 776 (10th Cir. 2016) (citations, alterations, and quotations omitted).

[3] *United States v. Neilson*, 721 F.3d 1185, 1187–88 (10th Cir. 2013) (quoting U.S.S.G. § 1B1.2, cmt. n. 1).

determine which guideline is the most appropriate, the Court considers "the language in the guideline itself, as well as the 'interpretative and explanatory commentary to the guideline' provided by the Sentencing Commission."[4]  The Guidelines' commentary "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."[5]  Indeed, failing to follow the commentary "could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal."[6]  The guideline's commentary is inconsistent with its text when " 'following one will result in violating the dictates of the other.' "[7]

Here, Defendants were convicted of conspiracy to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a.  Section 2332a(c)(2)(A)–(D) provides four definitions for the term "weapon of mass destruction."[8]  Subsection (A) defines weapon of mass destruction to include "destructive devices"—i.e., conventional weapons.[9]  Subsections (B)–(D) address chemical, biological, and nuclear weapons.  Defendants were convicted of using a "destructive device" pursuant to subsection (A).

---

[4] *United States v. Robertson*, 350 F.3d 1109, 1112–13 (10th Cir. 2003) (quoting *United States v. Frazier*, 53 F.3d 1105, 1112 (10th Cir.1995)).

[5] *Stinson v. United States*, 508 U.S. 36, 38 (1993).

[6] U.S.S.G. § 1B1.7 (Significance of Commentary) (citing 18 U.S.C. § 3742); *see also Stinson*, 508 U.S. at 43 (citing § 1B1.7).

[7] *United States v. Morris*, 562 F.3d 1131, 1135 (10th Cir. 2009) (quoting *Stinson* 508 U.S. at 43).

[8] 18 U.S.C. § 2332a(c)(2)(A)–(D).

[9] *See* 18 U.S.C. § 2332a(c)(2)(A) (defining a "weapon of mass destruction" to include "any destructive device as defined in section 921 of this title").  Section 921 defines "destructive device" to include, among other things, explosive, incendiary, or poison gas bombs, grenades, rockets, missiles, mines, or similar devices.

The statutory index provides three guidelines applicable to convictions under § 2332a. Those guidelines are § 2A6.1 (Threatening or Harassing Communications; Hoaxes; False Liens), § 2K1.4 (Arson; Property Damage by Use of Explosives), and. § 2M6.1 (Unlawful Activity Involving Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or Delivery Systems, Chemical Weapons, or Other Weapons of Mass Destruction; Attempt or Conspiracy). All parties agree that § 2A6.1 is inapplicable. The PSR determined that § 2M6.1 does not apply to Defendants because § 2M6.1's commentary specifically excludes destructive devices from its definition of "Weapon of mass destruction."[10] Thus, by process of elimination, the PSR stated that § 2K1.4 applied.

Defendants argue that the commentary to § 2M6.1 should be disregarded because it conflicts with the text of the guideline. To support this contention, Defendants point to § 2M6.1's heading, which, after listing nuclear, biological, and chemical weapons, includes the phrase "or other weapons of mass destruction." Defendants argue that "other weapons of mass destruction" must include "destructive devices," and that limiting § 2M6.1 to crimes involving the unlawful use of nuclear, chemical, and biological substances is contrary to a plain reading of the guideline.

This is a novel issue in the Tenth Circuit, and there is little caselaw from other circuits addressing the matter. Defendants cite no cases where a court has held that § 2M6.1 applies to a crime involving a "destructive device" as defined by 18 U.S.C. § 2332a(c)(2)(A). The Government relies primarily on an unpublished opinion from the United States District Court for the Northern District of New York, in which the court concluded that § 2M6.1 is inapplicable to

---

[10] *See* U.S.S.G. § 2M6.1, cmt. n. 1 (" 'Weapon of mass destruction' has the meaning given that term in 18 U.S.C. § 2332a(c)(2)(B), (C), and (D).").  Conventional "destructive devices" are covered in subsection (A).

crimes involving "destructive devices," but did not address the alleged conflict between the text and commentary that Defendants raise here.[11]

Based on a plain reading of the guideline, the Court concludes that § 2M6.1's text and commentary are not in conflict. Section 2M6.1's heading mirrors with specificity the nuclear, biological, and chemical materials covered in § 2332a(c)(2)(B), (C), and (D). But the heading does not extend the same treatment to subsection (A). If the intent was for § 2M6.1 to apply to all convictions under § 2332a, it would be unusual to explicitly include nuclear, biological, and chemical materials, but omit "destructive devices" from the heading. Indeed, the most obvious conclusion is that this omission was purposeful.

More importantly, absent an irreconcilable clash between the commentary and the text, the commentary is authoritative, and it would be error for the Court to set it aside. Section 2M6.1 does not define or explain the meaning of "other weapons of mass destruction." Certainly nothing in the text requires the guideline to apply to all "destructive devices." The heading's undefined phrase "other weapons of mass destruction" is simply insufficient to create an irreconcilable clash between the text and commentary. Accordingly, the Court will follow the commentary and hold that § 2M6.1 is inapplicable here. The correct guideline is therefore § 2K1.4.

As the PSR correctly stated, Defendants intended to cause death or serious bodily injury to their victims; so pursuant to § 2K1.4(c)(1), this guideline is cross-referenced to § 2A1.5. *See* U.S.S.G. § 2K1.4(c)(1) ("If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against

---

[11] *See United States v. Aref*, 2007 WL 804814, at *3 (N.D.N.Y. 2007) ("A Guideline sentence for a violation of § 2332a is determined using either U.S.S.G. § 2K1.4 or § 2M6.1. Section 2M6.1, which is the higher guideline, does not apply because the definition of weapon of mass destruction in Application Note 1 excludes the subsection of § 2332a that is charged in the Superseding Indictment.").

the Person) if the resulting offense level is great than that determined above."). The most analogous guideline is U.S.S.G. § 2A1.5 (Conspiracy or Solicitation to Commit Murder), which carries a Base Offense Level of 33. Defendants' base offense level was correctly calculated at 33, and Defendants' objection is overruled.[12]

## B. Hate Crime Enhancement

Defendants Allen and Stein object to the PSR's application of a hate crime enhancement.[13] There is some confusion in the PSR about who is responsible for deciding if the hate crime enhancement applies. The guidelines state:

> If the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels.[14]

The PSR stated that if the Court determines beyond a reasonable doubt that the Defendants selected their victims because of their race, religion, or national origin, the hate crime enhancement would apply. This conclusion, however, is contrary to the guideline, which allows the Court to make this determination only in cases involving a guilty plea or a plea of no contest. But in cases

---

[12] The Government at the November 19 hearing, and in its sentencing memorandum, argues that a calculation under Count 2 would also result in a Base Offense Level of 33. If the Government is correct on that matter, then even if Defendants were correct that § 2M6.1 can be applied to crimes involving "destructive devices" and that § 2M6.1 is the more appropriate guideline for their offense than § 2K1.4, Defendants would still carry a Base Offense Level of 33. Because the Court concludes 2M6.1 does not apply, it makes no ruling on the Government's contention.

[13] *See* U.S.S.G. § 3A1.1(a) (Hate Crime Motivation or Vulnerable Victim). Under this guideline Defendants Offense Level would be increased by 3 levels. The PSR applied this enhancement to all three Defendants, but Defendant Wright raised no objection to this enhancement.

[14] U.S.S.G. § 3A1.1(a). The commentary to § 3A1.1 instructs the Court to note that "special evidentiary requirements govern the application of [subsection (a)]. U.S.S.G. § 3A1.1(a), cmt. n. 1.

where criminal defendants put the government to its burden of proof, it is the prerogative of "the finder of fact at trial" to make this finding. The Court therefore has no role in deciding whether the Government carried its burden to prove Defendants committed a hate crime. That determination is instead left to the wisdom of the jury.

It is undisputed that when the jury convicted Defendants on Count 2, it found beyond a reasonable doubt that Defendants targeted their victims because of their race, religion, or national origin.[15] The Jury made no such specific finding with regards to Count 1. Allen and Stein argue that taking an enhancement that arises from Count 2 and applying it to an offense level calculation based on Count 1 is improper.[16] The Court disagrees. Count 1 and Count 2 are grouped together under § 3D1.2 because both counts "involve[ed] substantially the same harm."[17] This means that both counts necessarily involved the same victims, and both counts involved the same criminal act or multiple criminal acts based on a common criminal objective.[18] Defendants' common criminal objective was to detonate multiple bombs at an apartment complex, and this plan formed the basis

---

[15] The jury found that Defendants conspired to interfere with their victims' housing rights and that "the crime would not have occurred but-for the race, or the religion, or the national origin" of their intended victims.

[16] Defendant Allen also argues it was procedurally flawed for the PSR to forgo a calculation of the Base Offense Level under Count 2. The Court disagrees that a Count 2 calculation was necessary because it was clear that Count 1 would result in the highest possible offense level. *See* U.S.S.G. § 3D1.3, Application Note 2 ("Sometimes, it will be clear that one count in the Group cannot have a higher offense level than another . . . . The formal determination of the offense level for such a count may be unnecessary.").

[17] U.S.S.G. § 3D1.2.

[18] U.S.S.G. § 3D1.2(a)–(b) ("All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction. (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. . . .").

for Defendants' convictions under Count 1 and Count 2. In fact, it is the similarity between the two counts that allows them to be grouped together for sentencing purposes.[19]

Because the underlying facts in these two counts are so intertwined—in particular, both counts involved targeting the same victims—when the jury found beyond a reasonable doubt that Defendants selected their victims because of their race, religion, or national origin in Count 2, that finding is sufficient to conclude that the jury also found beyond a reasonable doubt that Defendants targeted their victims based on their protected status in Count 1. Thus, the Court concludes that the PSR properly increased Defendants offense level by three levels under § 3A1.1(a), and this objection is overruled.

## C.    Terrorism Enhancement

Defendants object to the PSR's application of an enhancement pursuant to § 3A1.4 (Terrorism). This enhancement is significant—Defendants' offense level would be raised 12 levels, and their criminal history would automatically be increased to Category VI.[20] The terrorism enhancement applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism. . . ."[21] Section § 3A1.4's commentary states that a "federal crime of terrorism" has the same meaning given the term in 18 U.S.C. § 2332b(g)(5),[22] which limits a "federal crime of terrorism" to offenses that are "calculated to influence or affect the conduct of

---

[19] *Id.*

[20] U.S.S.G. § 3A1.4(b).

[21] U.S.S.G. § 3A1.4(a).

[22] U.S.S.G. § 3A1.4, cmt. n. 1.

government by intimidation or coercion, or to retaliate against government conduct."[23] Defendants argue that their conspiracy was not calculated to influence the government or to retaliate against government conduct. Rather, the conspiracy was directed at, and intended to influence, a civilian population. The Government argues in response that targeting a civilian population is not mutually exclusive with intending to influence or retaliate against the government.

It is surely uncontroversial that a crime can target civilians but be intended to provoke a reaction from the government or be committed to retaliate against government conduct. And the Government has provided ample authority—albeit from jurisdictions outside the Tenth Circuit— supporting the contention that the terrorism enhancement can apply to crimes targeting only civilians.[24] This does not, however, adequately resolve whether the enhancement applies here. To apply this enhancement the Court must find by a preponderance of the evidence that Defendants intended to influence or affect the conduct of the government, or intended to retaliate against government conduct.[25]

---

[23] 18 U.S.C § 2332b(g)(5)(A). Subsection (B) also requires the crime to be a violation of one of several enumerated statutes, including 18 U.S.C. § 2332a, which is the statute Defendants were convicted of in Count 1.

[24] The Government provided some of this authority for the first time at the November 19 hearing. The Court ordered the Government to file the additional authority and provided Defendants an opportunity to respond. After Defendants' responded, the Government filed a Reply brief which consisted primarily of attachments. Most of the attachments were relevant court documents pulled from the Government's additional authorities, as well as transcripts from Defendants' trial. Allen and Stein filed a Motion to Strike the Government's Reply for being filed without leave of Court, citing a local rule pertaining to civil trials. The Government's Reply is within the scope of Defendants' response, and the Court takes it into consideration in deciding whether the terrorism enhancement applies to Defendants. Allen's Motion to Strike is denied, and Stein's Motion to Join Allen's Motion is denied as moot.

[25] Defendants object to this standard. Defendants argue that the terrorism enhancement should apply only when the jury makes the necessary factual findings beyond a reasonable doubt. Defendants note that the Tenth Circuit once observed, without ruling on the issue, that it is "questionable" whether "a district judge may . . . increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent." *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (citation omitted) (declining to rule on the issue because the defendant "ha[d] not challenged the district court's power to find facts at sentencing").

The Tenth Circuit's speculation was based on a Justice Scalia dissent to a denial of certiorari, which was joined by two other Supreme Court justices. *See Jones v. United States*, 135 S. Ct. 8, 190 L. Ed. 2d 279 (2014) (stating that the Supreme Court should grant certiorari to clarify whether it is constitutionally unreasonable for judges to

Defendants' objective with the conspiracy cannot be neatly distilled into a single purpose. Although bringing harm to the Muslim residents of the Mary Street Apartments was unquestionably a core goal of the conspiracy, the evidence shows that Defendants had bigger plans than simply killing local Muslims. Defendants sought to inspire like-minded citizens to engage in similar violent conduct nationwide, to discourage local landlords from leasing to Muslims, and to coerce government officials to change their conduct toward Muslims.

Throughout the conspiracy Stein expressed his frustration with the government and its role in bringing Muslims into the United States.[26] Both Allen and Stein suggested targeting local government officials and their families as a way of curtailing the presence of local Muslims.[27]

---

enhance a defendant's sentence based on judge-found facts, or whether all sentences below the statutory maximum are substantially reasonable). Importantly, in his dissent Justice Scalia recognized that "the Courts of Appeals have uniformly taken [the Supreme Court's] continuing silence to suggest that the Constitution does permit otherwise unreasonable sentences supported by judicial factfinding, so long as they are within the statutory range." *Id.* at 9 (citations omitted). And even more important to this Court's consideration, the Tenth Circuit is counted among the circuits that has adopted this position. *Id.* (citing *United States v. Redcorn*, 528 F.3d 727, 745–746 (10th Cir. 2008)); *see also United States v. Hall*, 473 F.3d 1295, 1312 (10th Cir. 2007). Absent binding authority contradicting the Tenth Circuit's prior decisions on this matter, the Court must conclude that it possesses the power to enhance Defendants' sentence based on its own findings of fact.

   The Court also disagrees with Defendants' second contention: that the Court must employ a higher standard of proof than preponderance of the evidence. At the November 19 hearing, Defendants acknowledged that "the weight of the law is against us on this argument," but that they wished to preserve this issue for appeal. Although the Tenth Circuit has not weighed in on this issue, the majority of courts that have considered the issue have determined that preponderance of the evidence is the proper standard of proof for determining whether the terrorism enhancement applies, and the Court will apply that standard here. *See United States v. Fidse*, 778 F.3d 477, 481 (5th Cir. 2015); *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014); *United States v. Chandia*, 675 F.3d 329, 339 (4th Cir. 2012). *But see United States v. Tankersley*, 537 F.3d 1100, 1106 (9th Cir. 2008) (applying a "clear and convincing evidence" standard).

   [26] Stein stated: "The f*ckin' cockroaches in this country have got to go. Period. . . . They are the f*cking problem in this country right now. They are the threat that we have in the country right now. . . . *They're bringing them in by the f*ckin' plane load every god damn day. That god damn n*gger in the f*ckin' White House is making sure of it.*" (emphasis added).

   [27] Stein, who believed local officials were responsible for bringing Muslims to the area, stated, "Next [target] I got, city and county official who are [] directly involved with bringing these mother*ckers in here, they know [Muslims are] coming in, [and] they're helping facilitate it, make it happen. They're a f*cking target too in my mind." Allen also suggested that targeting city council members would more effectively stop Muslims from entering the community than targeting Muslims directly. At another time, Allen suggested committing extreme acts of violence against the mayor and his family to incentivize change at the local government level.

Then, when Defendants' final plan to bomb the Mary Street Apartments started to take shape, Defendants decided they should release a manifesto to ensure the purpose of their attack was clear and to encourage like-minded people to take similar actions against Muslims and the government. Although the evidence at trial showed that Allen drafted the manifesto, all three Defendants participated in crafting its message. Additionally, all three Defendants discussed how to release the manifesto in conjunction with the bombing to ensure it reached the most people.

The Government presented the jury with an unfinished draft of the manifesto recovered at G&G. The manifesto was addressed to the United States government and the American people. It provided a list of grievances against the government—including "not enforcing our borders" and "illegally bringing in Muslims by the thousands"—and stated multiple times that the purpose of the document was to force people to "wake up" and take a stand against the tyranny of the government. The document concluded by urging government officials and private citizens to act to save the country and warning that their families and businesses would be in danger if they continued to "sell out this country."

Additionally, when Stein called a meeting with certain members of KSF to discuss ways in which they could retaliate against Muslims for the mass shooting at the Pulse nightclub, Stein's frustration was not just with the shooter, but also with the government for its response to the shooting. Stein stated that he was "sick and tired of seeing our own f*cking people get slaughtered by our own f*cking government" and that Muslims were being brought into the country "by the plane load every day." The Orlando shooting and the government's response to it was the catalyst event that caused Stein to flip a switch and go into "organization mode," brainstorming ways to take matters into his own hands.

This is just some of the evidence demonstrating that Defendants' conspiracy was intended, at least in part, to influence, affect, or retaliate against the government. But, as the Court has already stated, the evidence suggests that Defendants had more than one purpose or goal with the conspiracy, including influencing the decisions of private citizens. The issue then becomes to what extent or degree influencing, affecting, or retaliating against the government needs to be Defendants' purpose for the terrorism enhancement to apply. Defendants ask the Court to adopt a standard that for the terrorism enhancement to apply, influencing the government must be Defendants' "primary intent" or "dominant purpose."

The degree to which a defendant must intend his crime to influence the government for the terrorism enhancement to apply is a novel issue in the Tenth Circuit. Indeed, only the Sixth Circuit has provided any guidance on this issue, stating that it is not necessary that influencing the government be Defendants' "ultimate or sole aim."[28] Since both the Government and Defendants rely heavily on the Sixth Circuit's *Wright* decision, the Court will give that opinion careful consideration.

In *Wright*, four defendants involved with the Occupy Cleveland movement were convicted of, among other charges, conspiracy to use a weapon of mass destruction.[29] At the planning stage, the defendants discussed a variety of possible actions, including bombing government buildings, bombing a bridge, bombing cargo ships, and assaulting police officers at a political rally.[30] The defendants asserted that their goal was to influence corporate behavior or disrupt the lives of the

---

[28] *See United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014).

[29] *Id.* at 405.

[30] *Id.*

"one percent," and that they did not target the government specifically.[31]   Ultimately, the defendants settled on detonating explosives on a bridge that was part of the Ohio state highway system.[32]

The Sixth Circuit held that the district court did not err in applying the § 3A1.4 terrorism enhancement to three of the four defendants.[33]   In upholding the district court's application of the terrorism enhancement, the Sixth Circuit relied on the following facts.  Early in the planning stage the defendants planned to violently target law enforcement officers during a protest in Chicago; the defendants discussed targeting government buildings with explosives; the defendants considered their plan to be a terrorist act, or at least anticipated that it would be seen as such; the defendants discussed that bombing a bridge would likely prompt the government to take heightened security measures; and one defendant commented that this endeavor would be a "nice learning experience" for future actions.[34]   "Viewing this evidence cumulatively" the Sixth Circuit held that the defendants "were aware of the consequences of their acts and chose to act in ways that would bring about the consequences, even if they had other goals in mind, such as antagonizing the 'one percent.' "[35]

---

[31] *Id.* at 408.

[32] *Id.* at 405–06.

[33] The Sixth Circuit vacated the sentence of one defendant who was a latecomer to the conspiracy and remanded for resentencing because the district court did not adequately explain the basis for applying the terrorism enhancement to that defendant.

[34] *Id.* at 409–10.

[35] *Id.* at 410; *see also United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (explaining that "calculation" concerns "the object that the [defendant] seeks to achieve through planning or contrivance").

Notably, the Sixth Circuit took into consideration the defendants' discussions planning the attack, even discussions relating to plans they ultimately decided not to pursue. For example, the Sixth Circuit relied on the defendants' conversations about assaulting police officers at a political rally in Illinois. Not only did the defendants in *Wright* not follow through with this plan, it was nothing like the offense they were convicted of: conspiracy to use a weapon of mass destruction in Ohio. Nevertheless, the Sixth Circuit found these discussions—as well as other conversations about abandoned plans to target government facilities—relevant to whether the defendants' offense was calculated to influence of affect government conduct.[36]

Here, the Court concludes that Defendants' conspiracy had a split purpose: in part to influence the government and in part to influence private citizens. If the terrorism enhancement only applied if influencing or retaliating against the government was a defendant's sole intent or principal purpose, the Court would sustain Defendants' objection, as the Court agrees that influencing the government was not Defendants' sole concern. But the Court is not convinced this is the correct standard. Indeed, there is nothing in the guideline, statutory definition, or caselaw supporting the Defendants' suggestion that influencing the government must be the primary intent or dominant purpose.[37] Concluding otherwise reads into the guideline something that is not there.[38]

---

[36] Defendants argue that *Wright* has one important distinguishing fact from their case. In *Wright*, the defendants were targeting a bridge that was part of the Ohio highway system. Defendants argue that this constitutes a government target, which would justify applying the terrorism enhancement. Yet it does not appear from *Wright* that the Sixth Circuit considered the bridge to be a government target. Neither was that a consideration the Court relied on in affirming the terrorism enhancement.

[37] *See Wright*, 747 F.3d at 408 ("Nor is it necessary that influencing the government be the defendant's ultimate or sole aim.").

[38] The Court notes that the commentary to § 3A1.4 states that if Defendants' conspiracy to use a weapon of mass destruction was intended to "intimidate or coerce a civilian population, rather than to influence of affect the conduct of government . . . an upward departure would be warranted" not to exceed the sentence Defendants' would

Furthermore, the Court disagrees with Defendants' factual characterization that influencing or retaliating against the government was not a significant purpose of the conspiracy. The Defendants initially considered assailing several government targets, including federal and local government officials. The Sixth Circuit's *Wright* decision informs this Court that such preliminary planning is relevant in determining the intent of the conspiracy, even if such plans were subsequently abandoned. Additionally, Defendants agreed to draft and disseminate a manifesto to be released in conjunction with the bombing. Defendants discussed that the purpose of the manifesto would be to inspire like-minded people to commit similar crimes against Muslims and the government; they also discussed that the manifesto should demand that the government change its policies on Muslim immigration and border security. Although Allen was the most vehement and outspoken about directing the manifesto toward the government, and he was the one who drafted the manifesto, Stein and Wright were both present for, and participated in, these discussions.

Finally, even if Stein and Wright gave no input into the manifesto and Allen was the only Defendant who intended to influence or retaliate against the government——a conclusion the Court rejects—the terrorism enhancement would still apply to all three Defendants. Allen intended for this conspiracy to influence or retaliate against the government, and he made that purpose abundantly clear to Stein and Wright. In a conspiracy, one Defendant is responsible for " 'all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken

have received had the enhancement applied. U.S.S.G. § 3A1.4, cmt. n. 4. Neither the guideline nor the commentary indicate that influencing the government must be Defendants' primary purpose.

criminal activity.' "[39]   It was more than foreseeable to Stein and Wright that Allen intended to influence government conduct by releasing the anti-government manifesto in conjunction with the bombing.  Indeed, both Stein and Wright encouraged (and contributed to) Allen's plan.  Stein and Wright are accountable for their co-conspirator's reasonably foreseeable actions.

As a final matter, Defendants highlight that prior to the trial, the Government provided a bill of particulars at Defendants' request.   Defendants argue that the bill of particulars demonstrated that the Government did not consider Defendants' actions to be a federal crime of terrorism.   This argument does not ultimately persuade the Court.   Defendants asked the Government for a bill of particulars on Count 1 because the original indictment included "essentially a bare bones recitation of the [Use of weapons of mass destruction] statute."[40] Specifically, Defendants asked the Government to identify which "people or property within the United States" were the targets of Defendants' conspiracy.  Defendants also took issue with the original indictment's recitation of all four elements under § 2332a(a)(2)(A)–(B),[41] and requested that the Government identify which of the four subsections it would be relying on.   The Government provided Defendants with answers to each of their questions.  The Court disagrees

---

[39]   *United States v. Figueroa-Labrada*, 720 F.3d 1258, 1265 (10th Cir. 2013) (quoting U.S.S.G. § 1b1.3(a)(1)(A), (B)).

[40] To obtain a conviction under § 2332a, the Government was required to prove that Defendants conspired to use a weapon of mass destruction against any person or property within the United States, *and* one of the following four criteria must be met.
 (A) the mail or any facility of interstate or foreign commerce is used in furtherance of the offense;
(B) such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce;
(C) any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense; or
(D) the offense, or the results of the offense, affect interstate or foreign commerce, or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce.  18 U.S.C. § 2332a(a)(2)(A)–(B).

[41] *Id.*

with Defendants that the bill of particulars demonstrated the Government never intended for Count 1 to be considered a federal crime of terrorism.

In sum, Defendants offense was calculated, at least in part, to influence, affect, or retaliate against government conduct. The Court concludes this is sufficient to trigger the terrorism enhancement, and Defendants' objection is thereby overruled.

## D. Organizer Enhancement

Defendant Stein objects to the PSR's application of a two-level enhancement for his role as an organizer in the conspiracy.[42] The Probation Office concluded that Stein was an organizer because he recruited other militia members to participate in the bombing and because he was Defendants' primary representative in dealing with the FBI's undercover agent. The Tenth Circuit has held that "a defendant may be deemed an organizer under § 3B1.1 for 'devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy.' "[43] Additionally, the commentary to § 3B1.1 provides a list of factors to be considered when deciding if a defendant should be considered a leader or organizer:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.[44]

---

[42] *See* U.S.S.G. § 3B1.1(c) "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . increase by 2 levels." (emphasis omitted).

[43] *United States v. Wardell*, 591 F.3d 1279, 1304 (10th Cir. 2009) (quoting *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997)).

[44] U.S.S.G. 3B1.1, cmt. n. 1.

While considering these factors, the Court remains conscious that "the gravamen of this enhancement is control, organization, and responsibility for the actions of others."[45] The enhancement is not triggered simply because a defendant is an "important" or "essential" member of the conspiracy.[46] Furthermore, a person "who merely suggests committing the offense" is not an organizer by virtue of making that suggestion.[47] Unlike a leader, an organizer need not exercise hierarchical control over his co-conspirators for the enhancement to apply.[48] The key to determining whether a defendant qualifies as an organizer is not "direct control" over his co-conspirators, but "relative responsibility" within the criminal enterprise.[49]

Stein played a pivotal role in the conspiracy. He was an intermediary between Defendants and the FBI's undercover operative. He initiated meetings and attempted to recruit others to join the conspiracy. He provided some of the materials used to build the explosives. Furthermore, he was often the most verbose conspirator in expressing his ill feelings toward Muslims and calling for action. That said, the only § 3B1.1 factor that weighs in favor of concluding that Stein was an "organizer" is the recruitment of accomplices, a role in which Stein proved to be largely ineffectual, as most of his targeted recruits declined to join the conspiracy. He was not solely responsible for devising the plan and he did not provide any more "wherewithal" when compared to his co-Defendants. Neither did he exercise greater decision-making authority than the other

---

[45] *United States v. Thompson*, 866 F.3d 1149, 1163–64 (10th Cir. 2017) (citations and quotations omitted), *vacated on other grounds* 138 S. Ct. 2706, 201 L. Ed. 2d 1093 (2018).

[46] *Id.*

[47] U.S.S.G. 3B1.1, cmt. n. 4.

[48] *Wardell*, 591 F.3d at 1304 (citations omitted).

[49] *Id.* (citation and quotation omitted).

Defendants. Stein was an essential member of the conspiracy, but the Court concludes he does not fall within 3B1.1's definition of an "organizer." The Court sustains Stein's objection. Stein's offense level is not increased by two increments under § 3B1.1 for being an organizer of the conspiracy.

**E.      Obstruction of Justice Enhancement**

Defendant Wright objects to the application of a two-level enhancement for obstruction of justice. U.S.S.G. § 3C1.1, which provides the basis for this enhancement, states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

Wright's objection tied this issue to his Renewed Motion for Judgment of Acquittal (Doc. 476), which the Court denied in an oral ruling on April 16, 2018. During the hearing held on November 19, 2018, regarding Defendants' objections to the PSR, Wright requested the Court clarify its reasons for denying his Motion for purposes of appealing this matter to the Tenth Circuit.

Wright's Rule 29 motion[50] for acquittal sought dismissal of Count 3, where the jury ultimately found Wright guilty of "knowingly and willingly making materially false, fictitious, and fraudulent statements" to the FBI "during the FBI's investigation of a domestic terrorism offense" in violation of 18 U.S.C. § 1001(a). The crux of Wright's argument is that the Government presented the jury with zero evidence on the issue of materiality, and that the

---

[50] Under Fed. R. Crim. P. 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The "relevant question" for the Court "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted).

Government represented to the jury that such evidence was not required, which was a misstatement of law. The Government disputes Wright's contention that it provided no evidence of materiality, and the Government argues that Wright incorrectly asserts that there must be direct testimony from FBI witnesses that Wright's false statements were material.

The Supreme Court has noted that a conviction under § 1001 "requires that the statements be 'material' to the Government inquiry, and that 'materiality' is an element of the offense that the Government must prove."[51] To be material, a statement "must have a 'natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed."[52] Whether a statement is material is a mixed question of law and fact.[53]

The issue before the Court is whether there must be direct evidence that Wright's false statements were material to the FBI's investigation. Wright argues that "[m]ateriality is demonstrated when the Government actually examines its witnesses on the issue." To support this contention, Wright cites *United States v. Kingston*,[54] as well as persuasive authorities from other circuits. The relevant takeaway from *Kingston*, however, is that government officials *can* testify on materiality, not that such testimony is required.[55] Likewise, the authority Wright relies on from outside jurisdictions all involve instances where the jury was presented with testimony on materiality, but they involve no discussion that would suggest such testimony is a baseline

---

[51] *United States v. Gaudin*, 515 U.S. 506, 509 (1995).

[52] *Gaudin*, 515 U.S. at 509.

[53] *See Gaudin*, 515 U.S. at 511–12.

[54] 971 F.2d 481 (10th Cir. 1992).

[55] *Id.* at 486–87.

requirement.[56]  Finally, Wright also cites a "Criminal Resource Manual" the U.S. Department of Justice prepared for federal prosecutors, which states that "[m]ateriality is best shown by the testimony of a witness, generally those who make the decisions on the application or statements in the particular case, concerning the influence that defendant's allegedly false statement might have had on the ultimate result of the transaction."[57]  That the DOJ considers using witness testimony to be the "best" way to show materiality is not determinative here.  "Best" practice is not synonymous with "only acceptable" practice.

Wright's position that his false statements are not material unless an FBI agent testified to that directly is unpersuasive.  The Court concludes that circumstantial evidence is sufficient for the jury to find materiality beyond a reasonable doubt.[58]  The question then becomes, was there sufficient circumstantial evidence for *any* rational juror to find beyond a reasonable doubt that Wright's false statements were material?  The Government cites a Third Circuit case in which the FBI's investigation into the defendant was "essentially complete" when they interviewed the defendant, and the defendant's false statements had no actual influence on the FBI's decisions.[59]  The Third Circuit focused on the "natural tendency to influence" language in the Supreme Court's

---

[56] *See United States v. Samuels*, 874 F.3d 1032, 1035 (8th Cir. 2017); *United States v. Wolf*, 860 F.3d 175, 195–96 (4th Cir. 2017); *United States v. Litvak*, 808 F.3d 160, 171 (2d Cir. 2015)

[57] *See* Office of the United States Attorneys, *911. Materiality*, Criminal Resource Manual, United States Department of Justice (https://www.justice.gov/jm/criminal-resource-manual-911-materiality).

[58] The Government relies on authority from the D.C. Circuit for the proposition that direct evidence is not required for a jury to find a false statement was material.  *See United States v. Verrusio*, 762 F.3d 1, 20–21 (D.C. Cir. 2014) ("Nor must the government present any testimony or other evidence specifically for the purpose of establishing the materiality of the defendant's false statement.  Rather, the jury can infer from other evidence that the false statement was capable of affecting the agency's functions.") (citations, alterations, and quotations omitted); *see also United States v. Cox*, 150 F. App'x 204, 205 (4th Cir. 2005)("This court 'must consider circumstantial as well as direct evidence, and allow the Government the benefit of all reasonable inferences from the facts proven to those sought to be established.' ").

[59] *United States v. McBane*, 433 F.3d 344, 350 (3d Cir. 2005).

materiality test, concluding that "the phrase 'natural tendency' connotes qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself."[60] On this basis the Third Circuit concluded that the defendant's false statements were material because they were a type of false statement that "would normally be capable of influencing a criminal investigation."[61]

In a similar case, the Seventh Circuit held that a defendant's false statements to the FBI were material despite the FBI being in possession of incriminating and contradictory recordings of the defendant that made the statements unlikely to have any effect on the FBI's investigation.[62] The Seventh Circuit held that the defendant's false statements were designed "to cast suspicion away from him, which *in the ordinary course would have an intrinsic capability—a 'natural tendency'—to influence an FBI investigation*."[63]

The Court concurs that "materiality" is an objective inquiry that is divorced from whether the false statement had any actual influence on the FBI's investigation. Here, the jury found beyond a reasonable doubt that Wright made at least one of five false statements, each pertaining to Wright's role in, and knowledge of, the conspiracy to use a weapon of mass destruction.[64] A

---

[60] *Id.* at 351 (citing *Gaudin*, 515 U.S. at 509).

[61] *Id.* at 352.

[62] *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008)

[63] *Id.* (emphasis added); *see also United States v. Mehanna*, 735 F.3d 32, 55 (1st Cir. 2013) ("[T]he defendant's mendacity was undertaken for the purpose of misdirecting the ongoing FBI investigation (or so the jury could have found). This is an important datum: where a defendant's statements are intended to misdirect government investigators, they may satisfy the materiality requirement of section 1001 even if they stand no chance of accomplishing their objective.").

[64] The five statements presented to the jury were: (1) "that Defendant Wright did not know anything about Defendant Allen manufacturing explosive devices at Defendant Wright's business, G&G Homes;" (2) that Defendant Wright had no knowledge of any explosives being located on the premises of his business, G&G Homes;" (3) "that Defendant Wright was not a member of a militia;" (4) that Defendant Allen had not invited Defendant Wright to a

reasonable juror could conclude that any of Wright's false statements would have the "natural tendency" to influence the FBI's investigation into Defendant's bombing conspiracy, even if no such influence occurred.

As a final matter, Wright also argues that the Government misrepresented the law to the jury, pointing to the following statement made by the Government during its closing argument rebuttal:

> [Defense Counsel] also mentioned to you that there's no evidence on this issue of materiality. Folks, the Government has no obligation to provide you evidence of what's obvious. And what's obvious or what should be obvious to you after you watch that video is how differently things would have gone on October 12th, if Gavin Wright, when given the opportunity, had told the truth. That's what's material. That's what makes that statement material, is how—how differently that day would have gone."

Wright argues that "the Government stated unequivocally to the jury that it had no obligation to admit evidence on an element of the offense" and that the Government implied that the jury could substitute its own common sense in place of actual evidence.

Assuming, without deciding, that the Government misstated the law, this error would not be grounds for acquittal. The jury is presumed to have followed the instructions given by the Court, even when the Government makes a misleading argument or misstatement of law.[65] The jury instructions expressly stated that to convict Wright on Count 3 the Government must prove beyond a reasonable doubt every element of the crime, including that Wright's false statement "was material to the FBI's investigation." The jury was also instructed that "[a] fact is 'material'

---

meeting of the Kansas Security Force;" and (5) that Defendant Wright had provided the FBI with all of his personal knowledge about Defendant Allen during the interview."

[65] *United States v. Currie*, 2018 WL 6712339, at *6 (10th Cir. 2018); *Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006).

if it has a natural tendency to influence or is capable of influencing a decision of the FBI to which it was made." As such, the Court presumes the jury followed the instructions and found that every element—including materiality—was proved beyond a reasonable doubt.

These are the reasons the Court denied Wright's Renewed Motion for Judgment of Acquittal, and the Court leaves that ruling undisturbed. Because Wright's Rule 29 Motion also formed the basis for his objection to the PSR's application of § 3C1.1's enhancement, that objection is overruled.[66]

## F.    Special Condition of Supervision

The Probation Office recommended that as a special condition of post-release supervision, Defendants be prohibited from participating in "any anti-government or tax protesting activities, or associate with individuals who are known members of these groups, or possess any literature advocating or supporting these groups during the term of supervision." Defendants objected to this condition of supervision. The Government then volunteered to modify the condition to the following.

> [Defendants are prohibited from] participating in any groups (including online groups) espousing anti-Muslim or anti-immigrant beliefs/ideologies, or in any militias or other groups that advocate engaging in criminal activity or overthrowing the United States government; or associating with individuals who are known members of such groups; or possessing any literature advocating or supporting these groups; or possessing any documents or paraphernalia indicating membership in a militia or a group that espouse violence against or hatred for Muslims or immigrants; or posting any comments on social media or other electronic media espousing violence against or hatred for Muslims or immigrants.

---

[66] The Court holds that the PSR properly applied the obstruction of justice enhancement to Wright based on his false statements to the FBI. Accordingly, the Court makes no ruling on the Government's alternative argument that the enhancement would apply because Wright concealed evidence of the conspiracy.

At the November 19 hearing, Defendants stated that they objected to the first part of the Government's modified condition: "participating in any groups (including online groups) espousing anti-Muslim or anti-immigrant beliefs or ideologies." Defendants argue that "anti-Muslim" and "anti-Immigrant" beliefs or ideologies is so broad that it fails to adequately give Defendants notice about the types of groups they can associate with while on supervision, including non-violent political groups. Defendants do not object to the conditions that prohibit Defendants from participating in groups that advocate criminal activity or violence against the United State or from "espousing violence against or hatred for Muslims or immigrants" on social media.

The Court agrees with Defendants that a prohibition from participating in any groups espousing "anti-Muslim" or "anti-immigrant" beliefs is vague and unnecessarily broad. The Court therefore sustains the objection. The Court will impose the following special condition of supervision: "Defendants are prohibited from participating in any groups, (including online groups) that advocate engaging in criminal activity or overthrowing the United States government; or associating with individuals who are known members of such groups; or participating in a militia or a group that espouses violence against Muslims or immigrants."

## G.     Miscellaneous Objections

Defendants also raised a variety of miscellaneous objections to the PSR. These objections were either so minor or entirely irrelevant for sentencing purposes, or they rely on Defendants' theories of the case at trial which were implicitly rejected by the jury's verdict, that all such objections are overruled.

## H.     Victim Impact Statements

The Government submitted about 20 short videos containing victim impact statements by residents of the Mary Street Apartments and attendees of the Mary Street Apartment mosque. The Government argues that these individuals are entitled to have their testimony heard under the Crime Victims' Rights Act ("CVRA").[67]  The CVRA guarantees every victim of a federal crime the right to be reasonably heard at sentencing.[68]  The CVRA defines a "crime victim" as "a person directly and proximately harmed" by a federal crime.[69]

Defendants filed a Motion to exclude these victim impact statements, contesting the residents' status as "victims."  Defendants first argue that the CVRA is inapplicable because § 3771—unlike some other federal statutes[70]—does not specifically state that it applies to inchoate crimes, like conspiracy.  This argument is unavailing.  The CVRA uses extraordinarily broad language—applying to any "Federal offense"—and the statute gives no indication that conspiracies, or any other federal crime, is excluded from that definition.  Neither is the Court convinced by Defendants' slippery-slope argument that allowing these individuals to testify as victims would open the floodgates to testimony from individuals with a miniscule connection to the Mary Street Apartments.[71]  The Government has not submitted any such testimony, and

---

[67] 18 U.S.C. § 3771.

[68] 18 U.S.C. § 3771(a)(4).

[69] 18 U.S.C. § 3771(e)(2)(A).

[70] *See* 18 U.S.C. § 3663(a)(2) (defining a "victim" for restitution purposes as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern").

[71] Defendants warn that allowing this testimony would by extension "open the theoretical door to anyone: 1) residing close to the apartment complex who might have been in fear once the United States held its press conference and may not be Somali and/or Muslim; 2) who regularly walked or drove by the complex who might have been in fear following the government's press conference; 3) who conducted business with any of the defendants, ad infinitum."

allowing these individuals to give victim impact statements does not eliminate judicial discretion in excluding dubious claims of victimhood, should any subsequently arise.

Defendants also argue that these videos would be unduly prejudicial, and they note that the Court in a pretrial order excluded all residents of the Mary Street Apartments from testifying at trial for just that reason. The Court does not consider its pretrial order to be of great relevance here. Victim impact statements have a different purpose than trial testimony, which the jury relies on in determining Defendants' guilt. Because the Mary Street Apartments residents learned everything about Defendants' conspiracy from the Government or the media, their testimony would not have been helpful to the jury in determining whether Defendants were guilty of the crime. However, their testimony is relevant at sentencing to determine the overall impact of Defendants' crimes. Having heard all the evidence at trial, the Court at sentencing will not be unduly influenced by these statements in determining the appropriate sentence, but the statements of the intended victims are nonetheless entitled to be heard. The Court concludes that this testimony is not so unduly prejudicial to require exclusion at this stage.[72]

Much of the parties' argument on this issue revolves around whether the Court is *required* under the CVRA to hear the testimony submitted by the Government. But this question does not ultimately drive the Court's ruling on this matter. Defendants have not demonstrated that, even if the residents are not *entitled* to testify, that the Court is stripped of its discretion to hear the testimony. The Court will allow the Government to present this evidence at sentencing, and Defendants' Motion to Exclude is denied.

---

[72] *See United States v. King*, 229 F.3d 1165 (10th Cir. 2000) (citing *Payne v. Tennessee*, 501 U.S. 808, 824-827 (1991)).

**IT IS THEREFORE ORDERED** that Defendants' objections to the base offense level calculation are **OVERRULED**.

**IT IS FURTHER ORDERED** that Allen and Stein's objections to the hate crime enhancement are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendants' objections to the terrorism enhancement are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant Curtis Wayne Allen's Motion to Strike Government's Reply (Doc. 475) is **DENIED**.

**IT IS FURTHER ORDERED** that Stein's Motion to Join (Doc. 476) Allen's Motion to Strike is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Stein's objection to the organizer enhancement is **SUSTAINED**.

**IT IS FURTHER ORDERED** that Wright's objection to the obstruction of justice enhancement is **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendants' objections to the special conditions of supervision are **SUSTAINED**.

**IT IS FURTHER ORDERED** that Defendants' Objection and Motion to Exclude "Victim" Impact Statements (Doc. 457.) is **DENIED.**

**IT IS SO ORDERED**.

Dated this 15th day of January, 2019.

Eric F Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE