```
              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS

   THE UNITED STATES OF AMERICA,     )  District
                                     )  Court
                        Plaintiff,   )  Case Nos.
      v.                             )  16-10141-01
                                     )  16-10141-02
                                     )  16-10141-03
                                     )
   CURTIS WAYNE ALLEN,               )  Circuit Court
   PATRICK EUGENE STEIN, and         )  Case Nos.
   GAVIN WAYNE WRIGHT,               )  19-3034
                                     )  19-3030
                        Defendants.  )  19-3035
```

TRANSCRIPT OF JURY TRIAL
VOLUME IV

        On the 26th day of March, 2018, came on to be heard
proceedings in the above-entitled and numbered cause before the
HONORABLE ERIC F. MELGREN, Judge of the United States District
Court for the District of Kansas, sitting in Wichita,
commencing at 8:27 A.M. Proceedings recorded by machine
shorthand.  Transcript produced by computer-aided
transcription.


APPEARANCES:

The plaintiff appeared by and through:
          Mr. Anthony W. Mattivi
          United States Attorney's Office
          290 US Courthouse
          444 SE Quincy
          Topeka, Kansas  66683-3592

          Ms. Risa Berkower
          Ms. Mary J. Hahn
          U.S. Department of Justice
          Civil Rights Division, Criminal Section
          950 Pennsylvania Avenue, NW
          Washington, DC 20530

The defendant Curtis Allen appeared by and through:
          Ms. Melody J. Brannon
          Mr. Rich Federico
          Federal Public Defender's Office
          117 SW 6th Avenue
          Suite 200
          Topeka, Kansas 66603

The defendant Patrick Stein appeared by and through:
            Mr. James R. Pratt
            Pratt Law, LLC
            445 North Waco
            Wichita, Kansas  67202

            Mr. Michael J. Shultz
            Shultz Law Office, P.A.
            445 North Waco
            Wichita, Kansas  67202

The defendant Gavin Wright appeared by and through:
            Ms. Kari S. Schmidt
            Mr. Tyler J. Emerson
            Conlee Schmidt & Emerson, LLP - Wichita
            200 West Douglas
            Suite 300
            Wichita, Kansas  67202

I N D E X

PAGE

WITNESSES
    For the Plaintiff
    STEPHANIE BLACKBURN
        Direct Examination By Ms. Hahn            23
        Cross-Examination By Mr. Federico         52
        Cross-Examination By Mr. Shultz           55
        Cross-Examination By Ms. Schmidt          57
        Redirect Examination By Ms. Hahn          57
    BRODY BENSON
        Direct Examination By Mr. Mattivi         59
        Cross-Examination By Ms. Brannon         103
        Cross-Examination By Mr. Shultz          125
    LULA HARRIS
        Direct Examination By Ms. Berkower       161
        Voir Dire Examination By Mr. Federico    277
        Cross-Examination By Mr. Federico        294

EXHIBITS                                     ADMD
For the Plaintiff:

No.          Photograph taken during          196
4-013        execution of search warrant,
             1500 Bluebell, Lot 129,
             Liberal, KS
No.          Photograph taken during          252
4-13         execution of search warrant
             at 1500 Bluebell, Lot 129,
             Liberal, KS
No.          Photograph taken during          229
8-134        execution of search warrant
             at G & G Mobile Homes,
             Liberal, KS
No.          Photograph taken during          221
8-24         execution of search warrant
             at G & G Mobile Homes, 1250
             E. Tucker Rd., Liberal, KS
No.          Photograph taken during          221
8-25         execution of search warrant
             at G & G Mobile Homes, 1250
             E. Tucker Rd., Liberal, KS
No.          Photograph taken during          221
8-26         execution of search warrant
             at G & G Mobile Homes, 1250
             E. Tucker Rd., Liberal, KS

| No. 8-28 | Photograph taken during execution of search warrant at G & G Mobile Homes, 1250 E. Tucker Rd., Liberal, KS | 221 |
|---|---|---|
| No. 8-34 | Photograph taken during execution of search warrant at G & G Mobile Homes, 1250 E. Tucker Rd., Liberal, KS | 221 |
| No. 9-006 | Photograph taken during execution of search warrant on storage locker Unit F002, Space Station Storage | 206 |
| No. 13g | Audio Clips | 79 |
| No. 13h | Audio Clips | 79 |
| No. 13j | Audio Clips | 79 |
| No. 13n | Audio Clips | 79 |
| No. 35 | Handwritten documents, 7 pgs. | 284 |
| No. 35a | Photograph of Exhibit 35 | 291 |
| No. 36 | Handwritten documents, 26 pgs. (PROVISIONALLY ADMITTED) | 285 |
| No. 36a | Photograph of Exhibit 36 | 291 |
| No. 37 | Handwritten note cards, 6 pgs. (PROVISIONALLY ADMITTED) | 286 |
| No. 37a | Photograph of Exhibit 37 | 291 |
| No. 66 | Receipt for Cell Phone | 266 |
| No. 72 | Notebook - PROVISIONALLY ADMITTED | 290 |
| No. 72a | Photograph of Notebook - PROVISIONALLY ADMITTED | 290 |
| No. 77 | Anarchist Cookbook CD | 276 |
| No. 100 | Post-It Notes (PROVISIONALLY ADMITTED) | 268 |
| No. 100a | Photograph of Exhibit 100 | 291 |
| No. 101 | Red notebook - PROVISIONALLY ADMITTED | 270 |
| No. 101a | Photograph of Exhibit 101 | 291 |
| No. 102a | Photograph of Exhibit 102 | 291 |
| No. 103 | *The Anarchist Cookbook* (PROVISIONALLY ADMITTED) | 281 |
| No. 103a | Photograph of Exhibit 103 | 291 |
| No. 105 | Binder | 209 |
| No. 105a | Binder 1 of 3 seized at Space Station Storage Unit | 292 |

|            |                                                                                              |     |
|------------|----------------------------------------------------------------------------------------------|-----|
|            | F002, 158 pgs.                                                                                |     |
| No. 106    | Binder                                                                                        | 209 |
| No. 106a   | Binder 2 of 3 Seized at Space Station Storage Unit F002, 289 pgs.                             | 292 |
| No. 107    | Binder                                                                                        | 209 |
| No. 107a   | Binder 3 of 3 Seized at Space Station Storage Unit F002, 399 pgs.                             | 292 |
| No. 177-03 | KBI photograph taken during execution of search warrant at 2399 and 2451 Road 10, Liberal, KS | 258 |
| No. 177-1  | KBI photograph taken during execution of search warrant at 2399 and 2451 Road 10, Liberal, KS | 260 |
| No. 177-2  | KBI photograph taken during execution of search warrant at 2399 and 2451 Road 10, Liberal, KS | 260 |
| No. 303a   | Aerial photograph of apartments                                                              | 33  |
| No. 303b   | Aerial photograph of apartments                                                              | 33  |
| No. 303c   | Photograph of apartments                                                                     | 33  |
| No. 304    | Scale                                                                                         | 264 |

EXHIBITS
For the Defendant Allen:

|           |                                     |     |
|-----------|-------------------------------------|-----|
| No. 912-a | Picture of Allen's home             | 172 |
| No. 912-b | Picture of Allen's home             | 173 |
| No. 912-l | Picture of Allen's home             | 324 |
| No. 912-c | Photograph of Allen's home          | 314 |
| No. 912-d | Business Plan for C & K Industries   | 315 |
| No. 912-e | Photograph of Allen's home          | 308 |
| No. 912-f | Book re. Hydrogen peroxide uses     | 317 |
| No. 912-g | Photograph of Allen's home          | 314 |
| No. 912-h | Photograph of Allen home            | 311 |
| No.       | Photograph of Allen home            | 311 |

No.     Photograph of Allen home          311
912-i

No.     Picture of Allen's Yukon          325
912-k

No.     Kansas Security Force             321
916-a   recruiting card

No.     Photograph                        319
916-b

916-c


REPORTER'S CERTIFICATE                    347

3-26-18   USA v. ALLEN, et al.   No. 16-10141          7

```
08:27:46   1          CLERK COOK:  All rise.  United States District
08:27:47   2   Court for the District of Kansas is now in session, the
08:27:49   3   Honorable Eric F. Melgren presiding.
08:27:52   4          THE COURT:  Good morning.  You may be seated.
08:27:54   5          A couple of matters to take up, Counsel, before we
08:27:58   6   bring in the jury.  The Government filed a motion at
08:28:03   7   12:15 A.M. this morning.  Has defendants seen that
08:28:08   8   motion?
08:28:10   9          MR. FEDERICO:  We have, Your Honor.
08:28:11  10          MR. SHULTZ:  Just briefly, Your Honor.
08:28:13  11          MS. SCHMIDT:  Yes, Your Honor.
08:28:14  12          THE COURT:  Any objections to the motion?
08:28:17  13          MR. FEDERICO:  Yes, Your Honor.  I'm going to
08:28:18  14   defer to Mr. Shultz.
08:28:19  15          THE COURT:  Mr. Shultz.
08:28:25  16          MR. SHULTZ:  Would you prefer me at the podium?
08:28:26  17          THE COURT:  The only comment I have, Michael, is I
08:28:28  18   think you're the one hardest to hear at your table.
08:28:31  19          MR. SHULTZ:  Okay.
08:28:32  20          THE COURT:  So wherever you stand we can hear you
08:28:34  21   is going to work.
08:28:35  22          MR. SHULTZ:  I will move to the podium.
08:28:41  23          THE REPORTER:  Thank you.
08:28:42  24          MR. SHULTZ:  Your Honor, we would argue that their
08:28:46  25   motion to admit the two maps -- one of the maps is a
```

3-26-18   USA v. ALLEN, et al.   No. 16-10141          8

| | | |
|---|---|---|
| 08:28:49 | 1 | aerial photo is how they describe it is -- we don't |
| 08:28:54 | 2 | necessarily have an objection to.  It's just an overhead |
| 08:28:56 | 3 | shot of the area.  The other one has two X's on it -- |
| 08:29:00 | 4 | THE COURT:  Right. |
| 08:29:01 | 5 | MR. SHULTZ:  -- as they described in their motion. |
| 08:29:03 | 6 | And then they want to play an audio clip involving a |
| 08:29:06 | 7 | discussion with Mr. Stein and others, purportedly |
| 08:29:10 | 8 | claiming to desire to commit acts of violence against |
| 08:29:17 | 9 | Ms. Blackburn's father. |
| 08:29:17 | 10 | THE COURT:  Right. |
| 08:29:18 | 11 | MR. SHULTZ:  Your Honor, we would argue that that |
| 08:29:20 | 12 | evidence is irrelevant to Ms. Blackburn.  And although |
| 08:29:25 | 13 | the reasons they cite as she's a connection between the |
| 08:29:28 | 14 | apartments and her father, she's a connection to the |
| 08:29:28 | 15 | property, et cetera, can all be done without that |
| 08:29:31 | 16 | audiotape or the map with the X's on it. |
| 08:29:33 | 17 | THE COURT:  Well, I think the Government's wants |
| 08:29:37 | 18 | to play that to get this witness to identify who |
| 08:29:40 | 19 | Ms. Blackburn is. |
| 08:29:41 | 20 | MR. SHULTZ:  And they can ask her that, Your |
| 08:29:42 | 21 | Honor.  They can say, "Who's Steve Burgess?"  "That's the |
| 08:29:44 | 22 | dad." |
| 08:29:44 | 23 | THE COURT:  It's Burgess, I'm sorry? |
| 08:29:46 | 24 | MR. SHULTZ:  Her name is Stephanie Burgess |
| 08:29:49 | 25 | Blackburn.  Burgess is her father.  He and his wife own |

Case 6:16-cr-10141-EFM   Document 539   Filed 04/12/19   Page 9 of 347

3-26-18   USA v. ALLEN, et al.   No. 16-10141          9

08:29:52  1  these apartments.

08:29:52  2      THE COURT:  Right, right, I understand that.  I

08:29:54  3  think, as I understand the Government's motion, they want

08:29:56  4  to, with respect to that audio clip or threat as the

08:30:02  5  other allegedly against whatever his name, is identify

08:30:04  6  who he is, i.e. he's the owner or manager of those

08:30:09  7  apartments.

08:30:10  8      MR. SHULTZ:  And, Your Honor, I can say they can

08:30:11  9  do that without the tape.

08:30:12  10     THE COURT:  Well, but it's kind of disconnected

08:30:14  11 from the evidence if they just kind of randomly say

08:30:17  12 "Who's Charlie Burgess?"

08:30:19  13     MR. SHULTZ:  Your Honor, I can write -- I can do

08:30:21  14 their -- "Who are you?"  "I manage Garden Spot

08:30:24  15 Apartments."  "Do you own those?"  "No."  "Who owns

08:30:26  16 them?"  "Steve Burgess."  "Who's that?"  "My dad."

08:30:28  17     THE COURT:  Yeah, Mr. Shultz, I understand how you

08:30:30  18 lay a foundation, but that's disconnected -- I mean,

08:30:35  19 let's just skip past whether they have to do it that way.

08:30:38  20 The law does provide -- does allow them to introduce some

08:30:44  21 evidence provisionally subject to a foundation being laid

08:30:47  22 later to do exactly what they're wanting to do.  So

08:30:50  23 what's the legal basis for your objection?

08:30:53  24     MR. SHULTZ:  I would argue with this witness, Your

08:30:55  25 Honor, it's designed to be sort of an end-run around the

3-26-18   USA v. ALLEN, et al.   No. 16-10141

10

08:30:57  1  court's earlier motion in limine about victim testimony.

08:30:58  2      THE COURT:  They addressed that in the motion.

08:31:00  3  They say they won't do that.  If they do, I'll sustain

08:31:02  4  any objections as far as to victim testimony.

08:31:06  5      MR. SHULTZ:  Well, Your Honor, I mean, they are

08:31:09  6  playing a clip that purportedly has our clients alleging

08:31:14  7  violence or allegedly plotting violence against this

08:31:16  8  witness' father.

08:31:17  9      THE COURT:  Are you going to be object to that

08:31:19  10  clip when it's offered in full?  Not provisionally.

08:31:23  11      MR. SHULTZ:  I do not believe so, Your Honor.

08:31:24  12      THE COURT:  So what's the objection to it being

08:31:26  13  offered now?

08:31:27  14      MR. SHULTZ:  The objection is she doesn't have any

08:31:29  15  knowledge of who's talking, when, where, et cetera.  The

08:31:32  16  objection, Your Honor, is to -- I guess I would say it's

08:31:35  17  kind of like a 404(b) -- or 403(b) -- or 403 objection,

08:31:39  18  that playing it through this witness, there's no

08:31:41  19  probative value to the clip itself that's above anything

08:31:45  20  they can do without the clip, and the prejudicial effect

08:31:48  21  to start off -- I presume she'll be the first witness --

08:31:51  22  to start off their examination is clearly to elicit an

08:31:56  23  emotional response.

08:31:57  24      THE COURT:  You understand, Mr. Shultz,

08:31:59  25  prejudicial evidence isn't objectional.  It's only unduly

Case 6:16-cr-10141-EFM   Document 539   Filed 04/12/19   Page 11 of 347

3-26-18   USA v. ALLEN, et al.   No. 16-10141                11

08:32:03   1   prejudicial.

08:32:04   2        MR. SHULTZ:  I would say it's unduly prejudicial

08:32:06   3   in context --

08:32:07   4        THE COURT:  What's your argument with respect to

08:32:09   5   the map?

08:32:10   6        MR. SHULTZ:  The same thing, Your Honor.  They

08:32:11   7   have two maps.  One doesn't have the X, and she could

08:32:14   8   testify to all that she was going to testify to without

08:32:19   9   the X's.  Again, she has no firsthand knowledge of the

08:32:23  10   connection between these, where they came from, who they

08:32:25  11   came from, what the purported --

08:32:27  12        THE COURT:  That's not required if the documents

08:32:29  13   are going to go provisionally admitted merely for her to

08:32:33  14   explain of that subject to their later admission.

08:32:37  15        MR. SHULTZ:  Again, Your Honor, I would say it's

08:32:38  16   unduly prejudicial given that the probative value of this

08:32:41  17   over the probative value of just asking the questions is

08:32:43  18   literally zero.  There's no additional probative value

08:32:46  19   from the X map or the audio clip.

08:32:48  20        THE COURT:  I'm going to grant the Government's

08:32:52  21   motion as to both pieces of the exhibit.  I think the

08:32:54  22   rules of evidence allow it.

08:32:56  23        I've an unusual schedule today.  I'm involved in

08:33:01  24   a -- briefly involved in a presentation over the noon

08:33:03  25   hour, so I'm going to want to take our lunch recess a bit

3-26-18   USA v. ALLEN, et al.   No. 16-10141

12

| | | |
|---|---|---|
| 08:33:07 | 1 | early today, no later than 11:40.  I guess that's |
| 08:33:10 | 2 | directed to the Government.  Well, it's directed to |
| 08:33:12 | 3 | whoever will be at the podium at that time.  I don't know |
| 08:33:14 | 4 | how long your witnesses will take, but I do want to take |
| 08:33:16 | 5 | a slightly earlier lunch recess today because I've got a |
| 08:33:22 | 6 | commitment over the lunch hour and a program.  And then |
| 08:33:26 | 7 | we're on tap to do our *James* hearing Take Three this |
| 08:33:32 | 8 | evening; correct? |
| 08:33:33 | 9 | MS. BRANNON:  Take Four. |
| 08:33:34 | 10 | THE COURT:  I'm sorry? |
| 08:33:35 | 11 | MS. BRANNON:  I think it's Take Four. |
| 08:33:37 | 12 | THE COURT:  Whatever.  Mr. Mattivi? |
| 08:33:40 | 13 | MR. MATTIVI:  There was one more issue I needed to |
| 08:33:42 | 14 | raise before we bring the jury in, Your Honor. |
| 08:33:44 | 15 | THE COURT:  All right. |
| 08:33:45 | 16 | MR. MATTIVI:  The second witness up today is Brody |
| 08:33:48 | 17 | Benson.  We plan to play a clip with him.  We've |
| 08:33:51 | 18 | identified it as Exhibit 13g.  And in that clip Mr. -- |
| 08:33:56 | 19 | and this, to be clear, Exhibit 13 -- we appreciate your |
| 08:34:00 | 20 | email on Friday evening.  We understand you view |
| 08:34:03 | 21 | Exhibit 13 as still an open question as to whether it's a |
| 08:34:07 | 22 | co-conspirator statement.  We intend to offer it today |
| 08:34:09 | 23 | just as a statement against Mr. Klein -- Mr. Stein.  So |
| 08:34:13 | 24 | we're not going to try to admit Exhibit 13 as a |
| 08:34:15 | 25 | co-conspirator statement at this point. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

13

| | | |
|---|---|---|
| 08:34:17 | 1 | THE COURT:  All right. |
| 08:34:17 | 2 | MR. MATTIVI:  There is a clip, 13g, where |
| 08:34:21 | 3 | Mr. Stein say, "I had envisioned kicking doors in with a |
| 08:34:25 | 4 | Mark 2 and a silencer." |
| 08:34:27 | 5 | Pursuant to the Court's limine ruling over the |
| 08:34:29 | 6 | weekend, we redacted that clip, so that it simply says, |
| 08:34:33 | 7 | "I'd envisioned kicking doors in with a Mark 2." |
| 08:34:37 | 8 | We spoke last night with Mr. Benson, in the |
| 08:34:41 | 9 | presence of his counsel, and admonished him, informed him |
| 08:34:44 | 10 | of the Court's ruling in limine and admonished him about |
| 08:34:47 | 11 | mentioning the fact that there was a silencer. |
| 08:34:49 | 12 | Mr. Benson is an individual who is entirely |
| 08:34:53 | 13 | distrustful of the government, and he did not think that |
| 08:34:56 | 14 | that was anything that he could be directed to do, to |
| 08:35:01 | 15 | inaccurately portray a recording to the Court.  I said, |
| 08:35:04 | 16 | Would you rather hear that from the Court than from me?" |
| 08:35:08 | 17 | And he said, "Yes, absolutely."  So I think before we |
| 08:35:10 | 18 | have him testify, my admonition about the ruling in |
| 08:35:15 | 19 | limine, I don't think, was sufficient to keep him from |
| 08:35:16 | 20 | mentioning it. |
| 08:35:17 | 21 | THE COURT:  Will he testify before the morning |
| 08:35:19 | 22 | recess? |
| 08:35:20 | 23 | MR. MATTIVI:  I believe he will.  And I think |
| 08:35:21 | 24 | we'll get to that clip before the morning recess. |
| 08:35:23 | 25 | THE COURT:  So do you want me to do that now? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141          14

08:35:25   1          MR. MATTIVI:  I can -- we had not planned to

08:35:28   2   position him until everybody was in the courtroom.  I

08:35:30   3   can -- I can --

08:35:31   4          THE COURT:  I mean, when do you want me to

08:35:33   5   admonish him?  I'm happy to do that.

08:35:35   6          MR. MATTIVI:  You have to do it and we'd like you

08:35:37   7   to do it before he testifies.  If we can get him up here

08:35:40   8   right now, I would be happy to do that.  I didn't plan to

08:35:43   9   put him outside the courtroom until Ms. Blackburn

08:35:45   10  actually took the witness stand, but I can call

08:35:47   11  downstairs and get him up here.

08:35:48   12         THE COURT:  My question is when did you wanted me

08:35:50   13  to do that, if you don't do it now?

08:35:52   14         MR. MATTIVI:  I'm sorry?

08:35:53   15         THE COURT:  If we don't -- is this on -- if we

08:35:57   16  don't do it now, when would you want me to do that?

08:35:59   17         MR. MATTIVI:  I think now would be the better

08:36:01   18  option.  I just need a moment to get him up here.

08:36:04   19         THE COURT:  All right.  Well, I guess let's do

08:36:06   20  that.

08:36:06   21         MR. MATTIVI:  Okay.

08:36:07   22         THE COURT:  Ms. Brannon?

08:36:11   23         MS. BRANNON:  Judge, I can probably fill in the

08:36:13   24  time.  First of all, regarding the statement about

08:36:18   25  admitting statements of Mr. Stein as a statement against

08:36:23  1  interest, we'd also ask the Court to issue a limiting

08:36:26  2  instruction at that time, that those statements are not

08:36:30  3  to be used against Mr. Wright and Mr. Allen.

08:36:31  4        THE COURT:  All right.

08:36:32  5        MS. BRANNON:  Secondly, Your Honor, we'd go

08:36:33  6  ahead --

08:36:33  7        THE COURT:  When would you like me to do that?

08:36:36  8        MS. BRANNON:  I suppose just prior to that

08:36:39  9  evidence being admitted.

08:36:40  10        THE COURT:  Okay.

08:36:41  11        MS. BRANNON:  We'd also move to invoke the rule

08:36:44  12  under Rule 615 regarding witnesses in the courtroom.

08:36:48  13        THE COURT:  Yeah, I assumed that that rule would

08:36:51  14  be invoked, actually assumed it had been invoked.  To the

08:36:54  15  extent it hasn't been, certainly to the extent that there

08:36:57  16  are any witnesses in the courtroom who have not

08:36:59  17  testified -- and I guess nobody's testified so far -- I'm

08:37:03  18  going to ask that you not be present during the testimony

08:37:05  19  of any other witnesses.

08:37:06  20        Counsel, I'll tell you that once a witness has

08:37:09  21  testified, I'm assuming that the rule is lifted, and so

08:37:13  22  if any of you anticipate that that witness may be

08:37:16  23  recalled and would like the rule continued with respect

08:37:19  24  to that witness, then you'll need to let me know at that

08:37:22  25  time.  I'll be happy to do so, but I'll need to have that

3-26-2018 USA v. ALLEN, et al, NO 16-10141          16

08:37:25  1  pointed out.

08:37:26  2        MS. BRANNON:  And, Judge, just as an extra

08:37:28  3  precaution, because I think some of these witnesses,

08:37:31  4  maybe as Mr. Mattivi described, we'd like to make sure

08:37:33  5  that they are advised that they are not to discuss their

08:37:36  6  testimony with any other witness, which is within the

08:37:40  7  rule.

08:37:40  8        THE COURT:  It is within the rule.  And I actually

08:37:42  9  struck a witness in a civil trial once for a violation of

08:37:46  10  that very rule.  But how do you want that to be done?  Do

08:37:50  11  you want to have the -- I mean, I'm not seeing these

08:37:52  12  witnesses.  Do you want to have the Government do it?

08:37:54  13        MS. BRANNON:  I think each party should be

08:37:56  14  responsible for their witnesses and advising them.

08:37:58  15        THE COURT:  Yeah, I think that's fair.

08:37:59  16        MR. MATTIVI:  We don't have an objection to that,

08:38:01  17  Your Honor.  We would, though, ask for an exception for

08:38:03  18  the rule to the two case agents and the experts.

08:38:06  19        THE COURT:  Certainly the rule doesn't -- well,

08:38:08  20  and the expert?

08:38:09  21        MR. MATTIVI:  Yes, sir.

08:38:09  22        THE COURT:  The rule doesn't apply, obviously, to

08:38:11  23  the case agent.  What's the status with respect to the

08:38:16  24  expert?

08:38:17  25        MR. MATTIVI:  We have two case agents in this

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

08:38:19   1   case, Your Honor.  We expect Ms. Kuhn to be sitting with

08:38:21   2   us at counsel table.  We just -- we don't expect Special

08:38:26   3   Agent Smith to be sitting with us but we do expect him to

08:38:28   4   be shuttling witnesses in and out on occasion, so I want

08:38:31   5   to be sure the fact he just might be bringing a witness

08:38:33   6   in, you know, isn't going to be a problem.

08:38:36   7          I'll let Ms. Hahn handle the expert issue.

08:38:40   8          MS. HAHN:  So the question is -- and actually this

08:38:41   9   may be something that Mr. Federico would agree to, is

08:38:44  10   that if, for example, Dr. Barrow, who's an expert for the

08:38:48  11   Government, is testifying, I imagine that they might want

08:38:52  12   to have their expert sitting in there, and vice versa.

08:38:54  13   If there's an expert that's put up by one of the defense

08:38:58  14   experts, we would like to have our expert sit in so that

08:39:01  15   we can consult --

08:39:02  16          THE COURT:  Well, are we talking about the parties

08:39:05  17   wanting to have an agreement to exclude experts from the

08:39:08  18   rule or are you asking for a ruling from the court?

08:39:12  19          MS. HAHN:  Honestly, Your Honor, I had not really

08:39:15  20   thought about it.  So why don't I consult with the

08:39:17  21   defense and get back to you on that?

08:39:19  22          THE COURT:  All right.

08:39:20  23          MS. HAHN:  There are no experts here today as far

08:39:22  24   as I know.

08:39:22  25          THE COURT:  We'll take that issue up later then.

3-26-2018 USA v. ALLEN, et al, NO 16-10141            18

08:39:24    1        MS. BRANNON:  Your Honor, we don't have any

08:39:26    2   objection Ms. Kuhn sitting at counsel table and being

08:39:28    3   accepted.  I'm not sure they should have two case agents.

08:39:33    4        THE COURT:  I think -- I think their reference to

08:39:35    5   Agent Smith was simply that he'll be in and out with

08:39:39    6   respect to shuttling witnesses.  As long as the "in and

08:39:41    7   out" doesn't lean excessively heavy on the "in" side,

08:39:45    8   then I think that's fair because as I've told you before,

08:39:48    9   I want to try to keep matters moving and not having

08:39:51   10   inordinate delays as we move witnesses into the court.

08:39:54   11        MS. BRANNON:  And that's fine, Your Honor.  The

08:39:56   12   last two requests, I think these are resolved, but we

08:39:58   13   just wanted to get them on the record.  We understand

08:40:00   14   that the Government has already provided us all *Jencks*

08:40:03   15   material.  And I wanted to make sure that was correct.

08:40:06   16   And Mr. Mattivi's indicating it is.

08:40:08   17        And secondly, we wanted to make sure that all

08:40:11   18   *Brady* and *Giglio* information has been provided to us.  I

08:40:13   19   know a significant amount has but we just wanted to put

08:40:16   20   that on the record.

08:40:17   21        MR. MATTIVI:  It has.  And the summary that the

08:40:18   22   defense asked for with regard to UCEs, I have a draft of

08:40:23   23   that in my in-box and I expect to send that out later in

08:40:26   24   the day.

08:40:26   25        THE COURT:  All right.  Thank you, Counsel.

| | | |
|---|---|---|
| 08:40:28 | 1 | Ms. Schmidt, you were standing earlier, did you -- |
| 08:40:30 | 2 | MS. SCHMIDT:  Your Honor, I got what I needed. |
| 08:40:32 | 3 | Thank you. |
| 08:40:32 | 4 | THE COURT:  Very well.  Thank you. |
| 08:40:33 | 5 | MR. MATTIVI:  And then Mr. Benson is here with |
| 08:40:36 | 6 | Mr. Maughan representing him, Your Honor, if you wouldn't |
| 08:40:39 | 7 | mind taking up that limiting ruling. |
| 08:40:42 | 8 | THE COURT:  Certainly. |
| 08:40:42 | 9 | Mr. Benson, I understand that you're going to be |
| 08:40:46 | 10 | testifying in this trial.  We will endeavor in this trial |
| 08:40:51 | 11 | to make sure that all sides have as fair a trial as |
| 08:40:56 | 12 | possible, because, barring that, theoretically, God |
| 08:41:00 | 13 | forbid, the court of appeals could send this case back to |
| 08:41:03 | 14 | be retried.  To that extent, I've made numerous rulings |
| 08:41:07 | 15 | in advance as to what is and is not appropriately |
| 08:41:11 | 16 | admitted in this case. |
| 08:41:14 | 17 | I'm advised by the Government that one of my |
| 08:41:17 | 18 | rulings may impact some matters that you're going to talk |
| 08:41:20 | 19 | about, and I've ruled that discussions of silencers are |
| 08:41:27 | 20 | enough removed from what we're trying here, we call it |
| 08:41:34 | 21 | "prejudicial," it just means that it can kind of evoke |
| 08:41:37 | 22 | emotions that are unrelated to the trial, and so I've |
| 08:41:40 | 23 | ruled that those should not be discussed in this trial. |
| 08:41:44 | 24 | To the extent that your testimony may otherwise |
| 08:41:48 | 25 | involve matters that might involve testimony regarding |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

20

| | | |
|---|---|---|
| 08:41:52 | 1 | silencers, then the Court's ordering you not to mention |
| 08:41:55 | 2 | those or discuss those during your testimony.  You |
| 08:41:58 | 3 | understand, sir? |
| 08:41:58 | 4 | MR. BENSON:  Yes. |
| 08:41:59 | 5 | THE COURT:  Any problems with that? |
| 08:42:02 | 6 | MR. BENSON:  At this point? |
| 08:42:04 | 7 | THE COURT:  Well, at any point.  Do you have any |
| 08:42:07 | 8 | problem with that at any point?  Let me put it to you at |
| 08:42:11 | 9 | this point, Mr. Benson, if you violate my rule, you will |
| 08:42:14 | 10 | have a problem with it because since I've given you that |
| 08:42:17 | 11 | order in direct court and if you violated my rule you can |
| 08:42:20 | 12 | expect that I'll create a problem for you on that.  I'm |
| 08:42:25 | 13 | sure we won't have to have that -- |
| 08:42:27 | 14 | MR. BENSON:  I don't -- |
| 08:42:27 | 15 | THE COURT:  I'm sorry, I can't hear you, sir. |
| 08:42:29 | 16 | MR. BENSON:  I've said I don't understand.  And I |
| 08:42:31 | 17 | don't appreciate being threatened. |
| 08:42:32 | 18 | THE COURT:  Well, sir, the reason I'm threatening |
| 08:42:34 | 19 | you is because you said you don't have a problem at this |
| 08:42:37 | 20 | point, and you seem to indicate that you might have a |
| 08:42:38 | 21 | problem at some other point.  So what I want is an |
| 08:42:43 | 22 | unequivocal answer from you. |
| 08:42:44 | 23 | MR. BENSON:  [Inaudible]  Then I don't have a |
| 08:42:45 | 24 | problem with it in this court at this point, but I do |
| 08:42:48 | 25 | have a problem. |

| | | |
|---|---|---|
| 08:42:48 | 1 | THE COURT:  What's your problem? |
| 08:42:50 | 2 | MR. BENSON:  It's a First Amendment violation. |
| 08:42:53 | 3 | THE COURT:  Well, it's not a First Amendment |
| 08:42:56 | 4 | violation with respect to trials in this case.  What you |
| 08:42:58 | 5 | say outside of this -- sir. |
| 08:42:59 | 6 | MR. BENSON:  Silencers can be -- |
| 08:43:01 | 7 | THE COURT:  Sir, it is -- this works better if one |
| 08:43:04 | 8 | of us talks at a time.  All right? |
| 08:43:07 | 9 | You have an absolute First Amendment right to say |
| 08:43:09 | 10 | anything you want to outside of this trial.  But I'm in |
| 08:43:13 | 11 | control within this trial, and I'm in control to give all |
| 08:43:16 | 12 | sides a fair trial and so my instruction to you is not to |
| 08:43:19 | 13 | mention silencers at all while you're testifying in this |
| 08:43:22 | 14 | trial.  What you do otherwise is of no concern to me. |
| 08:43:25 | 15 | MR. BENSON:  Okay. |
| 08:43:25 | 16 | THE COURT:  Is that good?  Are we good on that? |
| 08:43:28 | 17 | MR. BENSON:  Yes. |
| 08:43:28 | 18 | THE COURT:  Very well.  All right. |
| 08:43:29 | 19 | Anything else we need to take up regarding this? |
| 08:43:32 | 20 | MR. MATTIVI:  I don't believe so, Your Honor. |
| 08:43:33 | 21 | Thank you. |
| 08:43:34 | 22 | THE COURT:  I think, Mr. Benson, that you're going |
| 08:43:36 | 23 | to be the Government's second witness, and so one of my |
| 08:43:39 | 24 | rules is that the witnesses can't be in here when |
| 08:43:41 | 25 | somebody else is testifying, so we'll have you taken back |

3-26-2018 USA v. ALLEN, et al, NO 16-10141         22

| | | |
|---|---|---|
| 08:43:45 | 1 | to the witness room until you testify.  I'll call you at |
| 08:43:50 | 2 | that point. |
| 08:43:50 | 3 | MR. MATTIVI:  Thank you, Your Honor. |
| 08:43:51 | 4 | THE COURT:  Are we ready to bring the jury in, |
| 08:43:53 | 5 | counsel? |
| 08:43:54 | 6 | MR. MATTIVI:  Government's ready, Your Honor. |
| 08:43:57 | 7 | MS. BRANNON:  We are, Your Honor. |
| 08:43:57 | 8 | THE COURT:  All right.  Mr. Cook, would you bring |
| 08:43:59 | 9 | the jury in. |
| 08:43:59 | 10 | (The jury returned to the courtroom, after which |
| 08:46:23 | 11 | the following proceedings were had:) |
| 08:46:23 | 12 | THE COURT:  You all may be seated.  Good morning, |
| 08:46:26 | 13 | ladies and gentlemen of the jury. |
| 08:46:26 | 14 | THE JURY (in unison):  Good morning. |
| 08:46:27 | 15 | THE COURT:  I trust that you had a good weekend. |
| 08:46:29 | 16 | I assume, if you're KU fans, you had a great weekend; if |
| 08:46:33 | 17 | you're K-State fans, you had a lousy weekend.  And if we |
| 08:46:37 | 18 | did our voir dire correctly, we don't have any Duke fans |
| 08:46:40 | 19 | on the jury.  So are you all ready to proceed? |
| 08:46:43 | 20 | THE JURY (in unison):  Yes. |
| 08:46:44 | 21 | THE COURT:  All right.  As you recall, you heard |
| 08:46:46 | 22 | opening statements Thursday afternoon.  I indicated when |
| 08:46:49 | 23 | we came back Monday morning we'd begin presentation of |
| 08:46:51 | 24 | the evidence. |
| 08:46:51 | 25 | The Government, you may call your first witness. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141        23

| | | |
|---|---|---|
| 08:46:53 | 1 | MS. HAHN:  Your Honor, the Government calls |
| 08:46:55 | 2 | Stephanie Blackburn to the stand. |
| 08:47:15 | 3 | THE COURT:  Good morning, Ms. Blackburn.  We're |
| 08:47:17 | 4 | going to ask that you stand in front of my courtroom |
| 08:47:19 | 5 | deputy here.  He will give you an oath, and then you may |
| 08:47:21 | 6 | have a seat in the witness box to the right. |
| 08:47:24 | 7 | STEPHANIE BLACKBURN, |
| 08:47:24 | 8 | having been first duly sworn to testify the truth, the |
| 08:47:24 | 9 | whole truth, and nothing but the truth, testified as |
| 08:47:35 | 10 | follows: |
| 08:47:35 | 11 | CLERK COOK:  You may go around, take a seat. |
| 08:47:45 | 12 | DIRECT EXAMINATION |
| 08:47:49 | 13 | BY MS. HAHN: |
| 08:47:51 | 14 | Q.     Good morning, Ms. Blackburn. |
| 08:47:53 | 15 | **A.     Good morning.** |
| 08:47:53 | 16 | Q.     Can you please introduce yourself to the jury and |
| 08:47:56 | 17 | spell your name for the court reporter. |
| 08:47:58 | 18 | **A.     My name is Stephanie Blackburn, S-T-E-P-H-A-N-I-E,** |
| 08:48:04 | 19 | **B-L-A-C-K-B-U-R-N.** |
| 08:48:07 | 20 | Q.     And, Ms. Blackburn, do you have some connection to |
| 08:48:10 | 21 | the apartment buildings located at 312 West Mary Street |
| 08:48:14 | 22 | in Garden City, Kansas? |
| 08:48:16 | 23 | **A.     Yes, I do.** |
| 08:48:17 | 24 | Q.     And what is your connection to those buildings? |
| 08:48:19 | 25 | **A.     312 West Mary Street is a part of our family-owned** |

```
08:48:24   1   business.
08:48:25   2   Q.     And at some point in 2016, in October of 2016, did
08:48:29   3   you learn that those apartment buildings were connected
08:48:31   4   to a federal investigation?
08:48:33   5   A.     Yes, I did.
08:48:34   6   Q.     And very briefly, what did you learn?
08:48:37   7   A.     I learned that there were three men that had
08:48:43   8   intent and plotted to bomb our apartments at 312 West
08:48:48   9   Mary Street.
08:48:48  10   Q.     I'm going to ask you some questions about that in
08:48:50  11   a little bit but I'm just going to ask you to let the
08:48:53  12   jury get to know you a little bit better.
08:48:55  13   A.     Okay.
08:48:56  14          THE COURT:  Ms. Hahn, can I ask, is your
08:48:59  15   microphone on?  You might speak into it a bit more
08:49:02  16   directly.
08:49:02  17          MS. HAHN:  Okay.  How's that?
08:49:04  18          THE COURT:  Much better.  Thank you.
08:49:05  19          MS. HAHN:  There we go.
08:49:06  20   BY MS. HAHN:
08:49:07  21   Q.     Where do you live?
08:49:08  22   A.     I live in Holcomb, Kansas.
08:49:10  23   Q.     Do you have any children?
08:49:11  24   A.     Yes, I have three children.
08:49:13  25   Q.     And where did you grow up?
```

| | | |
|---|---|---|
| 08:49:15 | 1 | A.      I grew up in Garden City, Kansas. |
| 08:49:18 | 2 | Q.      Okay.  So you are born and bred in Kansas? |
| 08:49:20 | 3 | A.      Yes, I was -- |
| 08:49:21 | 4 | Q.      Have you lived anywhere else? |
| 08:49:22 | 5 | A.      I was born in Liberal and moved to Garden City |
| 08:49:25 | 6 | when I was about six and have been in that area ever |
| 08:49:29 | 7 | since. |
| 08:49:29 | 8 | Q.      Let's talk a little bit about Garden Spot Rentals. |
| 08:49:33 | 9 | What is Garden Spot Rentals? |
| 08:49:35 | 10 | A.      Garden Spot Rentals is a family-owned business. |
| 08:49:40 | 11 | We have 419 rental units around the Garden City and |
| 08:49:46 | 12 | Holcomb area. |
| 08:49:46 | 13 | Q.      And are you currently employed by Garden Spot |
| 08:49:49 | 14 | Rentals? |
| 08:49:49 | 15 | A.      Yes, I am. |
| 08:49:50 | 16 | Q.      How long have you worked there? |
| 08:49:52 | 17 | A.      I've been there for ten years. |
| 08:49:53 | 18 | Q.      And where's the Garden Spot Rentals apartments |
| 08:49:57 | 19 | office located? |
| 08:49:58 | 20 | A.      Our office is located at 108 North Main Street in |
| 08:50:02 | 21 | Garden City, Kansas. |
| 08:50:03 | 22 | Q.      And what types of properties does Garden Spot |
| 08:50:07 | 23 | Rentals rent? |
| 08:50:07 | 24 | A.      We have houses, apartments, and storage units. |
| 08:50:10 | 25 | Q.      And who owns Garden Spot Rentals? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

26

| | | |
|---|---|---|
| 08:50:12 | 1 | **A.     My parents do, Steve and Ann Burgess.** |
| 08:50:15 | 2 | Q.     And do your parents, Steve and Ann, live in the |
| 08:50:19 | 3 | Garden City area? |
| 08:50:19 | 4 | **A.     Yes, they do.** |
| 08:50:21 | 5 | Q.     And who founded Garden Spot Rentals? |
| 08:50:23 | 6 | **A.     My parents did.** |
| 08:50:24 | 7 | Q.     When did your parents found Garden Spot Rentals? |
| 08:50:27 | 8 | **A.     In 1983, with the purchase of one single house.** |
| 08:50:31 | 9 | Q.     So over 30 years ago they had one house? |
| 08:50:34 | 10 | **A.     Yes.** |
| 08:50:34 | 11 | Q.     And I think you testified earlier how many homes |
| 08:50:38 | 12 | does Garden Spot Rentals rent out today? |
| 08:50:40 | 13 | **A.     We've got 419.** |
| 08:50:43 | 14 | Q.     Do you know of any other landlords in the Garden |
| 08:50:46 | 15 | City/Holcomb area that rents out as many rental units as |
| 08:50:50 | 16 | Garden Spot Rentals does? |
| 08:50:51 | 17 | **A.     No, I do not.** |
| 08:50:54 | 18 | Q.     Are your parents currently involved in the |
| 08:50:56 | 19 | day-to-day operations of Garden Spot Rentals? |
| 08:50:58 | 20 | **A.     No, they're not.** |
| 08:50:59 | 21 | Q.     Why not? |
| 08:51:00 | 22 | **A.     It's health- and age-related issues.** |
| 08:51:04 | 23 | Q.     And even though your father is no longer part of |
| 08:51:07 | 24 | the day-to-day operations, who is known as the face of |
| 08:51:10 | 25 | your family's company? |

| 08:51:12 | 1 | A.      My dad, Steve Burgess. |
| 08:51:13 | 2 | Q.      And was your dad Steve Burgess the face of the |
| 08:51:17 | 3 | company throughout 2016? |
| 08:51:19 | 4 | A.      Yes, he was. |
| 08:51:19 | 5 | Q.      And who is currently in charge of the day-to-day |
| 08:51:22 | 6 | operations of Garden Spot Rentals? |
| 08:51:24 | 7 | A.      I am. |
| 08:51:24 | 8 | Q.      And how long have you been in charge of those |
| 08:51:26 | 9 | day-to-day operations? |
| 08:51:28 | 10 | A.      About the last five years. |
| 08:51:31 | 11 | Q.      You testified that Garden Spot Rental rents out |
| 08:51:34 | 12 | the units at 312 West Mary Street in Garden City? |
| 08:51:37 | 13 | A.      That's correct. |
| 08:51:38 | 14 | Q.      And are you personally familiar with and have you |
| 08:51:40 | 15 | actually visited those apartments at 312 West Mary |
| 08:51:44 | 16 | Street? |
| 08:51:44 | 17 | A.      Yes, I have. |
| 08:51:45 | 18 | Q.      And are you familiar with an apartment complex |
| 08:51:48 | 19 | located at 305 West Mary Street in Garden City? |
| 08:51:52 | 20 | A.      Yes, I am. |
| 08:51:53 | 21 | Q.      How are you familiar with the apartments at 305 |
| 08:51:56 | 22 | West Mary Street? |
| 08:51:57 | 23 | A.      305 West Mary Street are also part of our |
| 08:52:00 | 24 | business. |
| 08:52:01 | 25 | Q.      And have you personally visited the apartments at |

08:52:03   1   305 West Mary Street?

08:52:05   2   **A.        Yes, I have.**

08:52:06   3   Q.        Where are 305 and 312 West Mary Street in relation

08:52:11   4   to each other?

08:52:12   5   **A.        312 West Mary Street is located on the south side**

08:52:16   6   **of Mary Street, and 305 West Mary is located on the north**

08:52:20   7   **side.  They are basically right across the street.  305's**

08:52:24   8   **a little bit more east.**

08:52:25   9   Q.        Okay.

08:52:28   10              MS. HAHN:  Your Honor, at this point I would like

08:52:29   11   to show the witness a few exhibits, but we're not going

08:52:32   12   to publish them to the jury.

08:52:34   13              THE COURT:  All right.

08:52:37   14              MS. HAHN:  Please show the witness Government

08:52:40   15   Exhibit 94a, page 10.

08:52:46   16              MR. MOORE:  If we could clear the screen.

08:52:51   17              THE COURT:  You can also clear the screen,

08:52:54   18   Ms. Hahn, at your podium, if you touch the bottom left.

08:53:02   19   There.

08:53:02   20              MS. HAHN:  There we go.

08:53:18   21   BY MS. HAHN:

08:53:18   22   Q.        Ms. Blackburn, do you recognize page 10 of

08:53:22   23   Government Exhibit 24a?

08:53:23   24   **A.        Yes, I do.**

08:53:24   25   Q.        What does it show?

08:53:25   1   **A.        This is an aerial view of -- on the top it's 305**

08:53:31   2   **West Mary Street, with it looks like a hand-drawn X over**

08:53:36   3   **the top all the way across.   There's also an aerial view**

08:53:39   4   **to the -- on the bottom portion of 312 West Mary, with a**

08:53:44   5   **hand-drawn X all the way across.**

08:53:46   6   Q.    And minus the handwriting, do these show a true

08:53:49   7   and accurate representation of the layout of the

08:53:51   8   apartment complexes located at 305 and 312 West Mary

08:53:55   9   Street?

08:53:55  10   **A.        Yes, they do.**

08:53:57  11       MS. HAHN:  Your Honor, at this point I would seek

08:53:58  12   to conditionally admit this exhibit, based on your

08:54:02  13   earlier ruling.

08:54:05  14       MR. FEDERICO:  No objection, Your Honor.

08:54:06  15       THE COURT:  All right.  Ladies and gentlemen,

08:54:08  16   you're going to see this during the trial.  We're going

08:54:11  17   to show you an exhibit now that may potentially be fully

08:54:16  18   admitted later on when the circumstances surrounding the

08:54:21  19   creation of this exhibit are more fully explained.  But

08:54:26  20   in order to not have witnesses on and off, back and forth

08:54:28  21   on the stand, we'll try to take one witness at a time.

08:54:31  22   I'm going to provisionally admit this exhibit and display

08:54:36  23   it to the jury.

08:54:36  24       What provisionally admits it means that I'm going

08:54:39  25   to let the witness to testify to it subject to the

08:54:41  1  Government's representation that they'll lay a -- we call

08:54:44  2  it a foundation -- a more full foundation later on, which

08:54:49  3  will actually allow me to admit it later.

08:54:50  4       In the event that they don't do that, then I'll

08:54:52  5  come back and tell you that you couldn't consider any

08:54:55  6  testimony that this witness had given about that exhibit

08:54:59  7  but for purposes of our trial right now, I'm

08:55:00  8  provisionally admitting the exhibit, allowing you to see

08:55:03  9  it and the witness to testify from it.

08:55:05  10      You may publish it to the jury.

08:55:07  11      MS. HAHN:  Thank you, Your Honor.  With the

08:55:08  12  permission of the court, can we please publish it later?

08:55:12  13      THE COURT:  Oh, all right.  Can you take it down?

08:55:15  14      MR. MOORE:  Sure, oh, yes.

08:55:17  15      MS. HAHN:  I'm just going to go through several

08:55:18  16  exhibits and just have Ms. Blackburn lay the foundation

08:55:21  17  for admission and then we'll publish them as the exam

08:55:24  18  goes on, if that's okay.

08:55:24  19      THE COURT:  Yes.

08:55:26  20      MS. HAHN:  Okay.  Can we show the witness and only

08:55:28  21  the witness and the court and personnel Government

08:55:32  22  Exhibit 152.

08:55:34  23      And if you could scroll down to the photographs.

08:55:40  24      And I'm going to have you scroll through the

08:55:43  25  photographs.

08:55:43   1          MR. MOORE:  Sure.

08:56:35   2   BY MS. HAHN:

08:56:36   3   Q.     Ms. Blackburn, do you recognize what's contained

08:56:38   4   in Government Exhibit 152?

08:56:39   5   **A.     Yes, I do.**

08:56:40   6   Q.     And what's contained in this exhibit?

08:56:42   7   **A.     These are photographs of our properties at 312**

08:56:46   8   **West Mary.**

08:56:48   9   Q.     And are these photographs true and accurate

08:56:51  10   representation of the property at 312 West Mary Street?

08:56:54  11   **A.     Yes, they are.**

08:56:55  12          MS. HAHN:  Your Honor, the Government would move

08:56:56  13   to admit Government Exhibit 152.

08:57:01  14          MR. FEDERICO:  Your Honor, the first page that was

08:57:03  15   shown to the witness seemed to be handwritten notes that

08:57:05  16   I'm not sure their connection to the photographs.  We

08:57:08  17   don't object to the admission of the photographs but to

08:57:11  18   those handwritten notes, lack of foundation, hearsay.

08:57:14  19          MR. SHULTZ:  We'd join, Your Honor.

08:57:15  20          THE COURT:  I think the objection's well-stated.

08:57:17  21   What about the first page, Ms. Hahn?

08:57:18  22          MS. HAHN:  Your Honor, for our purposes what we

08:57:21  23   are really seeking to admit are the photographs.

08:57:23  24          THE COURT:  Well, that's not what your motion was.

08:57:25  25   I'm going to grant the request to admit the photographs

| | | |
|---|---|---|
| 08:57:28 | 1 | of 152 but not the entire exhibit. |
| 08:57:31 | 2 | MS. HAHN:  And that's fine, Your Honor.  We will |
| 08:57:33 | 3 | excise those pages. |
| 08:57:36 | 4 | And, Your Honor, I'm going to show the witness |
| 08:57:39 | 5 | Government Exhibit 303a, b, and c. |
| 08:57:49 | 6 | BY MS. HAHN: |
| 08:57:51 | 7 | Q.     Ms. Blackburn, do you recognize what's depicted in |
| 08:57:56 | 8 | 303a? |
| 08:57:57 | 9 | **A.     Yes, I do.** |
| 08:57:58 | 10 | Q.     And what is it? |
| 08:57:59 | 11 | **A.     This is an aerial view of 305 West Mary and 312** |
| 08:58:05 | 12 | **West Mary.** |
| 08:58:05 | 13 | Q.     Okay. |
| 08:58:07 | 14 | MS. HAHN:  Can we show the witness 303b, please. |
| 08:58:07 | 15 | BY MS. HAHN: |
| 08:58:13 | 16 | Q.     Ms. Blackburn, do you recognize this? |
| 08:58:15 | 17 | **A.     Yes, I do.** |
| 08:58:16 | 18 | Q.     And what does it represent? |
| 08:58:18 | 19 | **A.     This is more over on the east side, the east** |
| 08:58:21 | 20 | **drive, of 312 West Mary.** |
| 08:58:23 | 21 | Q.     Okay. |
| 08:58:24 | 22 | MS. HAHN:  And can we show the witness 303c. |
| 08:58:24 | 23 | BY MS. HAHN: |
| 08:58:30 | 24 | Q.     Ms. Blackburn, what does 303c represent? |
| 08:58:32 | 25 | **A.     It's an aerial, more-close view of 312 West Mary** |

| | | |
|---|---|---|
| 08:58:39 | 1 | **Street only.** |
| 08:58:39 | 2 | Q.    And do Exhibits 303a, 303b, and 303c represent a |
| 08:58:45 | 3 | true and accurate representation of the apartment |
| 08:58:48 | 4 | buildings at 312 West Mary Street? |
| 08:58:50 | 5 | **A.    Yes, they do.** |
| 08:58:51 | 6 | MS. HAHN:  Your Honor, we'd seek to admit 303 -- |
| 08:58:55 | 7 | Government's Exhibit 303a, 303b, and 303c. |
| 08:58:58 | 8 | MR. FEDERICO:  No objection, Your Honor. |
| 08:59:01 | 9 | MR. SHULTZ:  No objection. |
| 08:59:01 | 10 | MS. SCHMIDT:  No objection. |
| 08:59:02 | 11 | THE COURT:  Those exhibits will be admitted. |
| 08:59:04 | 12 | BY MS. HAHN: |
| 08:59:04 | 13 | Q.    We're going to take a look at these exhibits in |
| 08:59:08 | 14 | just a bit but let's get a little bit of background on |
| 08:59:11 | 15 | 312 West Mary Street.  Okay? |
| 08:59:12 | 16 | **A.    Okay.** |
| 08:59:13 | 17 | Q.    How many stories is each apartment building at 312 |
| 08:59:15 | 18 | West Mary Street? |
| 08:59:16 | 19 | **A.    They are one story.** |
| 08:59:17 | 20 | Q.    And how many apartments are at 312 West Mary |
| 08:59:20 | 21 | Street? |
| 08:59:20 | 22 | **A.    There's 30 two-bedroom units there.** |
| 08:59:24 | 23 | Q.    And and typically how many units are vacant at 312 |
| 08:59:28 | 24 | West Mary Street? |
| 08:59:29 | 25 | **A.    Typically none.** |

08:59:30    1   Q.     That's good for business.   How many buildings are

08:59:36    2   at 312 West Mary Street?

08:59:37    3   **A.     There are eight buildings.**

08:59:39    4   Q.     And what are the buildings made of?

08:59:41    5   **A.     They're made of brick, sheetrock, shingles, glass,**

08:59:46    6   **wood.**

08:59:48    7   Q.     Are they fortified in any way against bomb

08:59:51    8   threats?

08:59:51    9   **A.     No, they are not.**

08:59:54   10   Q.     No bomb shelters there?

08:59:56   11   **A.     No.**

08:59:56   12   Q.     Can you describe the basic layout of 312 West Mary

09:00:00   13   Street.

09:00:00   14   **A.     312 West Mary Street would be somewhat in the**

09:00:03   15   **shape of a U.   There's a drive on the east side that goes**

09:00:08   16   **around over to the west side, along with parking inside**

09:00:12   17   **next to their doors.**

09:00:14   18       MS. HAHN:   Your Honor, at this time we'd like to

09:00:16   19   publish to the jury Exhibit 152, page 3.

09:01:03   20   BY MS. HAHN:

09:01:03   21   Q.     Ms. Blackburn, what is shown here?

09:01:05   22   **A.     That is a sign or an advertisement in front of the**

09:01:09   23   **312 West Mary apartments.**

09:01:10   24   Q.     And Garden Spot Apartments is your company?

09:01:13   25   **A.     Yes, it is.**

09:01:14  1  Q.     And that telephone number?

09:01:16  2  **A.     That is our office phone number, yes.**

09:01:20  3         MS. HAHN:  Can we pull up Government's Exhibit

09:01:22  4  303a, please.

09:01:22  5  BY MS. HAHN:

09:01:27  6  Q.    Ms. Blackburn, can you identify what's shown in

09:01:29  7  this photo?

09:01:30  8  **A.     That is an aerial view of 305 West Mary and 312**

09:01:34  9  **West Mary.**

09:01:36 10  Q.    Can you show the jury where 312 West Mary Street

09:01:39 11  apartments are located on this photograph?

09:01:41 12         THE COURT:  If you touch your screen, ma'am, it

09:01:44 13  will actually make a mark that will display on all of the

09:01:47 14  monitors.

09:01:48 15         THE WITNESS:  Okay.

09:01:51 16         (Witness indicates.)

09:01:53 17  BY MS. HAHN:

09:01:53 18  Q.    There you go.  Where you put that little green

09:01:58 19  dot, is that 312 West Mary Street?

09:01:59 20  **A.     That is 312 West Mary.   Sorry.**

09:02:02 21  Q.    And how about 305 West Mary Street?  If you want

09:02:06 22  to circle the whole thing.

09:02:07 23  **A.     Cycle the whole thing?  Okay.  (Witness**

09:02:12 24  **indicates.)  That is 305 West Mary Street.**

09:02:14 25  Q.    Okay.  Terrific.  And what is the street running

09:02:17   1  in between the two?

09:02:18   2  A.       That would be Mary Street.

09:02:24   3           MS. HAHN:  Can we pull up Government Exhibit 303c.

09:02:24   4  BY MS. HAHN:

09:02:30   5  Q.       And what are we seeing here?

09:02:31   6  A.       An aerial view, more up close, of 312 West Mary

09:02:35   7  Street.

09:02:35   8  Q.       Okay.  Previously you testified that 312 West Mary

09:02:39   9  Street was in a U shape.

09:02:41   10  A.       Yes.

09:02:41   11  Q.       Can you show the jury what you mean by the U

09:02:44   12  shape?

09:02:45   13  A.       Yes.  The first building, the A building starts

09:02:48   14  over here on the east side, and then there's buildings

09:02:53   15  that run across the back on the south side, and then one

09:02:57   16  more building over here on the west side.  And then you

09:03:01   17  have two buildings, D and E, right here in the middle,

09:03:05   18  which kind of make up the middle of a U, and then you've

09:03:08   19  got driveways on either side, and then parking

09:03:12   20  (indicating throughout).

09:03:17   21  Q.       All right.  How many apartments are in each of the

09:03:20   22  buildings that make up the U of this property?

09:03:24   23  A.       There are four apartments.

09:03:26   24  Q.       And how many apartments are in each of the middle

09:03:29   25  two buildings that you indicated?

3-26-2018 USA v. ALLEN, et al, NO 16-10141            37

09:03:31    1  **A.       There are three in each one.**

09:03:32    2  Q.    And do people live in each of these apartments --

09:03:35    3  **A.       Yes.**

09:03:35    4  Q.    -- or each of these buildings?

09:03:38    5  **A.       Sorry.  Yes, they do.**

09:03:41    6        MS. HAHN:  Can we please publish Government's

09:03:44    7  Exhibit 303b.

09:03:44    8  BY MS. HAHN:

09:03:46    9  Q.    Ms. Blackburn, what does this photo show or

09:03:49   10  Government's Exhibit 303b show?

09:03:52   11  **A.       That shows the east side of 312 West Mary Street**

09:03:55   12  **apartments.**

09:03:55   13  Q.    And do all of the buildings -- are all of the

09:03:58   14  buildings made up the same types of materials that we see

09:04:01   15  here?

09:04:01   16  **A.       Yes.**

09:04:06   17  Q.    About how many people were living at 312 West Mary

09:04:10   18  Street as of October 2016?

09:04:13   19  **A.       Listed on contract, we have 85.**

09:04:16   20  Q.    And there might be some more, some less, depending

09:04:20   21  on whether people might have children or those sorts of

09:04:23   22  things; right?

09:04:24   23  **A.       That's correct.**

09:04:25   24  Q.    And does Garden Spot Rentals rent to families with

09:04:28   25  children?

3-26-2018 USA v. ALLEN, et al, NO 16-10141                38

| | | |
|---|---|---|
| 09:04:28 | 1 | A.      Yes, we do. |
| 09:04:29 | 2 | Q.      And do they rent to seniors? |
| 09:04:32 | 3 | A.      Yes, we do. |
| 09:04:33 | 4 | Q.      Have you personally met almost all of the |
| 09:04:35 | 5 | residents at 312 West Mary Street apartments? |
| 09:04:38 | 6 | A.      Yes, I have. |
| 09:04:38 | 7 | Q.      And are the majority of the residents at 312 West |
| 09:04:43 | 8 | Mary Street a particular race? |
| 09:04:43 | 9 | A.      Yes. |
| 09:04:43 | 10 | Q.      What race with they? |
| 09:04:45 | 11 | A.      Somali. |
| 09:04:46 | 12 | Q.      Okay.  Are they white or black or Asian or -- |
| 09:04:52 | 13 | A.      They are black. |
| 09:04:53 | 14 | Q.      And you mentioned that they are -- the majority |
| 09:04:56 | 15 | are Somalian? |
| 09:04:57 | 16 | A.      That's correct. |
| 09:04:58 | 17 | Q.      Is Somali a country? |
| 09:05:01 | 18 | A.      Yes. |
| 09:05:02 | 19 | Q.      Do you know where that country is located? |
| 09:05:03 | 20 | A.      In Africa. |
| 09:05:08 | 21 | Q.      And are there residents at 312 West Mary Street |
| 09:05:11 | 22 | who are Muslim? |
| 09:05:13 | 23 | A.      Yes. |
| 09:05:13 | 24 | Q.      Is there a place at 312 West Mary Street |
| 09:05:16 | 25 | apartments where Muslim residents can hold their |

| | | |
|---|---|---|
| 09:05:19 | 1 | religious services? |
| 09:05:20 | 2 | **A.        Yes, there is.** |
| 09:05:21 | 3 | Q.        What is that place called? |
| 09:05:22 | 4 | **A.        It's called a mosque.** |
| 09:05:23 | 5 | Q.        How long has that mosque been located at 312 West |
| 09:05:27 | 6 | Mary Street? |
| 09:05:27 | 7 | **A.        Since 2007.** |
| 09:05:28 | 8 | Q.        Did the residents at 312 West Mary Street have |
| 09:05:32 | 9 | permission to -- from your company -- to set up that |
| 09:05:35 | 10 | mosque? |
| 09:05:37 | 11 | **A.        Yes, they did.** |
| 09:05:37 | 12 | Q.        Does Garden Spot Rentals charge rent for that |
| 09:05:40 | 13 | mosque? |
| 09:05:40 | 14 | **A.        Yes.** |
| 09:05:40 | 15 | Q.        And who pays for that rent? |
| 09:05:42 | 16 | **A.        There are three individuals that live in other** |
| 09:05:46 | 17 | **places at 312 West Mary Street that have combined on that** |
| 09:05:51 | 18 | **contract to rent that property.** |
| 09:05:52 | 19 | Q.        Okay.  So just to be clear, the people who rent |
| 09:05:55 | 20 | the mosque live in apartments at 312 West Mary? |
| 09:05:58 | 21 | **A.        Yes.** |
| 09:05:59 | 22 | Q.        And why did Garden Spot Rentals allow the |
| 09:06:03 | 23 | residents to set up a mosque at the apartment complex? |
| 09:06:06 | 24 | **A.        A few of the residents had asked to set that up as** |
| 09:06:10 | 25 | **a convenience to the people that lived over at 312 West** |

09:06:14  1   **Mary.  We didn't find any reason why it would be a**

09:06:20  2   **problem.  They were still continuing to pay rent on the**

09:06:22  3   **property as they should.  They were going to keep up the**

09:06:26  4   **maintenance on the property as they should.  We did not**

09:06:28  5   **find a reason to tell them no.**

09:06:32  6   Q.     Okay.  It's been there since 2007, so over a

09:06:35  7   decade; right?

09:06:36  8   **A.     Yes, uh-huh.**

09:06:37  9   Q.     Have you ever received any complaints about that

09:06:40  10  mosque?

09:06:40  11  **A.     No, we had not.**

09:06:43  12        MS. HAHN:  If we could pull up 303, the

09:06:46  13  Government's Exhibit 303c, please.

09:06:46  14  BY MS. HAHN:

09:06:52  15  Q.     Can you show the jury on the screen where that

09:06:55  16  mosque is located in the apartment complex.

09:06:58  17  **A.     It's right there (indicating).**

09:07:01  18  Q.     Okay.  And that is on which side of the apartment

09:07:04  19  complex?

09:07:05  20  **A.     That would be over on the east side, 312A-1.**

09:07:13  21  Q.     Does Garden Spot Rentals own any other properties

09:07:16  22  where a mosque is located in the complex?

09:07:19  23  **A.     Yes, we do.**

09:07:20  24  Q.     And what property is that?

09:07:21  25  **A.     305 West Mary.**

09:07:23  1  Q.      And that's the property that you testified is just

09:07:25  2  to the north of 312?

09:07:27  3  **A.      That's correct.**

09:07:29  4  Q.      Of the 400-plus homes rented by Garden Spot

09:07:33  5  Rentals, other than 312 West Mary and 305 West Mary, do

09:07:37  6  any of the other apartment complexes have mosques located

09:07:39  7  in them?

09:07:41  8  **A.      No.**

09:07:41  9  Q.      All right.  Let's take a step back and talk about

09:07:45  10 the history of Garden Spot Rentals renting to immigrants.

09:07:48  11 Okay?  Has 312 West Mary had high immigrant population as

09:07:53  12 long as you can remember?

09:07:53  13 **A.      Yes, it has.**

09:07:54  14 Q.      And does Garden Spot Rentals have a business

09:07:57  15 philosophy about renting to immigrants?

09:08:00  16 **A.      Yes.  My dad started this policy and philosophy**

09:08:05  17 **whenever he began the business.  He had no problem**

09:08:07  18 **renting to anyone.  We kind of have an open-door policy,**

09:08:12  19 **as long as they qualify.**

09:08:14  20 Q.      And is that something that Garden Spot Rentals has

09:08:17  21 a business reputation out in the community as being open

09:08:20  22 to renting to immigrants?

09:08:22  23 **A.      Yes, we do.**

09:08:24  24 Q.      Have different immigrant groups lived at 312 West

09:08:27  25 Mary Street over the years?

| | | |
|---|---|---|
| 09:08:28 | 1 | **A.        Yes.** |
| 09:08:28 | 2 | Q.        And at some point you mentioned that today the |
| 09:08:33 | 3 | majority of the residents are Somali; right? |
| 09:08:35 | 4 | **A.        Yes, that's correct.** |
| 09:08:35 | 5 | Q.        At some point when did the Somalis start to live |
| 09:08:39 | 6 | at 312 West Mary Street? |
| 09:08:40 | 7 | **A.        Around 2006-2007.** |
| 09:08:43 | 8 | Q.        And about how long have most of the current Somali |
| 09:08:46 | 9 | residents lived at 312 West Mary Street? |
| 09:08:49 | 10 | **A.        There are several that have been there for 10, 12,** |
| 09:08:53 | 11 | **5, 8, years.** |
| 09:08:55 | 12 | Q.        Pretty stable group of people? |
| 09:08:57 | 13 | **A.        Yes, uh-huh.** |
| 09:08:57 | 14 | Q.        Let's talk a little bit about the criteria that |
| 09:09:01 | 15 | your company uses to determine whether someone can live |
| 09:09:04 | 16 | at the apartments at 312 West Mary.  What are the |
| 09:09:08 | 17 | criteria? |
| 09:09:09 | 18 | **A.        They must bring in a picture ID, like a** |
| 09:09:12 | 19 | **state-issued ID, Social Security card.  We take color** |
| 09:09:16 | 20 | **copies of those to keep in our file.  They must be** |
| 09:09:19 | 21 | **employed full time and be able to make enough income, at** |
| 09:09:23 | 22 | **least three times the amount of the rent, in order to be** |
| 09:09:27 | 23 | **able to afford the -- afford to live there.  They also** |
| 09:09:32 | 24 | **must -- they must have some rental history.** |
| 09:09:36 | 25 | Q.        So to be clear, the Somalian tenants who have |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

43

| | | |
|---|---|---|
| 09:09:40 | 1 | lived there a long time qualified and were employed at |
| 09:09:44 | 2 | the time of their application? |
| 09:09:45 | 3 | **A.      That's correct.** |
| 09:09:45 | 4 | Q.     Is there a particular employer that has hired many |
| 09:09:48 | 5 | of the residents of 312 West Mary Street? |
| 09:09:50 | 6 | **A.      Yes, there is.** |
| 09:09:51 | 7 | Q.     Which employer is that? |
| 09:09:52 | 8 | **A.      Tyson beef packing plant.** |
| 09:09:56 | 9 | Q.     About what percentage of the households at 312 |
| 09:09:59 | 10 | West Mary Street is employed by Tyson? |
| 09:10:01 | 11 | **A.      A hundred percent.** |
| 09:10:02 | 12 | THE COURT:  Ms. Blackburn, we seem to be having |
| 09:10:04 | 13 | problems with your microphone. |
| 09:10:06 | 14 | THE WITNESS:  I'm sorry. |
| 09:10:07 | 15 | THE COURT:  Can you lean a little more closely |
| 09:10:10 | 16 | into it? |
| 09:10:10 | 17 | THE WITNESS:  I can do that, yes. |
| 09:10:11 | 18 | THE COURT:  It seems like it sounds like you're a |
| 09:10:14 | 19 | bit under water. |
| 09:10:15 | 20 | Are you all sort of noticing that?  Sort of a |
| 09:10:17 | 21 | distortion.  For some reason I can't explain we have two |
| 09:10:21 | 22 | microphones on the witness stand. |
| 09:10:21 | 23 | THE WITNESS:  Do you want me to pull one of them |
| 09:10:23 | 24 | closer to me? |
| 09:10:24 | 25 | THE COURT:  Yeah, use just one of them otherwise |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

44

```
09:10:26   1   we'll get feedback.  But try the one to your right and
09:10:30   2   let's see if we can get you out from under the sea.
09:10:33   3           THE WITNESS:  Okay.
09:10:34   4           THE COURT:  That's much better.
09:10:35   5           Justin, can you shut the other one off?
09:10:37   6           I'm sorry to interrupt you, Ms. Hahn.  It just
09:10:40   7   sounded like they were getting some distortion.
09:10:42   8           MS. HAHN:  I agree with you, Your Honor.
09:10:43   9           You and I both have problems with the microphone
09:10:46  10   today, but I think they are all sorted.
09:10:46  11           THE COURT:  I think that microphone's better, so
09:10:48  12   let's continue with that, thank you.
09:10:49  13   BY MS. HAHN:
09:10:50  14   Q.     Once residents are approved to live at 312 West
09:10:53  15   Mary Street, do they have to sign a rental agreement?
09:10:55  16   A.     Yes, they do.
09:10:56  17   Q.     And does that rental agreement contain certain
09:10:58  18   rules that the families have to obey?
09:11:00  19   A.     Yes, it does.
09:11:01  20   Q.     And what are some of those rules?
09:11:03  21   A.     They must pay their rent by the first day of the
09:11:06  22   month.  If they don't they must pay late charges that go
09:11:09  23   along with that, depending on how late they are.  They
09:11:12  24   need to keep their property clean and sanitary.  They
09:11:15  25   also need to keep things clean outside.  They need to
```

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

09:11:19   1   observe quiet hours from 10:00 o'clock at night until

09:11:23   2   8:00 o'clock in the morning.  They must respect their

09:11:25   3   neighbors, give 30-day notice if they are going to move

09:11:30   4   out.

09:11:30   5   Q.    And what happens if someone doesn't stick to those

09:11:33   6   rules?

09:11:33   7   A.    They might be issued a verbal or a written warning

09:11:38   8   or a letter.  If that doesn't seem to solve the problem,

09:11:42   9   we will issue an eviction notice and we will follow

09:11:44   10   through with that.

09:11:46   11   Q.    So is it fair to say that the Somali tenants who

09:11:50   12   have lived at 312 West Mary Street for 5, 10, 12 years

09:11:54   13   have not had any trouble obeying the rules of Garden Spot

09:11:57   14   Rentals?

09:11:57   15   A.    That's correct.

09:11:57   16   Q.    So they've paid their rent?

09:12:00   17   A.    Yes.

09:12:00   18   Q.    Kept the apartments clean?

09:12:02   19   A.    Yes.

09:12:02   20   Q.    And haven't created any disturbances?

09:12:05   21   A.    That is correct.

09:12:06   22   Q.    And have you continued your father's policy of

09:12:11   23   renting to people regardless of what race they are?

09:12:14   24   A.    Yes.

09:12:14   25   Q.    Regardless of what country of origin they might

3-26-2018 USA v. ALLEN, et al, NO 16-10141

46

| | | |
|---|---|---|
| 09:12:17 | 1 | come from? |
| 09:12:17 | 2 | **A.        That's right.** |
| 09:12:17 | 3 | Q.      And regardless of what religion they might |
| 09:12:20 | 4 | practice? |
| 09:12:20 | 5 | **A.        That's correct.** |
| 09:12:22 | 6 | Q.      Let's talk a little bit about Garden Spot's |
| 09:12:25 | 7 | commercial activities, sort of business side of Garden |
| 09:12:29 | 8 | Spot Rentals.  How many employees does Garden Spot |
| 09:12:33 | 9 | Rentals -- does Garden Spot Rentals have? |
| 09:12:35 | 10 | **A.        We have five now.** |
| 09:12:36 | 11 | Q.      And does that include you? |
| 09:12:38 | 12 | **A.        Yes, it does.** |
| 09:12:38 | 13 | Q.      And are there some additional ones along the way? |
| 09:12:42 | 14 | **A.        Yes, we do have some people that we use for** |
| 09:12:45 | 15 | **contract labor, yes.** |
| 09:12:46 | 16 | Q.      And how much does each unit at 312 West Mary |
| 09:12:51 | 17 | Street rent for? |
| 09:12:51 | 18 | **A.        $550 a month.** |
| 09:12:53 | 19 | Q.      Does Garden Spot Rentals maintain a website? |
| 09:12:56 | 20 | **A.        Yes, we do.** |
| 09:12:57 | 21 | Q.      What information and services are available on |
| 09:13:00 | 22 | that website? |
| 09:13:01 | 23 | **A.        If you go to our website, you can view a list of** |
| 09:13:04 | 24 | **our vacancies.  You can also get a printable application.** |
| 09:13:09 | 25 | **You can fill out a notice to move out.  You can pay your** |

09:13:12   1   **rent.  You can find out information about Garden Spot**

09:13:15   2   **Rentals on our web page.**

09:13:17   3   Q.      And does Garden Spot Rentals rent to people who

09:13:21   4   are moving from outside of Kansas and are moving into

09:13:24   5   Kansas?

09:13:24   6   **A.      Yes, we do.**

09:13:27   7   Q.      I'm going to draw your attention to October of

09:13:30   8   2016.  In October of 2016 I think you testified that you

09:13:35   9   learned that three men had been arrested and charged with

09:13:39   10  planning to bomb 312 West Mary Street apartments?

09:13:42   11  **A.      Yes.**

09:13:42   12  Q.      Did you know one of the men charged?

09:13:45   13  **A.      Yes.**

09:13:46   14  Q.      Who did you know?

09:13:47   15  **A.      Gavin Wright.**

09:13:48   16  Q.      And can you identify Gavin Wright in the courtroom

09:13:51   17  today?

09:14:12   18          (Brief pause.)

09:14:29   19  **A.      Yes, I believe I can.**

09:14:32   20  Q.      And can you point out Mr. Wright, or who you

09:14:36   21  believe defendant Wright to be?

09:14:39   22  **A.      I believe that's (indicating) --**

09:14:44   23  Q.      Where along the table is he seated?

09:14:47   24  **A.      Third from the right, from my right.**

09:14:47   25          (Whereupon, a sotto voce discussion was had

| | | |
|---|---|---|
| 09:15:02 | 1 | between Ms. Hahn and Ms. Berkower.) |
| 09:15:07 | 2 | BY MS. HAHN: |
| 09:15:07 | 3 | Q.    Can you identify what defendant Wright is wearing? |
| 09:15:10 | 4 | A.    A sweater vest. |
| 09:15:25 | 5 | MS. HAHN:  Can the record reflect the witness has |
| 09:15:27 | 6 | identified defendant Wright? |
| 09:15:28 | 7 | THE COURT:  The record will reflect. |
| 09:15:31 | 8 | BY MS. HAHN: |
| 09:15:31 | 9 | Q.    Now, you hesitated for a while. |
| 09:15:34 | 10 | A.    Yeah.  He's changed. |
| 09:15:35 | 11 | Q.    Do you know defendant Wright well? |
| 09:15:36 | 12 | A.    No, not well, no. |
| 09:15:39 | 13 | Q.    Have you seen or spoken to defendant Wright since |
| 09:15:41 | 14 | his arrest? |
| 09:15:42 | 15 | A.    No, I have not. |
| 09:15:43 | 16 | Q.    And how long has it been since you have last seen |
| 09:15:46 | 17 | or spoken to defendant Wright? |
| 09:15:48 | 18 | A.    Maybe ten years. |
| 09:15:50 | 19 | Q.    And even when you used to see him about ten years |
| 09:15:53 | 20 | ago, about how often would you see him? |
| 09:15:55 | 21 | A.    Once or twice a year. |
| 09:15:58 | 22 | Q.    After the charges were brought, did you and your |
| 09:16:01 | 23 | company have to spend money to add certain items at 312 |
| 09:16:04 | 24 | West Mary Street? |
| 09:16:05 | 25 | A.    We did. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

49

| | | |
|---|---|---|
| 09:16:05 | 1 | Q.     And what did you spend the money on? |
| 09:16:07 | 2 | **A.     We added some extra lighting at 312 West Mary** |
| 09:16:10 | 3 | **Street, to try to help the tenants feel more secure.** |
| 09:16:15 | 4 | Q.     Had the apartments at 312 West Mary Street been |
| 09:16:20 | 5 | bombed, what effect would that have had on the company |
| 09:16:22 | 6 | your parents founded 30 years ago? |
| 09:16:24 | 7 |         MR. FEDERICO:  Objection.  Relevance, 403. |
| 09:16:25 | 8 |         THE COURT:  Sustained. |
| 09:16:27 | 9 |         MS. HAHN:  Your Honor, this goes to the financial |
| 09:16:29 | 10 | effect. |
| 09:16:30 | 11 |         THE COURT:  I'm sustaining the objection. |
| 09:16:35 | 12 |         MS. HAHN:  Can we pull up Government's Exhibit |
| 09:16:38 | 13 | 303a. |
| 09:16:38 | 14 | BY MS. HAHN: |
| 09:16:42 | 15 | Q.     You previously identified this as an aerial of 305 |
| 09:16:45 | 16 | and 312 West Mary Street apartments? |
| 09:16:48 | 17 | **A.     Yes.** |
| 09:16:49 | 18 |         MS. HAHN:  And at this time I would like to |
| 09:16:52 | 19 | publish Government Exhibit 94a, page 10, and that is the |
| 09:16:57 | 20 | exhibit that Your Honor has conditionally admitted. |
| 09:17:02 | 21 |         THE COURT:  Is this an exhibit the witness has |
| 09:17:04 | 22 | previously identified? |
| 09:17:05 | 23 |         MS. HAHN:  Yes. |
| 09:17:05 | 24 |         THE COURT:  All right. |
| 09:17:11 | 25 | BY MS. HAHN: |

09:17:11  1  Q.     Can you identify what is depicted in this

09:17:14  2  photograph?

09:17:15  3  **A.     That is an aerial view of 305 West Mary, with a**

09:17:20  4  **large X drawn across the top, all the way across, and**

09:17:24  5  **also an aerial view of 312 West Mary, with a large X**

09:17:28  6  **drawn across the top.**

09:17:33  7       MS. HAHN:  Your Honor, at this time I would like

09:17:34  8  to publish to the jury and play for the jury the clip

09:17:38  9  that Your Honor has conditionally admitted.

09:17:40  10      THE COURT:  All right.  Members of the jury, I

09:17:42  11 think we told you during jury selection you were going to

09:17:46  12 hear a lot of audio recordings, and I'm going to have to

09:17:48  13 explain to you from time to time what you're hearing.  At

09:17:50  14 this point, again, this audio recording is one that I'm

09:17:53  15 provisionally admitting for you to hear for this witness

09:17:55  16 to identify a portion of it.  It's going to be provided

09:17:59  17 to you subject to the Government later laying more

09:18:03  18 foundation of it.

09:18:04  19      And the audio recording that you'll hear is, as I

09:18:09  20 understand, of defendant Stein speaking.  And on this

09:18:14  21 audio clip -- and it may differ as to others and I'll

09:18:18  22 explain to you as the trial goes on, but as to this audio

09:18:21  23 recording the comments you hear from defendant Stein are

09:18:24  24 only relevant to him and not to Mr. Allen or Mr. Wright.

09:18:27  25      MS. HAHN:  Actually, Your Honor, this one involves

| | | |
|---|---|---|
| 09:18:31 | 1 | Mr. Stein and Mr. Wright, and this one postdates the |
| 09:18:34 | 2 | August 14th -- it's an August 14th, 2016. |
| 09:18:39 | 3 | THE COURT:  All right.  Well, that's different |
| 09:18:41 | 4 | than I was informed earlier. |
| 09:18:42 | 5 | MS. HAHN:  So the one -- I believe Mr. Mattivi |
| 09:18:45 | 6 | raised a clip that would be admitted against Mr. Stein |
| 09:18:49 | 7 | only.  And that would come in through the testimony for |
| 09:18:52 | 8 | the other witness.  This one was one that was subject to |
| 09:18:55 | 9 | the *James* hearing.  The defendants didn't lodge any |
| 09:18:58 | 10 | objections to it and our papers noted that it would be |
| 09:19:01 | 11 | coming in as an 801(d)(2)(E) statement. |
| 09:19:05 | 12 | THE COURT:  All right.  Well, then you may publish |
| 09:19:07 | 13 | that clip. |
| 09:19:08 | 14 | MS. HAHN:  Thank you, Your Honor. |
| 09:19:13 | 15 | (Playing clip in open court.) |
| 09:20:17 | 16 | BY MS. HAHN: |
| 09:20:18 | 17 | Q.    Ms. Blackburn, as of August 14, 2016, who is known |
| 09:20:21 | 18 | as the landlord of the apartments at 312 West Mary |
| 09:20:25 | 19 | Street? |
| 09:20:25 | 20 | **A.    My dad.** |
| 09:20:27 | 21 | THE COURT:  Use the microphone, Ms. Hahn, please. |
| 09:20:31 | 22 | BY MS. HAHN: |
| 09:20:32 | 23 | Q.    Would you like me to repeat the question? |
| 09:20:33 | 24 | **A.    Yes.** |
| 09:20:33 | 25 | Q.    As of August 14th, 2016, who was known as the |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

52

| | | |
|---|---|---|
| 09:20:37 | 1 | landlord of the apartments at 312 West Mary Street? |
| 09:20:40 | 2 | **A.    My dad.** |
| 09:20:41 | 3 | Q.    And what is your father's last name? |
| 09:20:43 | 4 | **A.    Burgess.** |
| 09:20:45 | 5 | MS. HAHN:  Your Honor, thank you. |
| 09:20:48 | 6 | THE COURT:  No further questions? |
| 09:20:49 | 7 | MS. HAHN:  No further questions for this witness. |
| 09:20:51 | 8 | THE COURT:  Cross-examination. |
| 09:20:53 | 9 | MR. FEDERICO:  Thank you, Your Honor. |
| 09:20:54 | 10 | THE COURT:  Mr. Federico. |
| 09:20:55 | 11 | MR. FEDERICO:  Thank you. |
| 09:20:56 | 12 | CROSS-EXAMINATION |
| 09:20:56 | 13 | BY MR. FEDERICO: |
| 09:21:07 | 14 | Q.    Good morning, Ms. Blackburn. |
| 09:21:08 | 15 | **A.    Good morning.** |
| 09:21:11 | 16 | Q.    You started your testimony by saying that you |
| 09:21:14 | 17 | became aware in 2016 of a plot against 312 West Mary; is |
| 09:21:18 | 18 | that accurate? |
| 09:21:19 | 19 | **A.    That's correct.** |
| 09:21:19 | 20 | Q.    And you became aware of that from law enforcement |
| 09:21:21 | 21 | officials; right? |
| 09:21:23 | 22 | **A.    No, I did not.** |
| 09:21:24 | 23 | Q.    Did you become aware of it through the media? |
| 09:21:26 | 24 | **A.    I became aware of it through watching the public** |
| 09:21:32 | 25 | **FBI briefing after the arrest.** |

3-26-2018 USA v. ALLEN, et al, NO 16-10141          53

| | | |
|---|---|---|
| 09:21:34 | 1 | Q.    So through the media and the FBI publicizing it? |
| 09:21:38 | 2 | **A.    Yes.** |
| 09:21:39 | 3 | Q.    Now, a moment ago the Government just showed you a |
| 09:21:43 | 4 | transcript of an audio clip.  Do you remember that? |
| 09:21:45 | 5 | **A.    Yes.** |
| 09:21:45 | 6 | Q.    And did you notice that on the left side of that |
| 09:21:49 | 7 | transcript it had, as one of the speakers, S-73282? |
| 09:21:54 | 8 | **A.    I didn't notice that, no.** |
| 09:21:56 | 9 | Q.    Okay.  Do you know who that is? |
| 09:21:59 | 10 | **A.    No.** |
| 09:22:01 | 11 | Q.    Ms. Blackburn, you testified also on direct, I |
| 09:22:06 | 12 | believe, that your tenants at 312 West Mary have to abide |
| 09:22:10 | 13 | by the conditions of their leases.  Is that accurate? |
| 09:22:12 | 14 | **A.    That's correct.** |
| 09:22:13 | 15 | Q.    And, if not, they could get a notice, I believe |
| 09:22:15 | 16 | you said? |
| 09:22:16 | 17 | **A.    Yes.** |
| 09:22:16 | 18 | Q.    So is it fair to say then that you keep sort of |
| 09:22:20 | 19 | tabs somewhat on the conduct of your tenants? |
| 09:22:22 | 20 | **A.    Somewhat, yes.** |
| 09:22:24 | 21 | Q.    Okay.  So you're aware then that within the last |
| 09:22:27 | 22 | three years alone there have been 18 police contacts |
| 09:22:30 | 23 | between the tenants at 312 West Mary and Garden City |
| 09:22:33 | 24 | police? |
| 09:22:33 | 25 |     MS. HAHN:  Your Honor, object. |

| | | |
|---|---|---|
| 09:22:35 | 1 | THE COURT: Overruled. |
| 09:22:37 | 2 | **A.     No, I was not aware of that.** |
| 09:22:40 | 3 | BY MR. FEDERICO: |
| 09:22:42 | 4 | Q.     Even in 2016 are you aware of an incident that had |
| 09:22:44 | 5 | to deal with burglary and assault that happened at 312 |
| 09:22:47 | 6 | West Mary? |
| 09:22:49 | 7 | MS. HAHN: Your Honor, objection. |
| 09:22:49 | 8 | THE COURT: Well, you opened the door to this, |
| 09:22:52 | 9 | Ms. Hahn, so your objection's overruled. |
| 09:22:55 | 10 | **A.     Could you repeat the question, please?** |
| 09:22:57 | 11 | BY MR. FEDERICO: |
| 09:22:58 | 12 | Q.     Yes, sure.  In 2016, there was an incident where |
| 09:23:02 | 13 | one of the residents was arrested for an assault and |
| 09:23:05 | 14 | burglary and threats at 312 West Mary. |
| 09:23:07 | 15 | **A.     I was not aware of that.** |
| 09:23:08 | 16 | Q.     So that tenant wasn't expelled? |
| 09:23:11 | 17 | **A.     I was not aware of the incident, no.** |
| 09:23:13 | 18 | Q.     And even last year, one for -- was arrested there |
| 09:23:16 | 19 | for second-degree murder? |
| 09:23:21 | 20 | **A.     I was not aware of that.** |
| 09:23:24 | 21 | MR. FEDERICO: Thank you, Your Honor.  No |
| 09:23:26 | 22 | additional questions. |
| 09:23:26 | 23 | THE COURT: Cross-examination from defendant |
| 09:23:28 | 24 | Stein? |
| 09:23:36 | 25 | MR. SHULTZ: Thank you, Your Honor. |

| | | |
|---|---|---|
| 09:23:38 | 1 | CROSS-EXAMINATION |
| 09:23:39 | 2 | BY MR. SHULTZ: |
| 09:23:41 | 3 | Q.     Good morning, Ms. Blackburn. |
| 09:23:43 | 4 | A.     **Good morning.** |
| 09:23:44 | 5 | Q.     Before you learned of the allegations from the FBI |
| 09:23:47 | 6 | and the media, did the FBI ever contact you to tell you |
| 09:23:51 | 7 | to be on the lookout for Patrick Stein? |
| 09:23:53 | 8 | A.     **No.** |
| 09:23:53 | 9 | Q.     Did any tenants ever talk about seeing Patrick |
| 09:23:56 | 10 | Stein? |
| 09:23:57 | 11 | A.     **No.** |
| 09:23:57 | 12 | Q.     Or hearing any threats from him? |
| 09:24:00 | 13 | A.     **Not that we were told of, no.** |
| 09:24:01 | 14 | Q.     The conversation that was played for you, you had |
| 09:24:05 | 15 | no idea -- you'd never heard that before at least August |
| 09:24:08 | 16 | of -- October of 2016; correct? |
| 09:24:11 | 17 | A.     **Could you repeat the question?** |
| 09:24:12 | 18 | Q.     The conversation that was played to you this |
| 09:24:15 | 19 | morning, had you ever heard of that -- heard that before |
| 09:24:18 | 20 | at least October 14, 2016? |
| 09:24:20 | 21 | A.     **No, I'd never heard that before.** |
| 09:24:22 | 22 | Q.     Before today? |
| 09:24:24 | 23 | A.     **No, not before today.  I've heard it before today,** |
| 09:24:27 | 24 | **but before October of 2016.** |
| 09:24:56 | 25 | Q.     You talked about contract laborers that you hire. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141          56

09:24:59  1   Is that to do, like, maintenance work as well?

09:25:02  2   **A.      Yes, that's correct.**

09:25:03  3   Q.      How many of those are there?

09:25:04  4   **A.      Currently we have two or three.**

09:25:08  5   Q.      And how often would they be in 312 West Mary?

09:25:13  6   **A.      Like in the apartments or --**

09:25:17  7   Q.      Just doing whatever you hire them to do, on

09:25:21  8   average.

09:25:21  9   **A.      A few times a month maybe.**

09:25:23  10  Q.      Okay.  And then you have three maintenance people,

09:25:26  11  I believe, as well?

09:25:27  12  **A.      That's correct.**

09:25:27  13  Q.      Is that the contract people or are those

09:25:30  14  different?

09:25:31  15  **A.      Those are on regular payroll.**

09:25:33  16  Q.      And how often would they be there doing

09:25:37  17  maintenance on the apartments at 312 West Mary?

09:25:39  18  **A.      Often.**

09:25:40  19  Q.      Would the tenants be familiar with them?

09:25:43  20  **A.      Yes.**

09:25:43  21  Q.      Did you ever hear any complaints from your

09:25:46  22  maintenance staff or contract laborers about Mr. Stein?

09:25:50  23  **A.      No.**

09:25:51  24          MR. SHULTZ:  Thank you.  No further questions.

09:25:53  25          THE COURT:  Thank you, Mr. Shultz.

09:25:54  1   Cross-examination from defendant Wright.

09:25:56  2                     CROSS-EXAMINATION

09:25:57  3   BY MS. SCHMIDT:

09:26:01  4   Q.      Ms. Blackburn, before August 14th of 2016, had

09:26:05  5   anyone made you aware of any alleged plots by Gavin

09:26:12  6   Wright against 312 Mary Street?

09:26:14  7   **A.      No.**

09:26:16  8           MS. SCHMIDT:  Thank you.

09:26:16  9           THE COURT:  Redirect, Ms. Hahn?

09:26:19  10                     REDIRECT EXAMINATION

09:26:19  11  BY MS. HAHN:

09:26:27  12  Q.      Ms. Blackburn, in your management of Garden Spot

09:26:31  13  Rentals, have you maintained a good relationship with law

09:26:34  14  enforcement?

09:26:34  15  **A.      Yes, we have.**

09:26:35  16  Q.      And when there's an issue, have you been notified

09:26:38  17  by law enforcement?

09:26:39  18  **A.      Yes.**

09:26:40  19  Q.      And to be clear an issue with your tenants, have

09:26:44  20  you been notified by law enforcement?

09:26:44  21  **A.      Yes, if there's something we need to be aware of.**

09:26:47  22  Q.      Okay.  And you were asked about various police

09:26:50  23  contacts and calls made for police to come to the

09:26:55  24  apartments at 312 West Mary Street; right?

09:26:57  25  **A.      Yes.**

| | | |
|---|---|---|
| 09:26:57 | 1 | Q.    Do you have any knowledge as to whether those |
| 09:27:00 | 2 | contacts actually involved any of the tenants that we |
| 09:27:03 | 3 | talked about who are Somalis? |
| 09:27:05 | 4 | A.    I do not. |
| 09:27:06 | 5 | Q.    Okay.  So it would be pure speculation that these |
| 09:27:09 | 6 | contacts were about the tenants at 312 West Mary Street; |
| 09:27:12 | 7 | correct? |
| 09:27:12 | 8 | A.    Correct. |
| 09:27:12 | 9 | Q.    Outsiders could come to the properties? |
| 09:27:16 | 10 | A.    Yes. |
| 09:27:16 | 11 | MS. HAHN:  Thank you, Your Honor. |
| 09:27:17 | 12 | THE COURT:  Any recross within the scope. |
| 09:27:21 | 13 | Mr. Federico? |
| 09:27:22 | 14 | MR. FEDERICO:  No, Your Honor.  Thank you. |
| 09:27:23 | 15 | THE COURT:  Mr. Shultz? |
| 09:27:25 | 16 | MR. SHULTZ:  No, Your Honor.  Thank you. |
| 09:27:26 | 17 | THE COURT:  Ms. Schmidt? |
| 09:27:27 | 18 | MS. SCHMIDT:  No, Your Honor. |
| 09:27:27 | 19 | THE COURT:  May this witness be excused? |
| 09:27:29 | 20 | MS. HAHN:  Yes. |
| 09:27:30 | 21 | THE COURT:  Ms. Blackburn, you may step down. |
| 09:27:32 | 22 | Thank you for your attendance here.  You are free to go. |
| 09:27:35 | 23 | (Witness excused from the witness stand.) |
| 09:27:35 | 24 | THE COURT:  Government may call your next witness. |
| 09:27:38 | 25 | MR. MATTIVI:  Government calls Brody Benson, Your |

09:27:41   1    Honor.

09:27:59   2         THE COURT:  Mr. Benson, if you would come forward

09:28:01   3    and stand in front of my courtroom deputy, he will gave

09:28:04   4    give you the oath to tell the truth, and then you may

09:28:07   5    have a seat in the witness box.

09:28:11   6         CLERK COOK:  Please raise your right hand.

09:28:13   7                        BRODY BENSON,

09:28:13   8    having been first duly sworn to testify the truth, the

09:28:13   9    whole truth, and nothing but the truth, testified as

09:28:30   10   follows:

09:28:31   11                    DIRECT EXAMINATION

09:28:31   12   BY MR. MATTIVI:

09:28:34   13   Q.     Mr. Benson, good morning.

09:28:35   14   **A.     Good morning.**

09:28:37   15   Q.     Would you introduce yourself to the jury, please,

09:28:39   16   and spell your name.

09:28:41   17   **A.     My name's Brody Benson, B-R-O-D-Y, B-E-N-S-O-N.**

09:28:46   18   Q.     Mr. Benson, I'm going to ask you to reach up to

09:28:48   19   that microphone in front of you and pull it just a little

09:28:50   20   bit closer so that everybody's able to hear you.  All

09:28:53   21   right?

09:28:53   22   **A.     Is that better?**

09:28:54   23   Q.     Much better.  Sir, where do you live?

09:28:56   24   **A.     Arlington Kansas.**

09:28:58   25   Q.     And what do you do for a living?

| | | |
|---|---|---|
| 09:28:59 | 1 | A.     Communications contractor. |
| 09:29:00 | 2 | Q.     You and I have met before today; correct? |
| 09:29:03 | 3 | A.     Yes. |
| 09:29:04 | 4 | Q.     And we've talked about your testimony here in |
| 09:29:07 | 5 | court; is that correct? |
| 09:29:08 | 6 | A.     Yes. |
| 09:29:08 | 7 | Q.     And you've expressed to me that you have |
| 09:29:11 | 8 | conflicting views about the government, haven't you? |
| 09:29:13 | 9 | A.     That's correct. |
| 09:29:13 | 10 | Q.     Would you explain to the jury what you mean by |
| 09:29:15 | 11 | that? |
| 09:29:17 | 12 | A.     They -- the problems that I have is not with the |
| 09:29:20 | 13 | government, but some of the overstepping bounds that the |
| 09:29:24 | 14 | government has gotten to at this point. |
| 09:29:27 | 15 | Q.     You're not the kind of person that would normally |
| 09:29:29 | 16 | cooperate with the government, are you, Mr. Benson? |
| 09:29:31 | 17 | A.     No, I wouldn't. |
| 09:29:32 | 18 | Q.     And by "government" would that be accurate to say |
| 09:29:36 | 19 | that that includes the FBI? |
| 09:29:37 | 20 | A.     Yes. |
| 09:29:38 | 21 | Q.     Okay.  Let's talk about the times that we've met |
| 09:29:40 | 22 | in the past.  All right? |
| 09:29:41 | 23 |        The first time that anybody associated with the |
| 09:29:44 | 24 | prosecution reached out to you, it was someone from the |
| 09:29:47 | 25 | FBI; correct? |

| | | |
|---|---|---|
| 09:29:47 | 1 | **A.      Correct.** |
| 09:29:48 | 2 | Q.      They called you by phone; right? |
| 09:29:50 | 3 | **A.      Yes.** |
| 09:29:50 | 4 | Q.      And you declined to speak with them; correct? |
| 09:29:52 | 5 | **A.      Yes.** |
| 09:29:52 | 6 | Q.      Okay.  When was the next time somebody reached |
| 09:29:54 | 7 | out? |
| 09:29:55 | 8 | **A.      When the FBI actually showed up at my folks' place** |
| 09:29:59 | 9 | **and my mother called me and told me that they were there** |
| 09:30:01 | 10 | **and they wanted to talk.  They identified who they were,** |
| 09:30:05 | 11 | **and I went ahead and told them to go ahead and come to my** |
| 09:30:09 | 12 | **house.** |
| 09:30:09 | 13 | Q.      Okay. |
| 09:30:11 | 14 | THE COURT:  Mr. Benson, can I ask you, sir, to |
| 09:30:13 | 15 | pull that microphone just a bit closer.  This is such a |
| 09:30:16 | 16 | big room that it's hard to hear.  Thank you so much. |
| 09:30:20 | 17 | BY MR. MATTIVI: |
| 09:30:20 | 18 | Q.      You never had any substantive discussions with the |
| 09:30:24 | 19 | FBI about the case that they wanted to talk to you about; |
| 09:30:26 | 20 | correct? |
| 09:30:26 | 21 | **A.      No.** |
| 09:30:27 | 22 | Q.      You were subpoenaed to appear before a grand jury |
| 09:30:29 | 23 | in Topeka, though; correct? |
| 09:30:31 | 24 | **A.      Yes.** |
| 09:30:31 | 25 | Q.      And you appeared pursuant to the subpoena; |

| 09:30:33 | 1  | correct? |
| 09:30:34 | 2  | **A.      Yes.** |
| 09:30:34 | 3  | Q.      And before that grand jury presentation you met |
| 09:30:38 | 4  | with Ms. Berkower and Amy Kuhn, one of the agents; |
| 09:30:40 | 5  | correct? |
| 09:30:41 | 6  | **A.      Yes.** |
| 09:30:41 | 7  | Q.      And then you testified in front of the grand jury; |
| 09:30:43 | 8  | right? |
| 09:30:44 | 9  | **A.      Yes.** |
| 09:30:44 | 10 | Q.      Okay.  And then between then and now you and I |
| 09:30:47 | 11 | have met in the presence of your attorney and with an |
| 09:30:49 | 12 | agent present, and we've talked about what your testimony |
| 09:30:52 | 13 | would be; correct? |
| 09:30:53 | 14 | **A.      Yes.** |
| 09:30:53 | 15 | Q.      Okay.  Let's start by talking about the Kansas |
| 09:30:59 | 16 | Security Force, KSF.  Are you familiar with KSF? |
| 09:31:01 | 17 | **A.      Yes.** |
| 09:31:01 | 18 | Q.      Explain to the jury what Kansas Security Force is, |
| 09:31:04 | 19 | if you would, please. |
| 09:31:05 | 20 | **A.      Kansas Security Force was an unregulated militia** |
| 09:31:10 | 21 | **statewide.** |
| 09:31:11 | 22 | Q.      What do you mean "unregulated militia"? |
| 09:31:14 | 23 | **A.      It wasn't regulated in the sense of a governmental** |
| 09:31:19 | 24 | **body regulating the actual militia.** |
| 09:31:23 | 25 | Q.      Okay.  What was the purpose of the militia then? |

09:31:26  1  A.      To provide security in the event of natural

09:31:32  2  disasters, governmental breakdown, anything where first

09:31:38  3  responders are not available to protect family and

09:31:41  4  community.

09:31:41  5  Q.    Okay.  You and I have talked about a militia and

09:31:45  6  whether its purpose is offense or defense; correct?

09:31:48  7  A.      Correct.

09:31:48  8  Q.    How did you describe it?

09:31:49  9  A.      A militia is strictly for defense only,

09:31:54  10  protection.

09:31:54  11  Q.    And that's -- I'm sorry, I didn't mean to cut you

09:31:56  12  off.

09:31:57  13  A.      Defense or protection.

09:31:57  14  Q.    Okay.  And that's to protect you and your family

09:32:00  15  in the event that the government isn't around to do it

09:32:02  16  anymore; correct?

09:32:03  17  A.      Correct.

09:32:03  18  Q.    Okay.  How did you become involved with KSF?

09:32:07  19  A.      Through social media contacts, I was introduced to

09:32:14  20  an individual to go to an actual meet-and-greet and to

09:32:22  21  discuss a little bit about, you know, what the KSF was --

09:32:26  22  can you hear me?  Okay -- what the KSF was and, you know,

09:32:31  23  just to learn a little bit more about, you know, their

09:32:34  24  militia.

09:32:34  25  Q.    Would it be accurate to say that you were

3-26-2018 USA v. ALLEN, et al, NO 16-10141

64

| | | |
|---|---|---|
| 09:32:36 | 1 | recruited? |
| 09:32:36 | 2 | **A.      Yes.** |
| 09:32:37 | 3 | Q.      And who recruited you? |
| 09:32:38 | 4 | **A.      Derrick Hulen.** |
| 09:32:40 | 5 | Q.      When did that happen? |
| 09:32:41 | 6 | **A.      Early -- late 2015, 2016, roughly.** |
| 09:32:48 | 7 | Q.      Was this the first militia that you'd ever joined? |
| 09:32:52 | 8 | **A.      Yes.** |
| 09:32:53 | 9 | Q.      You told me that you had been involved with others |
| 09:32:56 | 10 | that were primarily social media; correct? |
| 09:32:59 | 11 | **A.      Yeah, they were just groups on, you know, social** |
| 09:33:02 | 12 | **media.** |
| 09:33:02 | 13 | Q.      Okay.  How was KSF different than those militias? |
| 09:33:05 | 14 | **A.      KSF actually did have some training.  You know,** |
| 09:33:10 | 15 | **they just weren't posting and doing things; they were** |
| 09:33:14 | 16 | **actually active and, you know, trying to be an actual** |
| 09:33:21 | 17 | **militia, not just a Facebook group or something.** |
| 09:33:23 | 18 | Q.      When you talk about training, what sorts of |
| 09:33:26 | 19 | training did they do that was appealing to you? |
| 09:33:29 | 20 | **A.      Survival, medical training, tactics, as far as,** |
| 09:33:35 | 21 | **you know, how to effectively, you know, defend your** |
| 09:33:39 | 22 | **property and home, just those basics.** |
| 09:33:44 | 23 | Q.      So KSF actually did the training, as opposed to |
| 09:33:48 | 24 | other groups that you've been associated with before? |
| 09:33:50 | 25 | **A.      Correct.** |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

65

| | | |
|---|---|---|
| 09:33:51 | 1 | Q.     And this was attractive to you? |
| 09:33:52 | 2 | A.     **Yes.** |
| 09:33:52 | 3 | Q.     One of the reasons that you joined? |
| 09:33:54 | 4 | A.     **Yes.** |
| 09:33:55 | 5 | Q.     When you first joined, were there divisions of the |
| 09:34:00 | 6 | Kansas Security Forces? |
| 09:34:00 | 7 | A.     **When I first joined, it was known to me that it** |
| 09:34:04 | 8 | **was just one statewide militia, and then, you know, as** |
| 09:34:09 | 9 | **time went on, it actually developed into divisions by,** |
| 09:34:13 | 10 | **you know, dividing the state up.** |
| 09:34:14 | 11 | Q.     Can you give us just an overview of how the |
| 09:34:17 | 12 | militia was divided up. |
| 09:34:19 | 13 | A.     **It was divided up into three different sections:** |
| 09:34:22 | 14 | **The first division, second division, and third division,** |
| 09:34:25 | 15 | **with third division being Western Kansas -- center Kansas** |
| 09:34:29 | 16 | **from Oklahoma to Nebraska was second division; and the** |
| 09:34:35 | 17 | **first division was Western Kansas, and then third** |
| 09:34:39 | 18 | **division would have been Eastern Kansas.** |
| 09:34:40 | 19 | Q.     Okay.  Which division did you become apart of? |
| 09:34:43 | 20 | A.     **Second division.** |
| 09:34:44 | 21 | Q.     Because that was the central part of the state? |
| 09:34:46 | 22 | A.     **Correct.** |
| 09:34:47 | 23 | Q.     Did you -- were you just a member or were you an |
| 09:34:49 | 24 | officer or did you evolve?  How did that work? |
| 09:34:52 | 25 | A.     **I evolved to become an officer of the second** |

09:34:54  1   **division.**

09:34:54  2   Q.    Okay.  Did you -- did KSF have a way to

09:34:59  3   communicate among all of the members?

09:35:00  4   **A.    Yes.**

09:35:00  5   Q.    How?

09:35:01  6   **A.    They used several different applications:  Through**

09:35:07  7   **Facebook chat group, and then through a walkie-talkie app**

09:35:11  8   **called Zello.**

09:35:12  9   Q.    Let's talk about that.

09:35:14  10  **A.    As well as regular telephone.**

09:35:16  11  Q.    Let's talk about each of those.  So you did have

09:35:18  12  regular telephone calls; correct?

09:35:19  13  **A.    Yes.**

09:35:19  14  Q.    Was this among the entire statewide group KSF or

09:35:24  15  by division?

09:35:25  16  **A.    Both.**

09:35:27  17  Q.    All right.  And then you said you also

09:35:28  18  communicated by Facebook chat; correct?

09:35:30  19  **A.    Correct.**

09:35:31  20  Q.    There may be some jurors who aren't familiar with

09:35:34  21  Facebook chat.  Can you describe your use of that to

09:35:37  22  them.

09:35:37  23  **A.    Basically it was a way to have instantaneous, kind**

09:35:43  24  **of like a text message, that was sent to everybody that**

09:35:48  25  **was, you know, in that group.  So instead of trying to**

3-26-2018 USA v. ALLEN, et al, NO 16-10141          67

09:35:51   1   text individual people on a regular phone, we used the

09:35:56   2   chat services of Facebook.  And then each one of those

09:36:00   3   members was in that particular group, so when, you know,

09:36:03   4   when somebody made a post, it instantaneously notified

09:36:07   5   everybody in that group.

09:36:07   6   Q.    Okay.  So that was an easier way to reach out to a

09:36:11   7   group; is that correct?

09:36:12   8   A.    Correct.

09:36:12   9   Q.    And then you described an app that you called

09:36:15   10  Zello; correct?

09:36:16   11  A.    Yes.

09:36:16   12  Q.    Would you explain that to the jury, please.

09:36:18   13  A.    Zello is something similar to, you know, a

09:36:22   14  Facebook chat group except for it's a walkie-talkie app

09:36:26   15  that you can use on your smartphones, similar to, you

09:36:31   16  know, how a regular FM radio walkie-talkie would use.  So

09:36:35   17  somebody could actually pick up their device, speak into

09:36:38   18  it, and those people that had that app downloaded on

09:36:44   19  their device would be able to hear that just like in a

09:36:48   20  walkie-talkie scenario.

09:36:51   21  Q.    Did you have Zello calls with just your division

09:36:54   22  or with other divisions or with the entire state?

09:36:56   23  A.    Pretty much all of 'em.  There was -- everybody

09:37:02   24  that was assigned to the statewide, to the state

09:37:07   25  leadership, you know, would be connected through Zello.

09:37:10   1   **And then each division, you know, had their own Zello**

09:37:13   2   **application to communicate just with their division.**

09:37:15   3   Q.      So you could do a Zello call just with your

09:37:18   4   division, or you could do it with all divisions; correct?

09:37:21   5   **A.      Correct.**

09:37:22   6   Q.      In your view, was KSF well-run?

09:37:26   7   **A.      No.**

09:37:26   8   Q.      What do you mean by that?

09:37:28   9   **A.      It was -- it wasn't coordinated very well, in my**

09:37:32  10   **opinion.**

09:37:32  11   Q.      Okay.  And was that a frustration to you?

09:37:36  12   **A.      Yes.**

09:37:37  13   Q.      We're going to come back to that in just a minute,

09:37:40  14   but let me ask you, do you know the defendant Patrick

09:37:42  15   Stein in this case?

09:37:43  16   **A.      Yes.**

09:37:43  17   Q.      Okay.  Would you point him out to the jury,

09:37:46  18   please?

09:37:46  19   **A.      (Indicating.)**

09:37:47  20   Q.      Describe what he's wearing.

09:37:48  21   **A.      Wearing a black shirt, white tie.**

09:37:51  22   Q.      Striped tie?

09:37:54  23   **A.      Yeah.**

09:37:54  24   Q.      All right.

09:37:55  25           MR. MATTIVI:  Your Honor, I'd ask the record

09:37:57   1   reflect identification of Mr. Stein.

09:37:58   2          THE COURT:  The record will reflect.

09:37:59   3   BY MR. MATTIVI:

09:38:00   4   Q.     When did you meet Patrick Stein, Mr. Benson?

09:38:02   5   A.     **The first meeting was during the recruitment with**

09:38:05   6   **Derrick Hulen.**

09:38:06   7   Q.     Okay.

09:38:07   8   A.     **A meet-and-greet.**

09:38:09   9   Q.     Let me ask you to spell that name for

09:38:11   10  Ms. Wilkinson if you would, please.

09:38:12   11  A.     **I'm not sure, H-U-L-L-E-N [sic], I think.**

09:38:16   12  Q.     Hulen?

09:38:17   13  A.     **I'm not a hundred percent sure on the spelling.**

09:38:20   14  Q.     All right.  So he invited you to a meet-and-greet;

09:38:22   15  is that right?

09:38:23   16  A.     **That is correct.**

09:38:23   17  Q.     And did you say that it was for recruitment?

09:38:27   18  A.     **Yes.**

09:38:27   19  Q.     Okay.  When was this?

09:38:30   20  A.     **Early 2014 -- or 2015, 2016, somewhere around in**

09:38:35   21  **there.**

09:38:35   22  Q.     All right.  Let's try to narrow that down a little

09:38:38   23  bit.  Early 2016?

09:38:40   24  A.     **Or late 2015, somewhere there.  I can't remember**

09:38:44   25  **the date.**

3-26-2018 USA v. ALLEN, et al, NO 16-10141          70

09:38:44   1   Q.      All right.  So where did that take place?

09:38:47   2   A.      Hutchinson, Kansas.

09:38:48   3   Q.      And did you meet Mr. Stein face to face?

09:38:51   4   A.      Yes.

09:38:53   5   Q.      Did you converse with him?

09:38:55   6   A.      Yes.

09:38:55   7   Q.      What was that about?

09:38:56   8   A.      Just general political conversations about, you

09:39:03   9   know, the country, the militia, you know, everything.  I

09:39:07  10   don't think Patrick was a member yet either at that

09:39:13  11   meeting.  I can't recall everything that was said at that

09:39:16  12   meeting.

09:39:16  13   Q.      Okay.  After that did you and he begin

09:39:19  14   communicating regularly?

09:39:21  15   A.      Not right off the bat, but eventually, yes, we

09:39:24  16   did.

09:39:24  17   Q.      Okay.  How did you communicate with Mr. Stein?

09:39:27  18   A.      By telephone and through Facebook and then

09:39:31  19   participated in, you know, some of the Zello

09:39:34  20   conversations.

09:39:34  21   Q.      During the course of your communication with him,

09:39:37  22   did you learn his views on Muslims?

09:39:39  23   A.      Yes, I did.

09:39:39  24   Q.      Okay.  What were they?  What did he express to you

09:39:42  25   that his views were?

| | | |
|---|---|---|
| 09:39:43 | 1 | A.       He did not like Muslims. |
| 09:39:45 | 2 | Q.    Was it -- was it different than your views on |
| 09:39:48 | 3 | Muslims, or did they match your views on Muslims? |
| 09:39:52 | 4 | A.       Whenever I first met him, I thought they were just |
| 09:39:55 | 5 | kind of, you know, similar as far as major distrust, but |
| 09:39:59 | 6 | later on it became clear that he had a deeper hatred for |
| 09:40:05 | 7 | Muslims. |
| 09:40:06 | 8 | Q.    Okay.  Tell us your feelings so that we can |
| 09:40:09 | 9 | distinguish his views from yours. |
| 09:40:12 | 10 | A.       I don't know how I can do that. |
| 09:40:15 | 11 | Q.    Okay.  Tell us your feelings on Muslims. |
| 09:40:17 | 12 | A.       I don't trust a lot of the Muslims in this |
| 09:40:22 | 13 | country, where he actually had, I guess, a deep hatred, |
| 09:40:28 | 14 | you know, that he wanted them removed or, you know, gone |
| 09:40:31 | 15 | out of the country. |
| 09:40:32 | 16 | Q.    Was there -- was there a term that he used to |
| 09:40:34 | 17 | refer to Muslims? |
| 09:40:36 | 18 | A.       Yes. |
| 09:40:36 | 19 | Q.    What was it? |
| 09:40:37 | 20 | A.       "Cockroaches." |
| 09:40:39 | 21 | Q.    Did he tell you ever how he felt about the fact |
| 09:40:43 | 22 | that Muslims were living in southwest Kansas? |
| 09:40:45 | 23 | A.       Yes. |
| 09:40:46 | 24 | Q.    What did he say? |
| 09:40:48 | 25 | A.       He wanted 'em out of southwest Kansas.  He wanted |

| | | |
|---|---|---|
| 09:40:52 | 1 | 'em gone. |
| 09:40:54 | 2 | Q.    In spring of 2016, was there a statewide |
| 09:41:00 | 3 | conference call with members of KSF? |
| 09:41:04 | 4 | A.    Yes. |
| 09:41:05 | 5 | Q.    And you told me that during that conference call |
| 09:41:07 | 6 | they discussed a scenario called when the "shit hits the |
| 09:41:12 | 7 | fan"; correct? |
| 09:41:13 | 8 | A.    Correct. |
| 09:41:13 | 9 | Q.    What is that?  Would you explain it to the jury, |
| 09:41:16 | 10 | please. |
| 09:41:16 | 11 | A.    That is in the event that there's been a total |
| 09:41:20 | 12 | breakdown and there's no longer first responders |
| 09:41:24 | 13 | available, as far as what we would do to ensure the |
| 09:41:28 | 14 | safety of our families and to formulate a plan as to |
| 09:41:34 | 15 | where -- you know, where this incident happened, you |
| 09:41:38 | 16 | know, within the state, if it impacted, you know, eastern |
| 09:41:40 | 17 | Kansas or western Kansas, that we have a plan in place |
| 09:41:44 | 18 | that we could, you know, take our families and, you know, |
| 09:41:48 | 19 | get them out of harm's way. |
| 09:41:50 | 20 | Q.    And now is it accurate to say that that's the kind |
| 09:41:53 | 21 | of scenario that a militia is in existence for and that |
| 09:41:57 | 22 | you want to be prepared for? |
| 09:41:59 | 23 | A.    Yes. |
| 09:41:59 | 24 | Q.    Okay.  So these are conversations that are typical |
| 09:42:03 | 25 | of militia conversations fairly broadly; correct? |

| | | |
|---|---|---|
| 09:42:05 | 1 | A.     I can only assume so, yeah. |
| 09:42:09 | 2 | Q.     Well, that's a good clarification.  They're |
| 09:42:11 | 3 | consistent with conversations among KSF members; correct? |
| 09:42:14 | 4 | A.     Yes. |
| 09:42:14 | 5 | Q.     All right.  On that call, did Patrick Stein say |
| 09:42:18 | 6 | what he thought should happen to Muslims in that kind of |
| 09:42:21 | 7 | a scenario? |
| 09:42:23 | 8 | A.     Excuse me? |
| 09:42:24 | 9 | Q.     When you were on that statewide conference call in |
| 09:42:27 | 10 | 2016, talking about that scenario, did Patrick Stein say |
| 09:42:30 | 11 | to you what he thought should happen to Muslims in that |
| 09:42:32 | 12 | scenario? |
| 09:42:34 | 13 | A.     In that scenario, he made a statement that he |
| 09:42:37 | 14 | thought that they should be eradicated, that there's no |
| 09:42:42 | 15 | rule of law, and that every -- every woman and child |
| 09:42:47 | 16 | should be killed. |
| 09:42:49 | 17 | Q.     What was your reaction to that? |
| 09:42:51 | 18 | A.     I was taken aback a little bit by that.  That kind |
| 09:42:56 | 19 | of -- that's not a defensive or protective action. |
| 09:43:02 | 20 | That's more of an extermination. |
| 09:43:06 | 21 | Q.     Okay.  There was another term that he used when we |
| 09:43:08 | 22 | spoke.  Do you remember what that was? |
| 09:43:10 | 23 | A.     No, I don't. |
| 09:43:12 | 24 | Q.     Would it be accurate to say that you've referred |
| 09:43:15 | 25 | to it as "ethnic cleansing"? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141                74

| | | |
|---|---|---|
| 09:43:17 | 1 | A.     Yes. |
| 09:43:17 | 2 | Q.     Is that something that you're comfortable with? |
| 09:43:19 | 3 | A.     No. |
| 09:43:21 | 4 | Q.     So what was your reaction at the time? |
| 09:43:24 | 5 | A.     At the time I was just kind of a little taken |
| 09:43:27 | 6 | aback and a little less trusting, I guess, in, you know, |
| 09:43:32 | 7 | interaction with him. |
| 09:43:32 | 8 | Q.     And you're referring now to Patrick Stein? |
| 09:43:34 | 9 | A.     Correct. |
| 09:43:35 | 10 | Q.     Let's talk about Curtis Allen.  Do you know the |
| 09:43:38 | 11 | defendant in this case named Curtis Allen? |
| 09:43:40 | 12 | A.     Yes. |
| 09:43:40 | 13 | Q.     Can you identify him for the jury, please. |
| 09:43:43 | 14 | A.     No, I can't. |
| 09:43:44 | 15 | Q.     I'm sorry? |
| 09:43:47 | 16 | A.     I'm not familiar with the -- I can't point him |
| 09:43:51 | 17 | out. |
| 09:43:51 | 18 | Q.     You can't point him out?  Okay.  Do you remember |
| 09:43:54 | 19 | him enough to talk about when you met him? |
| 09:43:56 | 20 | A.     Yes. |
| 09:43:56 | 21 | Q.     Okay.  When did you meet him? |
| 09:43:58 | 22 | A.     The first time I met him, I believe, was in |
| 09:44:05 | 23 | eastern Kansas at a security detail. |
| 09:44:08 | 24 | Q.     At a what? |
| 09:44:09 | 25 | A.     A security detail. |

09:44:11  1  Q.    Okay.  What do you mean by that?

09:44:13  2  **A.    We went on a security detail for a family that had**

09:44:18  3  **received threats, and that was the first time that I**

09:44:21  4  **believe I met Curtis Allen.**

09:44:23  5  Q.    Okay.  Can you explain that situation to the jury,

09:44:25  6  please.

09:44:26  7  **A.    That particular situation, the Sharps family was**

09:44:33  8  **involved.**

09:44:37  9  Q.    Sorry.  Go ahead.  You said there was a family

09:44:41  10 named Sharps; correct?

09:44:43  11 **A.    Correct.**

09:44:43  12 Q.    And did you say they had received threats?

09:44:45  13 **A.    Correct.**

09:44:45  14 Q.    Okay.  Would you explain that, please.

09:44:47  15 **A.    The threats, you know, had come from them being**

09:44:53  16 **involved with the Malheur Refuge in Oregon.  And they**

09:45:00  17 **were, you know, a Christian family that did a lot of**

09:45:02  18 **singing and one of the Sharp families was inside the**

09:45:06  19 **truck with a Lavoy Finnecum.**

09:45:09  20 Q.    Okay.  Let me help Jo out a little bit here.

09:45:11  21       You were talking about the Malheur Reserve case;

09:45:11  22 correct?

09:45:15  23 **A.    Correct.**

09:45:15  24 Q.    And is that M-A-L-H-E-U-R?

09:45:19  25 **A.    I guess so.**

09:45:19   1   Q.     Okay.  And you referred to a person by the name of

09:45:22   2   Lavoy Finnecum?

09:45:22   3   A.     Correct.

09:45:23   4   Q.     L-A-V-O-Y; is that right?

09:45:27   5   A.     I believe so.

09:45:28   6   Q.     F-I-N-N-E-C-U-M; correct?

09:45:31   7   A.     Okay.

09:45:32   8   Q.     So a person by the name of Lavoy Finnecum was

09:45:35   9   involved in a stand-off with federal authorities;

09:45:38   10  correct?

09:45:38   11  A.     Yes.

09:45:41   12  Q.     And the Sharp family was involved with that?

09:45:45   13  A.     They were there, yes.

09:45:46   14  Q.     And as a result of their involvement, you say they

09:45:49   15  had received some threats?

09:45:50   16  A.     Correct, yes.

09:45:51   17  Q.     So what was -- what was your action in response

09:45:54   18  and Mr. Allen's involvement?

09:45:56   19  A.     When the Sharps family came back to Kansas, they

09:46:00   20  were looking for some type of security detail at their

09:46:04   21  home, just to protect them in case an actual threat

09:46:09   22  happened.

09:46:09   23  Q.     Okay.  And you and Mr. Allen went and assisted in

09:46:14   24  that venture together?

09:46:14   25  A.     Correct.

09:46:15   1   Q.      And then did you also tell me that you met him at

09:46:18   2   a cookout at Cheney Lake, at a cookout in approximately

09:46:22   3   March of 2016?

09:46:23   4   A.      Yes.

09:46:23   5   Q.      Would you tell the jury about that, please.

09:46:25   6   A.      The cookout was a family orientated cookout for

09:46:28   7   each one of the members to, you know, come and let their

09:46:31   8   families introduce each other to each one of the members

09:46:34   9   of the KSF.

09:46:36   10  Q.      Okay.  In the course of your involvement with

09:46:39   11  Mr. Allen, did you come to learn his feelings about

09:46:41   12  Muslims?

09:46:42   13  A.      Somewhat, yes.

09:46:43   14  Q.      Okay.  How would you compare them with your own?

09:46:46   15  A.      I think he was -- he -- he didn't trust 'em as

09:46:52   16  well, same as me.

09:46:54   17  Q.      Okay.  So they were similar in that regard?

09:46:57   18  A.      Yes.

09:46:57   19  Q.      How did they compare to Mr. Stein's?

09:46:59   20  A.      He didn't have the hatred, I guess, that Mr. Stein

09:47:04   21  had.

09:47:05   22  Q.      That you ever saw, he didn't have the same level;

09:47:07   23  correct?

09:47:08   24  A.      He didn't convey that to me at any time.

09:47:10   25  Q.      Okay.  Your interactions with Mr. Stein and

09:47:12    1   Mr. Allen, were they all within the geographic boundaries

09:47:16    2   of the state of Kansas?

09:47:17    3   A.      Yes.

09:47:18    4   Q.      We're going to talk now about some clips.  I have

09:47:21    5   played for you a handful of clips over the times that we

09:47:24    6   have met; correct?

09:47:25    7   A.      Yes.

09:47:25    8   Q.      And did you recognize those clips?

09:47:28    9   A.      Yes.

09:47:28   10   Q.      They were all parts of a meeting that you attended

09:47:32   11   with Mr. Stein and later with Mr. Allen on June 14th of

09:47:36   12   2016; correct?

09:47:38   13   A.      Yes.

09:47:39   14          MR. MATTIVI:  Your Honor, at this time I'm going

09:47:41   15   to move for the admission of Exhibits 13g, 13h, 13j, and

09:47:46   16   13n.  And these are the ones that are subject, as I

09:47:49   17   mentioned to you earlier today, for use just against

09:47:53   18   Mr. Stein.

09:47:56   19          THE COURT:  Mr. Shultz?

09:47:58   20          MR. SHULTZ:  We don't have any objection, Your

09:48:01   21   Honor.

09:48:01   22          MS. BRANNON:  I believe Mr. Allen was not present

09:48:03   23   during this, so we'd ask the court to instruct the jury

09:48:06   24   about how to consider these statements.

09:48:07   25          THE COURT:  Yeah, members of the jury, as

3-26-2018 USA v. ALLEN, et al, NO 16-10141         79

09:48:09   1   Mr. Mattivi just said, this evidence is being offered

09:48:12   2   only against Mr. Stein and should not be considered as

09:48:15   3   evidence against either Mr. Allen or Mr. Wright, but

09:48:18   4   those exhibits are admitted, Mr. Mattivi, and you may

09:48:22   5   publish them.

09:48:23   6       MR. MATTIVI:  Thank you.

09:48:24   7   BY MR. MATTIVI:

09:48:24   8   Q.    Before we do that, Mr. Benson, would you talk a

09:48:27   9   little bit for the jury about this meeting on June 14th.

09:48:30  10   Who called this meeting?

09:48:31  11   **A.    Patrick Stein did.**

09:48:36  12   Q.    And where was it supposed to take place?

09:48:38  13   **A.    It took place at a shooting range I have on the**

09:48:40  14   **property.**

09:48:40  15   Q.    And that's near Hutchinson, Kansas; correct?

09:48:45  16   **A.    Close enough to Hutchinson, Kansas, yes.**

09:48:48  17   Q.    All right.  When Mr. Stein called the meeting, did

09:48:51  18   he tell you what the purpose was?

09:48:53  19   **A.    No.**

09:48:56  20   Q.    Let's put this meeting in context.  This occurred

09:49:00  21   when in relation to a fairly major terrorist event in the

09:49:03  22   United States?

09:49:04  23   **A.    Just a couple days later.**

09:49:06  24   Q.    And we're talking about the Pulse Nightclub

09:49:08  25   shooting in Orlando; correct?

3-26-2018 USA v. ALLEN, et al, NO 16-10141

80

09:49:10  1  A.      Correct.

09:49:10  2  Q.      When Mr. Stein called you to set up the meeting,

09:49:14  3  did he say that he was done and he was ready to do

09:49:17  4  something?

09:49:18  5  A.      Yes.

09:49:18  6  Q.      Okay.  How did you interpret that?

09:49:21  7  A.      At the time I think he was talking about our

09:49:24  8  leadership within the KSF.

09:49:25  9  Q.      So when I asked you a few minutes ago about KSF,

09:49:28  10  in your view, being poorly run, that's what you thought

09:49:31  11  Mr. Stein was talking about?

09:49:32  12  A.      Yes.

09:49:32  13  Q.      Okay.  Did you later find out otherwise?

09:49:35  14  A.      Yes.

09:49:35  15  Q.      What did you find out that the purpose of the

09:49:37  16  meeting was to be?

09:49:39  17  A.      I believe it to be a recruitment to carry out an

09:49:44  18  offensive action.

09:49:46  19  Q.      Okay.  Who was at this meeting?

09:49:49  20  A.      Dan Day, Patrick Stein, and Shelby Lewis.

09:50:00  21  Q.      Let's go back over that list again.  You said Dan

09:50:02  22  Day was there; correct?

09:50:03  23  A.      Correct.

09:50:03  24  Q.      A person you identified as Shelby Lewis,

09:50:07  25  L-e-w-i-s, correct?

3-26-2018 USA v. ALLEN, et al, NO 16-10141

81

| | | |
|---|---|---|
| 09:50:08 | 1 | A.      Yes. |
| 09:50:09 | 2 | Q.      You and Patrick Stein? |
| 09:50:10 | 3 | A.      Correct. |
| 09:50:13 | 4 | Q.      Let's go ahead and play a clip.  I'm going to ask |
| 09:50:16 | 5 | you to listen to the clip and then when it's done we'll |
| 09:50:18 | 6 | talk about it.  All right? |
| 09:50:20 | 7 | Sean, would you play 13g, please. |
| 09:50:26 | 8 | (Government's Exhibit 13g was played.) |
| 09:52:54 | 9 | BY MR. MATTIVI: |
| 09:52:54 | 10 | Q.      So, Mr. Benson, let's go back through that and |
| 09:52:57 | 11 | talk in a little -- sort of unpack some of the things you |
| 09:52:59 | 12 | talked about.  You started out by discussing your |
| 09:53:01 | 13 | property; correct? |
| 09:53:02 | 14 | A.      Correct. |
| 09:53:02 | 15 | Q.      What was the significance of that? |
| 09:53:05 | 16 | A.      For having an area for training. |
| 09:53:08 | 17 | Q.      Okay.  You -- did you refer to it as a bug-out |
| 09:53:10 | 18 | location? |
| 09:53:11 | 19 | A.      Possibly, yes. |
| 09:53:12 | 20 | Q.      Okay.  Explain to the jury, if you would, please, |
| 09:53:14 | 21 | what does that mean to you?  What is a bug-out location? |
| 09:53:17 | 22 | A.      A bug-out location is a secondary location if your |
| 09:53:21 | 23 | primary's been compromised and you have to evacuate. |
| 09:53:24 | 24 | Q.      Okay.  So it's a location to evacuate for what? |
| 09:53:27 | 25 | A.      A disaster, a breakdown of a rule of law. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

82

| | | |
|---|---|---|
| 09:53:32 | 1 | Q.      And so what are you going to do there? |
| 09:53:35 | 2 | **A.      To basically gather everybody together, create a** |
| 09:53:42 | 3 | **safe environment, and, you know, begin to, I guess,** |
| 09:53:46 | 4 | **survive or live or move, something.** |
| 09:53:49 | 5 | Q.      So under this "shit hits the fan" scenario that's |
| 09:53:53 | 6 | contemplated often by the militias, this is a safe place |
| 09:53:55 | 7 | for you to gather with your family and survive; correct? |
| 09:53:58 | 8 | **A.      Correct.** |
| 09:53:58 | 9 | Q.      A safe place to play defense while the rest of the |
| 09:54:02 | 10 | world does its things? |
| 09:54:03 | 11 | MS. BRANNON:  Objection.  Leading. |
| 09:54:05 | 12 | **A.      Correct.** |
| 09:54:05 | 13 | THE COURT:  Overruled. |
| 09:54:09 | 14 | BY MR. MATTIVI: |
| 09:54:09 | 15 | Q.      What was it about that property that made it |
| 09:54:11 | 16 | suitable for a bug-out location? |
| 09:54:13 | 17 | **A.      Water.** |
| 09:54:14 | 18 | Q.      Why do you say that? |
| 09:54:17 | 19 | **A.      Water is essential to survival.** |
| 09:54:20 | 20 | Q.      Okay.  Wherever you choose to go, that's one of |
| 09:54:22 | 21 | the things you're going to need; correct? |
| 09:54:24 | 22 | **A.      Correct.** |
| 09:54:24 | 23 | Q.      Is there anything else that made it good from a |
| 09:54:27 | 24 | defensive posture? |
| 09:54:29 | 25 | **A.      I guess the terrain.** |

3-26-2018 USA v. ALLEN, et al, NO 16-10141          83

| | | |
|---|---|---|
| 09:54:31 | 1 | Q.      All right.  Now, later on in the conversation, |
| 09:54:34 | 2 | though, you ask, "When the shit hits the fan, where's it |
| 09:54:37 | 3 | going to hit?"  Do you remember that? |
| 09:54:40 | 4 | **A.      Yes.** |
| 09:54:42 | 5 | Q.      What did you mean by that? |
| 09:54:42 | 6 | **A.      Generally it -- you know, where is it going to** |
| 09:54:44 | 7 | **hit.  I mean, it could happen anywhere.  It could be** |
| 09:54:48 | 8 | **from, you know, a nuclear strike from Russia or Korea or,** |
| 09:54:53 | 9 | **you know, a natural disaster where, you know, we have a** |
| 09:54:55 | 10 | **breakdown of rule of law.  It could happen anywhere.** |
| 09:54:57 | 11 | Q.      Okay.  And then in response to that, Mr. Stein |
| 09:55:01 | 12 | said, "Wherever we start it," correct? |
| 09:55:05 | 13 | **A.      Correct.** |
| 09:55:05 | 14 | Q.      How did you interpret that? |
| 09:55:06 | 15 | **A.      I just kind of ignored it at that -- you know, I** |
| 09:55:09 | 16 | **didn't pay attention to that at that time.** |
| 09:55:10 | 17 | Q.      Okay.  I heard some other -- I heard somebody |
| 09:55:12 | 18 | laugh on the recording.  Did you hear that? |
| 09:55:15 | 19 | **A.      Yes.** |
| 09:55:16 | 20 | Q.      Okay.  But then Mr. Stein says, "I ain't |
| 09:55:20 | 21 | necessarily starting -- I ain't necessarily starting |
| 09:55:22 | 22 | anything, but I want to start cleaning house."  Do you |
| 09:55:26 | 23 | remember that? |
| 09:55:26 | 24 | **A.      Yes.** |
| 09:55:26 | 25 | Q.      How did you interpret that remark? |

09:55:28   1   A.      I figured he was just blowing smoke at that point.

09:55:32   2   Q.      Okay.  And then he says, "They're bringing those

09:55:36   3   motherfuckers in by the planeload."   Do you remember

09:55:38   4   that?

09:55:39   5   A.      Yes.

09:55:39   6   Q.      What did that mean to you?

09:55:41   7   A.      That it was kind of a general thing that everybody

09:55:46   8   knew that there was a lot of mass, you know, immigration

09:55:49   9   or refugees brought in to the state of Kansas.

09:55:53   10   Q.      Okay.  So in your view that was a mention of

09:55:56   11   refugees coming in to the state; correct?

09:55:58   12   A.      Yes.

09:56:00   13   Q.      You then referenced someone named Ron, and what

09:56:04   14   you called guerrilla warfare; is that right?

09:56:06   15   A.      Correct.

09:56:07   16   Q.      Would you explain to the jury please what you were

09:56:10   17   talking about.

09:56:10   18   A.      Talking about the propaganda that we see on social

09:56:14   19   media and our major news networks is to be, you know,

09:56:17   20   using the name propaganda to fight back.

09:56:22   21   Q.      Well, you went on to say you can "take that same

09:56:26   22   tactic and you shift it around, you might be able to

09:56:28   23   start something without starting something."   Do you

09:56:31   24   remember saying that?

09:56:31   25   A.      Yes.

3-26-2018 USA v. ALLEN, et al, NO 16-10141     85

| | | |
|---|---|---|
| 09:56:31 | 1 | Q.     Explain to the jury what you meant, please. |
| 09:56:33 | 2 | **A.     Starting a movement, you know, a major push to** |
| 09:56:37 | 3 | **make, you know, a political change in the country.** |
| 09:56:40 | 4 | Q.     Okay.  So that was your intent in saying it was to |
| 09:56:43 | 5 | talk about political change? |
| 09:56:44 | 6 | **A.     Correct.** |
| 09:56:45 | 7 | Q.     But then Mr. Stein responded, "Well, I had |
| 09:56:48 | 8 | envisioned kicking fucking doors in with a goddamn Mark |
| 09:56:52 | 9 | II."  Do you remember that? |
| 09:56:52 | 10 | **A.     Yes.** |
| 09:56:53 | 11 | Q.     Okay.  What was your response to that? |
| 09:56:55 | 12 | **A.     I was kind of concerned, or starting to get kind** |
| 09:56:59 | 13 | **of concerned about his direction.** |
| 09:57:01 | 14 | Q.     And then Shelby Lewis said in response that he'll, |
| 09:57:05 | 15 | "Get just maybe as many as that dude last weekend."   Do |
| 09:57:09 | 16 | you remember that? |
| 09:57:10 | 17 | **A.     Yes.** |
| 09:57:10 | 18 | Q.     And do you know what she was referring to or what |
| 09:57:12 | 19 | did it mean to you? |
| 09:57:14 | 20 | **A.     Referring to the I believe it's 49 that were** |
| 09:57:17 | 21 | **killed in Pulse Nightclub.** |
| 09:57:19 | 22 | Q.     And then in response to that, Mr. Stein said, |
| 09:57:22 | 23 | "Nobody's even gonna know I'm there other than them |
| 09:57:25 | 24 | motherfuckers." |
| 09:57:26 | 25 |        Who did you believe he was referring to when he |

3-26-2018 USA v. ALLEN, et al, NO 16-10141          86

09:57:29   1   said that statement?

09:57:31   2   **A.       Referring to the Somalis.**

09:57:35   3   Q.      And you told him to "do a lot of recon"?

09:57:39   4   **A.       Correct.**

09:57:40   5   Q.      Is that right?  What did you mean by that?

09:57:42   6   **A.       Yes.  To actually do a lot of recon of the area, I**

09:57:46   7   **mean, just to watch the area.**

09:57:48   8   Q.      Okay.  And then Mr. Stein responded that it wasn't

09:57:51   9   something he planned to do the next day.  Is that right?

09:57:53   10  **A.       Correct.**

09:57:55   11  Q.      At this point in the conversation, what was your

09:57:58   12  level of concern?

09:58:01   13  **A.       I was thinking that this was escalating into**

09:58:04   14  **something that was going to be an offensive posture, an**

09:58:08   15  **action, and I was starting to get concerned.**

09:58:10   16  Q.      Okay.  Let's listen to another clip now.

09:58:14   17          THE COURT:  Before we do that, Mr. Mattivi, why

09:58:16   18  don't we take our morning break.

09:58:17   19          MR. MATTIVI:  All right.

09:58:18   20          THE COURT:  This seems like a good time to do

09:58:19   21  that.  Ladies and gentlemen, we're going to take our

09:58:21   22  morning recess at this point just to take a break.

09:58:23   23  During the break, remember the admonition of the Court:

09:58:26   24  Don't discuss this case with each other or anyone else.

09:58:28   25  Why don't we come back at 10:15 and we'll continue our

| | | |
|---|---|---|
| 09:58:32 | 1 | testimony.  We're in recess until then. |
| 09:58:34 | 2 | CLERK COOK:  All rise. |
| 09:58:35 | 3 | (The jury left the courtroom, after which the |
| 09:59:13 | 4 | following proceedings were had:) |
| 09:59:13 | 5 | THE COURT:  Government, you called your first |
| 09:59:16 | 6 | witness and I looked to your document 280, Government's |
| 09:59:20 | 7 | list of witnesses, and she wasn't on that list of |
| 09:59:22 | 8 | witnesses.  And then you introduced documents 303 and I |
| 09:59:26 | 9 | looked at your list of exhibits and they ended at 290 |
| 09:59:30 | 10 | something, so I wonder if you have an updated list of |
| 09:59:37 | 11 | witnesses.  Mine ends at 239. |
| 09:59:38 | 12 | MR. MATTIVI:  I do, Your Honor, and I apologize I |
| 09:59:40 | 13 | forgot to file an updated witness list.  We have one. |
| 09:59:43 | 14 | We have shared it with the defense.  I'll be happy |
| 09:59:45 | 15 | to get that on file. |
| 09:59:46 | 16 | THE COURT:  All right.  And you also have a more |
| 09:59:48 | 17 | updated exhibit list, because the one I have ends at 239, |
| 09:59:52 | 18 | and the first witness -- the first exhibit you introduced |
| 09:59:55 | 19 | was 303. |
| 09:59:55 | 20 | MR. MATTIVI:  Right, again, I apologize for |
| 09:59:57 | 21 | overlooking that.  We'll get it on file today. |
| 10:00:00 | 22 | THE COURT:  Great.  Anything we need to talk |
| 10:00:02 | 23 | about?  We'll come back at 11:15 -- I mean, 10:15. |
| 10:00:06 | 24 | (A recess was taken from 9:59 to 10:17 A.M.) |
| 10:00:06 | 25 | (The jury returned to the courtroom, after which |

| | | |
|---|---|---|
| 10:18:01 | 1 | the following proceedings were had:) |
| 10:18:01 | 2 | THE COURT:  You may be seated.  Members of the |
| 10:18:06 | 3 | jury, I had our IT people work on our microphones over |
| 10:18:13 | 4 | the break.  Hopefully that's going to work better.  But |
| 10:18:16 | 5 | if at any point you have trouble hearing the witness or |
| 10:18:18 | 6 | the attorneys, raise your hand and we will -- we'll do |
| 10:18:24 | 7 | something about it, so it was obvious with this morning |
| 10:18:28 | 8 | you had. |
| 10:18:28 | 9 | Mr. Mattivi, you may continue your examination. |
| 10:18:31 | 10 | MR. MATTIVI:  Thank you, Your Honor. |
| 10:18:32 | 11 | BY MR. MATTIVI: |
| 10:18:32 | 12 | Q.    So, Mr. Benson, we're going to go ahead and play |
| 10:18:37 | 13 | another clip from later in the conversation than what |
| 10:18:39 | 14 | you've heard before. |
| 10:18:40 | 15 | MR. MATTIVI:  Sean, could you play 13h, please. |
| 10:18:58 | 16 | (Government's Exhibit 13h was played.) |
| 10:19:17 | 17 | MR. MATTIVI:  Hang on. |
| 10:19:18 | 18 | THE COURT:  We don't have any -- |
| 10:19:28 | 19 | CLERK COOK:  Okay.  Good. |
| 10:21:25 | 20 | (Government's Exhibit 13h was played.) |
| 10:21:27 | 21 | MR. MATTIVI: |
| 10:21:27 | 22 | BY MR. MATTIVI: |
| 10:21:28 | 23 | Q.    So, Mr. Benson, would you explain your comments |
| 10:21:30 | 24 | about the Imams at the mosque. |
| 10:21:33 | 25 | **A.    In relation to?** |

| | | |
|---|---|---|
| 10:21:36 | 1 | Q.      Go ahead and pull that mic a little bit closer. |
| 10:21:40 | 2 | **A.      Can you hear me?** |
| 10:21:41 | 3 | Q.      I can. |
| 10:21:42 | 4 | **A.      Okay.  You want to know the relation -- restate** |
| 10:21:44 | 5 | **your question.** |
| 10:21:45 | 6 | Q.      Sure.  Explain what you were talking about. |
| 10:21:47 | 7 | Mr. Stein seemed to be focusing his attention on |
| 10:21:51 | 8 | President Obama in the White House.  You seemed to be |
| 10:21:52 | 9 | focusing yours on the Imams on a more local level; |
| 10:21:57 | 10 | correct? |
| 10:21:57 | 11 | **A.      I think I made mention of both.** |
| 10:21:59 | 12 | Q.      Okay.  So explain your thoughts on that, would you |
| 10:22:02 | 13 | please. |
| 10:22:02 | 14 | **A.      At the time we were seeing, you know, like stuff** |
| 10:22:06 | 15 | **throungh the news in other states where they were starting** |
| 10:22:11 | 16 | **to adopt certain laws or working to try to adopt certain** |
| 10:22:16 | 17 | **laws, like Sharia law, inside our court systems.  And a** |
| 10:22:21 | 18 | **lot of that was being, you know, pushed by, you know,** |
| 10:22:24 | 19 | **local mosques and leadership in those areas that had a,** |
| 10:22:28 | 20 | **you know, heavy, you know, presence of Muslims.** |
| 10:22:31 | 21 | Q.      Okay.  Near the beginning of that clip we heard |
| 10:22:35 | 22 | Mr. Stein say, "The cockroaches in this country have got |
| 10:22:37 | 23 | to go, period." |
| 10:22:38 | 24 | Do you remember that? |
| 10:22:39 | 25 | **A.      Yes.** |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

90

| | | |
|---|---|---|
| 10:22:40 | 1 | Q.      In your view, what was he referring to? |
| 10:22:43 | 2 | **A.      Just gone.** |
| 10:22:45 | 3 | Q.      Had you heard him use the term "cockroaches" |
| 10:22:47 | 4 | before? |
| 10:22:48 | 5 | **A.      Yes.** |
| 10:22:48 | 6 | Q.      So what group do you think he was referring to? |
| 10:22:50 | 7 | **A.      Muslims.** |
| 10:22:51 | 8 | Q.      And by "gone," what was your interpretation of |
| 10:22:55 | 9 | what he said? |
| 10:22:56 | 10 | **A.      No longer in the United States, just gone.** |
| 10:22:58 | 11 | Q.      Okay.  And then he goes on to say, "They are the |
| 10:23:01 | 12 | problem in this country right now.  They are the threat |
| 10:23:03 | 13 | that we have in this country right now." |
| 10:23:05 | 14 |         Had you heard him talk like that before? |
| 10:23:08 | 15 | **A.      Yeah, it wasn't anything new.  I mean, he always** |
| 10:23:12 | 16 | **had -- and any time the subject came up with Muslims, it** |
| 10:23:15 | 17 | **was kind of the same way.** |
| 10:23:16 | 18 | Q.      Okay.  And, in fact, you agree with him in some |
| 10:23:19 | 19 | respects; correct? |
| 10:23:20 | 20 | **A.      Yes, I do.** |
| 10:23:21 | 21 | Q.      Where do you disagree with him? |
| 10:23:22 | 22 | **A.      I disagree that, you know, taking action or** |
| 10:23:30 | 23 | **inflicting harm on somebody else is -- it's not the right** |
| 10:23:36 | 24 | **way.** |
| 10:23:36 | 25 | Q.      Then there's a fairly lengthy discussion or |

10:23:39    1    statement by Mr. Stein about "bringing them in by the

10:23:42    2    planeload every day, the person in the White House is

10:23:45    3    making sure of it, we found out Garden City is a main hub

10:23:48    4    that they're bringing them into and dispersing from

10:23:53    5    there."  Do you remember that?

10:23:53    6    A.      Yes.

10:23:53    7    Q.      And then we hear discussion of Dan Day mentioning

10:23:56    8    that they're looking for volunteers at that place.

10:23:59    9    Correct?

10:23:59   10    A.      Yes.

10:24:00   11    Q.      And, in fact, he talked about trying to volunteer

10:24:03   12    there; correct?

10:24:04   13    A.      Yes.

10:24:04   14    Q.      In your view, from the perspective of the militia

10:24:08   15    of KSF, is that something that would be valuable, having

10:24:10   16    a person who worked in the immigration office?

10:24:12   17    A.      Yes.

10:24:13   18    Q.      Why?

10:24:14   19    A.      To be able to pinpoint out, you know, what we

10:24:20   20    perceive may be been threats as far as extremists.

10:24:23   21    Q.      So whether you're playing offense or defense, it

10:24:26   22    would be, in your view, appropriate to be able to keep an

10:24:27   23    eye on this?

10:24:28   24    A.      Yes.

10:24:29   25    Q.      Okay.  Let's go on to another clip now.

3-26-2018 USA v. ALLEN, et al, NO 16-10141          92

| | | |
|---|---|---|
| 10:24:33 | 1 | MR. MATTIVI:  Sean, would you play 13j for us, |
| 10:24:37 | 2 | please. |
| 10:24:41 | 3 | ( Government's Exhibit 13j was played.) |
| 10:24:49 | 4 | MR. MATTIVI:  We don't have sound. |
| 10:24:50 | 5 | THE COURT:  We still don't have audio. |
| 10:24:57 | 6 | CLERK COOK:  It's not us. |
| 10:24:58 | 7 | MR. MATTIVI:  Okay. |
| 10:24:44 | 8 | (Government's Exhibit 13j was played.) |
| 10:26:12 | 9 | MR. MATTIVI:  Sorry, Your Honor.  Obviously, it |
| 10:26:14 | 10 | didn't do that when we practiced it. |
| 10:26:19 | 11 | (Government's Exhibit 13j was replayed.) |
| 10:28:42 | 12 | BY MR. MATTIVI: |
| 10:28:43 | 13 | Q.    So, Mr. Benson, let's talk about the beginning of |
| 10:28:46 | 14 | that conversation.  You talked about something called a |
| 10:28:49 | 15 | "false flag"; correct? |
| 10:28:50 | 16 | **A.    Yes.** |
| 10:28:51 | 17 | Q.    Can you explain to the jury what you meant by |
| 10:28:53 | 18 | "false flag"? |
| 10:28:54 | 19 | **A.    False flag, that, well, is used to elicit a** |
| 10:29:01 | 20 | **reaction from people.** |
| 10:29:04 | 21 | Q.    So am I correct in saying that that was the point |
| 10:29:07 | 22 | of your discussion, was that the Government is doing that |
| 10:29:10 | 23 | to create a reaction among people? |
| 10:29:12 | 24 | **A.    Yes.** |
| 10:29:12 | 25 | Q.    Okay.  Explain what you mean, please. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

10:29:15  1  **A.      By trying to get a reaction from the patriot**

10:29:22  2  **community to respond in some way, shape, or form is the**

10:29:27  3  **reason we refer to stuff as false flags.**

10:29:30  4  Q.    Okay.  And is there some opinion in the patriot

10:29:32  5  community that the government is orchestrating events

10:29:35  6  just to draw patriots out?

10:29:37  7  **A.      At the time, yes, definitely.**

10:29:41  8  Q.    That was your thought at the time?

10:29:43  9  **A.      Yes.**

10:29:43  10 Q.    Okay.  There's some conversation about a person --

10:29:45  11 and I'm not sure if we got the name right in the

10:29:47  12 transcript -- Allen O'Deary [phonetic] or Allen Ladeary

10:29:51  13 [phonetic]?

10:29:51  14 **A.      Yes.**

10:29:51  15 Q.    Would you explain that, please.

10:29:53  16 **A.      Alan Ledeary.  He's just another patriot.  He's**

10:29:57  17 **not in the state of Kansas.  He's got a large social**

10:30:00  18 **media presence.**

10:30:01  19 Q.    And then you make some comments about hunting

10:30:03  20 Muslims, don't you?

10:30:04  21 **A.      Yes.**

10:30:05  22 Q.    And pretty distasteful stuff?

10:30:08  23 **A.      Yes.**

10:30:08  24 Q.    Would you explain to the jury what your thoughts

10:30:10  25 were when you said those things.

10:30:12   1   A.      Just venting, blowing smoke.  We just had 49

10:30:16   2   Americans killed, you know, by, you know, a terrorist

10:30:20   3   act.  It probably wasn't the right thing but, you know,

10:30:24   4   that's just what I was saying at the time.

10:30:27   5   Q.    Okay.  And then Mr. Stein says, "In Garden City,

10:30:31   6   they got those apartment complexes where literally every

10:30:34   7   apartment, that's all it is, fucking goddamn cockroaches,

10:30:40   8   and, I mean, I wouldn't be against it if I could get

10:30:42   9   ahold of some RPGs.  I'll run some RPGs right through.

10:30:46   10  I'll blow every goddamned building up right there."

10:30:49   11      You remember that comment?

10:30:50   12  A.      Yes.

10:30:51   13  Q.    And then Shelby Lewis says, "We got to be

10:30:53   14  realistic, though, because I can't get any of those and

10:30:56   15  you can't either."  Correct?

10:30:57   16  A.      Yes.

10:30:58   17  Q.    Still with me?  And then Mr. Stein says, "Well,

10:31:02   18  there's ways."  You remember that?

10:31:04   19  A.      Yes.

10:31:05   20  Q.    Did you -- at that point did you think he was

10:31:10   21  serious?

10:31:10   22  A.      I thought he was serious.  I didn't really think

10:31:13   23  that it could accomplish anything.  I mean, I didn't -- I

10:31:16   24  thought it was just blowing smoke.

10:31:18   25  Q.    Okay.

3-26-2018 USA v. ALLEN, et al, NO 16-10141         95

| | | |
|---|---|---|
| 10:31:20 | 1 | MR. MATTIVI:  Let's go on to clip 13n, Sean, if |
| 10:31:26 | 2 | you would, please. |
| 10:31:28 | 3 | ( Government's Exhibit 13n was played.) |
| 10:32:45 | 4 | BY MR. MATTIVI: |
| 10:32:46 | 5 | Q.     Give us a little context for that.  What's the |
| 10:32:49 | 6 | clanging metal that we heard in the background? |
| 10:32:51 | 7 | A.     That's a gate. |
| 10:32:53 | 8 | Q.     Okay.  And when Mr. Stein mentions that he was |
| 10:32:58 | 9 | "putting some things together six, eight months ago to do |
| 10:33:01 | 10 | something a lot more crazy than this, and it didn't take |
| 10:33:04 | 11 | him long to have 20 or 25 people that were rolling with |
| 10:33:06 | 12 | him before shit changed," do you -- had he talked with |
| 10:33:11 | 13 | you about that? |
| 10:33:11 | 14 | A.     No. |
| 10:33:11 | 15 | Q.     Okay.  But he said, "I told you about that"; |
| 10:33:15 | 16 | correct?  You remember him saying that? |
| 10:33:16 | 17 | A.     Well, maybe about the statement, yes. |
| 10:33:18 | 18 | Q.     Right.  And it was Shelby Lewis who said yes; |
| 10:33:23 | 19 | correct? |
| 10:33:23 | 20 | A.     Yes. |
| 10:33:23 | 21 | Q.     So would you agree that it was clear that that was |
| 10:33:25 | 22 | between him and Shelby? |
| 10:33:27 | 23 | A.     Yes. |
| 10:33:27 | 24 | Q.     All right.  The recording stops not long after |
| 10:33:32 | 25 | this; is that right?  You remember looking at the entire |

3-26-2018 USA v. ALLEN, et al, NO 16-10141                96

| | | |
|---|---|---|
| 10:33:37 | 1 | transcript when we met before? |
| 10:33:39 | 2 | **A.        Yes, yes, yes.** |
| 10:33:40 | 3 | Q.        Okay.  I'm asking you to recall back to that time |
| 10:33:42 | 4 | on June 14th.  Do you remember? |
| 10:33:44 | 5 | **A.        Yes.** |
| 10:33:44 | 6 | Q.        So not long after that, something happened; |
| 10:33:47 | 7 | correct? |
| 10:33:48 | 8 | **A.        Yes.** |
| 10:33:48 | 9 | Q.        What happened? |
| 10:33:48 | 10 | **A.        Dan Day started exhibiting signs of heat stroke.** |
| 10:33:53 | 11 | Q.        What do you mean by that? |
| 10:33:55 | 12 | **A.        He started getting real pale, clammy, headaches.** |
| 10:34:01 | 13 | **It was hot out.  He hadn't had a lot of water.** |
| 10:34:04 | 14 | Q.        Okay.  So what actually happened?  Describe to us |
| 10:34:08 | 15 | what happened if you would, please. |
| 10:34:09 | 16 | **A.        Dan Day eventually got to a point where he laid** |
| 10:34:15 | 17 | **down on the ground, and we were concerned about his** |
| 10:34:20 | 18 | **particular health.  So I called up to my parents' place** |
| 10:34:24 | 19 | **where my sister-in-law was at.  She'd worked in the, you** |
| 10:34:28 | 20 | **know, medical field.  She came out to, you know, to** |
| 10:34:31 | 21 | **assess Dan, and we decided at that point in time to call** |
| 10:34:34 | 22 | **911 and have the EMS come out.** |
| 10:34:37 | 23 | Q.        Okay.  So did they come out? |
| 10:34:38 | 24 | **A.        Yes.** |
| 10:34:39 | 25 | Q.        Did they treat him there? |

| | | |
|---|---|---|
| 10:34:40 | 1 | A.      Yes. |
| 10:34:40 | 2 | Q.      And they transported him; correct? |
| 10:34:42 | 3 | A.      Yes. |
| 10:34:42 | 4 | Q.      Okay.  Describe to the jury if you would, please, |
| 10:34:45 | 5 | what happened after that, after Dan Day was taken to the |
| 10:34:47 | 6 | hospital. |
| 10:34:48 | 7 | A.      After Dan Day was taken to the hospital, Shelby |
| 10:34:52 | 8 | Lewis went ahead and left and went home.  Patrick stayed |
| 10:34:58 | 9 | 'cause Curtis Allen was almost to our property, so he |
| 10:35:04 | 10 | hung around and we hung around for Curtis to get there. |
| 10:35:06 | 11 | Q.      Had there been some conversation about Curtis |
| 10:35:09 | 12 | intending to join you? |
| 10:35:11 | 13 | A.      Excuse me? |
| 10:35:11 | 14 | Q.      Had there been some conversation prior to that |
| 10:35:14 | 15 | about the fact that Curtis was on his way? |
| 10:35:17 | 16 | A.      Yes. |
| 10:35:17 | 17 | Q.      Okay.  And he ultimately showed up; correct? |
| 10:35:20 | 18 | A.      Yes. |
| 10:35:20 | 19 | Q.      Describe for the jury if you would, please, what |
| 10:35:23 | 20 | happened when Mr. Allen got there. |
| 10:35:24 | 21 | A.      When Curtis arrived, Patrick just went over the |
| 10:35:29 | 22 | same thing that he went over with us at the shooting |
| 10:35:32 | 23 | range with Curtis. |
| 10:35:33 | 24 | Q.      Okay.  And you expressed last time we talked that |
| 10:35:39 | 25 | this heightened your level of concern; correct? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141                98

| | | |
|---|---|---|
| 10:35:41 | 1 | A.      Yes. |
| 10:35:41 | 2 | Q.      Explain to the jury why if you would, please. |
| 10:35:44 | 3 | A.      'Cause they -- actually, Patrick was actually, you |
| 10:35:48 | 4 | know, talking about using high explosives on the |
| 10:35:56 | 5 | Somali -- I guess where they're staying in -- in Liberal |
| 10:35:59 | 6 | or Garden City, I can't remember which. |
| 10:36:01 | 7 | Q.      Okay.  So there was specific discussion about the |
| 10:36:03 | 8 | use of high explosives once Mr. Allen showed up? |
| 10:36:06 | 9 | A.      Yes. |
| 10:36:06 | 10 | Q.      What did this do to your level of concern? |
| 10:36:09 | 11 | A.      Made me very concerned. |
| 10:36:10 | 12 | Q.      Okay.  Explain what you mean, please. |
| 10:36:13 | 13 | A.      That I actually thought it wasn't just talk, it |
| 10:36:16 | 14 | was more of a, you know, an actual "action" action. |
| 10:36:20 | 15 | Q.      Who was the person that actually mentioned it? |
| 10:36:22 | 16 | A.      Patrick. |
| 10:36:23 | 17 | Q.      Okay.  Could you see a response by Mr. Allen? |
| 10:36:26 | 18 | A.      Yes. |
| 10:36:26 | 19 | Q.      Okay.  What did you -- what did you observe? |
| 10:36:30 | 20 | A.      Not much of a response.  Like I don't know if this |
| 10:36:37 | 21 | is something he'd heard before or this is the first time |
| 10:36:40 | 22 | he'd heard it, but he didn't have a -- he didn't have a |
| 10:36:43 | 23 | real big response to it. |
| 10:36:46 | 24 | Q.      Okay.  Why at this point in the conversation have |
| 10:36:49 | 25 | you begun taking Patrick Stein seriously? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141          99

10:36:52   1   A.      That he was -- his demeanor and everything, that

10:36:59   2   he was actually going to perpetrate this, and that he had

10:37:05   3   actually may have already started acquiring some of the

10:37:07   4   items he was talking about.

10:37:08   5   Q.     Was there something specific about the

10:37:10   6   conversation that caused you to believe that perhaps he

10:37:12   7   was starting to acquire supplies?

10:37:16   8   A.      I can't recall with --

10:37:19   9   Q.     Okay.  But you remember being concerned about it?

10:37:21   10   A.      Yes.

10:37:21   11   Q.     Okay.  Mr. Day was not present at this point;

10:37:25   12   correct?

10:37:25   13   A.      Correct.

10:37:26   14   Q.     Okay.  What -- do you remember any of the

10:37:29   15   specifics about the conversation concerning the high

10:37:32   16   explosives and what Mr. Stein intended to do with them?

10:37:34   17   A.      He intended to place explosives at certain

10:37:40   18   locations at the -- I don't remember what they called it,

10:37:47   19   but where the mass majority of them were staying, in

10:37:51   20   their community, to place anhydrous or fertilizer-made

10:38:00   21   bombs.

10:38:02   22   Q.     How long after that did the meeting break up?

10:38:07   23   A.      I'm not sure.

10:38:08   24   Q.     Okay.  Do you remember why the meeting broke up?

10:38:11   25   A.      I think it was just getting late and I think that

3-26-2018 USA v. ALLEN, et al, NO 16-10141

100

10:38:15  1  Patrick was concerned about an issue he had with a friend

10:38:19  2  over here in Wichita.

10:38:20  3  Q.     Okay.  Once this meeting ended, what were your

10:38:26  4  thoughts about continued involvement with this group?

10:38:32  5  A.     There -- I was done.  I was out 'cause I actually

10:38:37  6  thought that -- I didn't think it was a good place for me

10:38:40  7  to be at the time.

10:38:41  8  Q.     Okay.  When did you -- when did you come to the

10:38:44  9  point of making that decision?

10:38:46  10  A.     Actually, I kind of had that by the next morning.

10:38:49  11  I called Shelby Lewis on the phone, and I told her I

10:38:53  12  didn't want to have any part of it, that I was done, I

10:38:56  13  wanted out.  I just wanted to distance myself from, you

10:39:01  14  know, everybody.

10:39:01  15  Q.     Okay.  So why not call Patrick Stein or Curtis

10:39:04  16  Allen?  Why'd you call Shelby?

10:39:06  17  A.     I believed that Shelby didn't have the mindset

10:39:10  18  that Patrick Stein had.

10:39:12  19  Q.     Okay.  So what did you communicate to her?

10:39:15  20  A.     That -- I told her I said, you know, "I'm not down

10:39:17  21  with what he's talking about" and, you know, I didn't

10:39:21  22  want to have any part of it.

10:39:22  23  Q.     Okay.  So what did you do then?

10:39:24  24  A.     Shortly after that I tendered my resignation with

10:39:28  25  KSF.

3-26-2018 USA v. ALLEN, et al, NO 16-10141

101

10:39:28  1  Q.      How did you do that?

10:39:29  2  A.      I sent -- well, I guess not a letter but a

10:39:34  3  communication with our state commander and resigned my

10:39:38  4  position.

10:39:39  5  Q.      Okay.  Now, did you say, "It's because they're

10:39:41  6  doing something I don't agree with"?

10:39:43  7  A.      No, I did not.

10:39:44  8  Q.      What did you say?

10:39:44  9  A.      I told them it was due to personal issues that I

10:39:48  10  had going on at the time that I couldn't effectively

10:39:50  11  perform my duties within the KSF.

10:39:52  12  Q.      But what was the real reason?

10:39:54  13  A.      The real reason was 'cause I didn't know if the

10:39:58  14  organization that I was with was what I was looking for

10:40:04  15  as far as, you know, a defense-type -- a defense service.

10:40:08  16  And I don't -- and I didn't know, you know, in the KSF

10:40:12  17  how many of the people had the same mindset, so I just

10:40:17  18  wanted out.

10:40:17  19  Q.      Okay.  You mentioned when we spoke that in the

10:40:23  20  militia community that you're often concerned about

10:40:27  21  informants; correct?

10:40:28  22  A.      Correct.

10:40:28  23  Q.      What did you mean by that?

10:40:30  24  A.      There's been in the patriot community or a lot of

10:40:38  25  the militias there's been a concern about paid informants

10:40:41  1  actually you know, trying to push people to commit

10:40:47  2  criminal acts, and that was basically the big concern

10:40:51  3  with informants.

10:40:53  4  Q.    Did you have a concern about an informant in this

10:40:56  5  group?

10:40:57  6  A.    No, not at the time, no.

10:40:59  7  Q.    Okay.  You mentioned to me at one point that you

10:41:03  8  were concerned about Patrick's actions; correct?

10:41:06  9  A.    Yes.

10:41:06  10  Q.    What did you mean by that?

10:41:08  11  A.    Well, another instance happened, you know, after I

10:41:13  12  left the KSF that made me really confirm that maybe

10:41:19  13  Patrick was an informant.

10:41:20  14  Q.    Okay.  Why?

10:41:22  15  A.    Because he was trying to recruit or get people to

10:41:27  16  commit, you know, an illegal act.

10:41:29  17  Q.    Okay.  Explain what you mean, please.  What are

10:41:31  18  the circumstances around that?

10:41:34  19  A.    I don't get what you're asking.

10:41:36  20  Q.    Right.  You said that you had that concern because

10:41:40  21  of something specific Patrick had done; correct?  He was

10:41:43  22  trying to recruit people; correct?

10:41:44  23  A.    Correct, yes.

10:41:45  24  Q.    Okay.  What specifically was he trying to get

10:41:48  25  people to do?

10:41:53   1   A.      People to do or trying to get me to do?

10:41:55   2   Q.      Yes, let's focus on what he was trying to get you

10:41:58   3   to do.

10:41:59   4   A.      The one instance where I actually thought he was

10:42:03   5   an informant was in regards to the actual election.  And

10:42:08   6   there was a political PAC that was going to be in

10:42:13   7   Washington, D.C., and this particular political PAC was

10:42:17   8   made up of ex-Navy SEALS.  And he was recruiting security

10:42:25   9   to go to Washington, D.C., you know, locally through

10:42:28   10  people he knew in Kansas.

10:42:30   11  Q.      Okay.  And why did that cause you concern that he

10:42:32   12  might be an informant?

10:42:34   13  A.      Because, one, it was Washington, D.C., and why

10:42:36   14  would a Navy SEAL want my protection?

10:42:39   15  Q.      Okay.  And the thing about him that caused you to

10:42:42   16  think he was an informant was the way he was pushing

10:42:46   17  people to do things; is that correct?

10:42:47   18  A.      Correct.

10:42:48   19          MR. MATTIVI:  Your Honor, I don't have any more

10:42:50   20  questions for Mr. Benson at this time.

10:42:52   21          THE COURT:  Thank you, Mr. Mattivi.

10:42:54   22          Ms. Brannon, you may cross-examine.

10:42:56   23          MS. BRANNON:  Thank you, Your Honor.

10:42:58   24                      CROSS-EXAMINATION

10:42:58   25  BY MS. BRANNON:

| | | |
|---|---|---|
| 10:43:06 | 1 | Q.    Good morning, Mr. Benson. |
| 10:43:07 | 2 | **A.    Good morning.** |
| 10:43:08 | 3 | Q.    You talked about these recruitment meetings with |
| 10:43:11 | 4 | KSF.  Once you were recruited, you actually had to join |
| 10:43:18 | 5 | KSF if they asked you to; is that right? |
| 10:43:22 | 6 | **A.    No.** |
| 10:43:22 | 7 | Q.    Well, you said you resigned your membership. |
| 10:43:25 | 8 | **A.    Well, within the KSF, as you went through a** |
| 10:43:29 | 9 | **certain vetting process --** |
| 10:43:30 | 10 | Q.    Uh-huh. |
| 10:43:31 | 11 | **A.    -- and, you know, you had a membership within KSF,** |
| 10:43:35 | 12 | **and then when you started to obtain field training** |
| 10:43:39 | 13 | **exercises and things like this, then you were actually** |
| 10:43:43 | 14 | **patched into the KSF.** |
| 10:43:44 | 15 | Q.    Did you understand that Patrick Stein had been |
| 10:43:47 | 16 | vetted? |
| 10:43:48 | 17 | **A.    Yes.** |
| 10:43:48 | 18 | Q.    And Shelby Lewis? |
| 10:43:50 | 19 | **A.    Excuse me?  Yes.** |
| 10:43:51 | 20 | Q.    And Dan Day? |
| 10:43:54 | 21 | **A.    Yes.** |
| 10:43:54 | 22 | Q.    Curtis Allen? |
| 10:43:56 | 23 | **A.    Yes.** |
| 10:43:57 | 24 | Q.    When Patrick Stein called this meeting on |
| 10:44:03 | 25 | June 14th, you believed at that point it was just another |

10:44:08   1   meeting; is that right?

10:44:09   2   **A.      That's correct, yes.**

10:44:10   3   Q.      Did you know who to expect at this meeting?

10:44:14   4   **A.      No.**

10:44:15   5   Q.      So you could have had 20 people or three; right?

10:44:18   6   **A.      Correct.**

10:44:19   7   Q.      But you expected the people that showed up would

10:44:22   8   be vetted members of KSF?

10:44:24   9   **A.      Correct.**

10:44:25   10  Q.      And it was Patrick Stein's idea to have this

10:44:29   11  meeting on your property?

10:44:30   12  **A.      It was a midway point, I believe.**

10:44:33   13  Q.      All right.  So just geographically it was

10:44:35   14  convenient for everyone?

10:44:36   15  **A.      Yes.**

10:44:36   16  Q.      And on your property, where exactly did you meet?

10:44:44   17  **A.      In a pasture where I have a shooting range.**

10:44:46   18  Q.      All right.  Was there a building out there?

10:44:48   19  **A.      A shed.**

10:44:49   20  Q.      Okay.

10:44:50   21  **A.      A shooting shed, a shack.**

10:44:52   22  Q.      Shooting shack.  All right.  Never heard that term

10:44:55   23  before.  So were there -- did you meet inside the shed?

10:44:59   24  **A.      Yes.**

10:44:59   25  Q.      Were there, like, chairs and everything?

10:45:01  1  A.      **No, there's two shooting tables and then stools to**

10:45:05  2  **sit on.**

10:45:08  3  Q.      When -- well, Patrick Stein and Dan Day arrived

10:45:11  4  together?

10:45:12  5  A.      **Yes.**

10:45:12  6  Q.      Shelby Lewis was already there?

10:45:17  7  A.      **I don't remember when she arrived, but she came by**

10:45:19  8  **herself.**

10:45:20  9  Q.      By the time they got there it was, what, maybe

10:45:23  10  8:00 in the evening?

10:45:26  11  A.      **I suppose.  It was in the evening.**

10:45:28  12  Q.      All right.  And this is June, so it was warm

10:45:30  13  outside, like you talked about.

10:45:32  14  A.      **Yeah.**

10:45:32  15  Q.      Was it still daylight when you met?

10:45:34  16  A.      **No.**

10:45:35  17  Q.      You talked a little bit later about the ambulance

10:45:37  18  coming for Dan Day.

10:45:38  19  A.      **Yes.**

10:45:39  20  Q.      It was well after dark when that happened; right?

10:45:42  21  A.      **Yes.**

10:45:43  22  Q.      Was it close to 11:00?

10:45:45  23  A.      **I don't know time.**

10:45:47  24  Q.      And it was after that that Curtis Allen showed up;

10:45:49  25  is that right?

| | | |
|---|---|---|
| 10:45:50 | 1 | A.      Correct, yes. |
| 10:45:50 | 2 | Q.     All right.  Let's talk a little bit about the |
| 10:45:54 | 3 | meeting in the shooting shack with yourself, Shelby, |
| 10:45:58 | 4 | Patrick Stein, and Dan Day.  At that point you've talked |
| 10:46:04 | 5 | about your relationship with Patrick Stein.  How well did |
| 10:46:07 | 6 | you know Dan Day? |
| 10:46:09 | 7 | A.      I knew him a little bit. |
| 10:46:11 | 8 | Q.     You had met him one time before; is that right? |
| 10:46:15 | 9 | A.      Yes. |
| 10:46:17 | 10 | Q.     Before this meeting that Patrick Stein called, you |
| 10:46:21 | 11 | already had a good sense about his view of Muslims; is |
| 10:46:25 | 12 | that right? |
| 10:46:25 | 13 | A.      Yes. |
| 10:46:29 | 14 | Q.     When you first met, there was a lot of talk about |
| 10:46:34 | 15 | things other than Muslims; is that right? |
| 10:46:37 | 16 | A.      I can't recall what all was discussed. |
| 10:46:40 | 17 | Q.     All right.  You weren't talking about politics and |
| 10:46:45 | 18 | the news? |
| 10:46:48 | 19 | A.      I recall we probably talked about politics.  I |
| 10:46:51 | 20 | can't remember what we talked about. |
| 10:46:52 | 21 | Q.     You remember talking about the Orlando shooting? |
| 10:46:56 | 22 | A.      Yes. |
| 10:46:56 | 23 | Q.     And that had just been a couple of days before? |
| 10:46:59 | 24 | A.      Yes. |
| 10:46:59 | 25 | Q.     And that drew your attention because, number one, |

| | | |
|---|---|---|
| 10:47:02 | 1 | there was so many Americans killed; is that right? |
| 10:47:05 | 2 | **A.      At the time, that was, yeah, one of the largest** |
| 10:47:10 | 3 | **mass shootings, you know, in modern time anyway.** |
| 10:47:13 | 4 | Q.      And the news reports that you had heard said that |
| 10:47:16 | 5 | the shooter was Muslim; is that correct? |
| 10:47:21 | 6 | **A.      The reports were -- I'm trying to remember back.** |
| 10:47:25 | 7 | **It's been awhile but, you know, either he's Muslim or** |
| 10:47:28 | 8 | **indoctrinated and had claimed -- claimed the attack for** |
| 10:47:37 | 9 | **Allah.** |
| 10:47:38 | 10 | Q.      Just make sure I heard right, "claimed the attacks |
| 10:47:41 | 11 | for Allah"? |
| 10:47:42 | 12 | **A.      ISIS, whatever you want -- whatever you want, you** |
| 10:47:47 | 13 | **know, they scream "Allah akbar" or whatever.** |
| 10:47:50 | 14 | Q.      And that was one of the reasons that that |
| 10:47:52 | 15 | particular event drew your attention? |
| 10:47:54 | 16 | **A.      That was one of the biggest ones, but that wasn't** |
| 10:47:58 | 17 | **the only one.** |
| 10:48:01 | 18 | Q.      You reviewed a lot of the things that Patrick |
| 10:48:04 | 19 | Stein said, and you understood this for him to be |
| 10:48:09 | 20 | recruiting you; is that correct? |
| 10:48:12 | 21 | **A.      Yes, I believe he made a statement that he needs** |
| 10:48:17 | 22 | **more than five.** |
| 10:48:18 | 23 | Q.      And you viewed that as basic, I believe you said |
| 10:48:21 | 24 | almost like a sales pitch to you? |
| 10:48:23 | 25 | **A.      Correct.** |

| | | |
|---|---|---|
| 10:48:27 | 1 | Q.      You participated in this conversation as well, as |
| 10:48:30 | 2 | we've heard; right? |
| 10:48:31 | 3 | **A.      Correct.** |
| 10:48:32 | 4 | Q.      And when he said some of these things about what |
| 10:48:35 | 5 | he wanted to do to Muslims, you gave the impression that |
| 10:48:39 | 6 | you were going along with it -- |
| 10:48:40 | 7 | **A.      Correct.** |
| 10:48:40 | 8 | Q.      -- right?  And you did that later when Curtis |
| 10:48:43 | 9 | Allen was part of the conversation; right? |
| 10:48:45 | 10 | **A.      Correct.** |
| 10:48:45 | 11 | Q.      When he said something that shocked you, you |
| 10:48:48 | 12 | didn't act shocked? |
| 10:48:49 | 13 | **A.      Correct.** |
| 10:48:49 | 14 | Q.      When he said something you didn't agree with, you |
| 10:48:52 | 15 | didn't raise your hand and say, "I don't agree with |
| 10:48:55 | 16 | that"? |
| 10:48:55 | 17 | **A.      Correct.** |
| 10:48:55 | 18 | Q.      When he said something about doing something |
| 10:48:58 | 19 | violent to someone else, you didn't try to stop him; is |
| 10:49:01 | 20 | that right? |
| 10:49:01 | 21 | **A.      Well, he was talking.  He wasn't doing.** |
| 10:49:04 | 22 | Q.      All right.  The nature of what he was talking |
| 10:49:13 | 23 | about at that time, would you consider it like your talk, |
| 10:49:16 | 24 | he was just venting? |
| 10:49:18 | 25 | **A.      Possibly, yes.** |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

110

| | | |
|---|---|---|
| 10:49:19 | 1 | Q.      Blowing smoke? |
| 10:49:20 | 2 | **A.      Yes.** |
| 10:49:28 | 3 | Q.      Was Shelby Lewis' reaction to him about the same |
| 10:49:31 | 4 | as yours? |
| 10:49:32 | 5 | **A.      I think hers was a little bit more docile than** |
| 10:49:36 | 6 | **mine.** |
| 10:49:36 | 7 | Q.      You were actively talking with him and drawing out |
| 10:49:41 | 8 | ideas; is that right? |
| 10:49:41 | 9 | **A.      Yes, I was engaging.** |
| 10:49:43 | 10 | Q.      That was what? |
| 10:49:44 | 11 | **A.      I was engaging in conversation, yes.** |
| 10:49:46 | 12 | Q.      You were encouraging a conversation? |
| 10:49:48 | 13 | **A.      I don't know if I was encouraging as well as** |
| 10:49:51 | 14 | **agreeing.** |
| 10:49:51 | 15 | Q.      Was Dan Day participating in the conversation? |
| 10:49:54 | 16 | **A.      Yes.** |
| 10:49:55 | 17 | Q.      Was he encouraging the conversation? |
| 10:49:57 | 18 | **A.      Yes.** |
| 10:49:59 | 19 | Q.      Did he appear surprised at some of the things |
| 10:50:01 | 20 | Patrick Stein was voicing? |
| 10:50:04 | 21 | **A.      I didn't see a surprise.  It was kind of difficult** |
| 10:50:08 | 22 | **to tell with Dan because he was having trouble with the** |
| 10:50:12 | 23 | **heat.** |
| 10:50:13 | 24 | Q.      He was having trouble, as you say, with the heat |
| 10:50:16 | 25 | the entire time you all were out there? |

10:50:18   1   A.      Yes.  He was exhibiting signs that he was very

10:50:22   2   uncomfortable and he didn't have any water.

10:50:34   3   Q.      The trouble that he was having with the breathing

10:50:36   4   and not having water, that didn't impede his conversation

10:50:41   5   or his participation with the conversation, did it?

10:50:43   6   A.      No.

10:50:47   7   Q.      Mr. Allen, you said and described, arriving later

10:50:51   8   and that was after Dan Day was taken away in an

10:50:53   9   ambulance?

10:50:55   10  A.      Sorry, I'm deaf in one ear, so repeat that,

10:50:59   11  please.

10:50:59   12  Q.      That's all right.  Mr. Allen showed up after Dan

10:51:04   13  Day was taken away in the ambulance; is that right?

10:51:07   14  A.      Correct, yes.

10:51:08   15  Q.      And it was after Shelby Lewis left?

10:51:11   16  A.      Yes.

10:51:11   17  Q.      And did you move the meeting to another location?

10:51:16   18  A.      We didn't move it.  The shooting range had no

10:51:20   19  lights and Curtis wouldn't find it, so we went to our

10:51:24   20  shop.

10:51:25   21  Q.      And was your shop, that was still on your land; is

10:51:29   22  that right?

10:51:29   23  A.      Correct.

10:51:32   24  Q.      And you knew before walking in there with Curtis

10:51:36   25  about his views on Muslims.  You described them as you

3-26-2018 USA v. ALLEN, et al, NO 16-10141

112

10:51:39   1  thought they were consistent with yours; right?

10:51:42   2  A.      Yes.

10:51:42   3  Q.      And they weren't as extreme as Patrick's?

10:51:44   4  A.      What, excuse me?

10:51:46   5  Q.      They weren't as extreme as Patrick's.

10:51:48   6  A.      As far as I knew, no.

10:51:53   7  Q.      Do you remember how long the three of you met in

10:51:56   8  the shop?

10:51:57   9  A.      No, I don't recall.

10:51:59  10  Q.      Was it 30 minutes, three hours?

10:52:03  11  A.      I really can't recall how long we were in there.

10:52:16  12  Q.      It was, in fact, Curtis Allen who broke up the

10:52:19  13  meeting and said he needed to leave; is that right?

10:52:22  14  A.      Possibly.  I don't remember.  I knew, you know,

10:52:26  15  Curtis was traveling, you know, home from work that he

10:52:30  16  had in Topeka, I believe, and I know he had a long drive

10:52:33  17  ahead of him, and I know Patrick had, you know, issues

10:52:38  18  here in town, so I couldn't tell you which one -- who

10:52:41  19  broke up the meeting.

10:52:50  20  Q.      Let's talk a little bit more about your reactions

10:52:54  21  to Patrick Stein.  And I believe on direct you talked

10:53:00  22  about having concerns about Islam, but you had very

10:53:06  23  specific concerns about how Muslims were being vetted

10:53:08  24  coming into the country.

10:53:10  25  A.      Yes, I did.

| | | |
|---|---|---|
| 10:53:11 | 1 | Q.      And you expressed those concerns to the KSF? |
| 10:53:16 | 2 | **A.      I think I always expressed those concerns** |
| 10:53:19 | 3 | **basically publicly to the whole world.** |
| 10:53:22 | 4 | Q.      Not ashamed of those views? |
| 10:53:25 | 5 | **A.      No.** |
| 10:53:25 | 6 | Q.      All right.  You would express them on Facebook, |
| 10:53:28 | 7 | for example? |
| 10:53:28 | 8 | **A.      Yes.** |
| 10:53:29 | 9 | Q.      And these Facebook chats that we were talking |
| 10:53:33 | 10 | about? |
| 10:53:33 | 11 | **A.      Yes.** |
| 10:53:34 | 12 | Q.      And just to go off topic for just a minute, before |
| 10:53:40 | 13 | you had this meeting on June 14th, you were Facebook |
| 10:53:43 | 14 | friends with Curtis Allen and Patrick Stein? |
| 10:53:45 | 15 | **A.      That is correct, yes.** |
| 10:53:46 | 16 | Q.      And Dan Day? |
| 10:53:48 | 17 | **A.      Yes.** |
| 10:53:49 | 18 | Q.      After this meeting, you remained Facebook friends |
| 10:53:51 | 19 | with all three of them; is that right? |
| 10:53:53 | 20 | **A.      Yes.** |
| 10:53:53 | 21 | Q.      And you continued to take part in the Facebook |
| 10:53:57 | 22 | chats that included Patrick Stein and Curtis Allen? |
| 10:54:01 | 23 | **A.      After -- no, actually, after I turned in my** |
| 10:54:04 | 24 | **resignation, I was removed from those groups.** |
| 10:54:06 | 25 | Q.      And when was it that you turned in your |

| | | |
|---|---|---|
| 10:54:08 | 1 | resignation? |
| 10:54:08 | 2 | A.      **Excuse me?** |
| 10:54:09 | 3 | Q.      When was it that you turned in your resignation? |
| 10:54:13 | 4 | A.      **Within days after the initial meeting at my** |
| 10:54:17 | 5 | **location.** |
| 10:54:17 | 6 | Q.      All right.  Let me look at something. |
| 10:54:25 | 7 | So you were removed from these Facebook chats, |
| 10:54:30 | 8 | then your name would not show up on the list of chat |
| 10:54:34 | 9 | recipients; right? |
| 10:54:36 | 10 | A.      **No, it would prevent me from joining in the chat** |
| 10:54:39 | 11 | **conversations and seeing any new conversations within the** |
| 10:54:43 | 12 | **group.  I was not blocked by the state of Kansas KSF; I** |
| 10:54:53 | 13 | **was just removed.  And that's a standard practice when a** |
| 10:54:57 | 14 | **member of the KSF leaves.** |
| 10:55:00 | 15 | Q.      Would you still receive Facebook chats? |
| 10:55:05 | 16 | A.      **Not with the KSF, no.** |
| 10:55:07 | 17 | Q.      Were there other Facebook chat rooms that you were |
| 10:55:11 | 18 | a member of that Patrick Stein was still a member of? |
| 10:55:15 | 19 | A.      **It's hard to say because I was involved, you know,** |
| 10:55:19 | 20 | **politically with, you know, a lot of other groups and** |
| 10:55:25 | 21 | **movements, so I was -- I was in hundreds of groups.** |
| 10:55:28 | 22 | Q.      It's fair to say that you didn't block Patrick |
| 10:55:32 | 23 | Stein from being a Facebook friend? |
| 10:55:33 | 24 | A.      **No, I did not.** |
| 10:55:34 | 25 | Q.      Or Curtis Allen? |

| 10:55:36 | 1 | A.      No. |
| 10:55:36 | 2 | Q.      Or Dan Day? |
| 10:55:37 | 3 | A.      No. |
| 10:55:39 | 4 | Q.      And to your knowledge, they didn't block you as |
| 10:55:41 | 5 | well? |
| 10:55:41 | 6 | A.      No, they didn't. |
| 10:55:42 | 7 | Q.      They had no reason to after that meeting on the |
| 10:55:44 | 8 | 14th; right? |
| 10:55:45 | 9 | A.      No. |
| 10:55:45 | 10 | Q.      Because they believed that you were in agreement |
| 10:55:48 | 11 | with what Patrick Stein was talking about? |
| 10:55:50 | 12 | A.      Yes. |
| 10:55:56 | 13 | Q.      I want to go to a couple of clips like the |
| 10:56:01 | 14 | Government played, because I want to make sure that we |
| 10:56:06 | 15 | get to all of it. |
| 10:56:09 | 16 |      Now, at some point you were talking about your |
| 10:56:14 | 17 | displeasure with Imams; right? |
| 10:56:16 | 18 | A.      Well, generally speaking because they were |
| 10:56:18 | 19 | normally the leaders that would spread the extremism into |
| 10:56:27 | 20 | mosques, to my understanding anyway. |
| 10:56:33 | 21 | Q.      All right.  And what was your understanding of the |
| 10:56:36 | 22 | role the Imam played within a mosque? |
| 10:56:38 | 23 | A.      Excuse me? |
| 10:56:39 | 24 | Q.      What was your understanding of the role that an |
| 10:56:42 | 25 | Imam would play within a mosque? |

| | | |
|---|---|---|
| 10:56:45 | 1 | **A.        I guess just the -- I guess kind of based, you** |
| 10:56:53 | 2 | **know, in Christianity, I guess maybe, you know, a** |
| 10:56:56 | 3 | **preacher or, you know, something like that as -- anyway.** |
| 10:57:01 | 4 | Q.     All right.  And within this conversation you were |
| 10:57:05 | 5 | having with Patrick Stein and Shelby Lewis and Dan Day, |
| 10:57:09 | 6 | you were actually advocating killing Imams, weren't you? |
| 10:57:13 | 7 | **A.        Well, I said that, yes, in that.  But I wasn't --** |
| 10:57:19 | 8 | **I wasn't advocating killing of Imams.** |
| 10:57:21 | 9 | Q.     Well, let's listen to this clip and, again, it's |
| 10:57:25 | 10 | from that same conversation that the Government played. |
| 10:57:31 | 11 | Let's see if I can get this to work. |
| 10:57:37 | 12 | THE COURT:  For the record, Ms. Brannon, what's |
| 10:57:38 | 13 | the clip? |
| 10:57:40 | 14 | MS. BRANNON:  It is a clip from that same |
| 10:57:43 | 15 | conversation on June 14th that the Government has |
| 10:57:46 | 16 | identified as Exhibit 13. |
| 10:57:49 | 17 | THE COURT:  13?  What's the suffix? |
| 10:58:03 | 18 | MS. BRANNON:  Your Honor, while he's working with |
| 10:58:05 | 19 | that, it is from Exhibit 13.  It is not one of the clips |
| 10:58:09 | 20 | that the government played.  We are simply using it as |
| 10:58:11 | 21 | impeachment. |
| 10:58:12 | 22 | THE COURT:  So you're not admitting it? |
| 10:58:13 | 23 | MS. BRANNON:  We are not admitting it. |
| 10:58:15 | 24 | THE COURT:  All right.  Thank you. |
| 10:58:19 | 25 | MS. BRANNON:  All right.  So let's listen to this |

10:58:21  1    clip.  And I don't have a script rolling.

10:58:24  2         (Clip from Government's Exhibit 13 was played.)

10:58:27  3    BY MS. BRANNON:

10:58:27  4    Q.    Now, is that your voice?

10:58:28  5    A.    Yes.

10:58:28  6    Q.    Okay.

10:58:29  7         (Clip from Government's Exhibit 13 was played.)

10:58:39  8    Q.    And that 49 Americans you're referring to is the

10:58:42  9    Orlando shooting; right?

10:58:45  10   A.    Yes.

10:58:45  11   Q.    Okay.

10:58:45  12        (Clip from Government's Exhibit 13 was played.)

10:59:16  13   Q.    You're talking about putting one right between the

10:59:18  14   eyes, you're talking about shooting an Imam between the

10:59:20  15   eyes; is that right?

10:59:22  16   A.    Yes.

10:59:27  17        (Clip from Government's Exhibit 13 was played.)

10:59:37  18   Q.    And you're talking about doing it in a way that

10:59:39  19   perhaps you wouldn't get caught doing it?

10:59:40  20   A.    Excuse me?

10:59:41  21   Q.    You're talking about doing it quietly, in a way

10:59:44  22   that you wouldn't get caught doing it; is that right?

10:59:46  23   A.    I don't know if I'd be -- I don't know if that's

10:59:49  24   correct, but --

10:59:50  25   Q.    All right.  So when you talked about going up and

3-26-2018 USA v. ALLEN, et al, NO 16-10141

118

| | | |
|---|---|---|
| 10:59:53 | 1 | shooting the Imam between the eyes and you said it would |
| 10:59:56 | 2 | be quiet, what were you talking about? |
| 11:00:00 | 3 | A.      Well, to be quiet, I guess I don't know how |
| 11:00:05 | 4 | else -- |
| 11:00:05 | 5 | Q.      Not drawing attention to yourself while -- |
| 11:00:08 | 6 | A.      Excuse me? |
| 11:00:09 | 7 | Q.      Not drawing attention to yourself while it's |
| 11:00:11 | 8 | happening? |
| 11:00:12 | 9 | A.      Correct. |
| 11:00:12 | 10 | Q.      All right.  And you didn't just bring this up once |
| 11:00:15 | 11 | about shooting the Imams between the eyes; you brought it |
| 11:00:18 | 12 | up several times; is that right? |
| 11:00:21 | 13 | A.      I don't know if I did.  I don't recall. |
| 11:00:24 | 14 | Q.      Did you review this recording and these |
| 11:00:27 | 15 | transcripts with the Government? |
| 11:00:28 | 16 | A.      I reviewed, yes. |
| 11:00:29 | 17 | Q.      And when did you do that? |
| 11:00:31 | 18 | A.      Excuse me? |
| 11:00:31 | 19 | Q.      When did you do that? |
| 11:00:33 | 20 | A.      I can't recall the actual dates, but I reviewed |
| 11:00:38 | 21 | some of the recording on my very first meeting with the |
| 11:00:41 | 22 | FBI and the Government. |
| 11:00:43 | 23 | Q.      Was that within the last week, two weeks? |
| 11:00:46 | 24 | A.      The first one?  No.  I had, you know, two with |
| 11:00:53 | 25 | them probably in the last week with the FBI or the |

Case 6:16-cr-10141-EFM   Document 539   Filed 04/12/19   Page 119 of 347
3-26-2018 USA v. ALLEN, et al, NO 16-10141
119

11:00:58  1  prosecution or whatever.

11:00:59  2  Q.     All right.  Did they -- listen to this clip.

10:59:27  3         (Clip from Government's Exhibit 13 was played.)

11:01:11  4  Q.     And, again, that's your voice; right?

11:01:13  5  A.     Yes.

10:59:27  6         (Clip from Government's Exhibit 13 was played.)

11:01:19  7  Q.     What's a Mark IV?

11:01:22  8  A.     I couldn't tell you.  I think it's just a rifle of

11:01:25  9  some sort.

11:01:25  10  Q.     But, again, you're still speaking; right?

11:01:27  11  A.     Yes.

11:01:27  12  Q.     And at least you knew it was a gun; right?

11:01:30  13  A.     I was basically agreeing with, you know, Patrick's

11:01:34  14  Mark II comment or something like that.

11:01:37  15  Q.     So Patrick had been talking about a Mark IV;

11:01:40  16  right?

11:01:41  17  A.     Possibly.

11:01:41  18  Q.     And you were talking about using the Mark IV on

11:01:44  19  the Imams.

11:01:47  20         (Clip from Government's Exhibit 13 was played.)

11:02:03  21  Q.     So in contrast to doing it quietly, this time

11:02:07  22  you're talking about drawing attention to shooting an I

11:02:09  23  ma'am; right?

11:02:11  24  A.     I don't know if you could say that, but --

11:02:15  25  Q.     Okay.

3-26-2018 USA v. ALLEN, et al, NO 16-10141

120

| | | |
|---|---|---|
| 11:02:16 | 1 | **A.      We're talking about it, yes.** |
| 11:02:17 | 2 | Q.      And you were talking about inspiring other groups |
| 11:02:21 | 3 | to do similar things; right? |
| 11:02:22 | 4 | **A.      No, I'm just explaining how it would actually** |
| 11:02:26 | 5 | **create an event, you know, just like the Las Vegas** |
| 11:02:30 | 6 | **shooting would be today, you know, in other words, it** |
| 11:02:34 | 7 | **creates a, you know, just a media storm.** |
| 11:02:39 | 8 | Q.      And copycats sometimes? |
| 11:02:41 | 9 | **A.      I guess so, yes.** |
| 11:02:42 | 10 | Q.      All right.  And I backed it up just a little bit |
| 11:02:46 | 11 | because I want to make sure that we get the words right. |
| 11:02:48 | 12 | (Listening to clip.) |
| 11:02:59 | 13 | Q.      "Small little groups everywhere doing the same |
| 11:03:02 | 14 | damn thing."  That's the copycats we were talking about; |
| 11:03:05 | 15 | right? |
| 11:03:05 | 16 | **A.      Right.** |
| 11:03:13 | 17 | Q.      Let's talk just for a minute about Dan Day's |
| 11:03:17 | 18 | involvement in this, because we've talked about your |
| 11:03:21 | 19 | reaction and Mr. Allen's and a little about bit Dan |
| 11:03:24 | 20 | Day's.  He was participating in the same way you were; |
| 11:03:28 | 21 | right? |
| 11:03:29 | 22 | **A.      I can't recall 'cause I haven't, you know, heard a** |
| 11:03:33 | 23 | **lot of recordings with Dan Day, so I don't remember** |
| 11:03:35 | 24 | **whether -- what he was saying.** |
| 11:03:38 | 25 | Q.      He was suggesting targets for these attacks that |

| | | |
|---|---|---|
| 11:03:43 | 1 | you were talking about.  You don't remember that? |
| 11:03:47 | 2 | **A.    I -- was that just something we just heard just a** |
| 11:03:51 | 3 | **little bit ago?** |
| 11:03:51 | 4 | Q.    No, but let me play another clip here and see if |
| 11:03:55 | 5 | it -- |
| 11:04:07 | 6 | (Clip from Government's Exhibit 13 was played.) |
| 11:04:16 | 7 | Q.    Sounds like we might be having some of the same |
| 11:04:19 | 8 | problems as the Government. |
| 11:04:22 | 9 | Regarding Dan Day, at the time that he came out |
| 11:04:25 | 10 | onto your property -- |
| 11:04:26 | 11 | **A.    Uh-huh.** |
| 11:04:27 | 12 | Q.    -- and you took him out to your shooting shack, |
| 11:04:30 | 13 | you did not know that he was an FBI informant, did you? |
| 11:04:33 | 14 | **A.    No, I did not.** |
| 11:04:34 | 15 | Q.    When you sat down and talked to him about |
| 11:04:38 | 16 | different things, you did not know he was wearing a wire; |
| 11:04:41 | 17 | is that right? |
| 11:04:41 | 18 | **A.    No, I did not.** |
| 11:04:42 | 19 | Q.    And you talked about a lot of things at this |
| 11:04:45 | 20 | meeting besides Muslims.  You talked about your personal |
| 11:04:48 | 21 | life? |
| 11:04:49 | 22 | **A.    Possibly.  I don't recall.** |
| 11:04:52 | 23 | Q.    All right. |
| 11:04:53 | 24 | **A.    I haven't heard the whole transcript.  I've only** |
| 11:04:56 | 25 | **heard just points of it.** |

| | | |
|---|---|---|
| 11:04:57 | 1 | Q.      Do you recall talking about your child custody |
| 11:05:01 | 2 | battle that was going on? |
| 11:05:01 | 3 | **A.      Yes.** |
| 11:05:01 | 4 | Q.      Do you recall talking about not liking lawyers |
| 11:05:05 | 5 | much? |
| 11:05:06 | 6 | **A.      Actually, no, I detest lawyers.** |
| 11:05:09 | 7 | Q.      Okay.  I don't think anybody's going to object |
| 11:05:15 | 8 | from either of the tables here.  A lot of people feel |
| 11:05:18 | 9 | like that. |
| 11:05:19 | 10 | You also talked about your plans about where you |
| 11:05:23 | 11 | wanted to live; right? |
| 11:05:25 | 12 | **A.      I can't recall.  You're talking, you know, almost** |
| 11:05:31 | 13 | **two years ago.** |
| 11:05:31 | 14 | Q.      A long time ago. |
| 11:05:32 | 15 | **A.      I can't recall everything.** |
| 11:05:34 | 16 | Q.      But you didn't have any reason to distrust this |
| 11:05:37 | 17 | group of people you were talking about, did you? |
| 11:05:39 | 18 | **A.      At the time, no, no, I did not.** |
| 11:05:41 | 19 | Q.      And when you were talking about these very |
| 11:05:44 | 20 | personal things with this group and with Dan Day, you |
| 11:05:49 | 21 | didn't know that essentially the FBI was listening in on |
| 11:05:51 | 22 | that, did you? |
| 11:05:52 | 23 | **A.      No, I did not.** |
| 11:05:58 | 24 | Q.      When Dan Day was taken away in the ambulance, |
| 11:06:01 | 25 | again, you were still unaware that he was a paid |

```
11:06:04   1  informant for the FBI?

11:06:06   2  A.      No, I did not know.

11:06:09   3  Q.      In fact, the next day you texted him to see how he

11:06:12   4  was doing; right?

11:06:13   5  A.      Yes.

11:06:13   6          MS. BRANNON:  Could I have just one moment, Your

11:06:15   7  Honor?

11:06:15   8          THE COURT:  You may.

11:06:29   9          (Clip from Government's Exhibit 13 was played.)

11:06:36  10  BY MS. BRANNON:

11:06:36  11  Q.      You recognize that as Dan Day's voice?

11:06:38  12  A.      Yes.

11:06:40  13  Q.      And you heard him refer to Mary Street?

11:06:43  14  A.      Excuse me?

11:06:44  15  Q.      You heard him refer to Mary Street?

11:06:46  16  A.      Mary Street?

11:06:47  17  Q.      Uh-huh.

11:06:48  18  A.      Is that a place or a name?

11:06:49  19  Q.      Let me back it up a little bit so you can listen

11:06:52  20  to it again.

11:06:53  21          (Clip from Government's Exhibit 13 was played.)

11:07:24  22  Q.      So did you understand at that time what Dan Day

11:07:29  23  was proposing?

11:07:33  24  A.      I don't know if I quite understood what he was

11:07:38  25  proposing, but he was in agreement.
```

3-26-2018 USA v. ALLEN, et al, NO 16-10141

124

11:07:41　1　Q.　　Do you know -- he made a reference to Ramadan at

11:07:43　2　the end.　Do you know what Ramadan is?

11:07:46　3　**A.　　A Muslim holiday, I guess.**

11:07:50　4　　　MS. BRANNON:　All right.　Just one moment, Your

11:07:55　5　Honor.

11:07:55　6　　　(Whereupon, a sotto voce discussion was had among

11:07:56　7　Ms. Brannon, Mr. Federico, and Mr. Allen.)

11:08:23　8　BY MS. BRANNON:

11:08:24　9　Q.　　Just going back for a minute to the shop where you

11:08:29　10　were meeting with Curtis Allen and Patrick Stein.　You

11:08:33　11　didn't get to listen to a recording of that, did you?

11:08:36　12　**A.　　No.**

11:08:36　13　Q.　　'Cause you understand there was no recording;

11:08:39　14　right?

11:08:39　15　**A.　　As far as I know, right.**

11:08:40　16　Q.　　'Cause Dan Day was gone?

11:08:42　17　**A.　　Excuse me?**

11:08:43　18　Q.　　Because Dan Day was gone?

11:08:45　19　**A.　　I don't know.**

11:08:47　20　Q.　　Okay.　Do you remember talking about Curtis

11:08:51　21　Allen's business that he was trying to get started?

11:08:54　22　**A.　　Yes, possibly, 'cause, you know, I was interested**

11:08:58　23　**in solar and I know he was getting into solar.**

11:09:02　24　Q.　　Do you remember talking about any of the other

11:09:04　25　businesses and things that Curtis was trying to get into,

| | | |
|---|---|---|
| 11:09:07 | 1 | such as an ammo company? |
| 11:09:09 | 2 | **A.      Excuse me?** |
| 11:09:09 | 3 | Q.      Do you remember any of the other businesses that |
| 11:09:12 | 4 | Curtis was talking about? |
| 11:09:15 | 5 | **A.      I don't recall what all we were talking about.** |
| 11:09:18 | 6 | Q.      But you were primarily interested in the solar |
| 11:09:21 | 7 | company he was -- |
| 11:09:22 | 8 | **A.      Excuse me?** |
| 11:09:23 | 9 | Q.      You were primarily interested in the solar |
| 11:09:25 | 10 | business that he was trying to build? |
| 11:09:26 | 11 | **A.      Correct, yes.** |
| 11:09:27 | 12 | Q.      You talked about what a long day it had been.  Do |
| 11:09:30 | 13 | you remember Curtis falling asleep during the |
| 11:09:32 | 14 | conversation. |
| 11:09:34 | 15 | **A.      I don't know.  Possibly.  I don't recall.** |
| 11:09:36 | 16 | MS. BRANNON:  All right.  Thank you.  Nothing |
| 11:09:38 | 17 | further. |
| 11:09:38 | 18 | THE COURT:  Cross-examination by Mr. Stein. |
| 11:09:44 | 19 | MR. SHULTZ:  Thank you, Your Honor. |
| 11:09:57 | 20 | CROSS-EXAMINATION |
| 11:09:58 | 21 | BY MR. SHULTZ: |
| 11:10:02 | 22 | Q.      Good morning, Mr. Benson. |
| 11:10:03 | 23 | **A.      Good morning.** |
| 11:10:12 | 24 | Q.      I want to kind of start in the back.  After this |
| 11:10:15 | 25 | meeting Ms. Brannon was talking with you about, the |

| | | |
|---|---|---|
| 11:10:20 | 1 | meeting was unrecorded, that was just you, Patrick, and |
| 11:10:23 | 2 | Curtis Allen; correct? |
| 11:10:24 | 3 | **A.      Excuse me?** |
| 11:10:25 | 4 | Q.      That was just you, Patrick, and Curtis Allen at |
| 11:10:29 | 5 | the meeting at your shop? |
| 11:10:30 | 6 | **A.      Correct, yes.** |
| 11:10:31 | 7 | Q.      Okay.  And Patrick, during that conversation, was |
| 11:10:38 | 8 | outside at the time; correct? |
| 11:10:40 | 9 | **A.      Excuse me?** |
| 11:10:41 | 10 | Q.      Patrick was outside of the shop a lot of the time |
| 11:10:44 | 11 | during that conversation; correct? |
| 11:10:45 | 12 | **A.      Possibly.  He's engrossed in his phone quite a** |
| 11:10:49 | 13 | **bit.** |
| 11:10:49 | 14 | Q.      He was talking to Dan Day; is that correct? |
| 11:10:51 | 15 | **A.      I don't know if it was Dan Day or his friend in** |
| 11:10:54 | 16 | **Wichita, but I knew -- I knew he had been in contact with** |
| 11:10:57 | 17 | **Dan, I believe.** |
| 11:11:00 | 18 | Q.      And he had a friend in Wichita, you said? |
| 11:11:04 | 19 | **A.      Yes.** |
| 11:11:04 | 20 | Q.      And he was on his way to Wichita to visit that |
| 11:11:09 | 21 | friend? |
| 11:11:09 | 22 | **A.      As far as I understood, yes.** |
| 11:11:13 | 23 | Q.      You told the Government, I believe -- I just want |
| 11:11:16 | 24 | to set a couple of -- or ask a couple of things kind of |
| 11:11:19 | 25 | to just start off.  You said you reviewed the whole |

| | | |
|---|---|---|
| 11:11:21 | 1 | transcript with them of the recorded part of this |
| 11:11:23 | 2 | conversation? |
| 11:11:23 | 3 | A.    I only reviewed the transcript of my federal grand |
| 11:11:29 | 4 | jury statement, as far -- in -- in entirety. |
| 11:11:34 | 5 | Q.    Did you review the transcript of the recorded |
| 11:11:36 | 6 | conversation, the excerpts of which we've seen? |
| 11:11:39 | 7 | A.    Parts of it, yes. |
| 11:11:40 | 8 | Q.    Not the whole thing? |
| 11:11:41 | 9 | A.    No. |
| 11:11:41 | 10 | Q.    I want to ask you about this idea that you say |
| 11:11:44 | 11 | Patrick came up -- talked about high explosives.  The |
| 11:11:47 | 12 | only place I saw in the transcript or the recording when |
| 11:11:50 | 13 | Patrick talked about explosives was that comment he made |
| 11:11:52 | 14 | about RPGs.  Is that right? |
| 11:11:55 | 15 | A.    I don't recall, but, you know, that's one instance |
| 11:11:58 | 16 | that he talked about it. |
| 11:11:59 | 17 | Q.    That was the only instance, wasn't it? |
| 11:12:01 | 18 | A.    I don't recall. |
| 11:12:02 | 19 | Q.    Okay.  You said that during the meeting in your |
| 11:12:06 | 20 | shop that was unrecorded Patrick just said the same stuff |
| 11:12:10 | 21 | he said during the meeting that was recorded; correct? |
| 11:12:12 | 22 | A.    Pretty much, yes. |
| 11:12:13 | 23 | Q.    Okay.  You said you're not normally the kind of |
| 11:12:17 | 24 | person that's going to cooperate with the FBI. |
| 11:12:19 | 25 | A.    Correct. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

128

```
11:12:20   1   Q.      That's 'cause you don't trust them; right?

11:12:22   2   A.      I don't trust you.

11:12:23   3   Q.      Okay.  I appreciate that.  But you also don't

11:12:26   4   trust the government?

11:12:28   5   A.      No, I don't trust the government.

11:12:29   6   Q.      So you're not normally going to cooperate, but

11:12:31   7   you're here?

11:12:32   8   A.      Excuse me?

11:12:33   9   Q.      But you're here.

11:12:34  10   A.      I was forced here by a subpoena.

11:12:36  11   Q.      Okay.  Before -- I noticed that you hired a lawyer

11:12:40  12   to come with you.  Is that right?

11:12:41  13   A.      That is correct, yes.

11:12:42  14   Q.      Do you have a deal with the prosecution or with

11:12:47  15   the Government --

11:12:47  16   A.      No.

11:12:47  17   Q.      -- to avoid prosecution?

11:12:48  18   A.      No.

11:12:48  19   Q.      Nothing at all?

11:12:49  20   A.      No.

11:12:50  21   Q.      Did the Government discuss with you the

11:12:52  22   possibility that they might charge you with crimes?

11:12:54  23   A.      Possibly, yes, if I perjured myself from my grand

11:12:59  24   jury statement, yes.

11:12:59  25   Q.      That's the only thing?
```

Case 6:16-cr-10141-EFM   Document 539   Filed 04/12/19   Page 129 of 347
3-26-2018 USA v. ALLEN, et al, NO 16-10141
129

| | | |
|---|---|---|
| 11:13:00 | 1 | A.      Yes. |
| 11:13:01 | 2 | Q.      They never talked to you about any other charges? |
| 11:13:03 | 3 | A.      No. |
| 11:13:03 | 4 | Q.      Okay.  Did they threaten you with prosecution |
| 11:13:08 | 5 | aside from perjury? |
| 11:13:10 | 6 | A.      Excuse me? |
| 11:13:10 | 7 | Q.      Did they threaten you with prosecution aside from |
| 11:13:14 | 8 | perjury? |
| 11:13:15 | 9 | A.      No. |
| 11:13:16 | 10 | Q.      Okay.  You never tried to talk Patrick Stein down |
| 11:13:24 | 11 | any time he made a "offensive" comment about Muslims |
| 11:13:27 | 12 | during these conversations, did you? |
| 11:13:29 | 13 | A.      No. |
| 11:13:29 | 14 | Q.      You offered suggestions as to how he could |
| 11:13:33 | 15 | accomplish the things he was saying, didn't you? |
| 11:13:35 | 16 | A.      Possibly.  I don't recall the entire conversation. |
| 11:13:39 | 17 | Q.      Okay.  You talk about false flags.  Is that |
| 11:13:43 | 18 | like -- and during this conversation I think it's like |
| 11:13:46 | 19 | San Bernardino, that shooting was described as a false |
| 11:13:48 | 20 | flag; is that right? |
| 11:13:50 | 21 | A.      Well, it depends on, you know, who you're talking |
| 11:13:53 | 22 | to as to how they qualify, you know, things as false |
| 11:13:56 | 23 | flags.  I mean, there are some real deep-seated |
| 11:14:00 | 24 | conspiracy theories that, you know, you can say Sandy |
| 11:14:05 | 25 | Hook never even happened and that was a false flag.  So |

11:14:07   1   it's a broad, generalized term that I guess people use to

11:14:13   2   tag anything that they don't agree with.

11:14:19   3   Q.     Would you say that you participated

11:14:22   4   enthusiastically in this conversation out at the shooting

11:14:25   5   shack?

11:14:27   6   A.     You're describing emotion?  I can't recall what my

11:14:31   7   emotion was.

11:14:32   8   Q.     Were you energetic during this conversation?

11:14:36   9   A.     Was I energetic?

11:14:37   10  Q.     Uh-huh.

11:14:38   11  A.     I don't know why I would have been.  We were

11:14:42   12  sitting down.

11:14:43   13  Q.     Were you forceful in what you were saying at the

11:14:46   14  shooting shack?

11:14:46   15  A.     Excuse me?

11:14:47   16  Q.     Were you forceful in what you were saying and

11:14:50   17  advocating at the shooting shack?

11:14:51   18  A.     I guess it depends on how you take my tone of

11:14:54   19  voice on the recording.

11:14:55   20  Q.     Your tone of voice and participation in this was

11:14:58   21  similar to everybody else who was there in the shooting

11:15:00   22  shack; correct?

11:15:01   23  A.     Possibly.

11:15:02   24  Q.     It wasn't any more hesitant than anybody else?

11:15:05   25  A.     Possibly.

11:15:08  1  Q.     Just possibly?  Is that just 'cause you don't

11:15:11  2  remember or you don't want to say?

11:15:14  3  **A.     No, it's -- I don't get your line of questioning**

11:15:18  4  **because you're talking about emotions that were two and a**

11:15:21  5  **half years ago, so I can, you know, only assume that, you**

11:15:26  6  **know, one thing that I can assure, you know, that the**

11:15:30  7  **posture there was not combative, so anything beyond that**

11:15:35  8  **I can't recall.**

11:15:36  9  Q.     Okay.  Well, the reason I ask you this is because

11:15:40  10  you told -- when you testified in this case under oath

11:15:42  11  earlier, you said your participation in this was

11:15:45  12  different -- was different than the others, didn't you?

11:15:49  13  **A.     Please clarify that.**

11:15:51  14  Q.     You were asked if you were uncomfortable with this

11:15:54  15  conversation; is that right?

11:15:57  16  **A.     I can't recall.  In other words, what context are**

11:16:01  17  **you relating that to?**

11:16:06  18       MR. SHULTZ:  May I approach, Your Honor?

11:16:07  19       THE COURT:  You may.

11:16:16  20  BY MR. SHULTZ:

11:16:16  21  Q.     I'm going to show you a transcript of your

11:16:19  22  testimony from earlier.  You recall being asked the

11:16:22  23  question?

11:16:22  24       THE COURT:  Members of the jury, can you all hear

11:16:24  25  Mr. Shultz?

| | | |
|---|---|---|
| 11:16:25 | 1 | THE JURY (in unison):  (Nods head.) |
| 11:16:26 | 2 | BY MR. SHULTZ: |
| 11:16:27 | 3 | Q.    "Despite being uncomfortable, did you still |
| 11:16:29 | 4 | participate in it?"  What was your answer? |
| 11:16:31 | 5 | **A.    I said, "Yes."** |
| 11:16:32 | 6 | Q.    Okay.  And then you were asked, "Why is that?" |
| 11:16:36 | 7 | You see that? |
| 11:16:40 | 8 | **A.    Yes.** |
| 11:16:40 | 9 | Q.    And you said, "Well, when you're talking about |
| 11:16:42 | 10 | something like this and everybody's armed and, you know, |
| 11:16:44 | 11 | you just find the easiest solution to get out of it |
| 11:16:47 | 12 | because I was afraid of upsetting or escalating a |
| 11:16:50 | 13 | situation." |
| 11:16:51 | 14 | **A.    Yes, that's what I said.** |
| 11:16:52 | 15 | Q.    That's different than what you said today, isn't |
| 11:16:54 | 16 | it? |
| 11:16:56 | 17 | **A.    I guess roll back your tape so I can listen to** |
| 11:17:00 | 18 | **what I said.  I don't recall how I said anything** |
| 11:17:06 | 19 | **different.  I said it was noncombative, is the only thing** |
| 11:17:09 | 20 | **I said.** |
| 11:17:10 | 21 | Q.    Well, but when you talked to the government they |
| 11:17:12 | 22 | asked you why you said some of these things and you said |
| 11:17:14 | 23 | you were just venting? |
| 11:17:15 | 24 | **A.    Correct.** |
| 11:17:16 | 25 | Q.    Not "I was participating unwillingly because I was |

11:17:19   1   a little bit concerned about upsetting the situation"?

11:17:21   2   **A.      Correct.**

11:17:21   3   Q.      Those are two different answers; correct?

11:17:23   4   **A.      Correct.**

11:17:27   5   Q.      And you talked with the Government and with

11:17:29   6   Ms. Brannon about killing Imams; right?

11:17:31   7   **A.      Excuse me?**

11:17:32   8   Q.      You talked about Ms. Brannon and the Government

11:17:35   9   about killing Imams; right?

11:17:36  10   **A.      I made that statement.**

11:17:37  11   Q.      Yeah.  That wasn't the only proposed plan you made

11:17:40  12   that day, was it?

11:17:42  13   **A.      I don't know when you're talking about making**

11:17:45  14   **plans.**

11:17:47  15   Q.      Okay.  Fair point.

11:17:49  16   **A.      Madonna can sit on the, you know, grounds in the**

11:17:52  17   **capitol and talk about blowing up the White House, so I**

11:17:55  18   **don't quite understand your line of questioning.**

11:17:56  19   Q.      I'm sorry.  Say that again?

11:17:58  20   **A.      Madonna can stand in the Women's March at the**

11:18:04  21   **capitol and talk about dreaming about blowing up the**

11:18:06  22   **White House, so I don't understand your question.**

11:18:07  23   Q.      Well, I don't disagree with you.  So sometimes the

11:18:10  24   words we say do not indicate the ideas we're actually

11:18:14  25   going to put into play; is that fair?

3-26-2018 USA v. ALLEN, et al, NO 16-10141

134

| | | |
|---|---|---|
| 11:18:16 | 1 | **A.     That's fair, yes.** |
| 11:18:17 | 2 | Q.     And that's what you're saying you were doing at |
| 11:18:20 | 3 | this conversation on June 14th; right? |
| 11:18:22 | 4 | **A.     Yes.** |
| 11:18:23 | 5 | Q.     And you were talking similarly to everybody else |
| 11:18:28 | 6 | that was there; right? |
| 11:18:28 | 7 | **A.     I was talking.  Yes, I was engaging in the** |
| 11:18:31 | 8 | **conversation.** |
| 11:18:31 | 9 | Q.     In the same manner as everyone else was; correct? |
| 11:18:34 | 10 | **A.     Yes.** |
| 11:18:34 | 11 | Q.     And you were just venting? |
| 11:18:36 | 12 | **A.     Correct, yes.** |
| 11:18:37 | 13 | Q.     How do you know Patrick Stein wasn't just venting? |
| 11:18:41 | 14 | **A.     Because Patrick Stein later in the shop was** |
| 11:18:45 | 15 | **talking about acquiring explosives.** |
| 11:18:49 | 16 | Q.     The unrecorded conversations with Patrick Stein |
| 11:18:52 | 17 | caused you to determine he wasn't just venting? |
| 11:18:55 | 18 | **A.     I'm sorry I disappoint you.  I don't work for the** |
| 11:18:58 | 19 | **FBI.** |
| 11:18:58 | 20 | Q.     But there's no recording of that conversation; |
| 11:19:01 | 21 | right? |
| 11:19:01 | 22 | **A.     As far as to my knowledge, no.** |
| 11:19:06 | 23 | Q.     But you, when you were saying things like "We |
| 11:19:09 | 24 | should go ping, ping, ping and kill Imams" were just |
| 11:19:12 | 25 | venting; right? |

| | | |
|---|---|---|
| 11:19:13 | 1 | **A.        Practicing my First Amendment, yes.** |
| 11:19:13 | 2 | Q.        Okay. |
| 11:19:17 | 3 | **A.        You know, doing something and, you know, venting** |
| 11:19:21 | 4 | **and talking about something and actually going and taking** |
| 11:19:26 | 5 | **the next step to pursue an action is different, so yes.** |
| 11:19:37 | 6 | Q.        Everybody was armed that night; correct? |
| 11:19:39 | 7 | **A.        As far as I -- as far as I knew, yes.** |
| 11:19:43 | 8 | Q.        Because, in addition to believing in the First |
| 11:19:46 | 9 | Amendment, you believe in the Second Amendment? |
| 11:19:47 | 10 | **A.        That's correct, yes.** |
| 11:19:48 | 11 | Q.        Patrick Stein believed in the Second Amendment? |
| 11:19:50 | 12 | **A.        Yes.** |
| 11:19:50 | 13 | Q.        And was he carrying a firearm that night? |
| 11:19:52 | 14 | **A.        As far as I understood, he was.** |
| 11:19:53 | 15 | Q.        Okay.  That wouldn't be surprising to you, would |
| 11:19:56 | 16 | it? |
| 11:19:57 | 17 | **A.        No.  It was kind of common that everybody had a** |
| 11:19:59 | 18 | **concealed or something, so it was generally understood** |
| 11:20:02 | 19 | **that everybody, you know, had a firearm.** |
| 11:20:04 | 20 | Q.        And that's something that members of KSF did kind |
| 11:20:08 | 21 | of routine -- |
| 11:20:09 | 22 | **A.        Yes.** |
| 11:20:09 | 23 | Q.        -- as opposed to any specific purpose? |
| 11:20:12 | 24 | **A.        Yes.** |
| 11:20:13 | 25 | Q.        Patrick didn't carry a gun this night to make |

11:20:16  1  something happen or make a conversation go a different

11:20:18  2  way, did he?

11:20:21  3  **A.     No.**

11:20:31  4  Q.     You talked with the Government about Patrick's --

11:20:41  5  I think you described it as he had kind of a deep hatred

11:20:44  6  that you didn't have.  Is that right?

11:20:46  7  **A.     Yes.**

11:20:46  8  Q.     And that was because you -- I think you described

11:20:53  9  it to like he sort of said "I want to kill all the

11:20:56  10  Muslims" and you equated that, I think, ethnic cleansing?

11:21:00  11  **A.     Yes.**

11:21:02  12  Q.     And that's what kind of made you comfortable about

11:21:06  13  being with Patrick?

11:21:07  14  **A.     That gave me another insight to Patrick, his**

11:21:10  15  **actual belief system that didn't align with mine.**

11:21:12  16  Q.     Okay.  The ethnic cleansing was?

11:21:15  17  **A.     No, that was my statement as far as putting what**

11:21:19  18  **my feelings were into what I was thinking as far as**

11:21:22  19  **words.**

11:21:23  20  Q.     Okay.  So that's what was different, though, is

11:21:26  21  that Patrick felt that way and you didn't?

11:21:28  22  **A.     That's what I perceived, yes, with the comment**

11:21:32  23  **that he made on that --**

11:21:34  24  Q.     And that's what made you concerned?

11:21:37  25  **A.     About his manner.  It made me concerned that if**

```
11:21:46   1  there was ever a, you know, a scenario or a "shit hit the
11:21:53   2  fan" scenario that it may go more than just protecting
11:21:55   3  your family and property and everybody.  That was my
11:21:59   4  personal opinion.
11:22:00   5  Q.     Okay.  So I guess let's talk about the "shit hit
11:22:02   6  the fan" scenario.  That could be a natural disaster;
11:22:04   7  right?
11:22:05   8  A.     Yes.
11:22:05   9  Q.     It could be some kind of attack locally; correct?
11:22:10  10  A.     Correct.  Basically the breakdown of rule of law.
11:22:10  11  Q.     Okay.  What --
11:22:14  12  A.     No law, sorry.
11:22:15  13  Q.     What -- sorry.  One of the other concerns KSF
11:22:18  14  members had was that President Obama was going to declare
11:22:22  15  martial law sometime right around the election; correct?
11:22:25  16  A.     That was a concern, yes.
11:22:26  17  Q.     And that would be a "shit hit the fan" scenario;
11:22:29  18  right?
11:22:30  19  A.     Correct.
11:22:30  20  Q.     And the understanding or the belief among members
11:22:32  21  of KSF was that if that started, it would start on the
11:22:36  22  coasts; correct?
11:22:39  23  A.     Possibly.  You know, it could happen anywhere.
11:22:41  24  Q.     And it would work its way into the middle of
11:22:43  25  America; correct?
```

3-26-2018 USA v. ALLEN, et al, NO 16-10141

138

| | | |
|---|---|---|
| 11:22:44 | 1 | A.      Well, it wasn't going to happen in the middle of |
| 11:22:48 | 2 | Kansas.  There's really no strategic advantage for that. |
| 11:22:54 | 3 | Q.     And so a "shit hitting the fan" scenario doesn't |
| 11:22:59 | 4 | necessarily mean a tornado that hits all at one time, |
| 11:23:02 | 5 | right?  It could be a developing situation? |
| 11:23:03 | 6 | A.      Correct, a domino effect where, you know, the rule |
| 11:23:08 | 7 | of law is lost. |
| 11:23:08 | 8 | Q.     And the scenario of President Obama declaring |
| 11:23:12 | 9 | martial law, the idea was that would start probably |
| 11:23:14 | 10 | mostly around D.C., kind of move out; right? |
| 11:23:18 | 11 | A.      Possibly. |
| 11:23:18 | 12 | Q.     And it would take some time to get to Kansas? |
| 11:23:21 | 13 | A.      Yeah, that was one scenario, yes. |
| 11:23:23 | 14 | Q.     And so one of the things KSF members or maybe |
| 11:23:26 | 15 | other militia members wanted to do was be ready if that |
| 11:23:30 | 16 | scenario happened; right? |
| 11:23:31 | 17 | A.      Correct. |
| 11:23:31 | 18 | Q.     And to take whatever actions they needed to do to |
| 11:23:34 | 19 | be able to prevent the government from coming into |
| 11:23:37 | 20 | Kansas? |
| 11:23:37 | 21 | A.      I don't know if it's prevent the government from |
| 11:23:39 | 22 | coming into Kansas, but to protect and uphold the U.S. |
| 11:23:47 | 23 | Constitution. |
| 11:23:47 | 24 | Q.     Okay.  And one of those things, talk about like |
| 11:23:50 | 25 | blowing up bridges and roadways so that military vehicles |

| | | |
|---|---|---|
| 11:23:53 | 1 | coming in to enforce martial law might not be able to get |
| 11:23:57 | 2 | through; right? |
| 11:23:58 | 3 | A.      Yeah.  You know, there's a lot of tactics and |
| 11:24:00 | 4 | things like that, you know, talked about, you know, about |
| 11:24:02 | 5 | the UN being, you know, in the United States to enforce |
| 11:24:07 | 6 | law.  I mean, that's, you know, we seen that in other |
| 11:24:09 | 7 | countries, so naturally, you know, that was a discussion |
| 11:24:12 | 8 | of having foreign troops. |
| 11:24:14 | 9 | Q.     And that was a concern you shared? |
| 11:24:16 | 10 | A.      Yes. |
| 11:24:16 | 11 | Q.     Okay.  And Patrick Stein shared that concern as |
| 11:24:19 | 12 | well? |
| 11:24:19 | 13 | A.      Yes. |
| 11:24:21 | 14 | Q.     But you're kind of like I don't know if you want |
| 11:24:24 | 15 | to say red line or line that really made you feel like |
| 11:24:26 | 16 | you were different than Patrick Stein was this concern |
| 11:24:29 | 17 | about ethnic cleansing, wanting to kill all the Muslims; |
| 11:24:33 | 18 | is that right? |
| 11:24:33 | 19 | A.      That's the general idea.  It got to a point that, |
| 11:24:37 | 20 | you know, in a "shit hit the fan," I always use the |
| 11:24:40 | 21 | terminology "I wouldn't want it in my foxhole," 'cause I |
| 11:24:45 | 22 | felt that his individual, you know, person, you know, |
| 11:24:50 | 23 | would end up leaving me, you know, stranded, you know, if |
| 11:24:54 | 24 | I got wounded or hurt or something like that.  I didn't |
| 11:24:56 | 25 | know if I could rely on him in a "shit hit the fan" |

11:24:58   1   scenario.   That was my personal -- personal, you know,

11:25:03   2   take on Patrick after that comment.

11:25:06   3   Q.    Okay.  But you -- sorry.  I just want to make sure

11:25:10   4   I understand.  Your comment kind of the outset of your

11:25:12   5   testimony about Patrick Stein talking about wanting to

11:25:14   6   kill, I think you said, women and children, Muslim women

11:25:17   7   and children, was all in a scenario if there was a

11:25:19   8   complete and total breakdown in the rule of law under a

11:25:22   9   "shit hit the fan scenario"; right?

11:25:24   10   A.    Correct, yes.

11:25:26   11   Q.    Now, this ethnic cleansing or comment, I suppose,

11:25:34   12   you talked about that in your previous testimony as well;

11:25:37   13   right?

11:25:39   14   A.    Excuse me?

11:25:40   15   Q.    You talked --

11:25:41   16   A.    I may have made that comment, yes.

11:25:42   17   Q.    And the Government asked -- I mean, you were asked

11:25:46   18   if that was part of the reason why you were concerned

11:25:48   19   about Patrick?

11:25:50   20   A.    I was asked in relation to that particular

11:25:53   21   conversation when that was made on our statewide

11:25:58   22   conference call as far as what, you know, I felt.  And I

11:26:02   23   told the FBI like I'm telling you the same, that's what I

11:26:06   24   felt at the time.

11:26:07   25   Q.    And that conference call was in spring of 2016?

| | | |
|---|---|---|
| 11:26:10 | 1 | **A.        Excuse me?** |
| 11:26:10 | 2 | Q.        That conference call was in spring of 2016? |
| 11:26:13 | 3 | **A.        Roughly, probably, yes, yeah.** |
| 11:26:15 | 4 | Q.        And I guess the important question, it was before |
| 11:26:18 | 5 | June 14th, 2016; right? |
| 11:26:19 | 6 | **A.        Correct, yes.** |
| 11:26:20 | 7 | Q.        Before June 12th, 2016; right? |
| 11:26:23 | 8 | **A.        Correct.** |
| 11:26:26 | 9 | Q.        So still having those concerns you still had |
| 11:26:29 | 10 | Patrick out to your property; right? |
| 11:26:31 | 11 | **A.        Correct.** |
| 11:26:31 | 12 | Q.        One of the reasons your property is good as a |
| 11:26:34 | 13 | bug-out location is because of the water but it's also |
| 11:26:37 | 14 | very isolated; correct? |
| 11:26:38 | 15 | **A.        Correct.  Patrick was also an officer with the** |
| 11:26:42 | 16 | **first division, so it was a responsibility of the** |
| 11:26:48 | 17 | **officers to have communication with each other.** |
| 11:26:52 | 18 |         MR. SHULTZ:  Are we connected to our Apple TV? |
| 11:26:57 | 19 |         CLERK COOK:  Yes.  Blackout is off, so it should |
| 11:27:16 | 20 | be projecting if there's something to project. |
| 11:27:19 | 21 |         MR. SHULTZ:  There we go.  I just couldn't see |
| 11:27:23 | 22 | Trial Pad for iPad there.  Okay. |
| 11:27:23 | 23 | BY MR. SHULTZ: |
| 11:27:26 | 24 | Q.        You posted on Facebook with Patrick in those chat |
| 11:27:29 | 25 | groups; right? |

| | | |
|---|---|---|
| 11:27:30 | 1 | A.      Yeah.   Everybody was posting in those chat groups, |
| 11:27:33 | 2 | yes. |
| 11:27:33 | 3 | Q.     And, I mean, so one of the groups, that would be |
| 11:27:40 | 4 | you, Patrick, Curtis Allen, other -- and a few other |
| 11:27:44 | 5 | people; right?  I'm not going to say names. |
| 11:27:48 | 6 | A.     What's the group? |
| 11:27:49 | 7 | Q.     I'm not sure.  How about Sabrina Greek? |
| 11:27:51 | 8 | A.     Excuse me? |
| 11:27:52 | 9 | Q.     Sabrina Greek? |
| 11:27:54 | 10 | A.     Sabrina Greek, she might have been in several |
| 11:27:55 | 11 | groups, but that gives me an idea, yeah. |
| 11:27:57 | 12 | Q.     Okay.  So -- so you were concerned about |
| 11:28:00 | 13 | advocating or even expressing the idea of ethnic |
| 11:28:03 | 14 | cleansing; right?  And that's one of the your criticisms |
| 11:28:07 | 15 | of Patrick? |
| 11:28:08 | 16 | A.     Actually performing it, yes. |
| 11:28:10 | 17 | Q.     But even talking about it, that's one of the |
| 11:28:12 | 18 | things why you thought Patrick was different than you; |
| 11:28:14 | 19 | right? |
| 11:28:15 | 20 | A.     Well, I -- let me -- let me put it to you this |
| 11:28:21 | 21 | way:  when you actually have a conversation with any |
| 11:28:25 | 22 | individual, you can kind of pick up, you know, mannerisms |
| 11:28:28 | 23 | and things like this as far as what their intent may or |
| 11:28:32 | 24 | may not be.  I'm not saying, you know, that he's a |
| 11:28:34 | 25 | die-hard racist or anything else like this.  My |

11:28:37   1   **perception is that he had more of a -- he had a**

11:28:43   2   **perception that, you know, he was -- he means more than**

11:28:46   3   **what he says.  That, you know, he would actually, you**

11:28:49   4   **know, do that.  That is my personal take, you know, on**

11:28:52   5   **Patrick.  And that's not saying that's the way he is, but**

11:28:56   6   **that was just my personal take.**

11:28:57   7   Q.    I want to show you something you posted on

11:28:59   8   Facebook on June 12th.  You see that, the author of that

11:29:04   9   comment it says Brody Jay Benson, that's you?

11:29:06  10   **A.    I don't know -- all I see -- I don't know what I'm**

11:29:10  11   **looking at numbers and stuff.**

11:29:12  12   Q.    Let me make sure you're looking at the same thing

11:29:14  13   that I and the jury are.

11:29:16  14        MR. MATTIVI:  Judge, I'm not sure that should be

11:29:18  15   in front of the jury until it's authenticated, should it?

11:29:21  16        THE COURT:  All right, Mr. Mattivi.

11:29:21  17        MR. SHULTZ:  Do what?

11:29:23  18        THE COURT:  I just agreed with Mr. Mattivi and

11:29:31  19   it's not just been displayed to the witness, for you to

11:29:31  20   lay a foundation and to authenticate.

11:29:31  21   BY MR. SHULTZ:

11:29:32  22   Q.    Okay.  You posted on Facebook -- so is it now in

11:29:35  23   front of you?

11:29:35  24   **A.    I see nothing.**

11:29:37  25   Q.    Okay.

11:29:38   1         MR. SHULTZ:  So now if I do it, it will just go to

11:29:40   2  him?

11:29:40   3         THE COURT:  I think, and well to counsel but not

11:29:43   4  to the jury.

11:29:46   5  BY MR. SHULTZ:

11:29:46   6  Q.     You see the author.  You had a Facebook account;

11:29:49   7  right?

11:29:52   8  A.     I have two Facebook accounts.

11:29:55   9  Q.     Okay.  One of them's Brody Jay Benson?

11:29:59  10  A.     Correct.

11:29:59  11  Q.     And you participate in a group with Patrick Stein,

11:30:06  12  Curtis Allen, Sabrina Greek.  That's one of the chat

11:30:11  13  rooms you participated in; right?

11:30:13  14  A.     Yes.

11:30:14  15  Q.     Okay.  Now on June 12th did you post something in

11:30:18  16  that group?

11:30:19  17  A.     I can't recall.

11:30:20  18  Q.     Okay.  Looking at that, does that refresh your

11:30:24  19  memory?

11:30:24  20  A.     I don't know what you're seeing, but I'm seeing

11:30:28  21  recipients, author, and body.  And I'm not seeing one of

11:30:35  22  the contacts or what group that was in or even who even

11:30:37  23  said it.

11:30:38  24  Q.     Who's the author of that comment?

11:30:40  25  A.     It says that I'm the author of that comment.  But

```
11:30:44   1   I want to see the source of that comment.  I want to see
11:30:47   2   what that group and what that is because I don't ever
11:30:50   3   recall making that comment.
11:30:52   4   Q.    You don't recall making that -- does anybody else
11:30:55   5   have access to your Brody Jay Benson Facebook account?
11:30:58   6   A.    No, not that I know of.  But I would like that --
11:31:02   7   I would like to know where that -- what group that was
11:31:05   8   in.
11:31:05   9   Q.    Okay.  What group is it in, based on the
11:31:07  10   recipients?  Is there a different name?
11:31:10  11   A.    There's several groups.  We had a KSF officers
11:31:13  12   chat.  There was a general membership chat.  There was
11:31:19  13   another chat that was actually not named the KSF that
11:31:26  14   members were in.  So I don't know where that came from.
11:31:31  15   So I'm going to say at this point no, I do not recognize
11:31:34  16   it.
11:31:34  17   Q.    You did not post that, you're saying?
11:31:36  18   A.    I said I don't recall if I posted that, but I said
11:31:39  19   I do not recognize it.
11:31:40  20   Q.    But nobody else had access to your Brody Jay
11:31:43  21   Benson account?
11:31:44  22   A.    As far as I know, no.
11:31:46  23   Q.    So who -- are the people that are listed there --
11:31:49  24   and you don't need to list them, are they -- which group,
11:31:52  25   which chat group are they normally in?
```

11:31:54  1  A.      I have no idea what chat groups they belong in.

11:31:57  2  Q.      Do you recognize the names there?

11:31:58  3  A.      I know the individuals, yes.

11:32:00  4  Q.      So that's somebody you regularly chatted with over

11:32:03  5  Facebook?

11:32:03  6  A.      Excuse me?

11:32:04  7  Q.      Those are people that you regularly chatted with

11:32:07  8  over Facebook?

11:32:08  9  A.      I probably chatted with over 30-, 40,000 people

11:32:12  10  over the years, so I can't recall everybody that I chat

11:32:16  11  with.

11:32:17  12  Q.      Okay.

11:32:17  13      MR. SHULTZ:  Your Honor, I'm going to say that

11:32:19  14  this is authentic enough.  I'd ask to publish it for the

11:32:23  15  jury.

11:32:23  16      MR. MATTIVI:  Objection, Your Honor.

11:32:24  17      THE COURT:  The witness has not identified the

11:32:25  18  statement, and he's been -- it's been displayed to him

11:32:31  19  and he doesn't recognize it, so I don't think there's a

11:32:32  20  sufficient foundation laid to allow you to publish it to

11:32:34  21  the jury so I'm going to overrule your motion.

11:32:38  22      MR. SHULTZ:  Okay.  We'll go with something else.

11:32:40  23  We'll come back to that.

11:33:23  24  BY MR. SHULTZ:

11:33:23  25  Q.      When you started the meeting on June 14th, the

| | | |
|---|---|---|
| 11:33:26 | 1 | concern primarily was leadership in the KSF; right? |
| 11:33:28 | 2 | **A.      That's what I presumed there was, yes.** |
| 11:33:30 | 3 | Q.      Well, I mean, you all discussed somebody named |
| 11:33:33 | 4 | Ron? |
| 11:33:34 | 5 | **A.      Yes.** |
| 11:33:34 | 6 | Q.      Who is Ron? |
| 11:33:35 | 7 | **A.      Ron Greek was the head of the KSF for the state of** |
| 11:33:41 | 8 | **Kansas.** |
| 11:33:43 | 9 | Q.      And you all complained about Ron's leadership; |
| 11:33:45 | 10 | right? |
| 11:33:46 | 11 | **A.      Yes.** |
| 11:33:46 | 12 | Q.      And so Patrick -- I think the Government played, I |
| 11:33:49 | 13 | don't remember the clip number, something that refers to |
| 11:33:54 | 14 | "Patrick cleaning house"; right? |
| 11:33:56 | 15 | **A.      Yes.** |
| 11:33:56 | 16 | Q.      And when Patrick was discussing that you all were |
| 11:33:58 | 17 | discussing cleaning house of the leadership of KSF; |
| 11:34:01 | 18 | correct? |
| 11:34:03 | 19 | **A.      When the initial phone conversation he called,** |
| 11:34:06 | 20 | **that's what he had mentioned in that initial phone** |
| 11:34:09 | 21 | **conversation before the meeting, yeah, just a general,** |
| 11:34:13 | 22 | **you know, ready to clean house.  So I took that in the** |
| 11:34:17 | 23 | **context that, you know, he was talking about the** |
| 11:34:20 | 24 | **leadership 'cause the leadership in the KSF was -- we** |
| 11:34:26 | 25 | **talked about that quite often because we had too many** |

| | | |
|---|---|---|
| 11:34:31 | 1 | **inconsistencies, you know, from the leadership that, you** |
| 11:34:34 | 2 | **know, really drove everybody else kind of crazy trying to** |
| 11:34:37 | 3 | **follow 'em.  So, you know, there was talk about, you** |
| 11:34:41 | 4 | **know, enacting within the KSF a kind of like a** |
| 11:34:47 | 5 | **tribunal-type deal where if there's enough votes within** |
| 11:34:51 | 6 | **the officers, that another officer could be removed.** |
| 11:34:53 | 7 | Q.     Okay. |
| 11:34:55 | 8 | MR. SHULTZ:  Your Honor, I've got a few -- I mean, |
| 11:34:57 | 9 | 20 to 30 minutes probably still.  I didn't know |
| 11:35:00 | 10 | schedule-wise if you wanted to -- |
| 11:35:02 | 11 | THE COURT:  Members of the jury, I informed |
| 11:35:03 | 12 | counsel this morning before you came in that, unusually |
| 11:35:05 | 13 | today, I have a commitment for a presentation over the |
| 11:35:08 | 14 | noon hour, so I told them I'd probably want to take an |
| 11:35:13 | 15 | early lunch break.  I estimated about 20 till.  I |
| 11:35:17 | 16 | appreciate, Mr. Shultz, your pausing.  Do you have |
| 11:35:20 | 17 | another five to eight minutes you can do, come to an |
| 11:35:23 | 18 | actual breaking point? |
| 11:35:24 | 19 | MR. SHULTZ:  Yes, Your Honor.  I mean I can keep |
| 11:35:27 | 20 | going. |
| 11:35:27 | 21 | THE COURT:  If you can do that, we can take |
| 11:35:28 | 22 | another five to seven minutes and then when you get to an |
| 11:35:31 | 23 | actual breaking point, we'll take a lunch recess at that |
| 11:35:33 | 24 | point.  Thank you. |
| 11:35:34 | 25 | MR. SHULTZ:  I apologize, Your Honor. |

```
11:35:36   1            THE COURT:  No, not at all.  I appreciate you
11:35:39   2   checking.
11:35:39   3            MR. SHULTZ:  I heard 11:30, so I didn't want to
11:35:43   4   keep you.
11:35:53   5   BY MR. SHULTZ:
11:35:53   6   Q.      You said you met Patrick Stein for the first time
11:35:55   7   in late 2015 or early 2016; right?
11:35:58   8   A.      Roughly, yes, as far as I can recall.
11:36:01   9   Q.      And you did not at that point, you said, I think,
11:36:05  10   realize, in your view, what Patrick thought about
11:36:07  11   Muslims; correct?
11:36:09  12   A.      He had the general concern that everybody had, you
11:36:14  13   know, as far as Islamic extremism, you know, happening in
11:36:17  14   the United States.
11:36:19  15   Q.      But I think you told the Government that you said
11:36:21  16   you came to understand later that Patrick's views were
11:36:24  17   different than yours maybe or deeper or something?
11:36:27  18   A.      Over a course of time, yes.
11:36:29  19   Q.      So that would have been after you met him the
11:36:31  20   first time?
11:36:32  21   A.      Yeah, later on, yes.
11:36:32  22   Q.      Okay.  So you have no idea what his views were
11:36:35  23   like or how he expressed those views before late 2015;
11:36:38  24   right?
11:36:39  25   A.      No, I didn't.
```

11:37:02  1   Q.    I want to ask you about -- so you said you had

11:37:05  2   concerns that Patrick might be an informant; correct?

11:37:08  3   A.    Correct.

11:37:09  4   Q.    And you had general concerns about paid informants

11:37:13  5   being hired to push people to do things; right?

11:37:16  6   A.    I had heard of militias actually being started by

11:37:19  7   paid informants.  You know, I mean, that's a general

11:37:24  8   consensus that, you know, we were all in fearful -- fear

11:37:28  9   of informants coming in, and when they're paid, doing

11:37:35  10  various different things that might get other people into

11:37:39  11  trouble.

11:37:40  12  Q.    Okay.  And the thing you thought that Patrick was

11:37:43  13  asking you to do was to go to provide security in

11:37:46  14  Washington, D.C.?

11:37:47  15  A.    Yeah.  There was a political PAC called Kilroy

11:37:51  16  that was made up of a bunch of ex-Navy SEALS, and this is

11:37:56  17  after I'd left the KSF, you know, Patrick was still

11:38:02  18  actively involved with the, you know, couple other, you

11:38:07  19  know, kind of not activist groups but, you know, social

11:38:10  20  movements, and the Liberty Restoration Committee was

11:38:16  21  working with Kilroy, you know, from what I understood at

11:38:19  22  the time.  And he had reached out to me on the phone and

11:38:23  23  was looking -- he was trying to raise money or something

11:38:27  24  to get together a bus to go to Washington, D.C. for the

11:38:32  25  presidential rally, to help provide security for this

11:38:37   1   political PAC.

11:38:40   2   Q.      And they were really -- like an election --

11:38:42   3   preelection rally?

11:38:43   4   A.      Yeah, something like that something Kilroy.  I

11:38:46   5   wasn't following it a hundred percent, but I knew who

11:38:49   6   Kilroy was, and, you know, they were doing some pre stuff

11:38:54   7   in Washington.  And that's -- that's my personal opinion,

11:38:59   8   is I didn't quite understand why any Navy SEALS would

11:39:03   9   want, you know, Kansas farm boys to come up and be their

11:39:09  10   security.  It just -- that didn't sit well with me, so I

11:39:12  11   turned it down.

11:39:13  12   Q.      Okay.  Had you had conversations before -- well,

11:39:18  13   roughly when did you have the conversation about

11:39:20  14   providing security?

11:39:21  15   A.      I don't know.  Been a time after I left the KSF.

11:39:26  16   Q.      I'm sorry, say that again.

11:39:29  17   A.      It had been sometime after I'd put in my

11:39:32  18   resignation to the KSF.

11:39:34  19   Q.      Okay.  And you had conversations before that

11:39:37  20   conversation but after you resigned from KSF?

11:39:40  21   A.      I can't recall.  I do know that he was active with

11:39:43  22   the Liberty Restoration Committee and, you know, they

11:39:46  23   were touring, you know, in western Kansas, so, you know,

11:39:50  24   I kind of assumed he had more of his time being spent on

11:39:55  25   the Liberty Restoration Committee, you know, than the

11:39:59   1   **Kilroy deal because I'd actually done some, you know,**

11:40:03   2   **stuff with the Liberty Restoration Committee but I'd**

11:40:06   3   **actually walked away from that as well.**

11:40:07   4   Q.     And Liberty Restoration Committee, you said

11:40:09   5   Patrick was more involved with that after the June 14

11:40:12   6   meeting?

11:40:13   7   **A.     As far as the interaction I had with Patrick, yes.**

11:40:15   8   Q.     Okay.  So you still interacted with him after

11:40:18   9   June 14th?

11:40:18   10  **A.     Excuse me?**

11:40:19   11  Q.     You still interacted with Patrick after June 14th?

11:40:21   12  **A.     Somewhat, yes.**

11:40:22   13  Q.     Okay.  At some point were you trying to form your

11:40:25   14  own group with past military vets?

11:40:27   15  **A.     Excuse me?**

11:40:28   16  Q.     Were you trying to at some point after June 14th

11:40:31   17  form your own group with military veterans?

11:40:35   18  **A.     I thought about it, yes, but I didn't do it.**

11:40:38   19  Q.     And you contacted Patrick to see if KSF would be

11:40:42   20  interested in training with you if that group got off the

11:40:44   21  ground?

11:40:44   22  **A.     I don't recall.  Possibly.  I don't remember.**

11:40:49   23         MR. SHULTZ:  Your Honor, this would probably be a

11:40:51   24  good stopping point.

11:40:52   25         THE COURT:  I appreciate that very much,

11:40:53   1   Mr. Shultz.  Thank you.

11:40:55   2        Members of the jury, we're going to take an early

11:40:57   3   lunch today, as I told you before.  I think we'll come

11:40:59   4   back at 1:15.  During the lunch break, remember the

11:41:02   5   admonition of the Court not to talk about the case with

11:41:04   6   anyone or let them discuss it with you or talk about it

11:41:07   7   amongst yourselves.  We will be in recess until 1:15.

11:41:11   8        CLERK COOK:  All rise.

11:41:11   9        (The jury left the courtroom, after which the

11:41:41  10   following proceedings were had.)

11:41:41  11        THE COURT:  Thank you, Mr. Benson, you may step

11:41:43  12   down as well for lunch.

11:41:44  13        Anything we need to talk about, counsel?

11:41:46  14        MR. MATTIVI:  Nothing known to the Government,

11:41:48  15   Your Honor.

11:41:48  16        THE COURT:  All right.  We'll be in recess until

11:41:50  17   1:15.  Thank you very much.

11:41:52  18        (A recess was taken from 11:41 A.M. to 1:19 P.M.)

13:19:56  19        CLERK COOK:  All rise.

13:19:59  20        THE COURT:  You can be seated.

13:20:02  21        Mr. Pratt?

13:20:04  22        MR. PRATT:  Yes, Your Honor.

13:20:05  23        THE COURT:  I've got a brief update on Mr. Shultz'

13:20:09  24   family situation.  How do you propose we proceed?

13:20:13  25        MR. PRATT:  Your Honor, I believe the Government

| | | |
|---|---|---|
| 13:20:15 | 1 | has agreed and has been gracious enough to agree to hold |
| 13:20:19 | 2 | off the continued cross-examination of Brody Benson until |
| 13:20:23 | 3 | we can kind of figure out what's going on.  Obviously, |
| 13:20:27 | 4 | Mr. -- Michael had prepared that and was doing very well |
| 13:20:31 | 5 | with that.  I don't feel comfortable taking his place on |
| 13:20:35 | 6 | that. |
| 13:20:35 | 7 | THE COURT:  Very well. |
| 13:20:36 | 8 | MR. PRATT:  If we can continue with the next |
| 13:20:38 | 9 | witness.  The Government was going to call, which I |
| 13:20:42 | 10 | believe is Lula Harris. |
| 13:20:43 | 11 | THE COURT:  And are you -- |
| 13:20:44 | 12 | MR. PRATT:  I'm fine with going forward. |
| 13:20:46 | 13 | THE COURT:  And, Mr. Mattivi, you have retained |
| 13:20:48 | 14 | Mr. Benson under subpoena and will recall him at some |
| 13:20:51 | 15 | time? |
| 13:20:52 | 16 | MR. MATTIVI:  Correct.  We've released him for the |
| 13:20:54 | 17 | day because it appears unlikely that we would return to |
| 13:20:57 | 18 | him for the day.  We'll make sure that arrangements are |
| 13:20:59 | 19 | made for him to be back tomorrow.  And I promised |
| 13:21:01 | 20 | Mr. Maughan we'll visit with him and keep him posted. |
| 13:21:04 | 21 | THE COURT:  All right.  Mr. Pratt, what do you |
| 13:21:06 | 22 | suggest I say to the jury?  I mean, I'm happy to say that |
| 13:21:11 | 23 | Mr. Shultz had a family emergency and can't be here, |
| 13:21:13 | 24 | unless you prefer I not say that. |
| 13:21:15 | 25 | MR. PRATT:  I think that's fine, Your Honor.  I |

13:21:17   1   think they're going to wonder why.

13:21:18   2       THE COURT:  I'm sure they are.  I've got to say

13:21:20   3   something.

13:21:21   4       MR. PRATT:  And I think that's fine, Your Honor.

13:21:22   5       THE COURT:  Okay.  I just didn't want to say that

13:21:24   6   if you had concerns about that.  All right.

13:21:25   7       Anything else then that we need to --

13:21:30   8   Ms. Berkower?

13:21:30   9       MS. BERKOWER:  Thank you, Your Honor.  Just a few

13:21:32  10   quick items.

13:21:34  11       With regard to the next witness, since we have --

13:21:36  12   we're all here without the jury before she comes in.

13:21:40  13   This particular witness, I am not planning to elicit on

13:21:45  14   direct examination that she knew that Mr. Allen was a

13:21:47  15   prohibited person at the time of the events of this case.

13:21:51  16   I'm planning to stay away from that.

13:21:53  17       THE COURT:  Was Mr. Allen a prohibited person?

13:21:55  18       MS. BERKOWER:  He was at the time, Your Honor.

13:21:56  19   The law has since changed under *Pollard*, and so he no

13:21:59  20   longer is, but she knew that --

13:22:01  21       THE COURT:  And so actually is it accurate to say

13:22:04  22   that he no longer was a prohibited person?  Was the law

13:22:08  23   changed retroactively?

13:22:10  24       MS. BERKOWER:  I don't believe so, Your Honor.  I

13:22:11  25   don't think he can be prosecuted now for it, but I don't

13:22:14   1   know that that affects his status previously.

13:22:15   2        THE COURT:  Is that -- would you agree,

13:22:18   3   Ms. Brannon?

13:22:20   4        MS. BRANNON:  Your Honor, I think under *Pollard*

13:22:23   5   and how it came down, it said it never was a crime.

13:22:26   6        THE COURT:  So he never was a prohibited person?

13:22:28   7        MS. BRANNON:  Correct.

13:22:28   8        THE COURT:  That was my understanding of the law

13:22:30   9   as well.

13:22:30   10        MS. BERKOWER:  Well, Your Honor, I guess I just

13:22:32   11   wanted to mention to the Court that I'm not planning to

13:22:34   12   elicit any testimony.  That is this witness' belief and I

13:22:39   13   wanted to flag it for purposes of cross-examination.  I

13:22:41   14   can't control what she says or doesn't say.  That was her

13:22:44   15   belief at the time when she was living with Mr. Allen,

13:22:46   16   so . . .

13:22:47   17        THE COURT:  All right.  Well, I guess if she

13:22:49   18   blurts that out we'll deal with it when it happens, so

13:22:52   19   thank you for the alert, Ms. Berkower.

13:22:54   20        MS. BERKOWER:  The other issue with this

13:22:56   21   particular witness is I had disclosed to -- the defense

13:22:59   22   had asked about a certain type of therapy that this

13:23:03   23   witness had received.  And when I asked her about it, she

13:23:07   24   did mention she had received some therapy, and so I

13:23:09   25   disclosed it to the defense once I learned of it.

13:23:11    1          At the same time, though, it's the Government's

13:23:13    2    position that any therapy that this witness received,

13:23:18    3    psycho -- psychological therapy that she received, is

13:23:19    4    relevant only to the extent that it might affect her

13:23:22    5    memory or ability to perceive and understand.  And I

13:23:25    6    guess I would ask that cross-examination be limited to

13:23:29    7    that to avoid trampling on any doctor/patient privilege

13:23:32    8    that she may have.

13:23:34    9          THE COURT:  Any anticipation from the defense of

13:23:36   10    issues on this?

13:23:38   11          MR. FEDERICO:  No anticipated issues, Your Honor.

13:23:40   12    We would concur with the Government that if we intend to

13:23:42   13    go into it we limit it to the purpose of her perception

13:23:45   14    or whether she's a percipient witness.

13:23:51   15          MS. BERKOWER:  And, Your Honor, the last issue is

13:23:52   16    something that I think I thought of after our last

13:23:55   17    hearing concerning this witness.

13:23:56   18          THE COURT:  And this is Miss Harris?

13:23:58   19          MS. BERKOWER:  Yes, Your Honor.

13:24:00   20          THE COURT:  Okay.  She's not identified in your

13:24:06   21    list as L.H.; testifying victim.

13:24:09   22          MS. BERKOWER:  She is identified on the witness

13:24:11   23    list as L.H.  She was disclosed to the defense with her

13:24:15   24    full name.

13:24:16   25          THE COURT:  Okay.  She is the person that you

| | | |
|---|---|---|
| 13:24:17 | 1 | listed as the testifying victim? |
| 13:24:19 | 2 | MS. BERKOWER:  No, Your Honor, she's not a victim. |
| 13:24:21 | 3 | I think there were security concerns for purposes of not |
| 13:24:24 | 4 | revealing her identity prior to the start of the trial. |
| 13:24:27 | 5 | We were revealing her identity in full to the defense. |
| 13:24:29 | 6 | THE COURT:  Right.  I'm just asking because if she |
| 13:24:32 | 7 | was alleged and, given my prior ruling with respect to |
| 13:24:36 | 8 | victims at the Mary Street apartment, I just wanted to |
| 13:24:38 | 9 | make sure we didn't have an issue here. |
| 13:24:39 | 10 | MS. BERKOWER:  Oh, she's not, Your Honor.  She's a |
| 13:24:41 | 11 | percipient witness, Your Honor. |
| 13:24:43 | 12 | THE COURT:  Very well.  And your last issue, |
| 13:24:45 | 13 | Ms. Berkower? |
| 13:24:45 | 14 | MS. BERKOWER:  The last issue was I think |
| 13:24:47 | 15 | something -- I know unfortunately Mr. Shultz is not here |
| 13:24:50 | 16 | with us this afternoon, but he mentioned at the last |
| 13:24:51 | 17 | hearing that they did intend to cross-examine her on |
| 13:24:54 | 18 | prior bad acts involving calling the police and |
| 13:24:57 | 19 | allegations that she would call the police without any |
| 13:24:59 | 20 | basis for doing so in the past.  And after thinking about |
| 13:25:02 | 21 | it some more, I realized that some of the incidents he |
| 13:25:05 | 22 | might have been referring to occurred before she ever |
| 13:25:07 | 23 | even knew Mr. Allen.  Obviously, to the extent they |
| 13:25:10 | 24 | involve Mr. Allen or relate to him in some way, then |
| 13:25:12 | 25 | that's fair game. |

13:25:14   1        THE COURT:  Didn't I rule on this?

13:25:15   2        MS. BERKOWER:  You ruled on whether they could ask

13:25:16   3   her about conduct that occurred after the defendant's

13:25:18   4   arrest but not prior to her knowing Mr. Allen, and so I

13:25:21   5   just wanted to clarify that ruling.

13:25:24   6        THE COURT:  I guess I'm confused.  Is this an

13:25:26   7   issue we're going to get into?  I'm happy to remain

13:25:31   8   confused if it's not relevant.

13:25:33   9        MR. PRATT:  Your Honor, the only thing I can say

13:25:35   10   is it's not in Mr. Shultz' outline, so I don't intend to

13:25:39   11   get into it.

13:25:39   12        THE COURT:  All right.  Very well.

13:25:40   13        MS. BERKOWER:  Thank you, Your Honor.

13:25:41   14        THE COURT:  Why don't you -- Mr. Cook, why don't

13:25:43   15   you bring in the jury.

13:25:45   16        And is your next witness ready to go, Government?

13:25:48   17        MS. BERKOWER:  She is, Your Honor.

13:25:49   18        THE COURT:  Very well.  Once the jury's present,

13:25:53   19   we will call her.

13:25:53   20        (The jury returned to the courtroom, after which

13:27:57   21   the following proceedings were had:)

13:27:57   22        THE COURT:  You may be seated.  Welcome back,

13:27:59   23   members of the jury.  Before we took our lunch recess,

13:28:03   24   Mr. Shultz, one of the attorneys for Mr. Stein was

13:28:05   25   cross-examining our last witness, Mr. Benson.  Over the

13:28:11  1   lunch break Mr. Shultz was informed that there was a

13:28:15  2   family emergency and he is unable to be with us the rest

13:28:18  3   of the day.

13:28:20  4       We've excused Mr. Benson for the day.  We're going

13:28:23  5   to bring him back in some near future.  I can't tell you

13:28:28  6   exactly when.  Part of that's going to depend on how

13:28:31  7   these matters evolve.  At that point we'll continue with

13:28:34  8   Mr. Shultz' cross-examination of him and the rest of the

13:28:39  9   testimony that he's had.  So obviously all of the

13:28:42  10  defendants are entitled to fully cross-examine Mr. Benson

13:28:46  11  and we will do that, but we're going to interrupt his

13:28:48  12  testimony due to unforeseen intervening events.  So I

13:28:50  13  just wanted to let you know about our rather abrupt

13:28:53  14  change in schedule today.

13:28:55  15      Given that, Ms. Berkower, could the Government

13:28:56  16  announce its next witness.

13:28:58  17      MS. BERKOWER:  Yes, Your Honor.  The Government

13:29:00  18  calls Lula Harris.

13:29:04  19      THE COURT:  Ms. Harris, if you would come stand in

13:29:07  20  front of my courtroom deputy here, he will administer the

13:29:09  21  oath to you and then you may have a seat in the witness

13:29:11  22  box.

13:29:11  23                      LULA HARRIS,

13:29:11  24  having been first duly sworn to testify the truth, the

13:29:11  25  whole truth, and nothing but the truth, testified as

3-26-2018 USA v. ALLEN, et al, NO 16-10141          161

| | | |
|---|---|---|
| 13:29:30 | 1 | follows: |
| 13:29:31 | 2 | DIRECT EXAMINATION |
| 13:29:31 | 3 | BY MS. BERKOWER: |
| 13:29:40 | 4 | Q.     Good afternoon. |
| 13:29:42 | 5 | **A.     Hello.** |
| 13:29:43 | 6 | Q.     Could you please say your name and spell it for |
| 13:29:46 | 7 | the court reporter. |
| 13:29:46 | 8 | **A.     Lula Donnette Harris, L-U-L-A, D-O-N-N-E-T-T-E,** |
| 13:29:53 | 9 | **H-A-R-R-I-S.** |
| 13:29:55 | 10 | Q.     And, Ms. Harris, in the summer and early fall of |
| 13:29:58 | 11 | 2016, what city did you live in? |
| 13:30:00 | 12 | **A.     Liberal, Kansas.** |
| 13:30:02 | 13 | Q.     Where did you live during that time? |
| 13:30:04 | 14 | **A.     1500 East Bluebell Road, Lot 129, ▮▮▮▮▮.** |
| 13:30:09 | 15 | Q.     Who did you live with in ▮▮▮▮▮? |
| 13:30:11 | 16 | **A.     Curtis Wayne Allen.** |
| 13:30:14 | 17 | Q.     Did you also know Patrick Stein? |
| 13:30:16 | 18 | **A.     Yes.** |
| 13:30:16 | 19 | Q.     How did you know him? |
| 13:30:17 | 20 | **A.     Through Curtis Allen.** |
| 13:30:21 | 21 | Q.     Did you also know Gavin Wright? |
| 13:30:24 | 22 | **A.     Yes.** |
| 13:30:24 | 23 | Q.     How'd you know him? |
| 13:30:26 | 24 | **A.     Through Curtis Allen.** |
| 13:30:27 | 25 | Q.     And during the time you lived in Liberal in 2016, |

3-26-2018 USA v. ALLEN, et al, NO 16-10141                    162

13:30:30   1   do you know whether Curtis Allen ever manufactured

13:30:32   2   homemade explosives?

13:30:34   3   **A.      Yes.**

13:30:35   4   Q.      Did he?

13:30:36   5   **A.      Yes.**

13:30:36   6   Q.      How do you know that?

13:30:37   7   **A.      I saw it.**

13:30:38   8   Q.      Now, I'm going to ask you a lot more about this in

13:30:41   9   a moment but first let me ask you about a few other

13:30:44   10  things.  Okay?

13:30:45   11  **A.      Okay.**

13:30:45   12  Q.      First let's talk a little bit more about Curtis

13:30:47   13  Allen.  When did you first meet him?

13:30:49   14  **A.      March 19th, 2006.**

13:30:51   15  Q.      What kind of relationship did you have with him?

13:30:54   16  **A.      On and off.  And we lived together, 2010 I moved**

13:31:01   17  **in, 2015.**

13:31:03   18  Q.      So did you have a romantic relationship with him?

13:31:06   19  **A.      Yes.**

13:31:06   20  Q.      And you said you lived with him from 2010 to 2015?

13:31:09   21  **A.      Yes.**

13:31:10   22  Q.      Now, do you see Mr. Allen here today in court?

13:31:14   23  **A.      Yes.**

13:31:15   24  Q.      Could you please point him out by something he's

13:31:17   25  wearing.

| | | |
|---|---|---|
| 13:31:18 | 1 | **A.      Yes, he has a print color shirt.** |
| 13:31:25 | 2 | Q.      And could you give a little more detail?  What |
| 13:31:27 | 3 | color jacket or top is he wearing other than that? |
| 13:31:30 | 4 | **A.      Maybe brown.   Looks brown to me.** |
| 13:31:34 | 5 | Q.      And what's his hair like? |
| 13:31:38 | 6 | **A.      Grown out.   He has black hair.** |
| 13:31:42 | 7 |         MS. BERKOWER:  Your Honor, can the record reflect |
| 13:31:43 | 8 | that Ms. Harris has identified defendant Curtis Allen? |
| 13:31:47 | 9 |         THE COURT:  The record will reflect. |
| 13:31:48 | 10 | BY MS. BERKOWER: |
| 13:31:48 | 11 | Q.      Now, you said you were dating him on and off |
| 13:31:51 | 12 | during the time you knew him? |
| 13:31:52 | 13 | **A.      Yes.** |
| 13:31:53 | 14 | Q.      But you lived with him for part of that time? |
| 13:31:55 | 15 | **A.      Yes.** |
| 13:31:56 | 16 | Q.      In total about how much of the time did you live |
| 13:31:59 | 17 | with him during that five-year period, was that |
| 13:32:02 | 18 | consistent? |
| 13:32:02 | 19 | **A.      Yes.** |
| 13:32:03 | 20 | Q.      And did you also live with him in part of 2016? |
| 13:32:06 | 21 | **A.      Yes.** |
| 13:32:06 | 22 | Q.      Was that also in Liberal? |
| 13:32:08 | 23 | **A.      Yes.** |
| 13:32:08 | 24 | Q.      And during what months of 2016 did you live with |
| 13:32:11 | 25 | him in Liberal? |

| 13:32:13 | 1 | **A.        June to October.** |

13:32:16   2   Q.      Now, had you also lived with him in Liberal

13:32:18   3   before?

13:32:19   4   **A.        Yes.**

13:32:19   5   Q.      When was that?

13:32:21   6   **A.        January of 2014 until end of January 2015.**

13:32:27   7   Q.      During that first time when you lived with him in

13:32:29   8   Liberal in 2014 to 2015, did he get involved with any

13:32:33   9   groups?

13:32:35   10   **A.        Yes, right at the end.**

13:32:36   11   Q.      What did he get involved with?

13:32:38   12   **A.        ZERT and Kansas -- KSF.**

13:32:42   13   Q.      What does KSF stand for?

13:32:43   14   **A.        Kansas Security Force.**

13:32:45   15   Q.      What was his role in the group?

13:32:49   16   **A.        Member.**

13:32:49   17   Q.      Did he also stay a member or did he move up in the

13:32:52   18   ranks?

13:32:52   19   **A.        He was promoted to Commander.**

13:32:55   20   Q.      Now, at some point in 2015, did you leave Liberal?

13:32:58   21   **A.        Yes, I did.**

13:32:58   22   Q.      When was that?

13:33:00   23   **A.        The end of January.**

13:33:02   24   Q.      Why'd you leave?

13:33:03   25   **A.        I went to help my son with a divorce and take care**

| 13:33:07 | 1 | of his kids. |
| 13:33:08 | 2 | Q.    And based on what you said a moment ago, you came |
| 13:33:10 | 3 | back to Liberal in June 2016? |
| 13:33:13 | 4 | A.    Yes. |
| 13:33:13 | 5 | Q.    What was the reason you came back? |
| 13:33:16 | 6 | A.    Originally to house-sit while he was going to -- |
| 13:33:23 | 7 | around to each township, doing the restoration of the |
| 13:33:27 | 8 | Constitution. |
| 13:33:28 | 9 | Q.    And when you got back to Liberal in June 2016, how |
| 13:33:31 | 10 | were things between you two at first? |
| 13:33:34 | 11 | A.    At first when I got there, for about the first |
| 13:33:39 | 12 | three weeks, they were fine.  He wanted to work on |
| 13:33:44 | 13 | getting back together, getting together. |
| 13:33:49 | 14 | Q.    Did that change at sometime? |
| 13:33:51 | 15 | A.    Yes. |
| 13:33:51 | 16 | Q.    Did it change for better or worse? |
| 13:33:52 | 17 | A.    For worse. |
| 13:33:53 | 18 | Q.    Now, given the time you spent with him, would you |
| 13:33:55 | 19 | recognize his voice? |
| 13:33:57 | 20 | A.    Yes. |
| 13:33:57 | 21 |     MS. BERKOWER:  Mr. Moore, if we could have clip |
| 13:34:02 | 22 | 15jj starting at 26 seconds. |
| 13:34:16 | 23 |     CLERK COOK:  It's not muted. |
| 13:34:21 | 24 |     MR. MOORE:  I didn't see it displayed. |
| 13:34:26 | 25 |     MS. BERKOWER:  The screens are all black. |

| | | |
|---|---|---|
| 13:34:37 | 1 | CLERK COOK:  Okay.  You're good. |
| 13:34:41 | 2 | MS. BERKOWER:  I think it's Government's Exhibit |
| 13:34:54 | 3 | 15jj starting at 26 seconds. |
| 13:35:12 | 4 | (Government's Exhibit 15jj was played.) |
| 13:35:20 | 5 | BY MS. BERKOWER: |
| 13:35:20 | 6 | Q.    You recognize that voice? |
| 13:35:21 | 7 | A.    Yes. |
| 13:35:21 | 8 | Q.    Whose voice is that? |
| 13:35:23 | 9 | A.    Curtis Allen's. |
| 13:35:24 | 10 | Q.    Now, you said you also know Patrick Stein? |
| 13:35:27 | 11 | A.    Yes. |
| 13:35:27 | 12 | Q.    Do you see him here today? |
| 13:35:30 | 13 | A.    Yes. |
| 13:35:30 | 14 | Q.    Could you point him out by something he's wearing. |
| 13:35:33 | 15 | A.    Glasses, white shirt. |
| 13:35:36 | 16 | MS. BERKOWER:  Your Honor, let the record reflect |
| 13:35:37 | 17 | that she has identified defendant Stein. |
| 13:35:39 | 18 | THE COURT:  The record will reflect. |
| 13:35:41 | 19 | BY MS. BERKOWER: |
| 13:35:41 | 20 | Q.    Could you tell us where you first met defendant |
| 13:35:44 | 21 | Stein. |
| 13:35:50 | 22 | A.    I'm sorry, I think you -- when I -- |
| 13:35:53 | 23 | Q.    Do you need me to ask you the question again? |
| 13:35:55 | 24 | A.    Well, I think -- no, I think I identified Gavin |
| 13:36:00 | 25 | Wright with the white shirt, and you said Patrick Stein. |

```
13:36:05    1   Right.

13:36:05    2   Q.    Okay.  So do you see Patrick -- just so the record

13:36:08    3   is clear, do you see Patrick Stein here in the court?

13:36:11    4   A.    Yes.

13:36:11    5   Q.    And could you identify him by something he is

13:36:13    6   wearing?

13:36:14    7   A.    Yes.  Glasses and a gray suit.

13:36:17    8   Q.    Is there anything else you could identify him by?

13:36:20    9   A.    Looks like a pattern on his tie.

13:36:23   10         MS. BERKOWER:  Your Honor, can the record reflect

13:36:25   11   that she's identified defendant Stein?

13:36:26   12         THE COURT:  It will.  I thought she was referring

13:36:28   13   to his white tie, white striped tie, before.  But can you

13:36:33   14   identify his position at the table just to make sure

13:36:36   15   we're accurate?  Roughly where at the table is he

13:36:40   16   sitting, middle?

13:36:41   17         THE WITNESS:  He's sitting next to attorney Pratt.

13:36:45   18         THE COURT:  All right.  Well, the record will

13:36:47   19   reflect that she has identified Mr. Stein.

13:36:49   20         MS. BERKOWER:  Thank you, Your Honor.

13:36:50   21   BY MS. BERKOWER:

13:36:51   22   Q.    Could you tell us where you first met Mr. Stein.

13:36:54   23   A.    At IHOP in Dodge City.

13:36:56   24   Q.    Was that a planned meet-up?

13:36:59   25   A.    Yes.
```

3-26-2018 USA v. ALLEN, et al, NO 16-10141

168

| | | |
|---|---|---|
| 13:36:59 | 1 | Q.        Who else was there? |
| 13:37:02 | 2 | **A.        Curtis Allen.** |
| 13:37:03 | 3 | Q.        And what is defendant Stein like, based on what |
| 13:37:05 | 4 | you know of him? |
| 13:37:06 | 5 | **A.        What he's like?  From the conversation he wanted** |
| 13:37:12 | 6 | **to have, he was very focused, antsy.  He's very vocal.** |
| 13:37:24 | 7 | Q.        And do you know his views on Muslims? |
| 13:37:27 | 8 | **A.        I asked him.  He was making statements, so calling** |
| 13:37:34 | 9 | **'em cockroaches, so I asked him why he did that.** |
| 13:37:37 | 10 | Q.        What did he say? |
| 13:37:38 | 11 | **A.        He told me that once they get here, you can't get** |
| 13:37:42 | 12 | **rid of 'em.** |
| 13:37:42 | 13 | Q.        And was that all at that conversation at the IHOP? |
| 13:37:48 | 14 | **A.        Between -- on that, they were having conversation** |
| 13:37:52 | 15 | **that's why Mr. Stein had wanted to meet Curtis, was to** |
| 13:37:57 | 16 | **figure out more places they need to survey targets and to** |
| 13:38:03 | 17 | **get more information on Dan Day's boss.** |
| 13:38:07 | 18 | Q.        So let me stop you there.  That meeting at the |
| 13:38:11 | 19 | IHOP, you said they talked about needing to do |
| 13:38:13 | 20 | surveillance? |
| 13:38:13 | 21 | **A.        Yes.** |
| 13:38:14 | 22 | Q.        Surveillance of what? |
| 13:38:15 | 23 | **A.        Different targets, different locations.** |
| 13:38:20 | 24 | Q.        What types of targets and locations? |
| 13:38:23 | 25 | **A.        I'm not real sure.** |

| | | |
|---|---|---|
| 13:38:26 | 1 | Q.      Now, from talking to him, would you recognize his |
| 13:38:30 | 2 | voice? |
| 13:38:30 | 3 | A.      Yes. |
| 13:38:31 | 4 | MS. BERKOWER:  If we could have clip 13h starting |
| 13:38:33 | 5 | at 15 seconds to 30 seconds, please. |
| 13:38:42 | 6 | (Government's Exhibit 13h was played.) |
| 13:38:57 | 7 | BY MS. BERKOWER: |
| 13:38:57 | 8 | Q.      So, Ms. Harris, do you recognize the male speaking |
| 13:38:59 | 9 | in that clip? |
| 13:39:00 | 10 | A.      Yes. |
| 13:39:00 | 11 | Q.      Who is speaking there? |
| 13:39:01 | 12 | A.      Patrick Stein. |
| 13:39:03 | 13 | Q.      Now, you said you also know Gavin Wright and that |
| 13:39:07 | 14 | you know him through Curtis? |
| 13:39:07 | 15 | A.      Yes. |
| 13:39:08 | 16 | Q.      How did you first meet him? |
| 13:39:11 | 17 | A.      I first met him at the little bar. |
| 13:39:14 | 18 | Q.      Where's that? |
| 13:39:15 | 19 | A.      It's down on South Kansas in Liberal. |
| 13:39:20 | 20 | Q.      And what kind of a place is that? |
| 13:39:22 | 21 | A.      It's just a little bar. |
| 13:39:24 | 22 | Q.      So have you spent time with him socially? |
| 13:39:27 | 23 | A.      Yes. |
| 13:39:27 | 24 | Q.      What kinds of things have you done with him |
| 13:39:30 | 25 | socially? |

| | | |
|---|---|---|
| 13:39:30 | 1 | A.      We went out to his house for a holiday meal and |
| 13:39:37 | 2 | also been to the VFW and sat with him.  We went out to |
| 13:39:44 | 3 | his house and mowed, stacked wood, visited. |
| 13:39:49 | 4 | Q.    Do you see him here today in court? |
| 13:39:51 | 5 | A.    Yes. |
| 13:39:51 | 6 | Q.    Could you point him out by something he's wearing? |
| 13:39:54 | 7 | A.    Yes.  The glasses and the white, long-sleeve |
| 13:40:00 | 8 | shirt. |
| 13:40:00 | 9 | Q.    And could you explain where at the table he's |
| 13:40:03 | 10 | sitting? |
| 13:40:04 | 11 | A.    He's further at the end. |
| 13:40:07 | 12 | MS. BERKOWER:  Your Honor, let the record reflect |
| 13:40:09 | 13 | she has identified defendant Gavin Wright. |
| 13:40:10 | 14 | THE COURT:  It will reflect. |
| 13:40:12 | 15 | BY MS. BERKOWER: |
| 13:40:12 | 16 | Q.    Now, would you recognize his voice from all the |
| 13:40:15 | 17 | time you've spent with him? |
| 13:40:16 | 18 | A.    Yes. |
| 13:40:16 | 19 | MS. BERKOWER:  Mr. Moore, if we could have |
| 13:40:19 | 20 | Government Exhibit 13 -- sorry, 12xxx from 13 seconds |
| 13:40:23 | 21 | lasting 19 seconds. |
| 13:40:26 | 22 | (Government's Exhibit 12xxx was played.) |
| 13:40:32 | 23 | BY MS. BERKOWER: |
| 13:40:33 | 24 | Q.    Do you recognize that voice? |
| 13:40:33 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 13:40:34 | 1 | Q.    Who is that? |
| 13:40:34 | 2 | **A.    That's Gavin Wright.** |
| 13:40:36 | 3 | Q.    Now, you said you've been to his house.  What town |
| 13:40:39 | 4 | did he live in? |
| 13:40:40 | 5 | **A.    State Line, Oklahoma.** |
| 13:40:42 | 6 | Q.    So that's in Oklahoma? |
| 13:40:44 | 7 | **A.    Yes.** |
| 13:40:44 | 8 | Q.    Let's talk now a little bit about what your life |
| 13:40:47 | 9 | is like with Curtis when you lived with him in Liberal in |
| 13:40:50 | 10 | 2016. |
| 13:40:52 | 11 | MS. BERKOWER:  Now, Mr. Moore, if we could please |
| 13:40:54 | 12 | have what's marked as Defense Exhibit Allen 912-a and |
| 13:40:58 | 13 | Allen 912-b, please. |
| 13:40:58 | 14 | By MS. BERKOWER: |
| 13:41:05 | 15 | Q.    Ms. Harris, do you recognize what's in |
| 13:41:08 | 16 | Exhibit 912-a? |
| 13:41:09 | 17 | **A.    Yes.** |
| 13:41:10 | 18 | Q.    What is that? |
| 13:41:11 | 19 | **A.    Mobile home we live in.** |
| 13:41:13 | 20 | Q.    That's the mobile home you lived in with Mr. Allen |
| 13:41:16 | 21 | in Liberal? |
| 13:41:17 | 22 | **A.    Yes.** |
| 13:41:17 | 23 | Q.    Is that what it looked like when you lived there? |
| 13:41:20 | 24 | **A.    Yes.** |
| 13:41:21 | 25 | MS. BERKOWER:  Your Honor, I seek to -- well, I |

13:41:24   1  guess I want to seek to admit their exhibit.

13:41:28   2       THE COURT:  I think this exhibit's been admitted,

13:41:30   3  hasn't it?

13:41:30   4       MS. BERKOWER:  I think it was shown in opening.  I

13:41:33   5  don't know it was actually it admitted.  I had the same

13:41:35   6  thought just now.  I thought it had been admitted but

13:41:38   7  realized it probably hadn't.

13:41:39   8       THE COURT:  What exhibit number is this again?

13:41:41   9       MS. BERKOWER:  It's Defense Exhibit 912-a.  We

13:41:43  10  also have it in our set of exhibits, I believe, but I

13:41:46  11  have the defense exhibit number marked.

13:41:47  12       THE COURT:  I don't think there's any prohibition

13:41:50  13  against you admitting someone else's exhibit.  They've

13:41:53  14  identified it, but you can refer to it and admit it.

13:41:56  15  912-a?

13:41:57  16       MS. BERKOWER:  Yes, Your Honor.

13:41:58  17       THE COURT:  Any objection to the admission of this

13:42:01  18  exhibit?

13:42:02  19       MR. FEDERICO:  No, Your Honor.

13:42:02  20       THE COURT:  Hearing no objection, 912-a will be

13:42:05  21  admitted.

13:42:06  22  BY MS. BERKOWER:

13:42:06  23  Q.   And if you could look at Defense Exhibit 912-b,

13:42:10  24  please.

13:42:12  25       Do you recognize that as well?

13:42:14    1   A.      Yes.

13:42:14    2   Q.      What is that?

13:42:15    3   A.      That's the front door area of the mobile home.

13:42:19    4   Q.      Is that what it looked like when you lived there?

13:42:21    5   A.      Yes.

13:42:21    6          MS. BERKOWER:  Your Honor, I'd seek to admit this

13:42:23    7   one as well.

13:42:24    8          THE COURT:  Any objection?

13:42:25    9          MR. FEDERICO:  No, Your Honor.

13:42:26   10          THE COURT:  Hearing no objection, 912-b is

13:42:28   11   admitted.

13:42:29   12   BY MS. BERKOWER:

13:42:29   13   Q.      Now, going back to 912-a, if we could, please, if

13:42:36   14   I could direct your attention to some rocks out in the

13:42:39   15   front yard.

13:42:39   16   A.      Yes.

13:42:39   17   Q.      Do you recognize what those are?

13:42:41   18   A.      Yes.

13:42:42   19   Q.      What are those?

13:42:44   20   A.      They're rocks.

13:42:45   21   Q.      What are they there for?

13:42:48   22   A.      The ones that are basically around the edge of the

13:42:54   23   yard are deterrence for people running into the yard.

13:42:59   24   Q.      And do you see that they're painted red, white,

13:43:02   25   and blue?

| | | |
|---|---|---|
| 13:43:03 | 1 | A.       Yes. |
| 13:43:03 | 2 | Q.       Whose idea was that? |
| 13:43:04 | 3 | A.       Curtis' and mine. |
| 13:43:05 | 4 | Q.       And did you do that together? |
| 13:43:07 | 5 | A.       Yes. |
| 13:43:07 | 6 | Q.       Who actually painted it? |
| 13:43:10 | 7 | A.       I want to say both of us. |
| 13:43:13 | 8 | Q.       And then going to 912-b, do you see that flag in |
| 13:43:20 | 9 | the picture? |
| 13:43:20 | 10 | A.       Yes. |
| 13:43:20 | 11 | Q.       Who bought that? |
| 13:43:23 | 12 | A.       We bought it at Dollar Tree. |
| 13:43:27 | 13 | Q.       Now, in the time that you lived with Curtis, when |
| 13:43:31 | 14 | something broke in the house, who would fix it? |
| 13:43:34 | 15 | A.       Curtis. |
| 13:43:35 | 16 | Q.       And was there ever a time where he had to call a |
| 13:43:38 | 17 | handyman? |
| 13:43:39 | 18 | A.       No. |
| 13:43:41 | 19 | Q.       So was he capable of fixing things around the |
| 13:43:44 | 20 | house? |
| 13:43:44 | 21 | A.       Yes.  Yes. |
| 13:43:46 | 22 | Q.       What kind of skills did he have? |
| 13:43:49 | 23 | A.       He could do carpentry.  He could do small wiring. |
| 13:44:00 | 24 | I mean, he could do plumbing.  He could do roofing, |
| 13:44:09 | 25 | painting. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

175

```
13:44:09   1   Q.     Ever see him try to fix something where he
13:44:11   2   couldn't do it?
13:44:12   3   A.     No.
13:44:13   4   Q.     Let's talk about what he did for work.  Was he
13:44:15   5   working when you first moved back to Liberal in 2016?
13:44:18   6   A.     Yes.
13:44:18   7   Q.     What job did he have?
13:44:20   8   A.     Alder Security Systems.
13:44:23   9   Q.     And what did that involve?
13:44:25  10   A.     For him, he was a technician.  He was also
13:44:31  11   installer and salesman.
13:44:36  12   Q.     And did he have a second job during the summer of
13:44:39  13   2016?
13:44:40  14   A.     Yes.
13:44:40  15   Q.     What job was that?
13:44:42  16   A.     He was going to work for G & G Mobile Home
13:44:47  17   dealership.
13:44:47  18   Q.     What is G & G Mobile Home?
13:44:49  19   A.     It's a mobile home dealership ran by Gavin Wright.
13:44:54  20   Q.     What does G & G stand for?
13:44:57  21   A.     Gavin and Garrett Wright.
13:44:59  22   Q.     And who's Garrett Wright?
13:45:02  23   A.     Gavin's brother.
13:45:03  24   Q.     Now, where is G & G located?
13:45:05  25   A.     At the corner of Tucker Road in Liberal.
```

| Time | Line | |
|---|---|---|
| 13:45:09 | 1 | Q.      Is that in Liberal, Kansas? |
| 13:45:11 | 2 | **A.      Yes.** |
| 13:45:11 | 3 | Q.      And did Curtis know Gavin Wright before he started |
| 13:45:15 | 4 | working at G & G? |
| 13:45:17 | 5 | **A.      Yes.** |
| 13:45:17 | 6 | Q.      Did he get the job through Gavin? |
| 13:45:19 | 7 | **A.      Yes.** |
| 13:45:19 | 8 | Q.      And while he worked there, did he ever actually |
| 13:45:22 | 9 | sell a mobile home? |
| 13:45:23 | 10 | **A.      No.** |
| 13:45:24 | 11 | Q.      Let's talk now about some of Curtis' views.  You |
| 13:45:27 | 12 | said you started dating him in 2006? |
| 13:45:29 | 13 | **A.      Yes.** |
| 13:45:29 | 14 | Q.      And in the time you've known him, did you feel you |
| 13:45:32 | 15 | got to know him pretty well? |
| 13:45:34 | 16 | **A.      Yes.** |
| 13:45:34 | 17 | Q.      Are there any issues he felt strongly about? |
| 13:45:37 | 18 | **A.      The way the country is being ran by the** |
| 13:45:39 | 19 | **government.** |
| 13:45:39 | 20 | Q.      What about that bothered him, or what did he feel |
| 13:45:42 | 21 | strongly about with regard to that? |
| 13:45:48 | 22 | **A.      The people that were running for president** |
| 13:45:53 | 23 | **bothered him a lot.  He just didn't like the immigrants** |
| 13:46:00 | 24 | **coming in.** |
| 13:46:01 | 25 | Q.      What did he not like about immigrants? |

13:46:05  1  A.      The illegals, immigrants, they were taking over

13:46:09  2  the country, they were taking jobs away.

13:46:12  3  Q.      Were there particular kinds of immigrants that

13:46:15  4  bothered him most?

13:46:17  5  A.      Definitely illegals, but Muslims.

13:46:22  6  Q.      How did he feel about Muslims?

13:46:24  7  A.      He thought that Muslims could bring Sharia law on

13:46:33  8  us or that we'd have to adapt to the Koran that they

13:46:41  9  worship.

13:46:43  10  Q.      How much of a concern was the imposition of Sharia

13:46:46  11  law to Curtis?

13:46:47  12  A.      That was a pretty strong issue.

13:46:50  13  Q.      And how did you know that he felt this way?

13:46:53  14  A.      'Cause he told me.

13:46:56  15  Q.      How'd he feel about Muslims in particular as

13:46:59  16  outside of immigrants?

13:47:00  17  A.      How do I feel about them?

13:47:02  18  Q.      No, how did he feel.

13:47:03  19  A.      Oh.  He just didn't feel they belonged here, that

13:47:12  20  they were violent, that they were a threat to our

13:47:18  21  country.

13:47:19  22  Q.      And did he keep his views on Muslims to himself?

13:47:23  23  A.      No.

13:47:23  24  Q.      Did he keep his views on immigration to himself?

13:47:26  25  A.      No.

3-26-2018 USA v. ALLEN, et al, NO 16-10141          178

| | | |
|---|---|---|
| 13:47:26 | 1 | Q.     How open was he about those views? |
| 13:47:29 | 2 | **A.     He was open enough to anybody that would listen to** |
| 13:47:32 | 3 | **him.** |
| 13:47:33 | 4 | Q.     And back when you were in 2016 when you lived in |
| 13:47:36 | 5 | Liberal, did Curtis start refusing to go to Walmart? |
| 13:47:39 | 6 | **A.     Yes.  He had boycotted Walmart.** |
| 13:47:42 | 7 | Q.     Why was that? |
| 13:47:44 | 8 | **A.     Because he went in one day to get a microwave** |
| 13:47:48 | 9 | **baking pan, and he walked up to an employee 'cause he** |
| 13:47:51 | 10 | **couldn't find them and asked for her assistance.  She** |
| 13:47:56 | 11 | **couldn't help him.  She told him he'd have to go get** |
| 13:47:59 | 12 | **somebody else, so she went and got somebody else, and she** |
| 13:48:02 | 13 | **was all wrapped up like -- in garb like she was a Muslim,** |
| 13:48:08 | 14 | **so after that he would not go back in Walmart.** |
| 13:48:10 | 15 | Q.     And so that had to do with them hiring Muslims? |
| 13:48:13 | 16 | **A.     Yes.** |
| 13:48:13 | 17 | Q.     Let's talk now about something else that was going |
| 13:48:16 | 18 | on with you in the summer of 2016.  In that summer, how |
| 13:48:19 | 19 | was your health? |
| 13:48:20 | 20 | **A.     Poor.** |
| 13:48:21 | 21 | Q.     What kind of health problem did you have? |
| 13:48:25 | 22 | **A.     I had found out while I was in El Dorado, Kansas,** |
| 13:48:30 | 23 | **that I had cancer.** |
| 13:48:31 | 24 | Q.     What kind of cancer did you have? |
| 13:48:33 | 25 | **A.     I had stage 4 lymph node and tonsil cancer.** |

| | | |
|---|---|---|
| 13:48:38 | 1 | Q.      Have -- overall have you received quite a lot of |
| 13:48:41 | 2 | treatment for your cancer? |
| 13:48:43 | 3 | **A.      Yes, I have.** |
| 13:48:43 | 4 | Q.      What kind of treatment have you received? |
| 13:48:45 | 5 | **A.      I took 35 radiation treatments to the neck and two** |
| 13:48:48 | 6 | **rounds of chemo.** |
| 13:48:49 | 7 | Q.      Have those treatments been successful? |
| 13:48:52 | 8 | **A.      So far my scans show that I don't have any** |
| 13:48:56 | 9 | **hotspots, any present cancer.** |
| 13:48:58 | 10 | Q.      In the summer of 2016, where were you in your |
| 13:49:01 | 11 | treatment? |
| 13:49:02 | 12 | **A.      I had just finished treatment May 18th.** |
| 13:49:05 | 13 | Q.      And did you know at that time whether the |
| 13:49:08 | 14 | treatment would be as successful as you now found it to |
| 13:49:12 | 15 | be? |
| 13:49:12 | 16 | **A.      No.** |
| 13:49:13 | 17 | Q.      In the summer of 2016, did the treatment have |
| 13:49:15 | 18 | physical effects on you? |
| 13:49:17 | 19 | **A.      Yes.** |
| 13:49:17 | 20 | Q.      How were you feeling physically at that time? |
| 13:49:19 | 21 | **A.      I was very tired, run down.  I had also lost my** |
| 13:49:25 | 22 | **feeding tube June 12th, so that was a downfall because of** |
| 13:49:35 | 23 | **my intake on water or food.** |
| 13:49:38 | 24 | Q.      When you first moved back in with Curtis in June |
| 13:49:41 | 25 | 2016, how much did you weigh? |

13:49:43   1   A.      When I first got there, I weighed 96 pounds.

13:49:49   2   Doing without air conditioning, I went down to 92.

13:49:51   3   Q.      And how tall are you?

13:49:53   4   A.      5 foot.

13:49:54   5   Q.      For comparison sake, how much do you weigh now?

13:49:56   6   A.      I weigh 120 pounds.

13:49:58   7   Q.      So in the summer of 2006 you were five feet tall

13:50:02   8   and 92 pounds?

13:50:03   9   A.      Yes, ma'am.

13:50:03   10  Q.      And just for comparison's sake, how tall is

13:50:06   11  Curtis?

13:50:06   12  A.      5-11.

13:50:07   13  Q.      How much did he weigh that summer?

13:50:09   14  A.      About 185 to 195.

13:50:13   15  Q.      On any given day that summer, how physically

13:50:16   16  strong were you feeling?

13:50:17   17  A.      Not very strong.  I had to have naps during the

13:50:21   18  day.

13:50:21   19  Q.      Were you working that summer?

13:50:22   20  A.      No.

13:50:22   21  Q.      Why not?

13:50:23   22  A.      I wasn't up to.

13:50:26   23  Q.      And before you got sick, had you worked?

13:50:28   24  A.      Yes.

13:50:29   25  Q.      Now, I -- in the summer of 2016 when you were

13:50:33  1   experiencing this, how did you spend most of your time?

13:50:39  2   **A.      Just sitting around playing on my iPad, checking**

13:50:49  3   **MAP.  We would go out to eat, something like that, so**

13:50:52  4   **that I could be in air conditioning or they would go have**

13:50:54  5   **a beer, Curtis would meet up with Gavin, have a beer so I**

13:50:59  6   **could be in air conditioning.**

13:51:02  7   Q.      And by comparison to then as far as your cancer

13:51:04  8   goes, how are you feeling now?

13:51:06  9   **A.      Better.**

13:51:07  10  Q.      Now, earlier you mentioned that Curtis had gotten

13:51:10  11  involved with KSF in 2015?

13:51:12  12  **A.      Yes.**

13:51:12  13  Q.      Was he still involved in KSF when you moved back

13:51:15  14  to Liberal in 2016?

13:51:16  15  **A.      Yes.**

13:51:16  16  Q.      In July of 2016 did you and Curtis go to the

13:51:21  17  Kearney County Fair in Lakin, Kansas?

13:51:23  18  **A.      Yes.**

13:51:23  19  Q.      And on the way to the fair did Curtis take service

13:51:26  20  calls in regards for his job?

13:51:27  21  **A.      Yes.**

13:51:27  22  Q.      What did that entail?

13:51:29  23  **A.      He was doing service calls on the way up there.**

13:51:37  24  **He told me that there was going to be some members up**

13:51:41  25  **there, had tables set out.  He specifically told me at**

| | | |
|---|---|---|
| 13:51:46 | 1 | **that time Dan Day would be there and not to mention --** |
| 13:51:49 | 2 | Q.      And let me stop you there.  You mentioned Dan Day. |
| 13:51:52 | 3 | Had you met him before? |
| 13:51:53 | 4 | **A.      No.** |
| 13:51:53 | 5 | Q.      Did he mention if other KSF members would also be |
| 13:51:57 | 6 | at the fair? |
| 13:51:57 | 7 | **A.      Yes.** |
| 13:51:57 | 8 | Q.      Who did he say would be there? |
| 13:51:59 | 9 | **A.      He said Trish and Cody.** |
| 13:52:02 | 10 | Q.      Is that Trish and Cody Burch? |
| 13:52:06 | 11 | **A.      Yes.** |
| 13:52:06 | 12 | Q.      And as you're driving did Curtis tell you |
| 13:52:09 | 13 | something significant about certain members of his |
| 13:52:11 | 14 | militia group? |
| 13:52:13 | 15 | **A.      Yes.  He told me that -- well, first off, not to** |
| 13:52:20 | 16 | **mention that there had been mines given to Dan Day by** |
| 13:52:27 | 17 | **Patrick Slattery, and that they were going to have a** |
| 13:52:31 | 18 | **meeting.  Him and a few other members were going to have** |
| 13:52:34 | 19 | **a meeting.** |
| 13:52:34 | 20 | Q.      And what did he say that he and a few members of |
| 13:52:36 | 21 | KSF were going to do? |
| 13:52:39 | 22 | **A.      Have a meeting after the fair.** |
| 13:52:41 | 23 | Q.      What were they going to talk about there? |
| 13:52:44 | 24 | **A.      They had business that pertained to Muslims.** |
| 13:52:50 | 25 | Q.      Did he mention a smaller cell to you? |

| | | |
|---|---|---|
| 13:52:52 | 1 | A.      Yes. |
| 13:52:52 | 2 | Q.      What did he say about that? |
| 13:52:54 | 3 | A.      Well, it was just made up of a few members that |
| 13:52:57 | 4 | were meeting. |
| 13:52:58 | 5 | Q.      And what was the smaller cell going to do? |
| 13:53:01 | 6 | A.      They were going to meet and talk. |
| 13:53:04 | 7 | Q.      What were they going to talk about? |
| 13:53:07 | 8 | A.      I assume where they were at with their progress on |
| 13:53:14 | 9 | the Muslims, what their plans were doing. |
| 13:53:17 | 10 | Q.      Now, did he also mention that this smaller cell |
| 13:53:20 | 11 | had tried to recruit others to join them? |
| 13:53:23 | 12 | A.      The others had told me that they had tried. |
| 13:53:29 | 13 | Q.      Who told you they had tried? |
| 13:53:31 | 14 | A.      Dan Reever told me that they had been asked to |
| 13:53:36 | 15 | join a group, a smaller group, to do something for the |
| 13:53:41 | 16 | country.  Dan Reever told them he had said he had a |
| 13:53:46 | 17 | family, he would not do any violent acts.  Trish and Cody |
| 13:53:50 | 18 | did the same thing.  She told me the same. |
| 13:53:52 | 19 | Q.      And on that drive did Curtis mention that the |
| 13:53:54 | 20 | smaller cell had tried are recruit Trish Burch and Dan |
| 13:54:00 | 21 | Reever to the smaller cell? |
| 13:54:01 | 22 | A.      No, he did not. |
| 13:54:04 | 23 | Q.      Now, when he told you about the smaller cell and |
| 13:54:07 | 24 | that they were meeting after the fair, did you take him |
| 13:54:09 | 25 | seriously? |

```
13:54:10    1  A.      Yes.

13:54:10    2  Q.      Why?

13:54:12    3  A.      Because they were actually talking inside the fair

13:54:19    4  about some of the stuff, as we sat at the table, but they

13:54:24    5  wanted to have a limited personnel in this meeting that

13:54:32    6  they were having.

13:54:32    7  Q.      So when you got to the actual fair -- let's take a

13:54:35    8  step back to when you first got to the fair.  Were KSF

13:54:39    9  members there?

13:54:39   10  A.      Yes.

13:54:40   11  Q.      Who was there?

13:54:41   12  A.      Dan Day, Jim from Deerfield, Patrick Stein, Cody

13:54:48   13  and Trish were in and out around the table that day.

13:54:53   14  Q.      And what did you do at the fair that day?

13:54:56   15  A.      We sat at the KSF table they had established

13:55:00   16  there.

13:55:00   17  Q.      What kind of KSF table was there?  Was it a

13:55:08   18  recruitment table for KSF?

13:55:09   19  A.      It displayed pictures of the recent tornado and

13:55:15   20  some of the members going and helping Eureka and the

13:55:19   21  damage that was done there.

13:55:20   22  Q.      And you mentioned you met Dan Day there?

13:55:23   23  A.      Dan Day was there, yes.

13:55:24   24  Q.      What was your impression of him?

13:55:28   25  A.      Umm, him and I ended up at the table by ourselves
```

13:55:35  1  just kind of talked.  He seemed nice.  He seemed like a

13:55:40  2  big marshmallow.

13:55:41  3  Q.     Did you find him to have a strong personality?

13:55:46  4  A.     Not really.

13:55:46  5  Q.     While you were at the fair, did you hear Curtis,

13:55:49  6  Patrick, and others talk about doing something to a

13:55:52  7  mosque?

13:55:52  8  A.     Yes.

13:55:55  9  Q.     What were they talking about doing?

13:55:56  10  A.     The subject came up while we were sitting around

13:55:59  11  the table that there were other militias meeting, and it

13:56:07  12  was Missouri and Colorado, and they wanted to enlist them

13:56:15  13  to cut a pig's throat and run it through a mosque all on

13:56:20  14  the same day.

13:56:21  15  Q.     And what was the goal of doing that?

13:56:23  16  A.     It would send a sign to the Muslims.

13:56:26  17  Q.     What kind of sign?

13:56:27  18  A.     That they weren't welcome there.

13:56:30  19  Q.     Later on in the day was there a barbecue picnic at

13:56:33  20  the fair?

13:56:34  21  A.     Yes.

13:56:34  22  Q.     And could you describe the setup for the picnic.

13:56:39  23  A.     You went into the building, there were tables, but

13:56:43  24  you went through the line and they provided -- they gave

13:56:47  25  you what you -- they plated it for you.

3-26-2018 USA v. ALLEN, et al, NO 16-10141          186

13:56:52   1   Q.      While you -- did you go and sit down with other

13:56:55   2   KSF members after you got your food?

13:56:56   3   A.      **Yeah, but we went back over to the fair part.  We**

13:57:00   4   **didn't stay -- it was already full where the actual food**

13:57:03   5   **was being given out.**

13:57:05   6   Q.      While you were at the picnic, was there any

13:57:08   7   discussion relating to a group called CAIR?

13:57:10   8   A.      **Yes.**

13:57:10   9   Q.      What kind of a group is CAIR?

13:57:13  10   A.      **CAIR was where Dan worked, Dan Day worked, and**

13:57:20  11   **it's, I think, part of the Catholic Charities.  But the**

13:57:25  12   **CAIR group was the ones that were bringing in the Somali**

13:57:29  13   **refugees.**

13:57:29  14   Q.      And was there talk about finding out who the

13:57:32  15   leader of that group was?

13:57:34  16   A.      **Yes.  It was --**

13:57:35  17   Q.      Did they want to try and locate her so that they

13:57:38  18   could harm her?

13:57:38  19   A.      **Yes.**

13:57:38  20   Q.      Did they want to locate her so they could kill

13:57:41  21   her?

13:57:42  22   A.      **Yes.**

13:57:42  23   Q.      And did you hear any discussion about the idea

13:57:47  24   behind carrying out that attack?

13:57:51  25   A.      **What they said was they wanted Dan Day to get her**

```
13:57:57   1   personal information.  That way they could attack her,

13:58:01   2   cut her head off, and leave fingernail clippings and hair

13:58:08   3   from a refugee or a Muslim.  That way it would look like

13:58:12   4   a Muslim had done it.  And then post a statement on a

13:58:18   5   government building, saying that if -- if they're not

13:58:23   6   stopped more incidents like this will happen.

13:58:25   7   Q.     And later on in the evening did Patrick Stein, Dan

13:58:29   8   Day, Curtis meet separately from the group of the rest of

13:58:31   9   the KSF members?

13:58:32  10   A.     Yes, after the fair was over.

13:58:33  11   Q.     Could you describe how that came about.

13:58:37  12   A.     They decided they were going to move -- as we were

13:58:40  13   closing the fair down, they decided they were going to

13:58:43  14   meet out by the horse arena.  So we all moved our

13:58:50  15   vehicles and parked over there in the parking area.

13:58:59  16   Stein turned up loud music, got out of his truck, and

13:59:04  17   Curtis left his phone in the car, and they met outside of

13:59:09  18   Patrick Stein's truck.

13:59:11  19   Q.     Were you a part of this meeting?

13:59:13  20   A.     No.

13:59:13  21   Q.     Were you allowed to be a part of this meeting?

13:59:15  22   A.     No.

13:59:15  23   Q.     Did you hear any part of this meeting?

13:59:17  24   A.     No.

13:59:17  25   Q.     What did you do while they were meeting?
```

| 13:59:19 | 1 | A.        I went back over to the fairgrounds and changed my |
| 13:59:24 | 2 | shoes, used the rest room, and then I went down, I walked |
| 13:59:28 | 3 | down to the actual horse arena. |
| 13:59:33 | 4 | Q.    And did Curtis tell you why he was leaving his |
| 13:59:37 | 5 | phone in the car when he went to meet with the others? |
| 13:59:39 | 6 | A.        So that no one could listen in. |
| 13:59:44 | 7 | Q.    And when the meeting was over, did -- what did you |
| 13:59:46 | 8 | do next? |
| 13:59:47 | 9 | A.        We left and drove back to Liberal. |
| 13:59:50 | 10 | Q.    As you were driving back, did Curtis tell you |
| 13:59:53 | 11 | about what had been discussed? |
| 13:59:54 | 12 | A.        Not at that time. |
| 13:59:55 | 13 | Q.    Later that night did he tell you? |
| 13:59:59 | 14 | A.        When we were in the shower he said if they |
| 14:00:02 | 15 | couldn't get ahold of the CAIR lady that ran the place, |
| 14:00:08 | 16 | that an alternative would be the mayor -- the Liberal |
| 14:00:12 | 17 | mayor's wife and they would do the same thing:  They |
| 14:00:17 | 18 | would cut her head off and they would frame a Muslim by |
| 14:00:25 | 19 | fingernail clippings, and hair clippings and then they'd |
| 14:00:27 | 20 | put a statement on a government door. |
| 14:00:31 | 21 | Q.    Not a what was the idea behind that kind of |
| 14:00:33 | 22 | attack? |
| 14:00:34 | 23 | A.        To get them -- to get people to stop bringing in |
| 14:00:38 | 24 | the Muslims. |
| 14:00:41 | 25 | Q.    Now, did Curtis also tell you about another idea |

14:00:44  1  involving poisonous gas?

14:00:45  2  **A.     Yes.**

14:00:46  3  Q.     What was that idea?

14:00:48  4      MR. FEDERICO:  Your Honor, I'm going to object at

14:00:51  5  this point.  Primary basis would be the witness has been

14:00:52  6  nonresponsive in violation of some court limine orders,

14:00:56  7  and so I don't know what the Government has said to the

14:00:59  8  witness prior to this hearing but the witness has

14:01:01  9  continuously testified about matters that this Court's

14:01:03  10  already ruled on regarding REF403.

14:01:07  11      MS. BERKOWER:  And, yes, Your Honor I did advise

14:01:09  12  the witness and I was -- some of these answers were

14:01:12  13  not --

14:01:12  14      THE COURT:  Let me talk to you up here.

14:01:21  15      (At the bench with Court and counsel.)

14:01:27  16      THE COURT:  Mr. Federico, tell me -- Mr. Federico,

14:01:38  17  tell me specifically what you're referring to.

14:01:41  18      MR. FEDERICO:  Yes, Your Honor.  We moved in

14:01:43  19  limine to exclude testimony about beheadings.

14:01:45  20      THE COURT:  Yes, but I didn't get a

14:01:48  21  contemporaneous objection to that.

14:01:49  22      MR. FEDERICO:  Well, that's because the question

14:01:51  23  itself didn't raise it, but the witness just gratuitously

14:01:55  24  offered it twice.  She didn't say "behead"; she said cut

14:01:58  25  their heads off.

14:01:59  1        So the Government this morning notified defense

14:02:01  2  that they were going to lead the witness through that

14:02:04  3  section to avoid her saying it.  That didn't happen.  I

14:02:09  4  understand it's hard to anticipate when you think a

14:02:11  5  witness is going to rise to the question itself but it

14:02:15  6  didn't necessarily ask for it.

14:02:17  7        THE COURT:  Did you, Ms. Berkower, advise the

14:02:18  8  witness not to discuss beheadings?

14:02:20  9        MS. BERKOWER:  I did, I told her we could not talk

14:02:22  10  about beheadings and I was going to try to lead her to

14:02:25  11  avoid that.

14:02:26  12        I did ask her about nature of the attack in a

14:02:28  13  leading way, but when I asked her about the purpose of

14:02:30  14  the attack that is when she mentioned it.  I was not

14:02:33  15  expecting that answer.

14:02:34  16        Then with respect to the second time she mentioned

14:02:36  17  it, to be perfectly frank, that was not the same account

14:02:38  18  she had given in a prior statement of that particular

14:02:41  19  incident and so I was as surprised as the rest of the

14:02:44  20  group.  It was certainly not intentional.

14:02:47  21        THE COURT:  What would you suggest we should do at

14:02:49  22  this point?

14:02:49  23        MR. FEDERICO:  Your Honor at this point I don't

14:02:51  24  want a limiting instruction because that would highlight

14:02:53  25  the testimony again to the jurors, but would ask, though,

14:02:57    1    is that the Government is now eliciting sort of these

14:03:00    2    plots that really have no relationship to the charges

14:03:03    3    themself.  We'd ask the Government not be permitted to

14:03:06    4    ask any more questions about sort of any other ideas or

14:03:09    5    thoughts or communications that had nothing to do with

14:03:12    6    any of the charges in this case.

14:03:12    7        THE COURT:  What where do you plan, Ms. Berkower,

14:03:16    8    to go in your direct with this witness?

14:03:18    9        MS. BERKOWER:  This witness will testify -- this

14:03:20   10    witness, I anticipate, will testify that a -- that he

14:03:28   11    discussed several plans with her, and while she knew that

14:03:30   12    he had a strong desire and she knew that there was no

14:03:33   13    actual attack plan, after that the questions turned to

14:03:38   14    him manufacturing explosives and pretty much just that.

14:03:41   15        THE COURT:  Can we, out of concern that

14:03:44   16    Mr. Federico has raised, go directly to the explosives

14:03:48   17    portion of the examination?

14:03:50   18        MS. BERKOWER:  Yes, Your Honor.  I would like to

14:03:52   19    ask her, though, about the seriousness that she

14:03:54   20    understood him to be in his desire to carry out some kind

14:03:57   21    of attack at this time, without getting into the specific

14:04:00   22    details of what kind.

14:04:01   23        THE COURT:  I think you can do that.

14:04:02   24        MS. BERKOWER:  And then I'll move on.

14:04:03   25        THE COURT:  All right.  Very well.  Thank you.

3-26-2018 USA v. ALLEN, et al, NO 16-10141

192

```
14:04:04   1           (Thereupon, the following proceedings continued in

14:04:17   2   the hearing of the jury, with the defendants present.)

14:04:17   3   BY MS. BERKOWER:

14:04:24   4   Q.     Now, Ms. Harris, at the time that you were having

14:04:26   5   this conversation with Curtis after the Lakin fair, did

14:04:31   6   you think he'd make a concrete plan to go out and

14:04:34   7   actually do stuff about Muslims?

14:04:37   8   A.     Say that -- excuse me, say that again.

14:04:40   9   Q.     We had been talking before this sidebar about

14:04:46  10   certain ideas that Mr. Allen had conveyed to you about

14:04:48  11   attacking Muslims.  You remember testifying about that?

14:04:51  12   A.     Yes.

14:04:51  13   Q.     At the time that he told you that stuff, based on

14:04:54  14   what he was telling you, did you think he had actually

14:04:56  15   made a concrete plan to go out and do that stuff?

14:05:03  16   A.     I know he wanted to.

14:05:05  17   Q.     Did you know whether he actually had concrete

14:05:08  18   plans at that time?

14:05:10  19   A.     He had plans on doing something.  I just don't

14:05:13  20   know which plan he was going to do at that time.

14:05:16  21   Q.     All right.  So let's take a step back a moment.

14:05:34  22   You said that Curtis was the Commander of KSF at that

14:05:37  23   time?

14:05:37  24   A.     Yes.

14:05:37  25   Q.     How often would he meet with the whole group in
```

14:05:42    1   person?

14:05:42    2   **A.      In person?  He only had a group meet-and-greet**

14:05:47    3   **get-togethers.**

14:05:48    4   Q.      And was there more online contact between that

14:05:52    5   group?

14:05:52    6   **A.      Every night he met on Zello.**

14:05:56    7   Q.      Was there a program -- that was the program the

14:05:58    8   group would use?

14:05:59    9   **A.      Yes.**

14:05:59   10   Q.      Did you ever hear parts of these Zello meetings?

14:06:03   11   **A.      Yes.**

14:06:05   12   Q.      How did you hear them?

14:06:06   13   **A.      Because Curtis had his phone on speakerphone.**

14:06:08   14   Q.      Why'd he do that?

14:06:09   15   **A.      He's hard of hearing.**

14:06:10   16   Q.      And in addition, did you also hear conversation,

14:06:14   17   phone conversations, that Curtis had with certain members

14:06:17   18   of KSF?

14:06:18   19   **A.      Yes.**

14:06:18   20   Q.      Which -- who did you hear him talking to?

14:06:21   21   **A.      Personal conversations, I heard him talk to**

14:06:25   22   **Patrick Stein.**

14:06:27   23   Q.      And were those also on speakerphone?

14:06:30   24   **A.      Yes.**

14:06:31   25   Q.      What did they talk about?

3-26-2018 USA v. ALLEN, et al, NO 16-10141

194

| | | |
|---|---|---|
| 14:06:34 | 1 | A.      Got a phone call from Patrick Stein one day and -- |
| 14:06:40 | 2 | Q.      Well, let me stop you there.  Did they ever talk |
| 14:06:42 | 3 | about Muslims on these calls? |
| 14:06:44 | 4 | A.      Yes. |
| 14:06:45 | 5 | Q.      Did Patrick Stein refer to Muslims on those calls |
| 14:06:48 | 6 | as "cockroaches"? |
| 14:06:56 | 7 | A.      No. |
| 14:06:56 | 8 | Q.      And would you hear Curtis talk to Gavin Wright on |
| 14:07:00 | 9 | speakerphone as well? |
| 14:07:01 | 10 | A.      Yes. |
| 14:07:02 | 11 | Q.      How often would he talk to Gavin Wright? |
| 14:07:08 | 12 | A.      Normally he would talk to him after work, to see |
| 14:07:13 | 13 | if he was going to go out and meet us, unless he was |
| 14:07:16 | 14 | already up at -- this was before he started G & G.  They |
| 14:07:21 | 15 | didn't have much phone conversation before he started up |
| 14:07:24 | 16 | there. |
| 14:07:25 | 17 | Q.      Did you ever hear Curtis talk on the phone with |
| 14:07:27 | 18 | Dan Day? |
| 14:07:28 | 19 | A.      No. |
| 14:07:30 | 20 | Q.      And did Curtis like to talk on the phone? |
| 14:07:33 | 21 | A.      Not really. |
| 14:07:34 | 22 | Q.      Why not? |
| 14:07:36 | 23 | A.      He just was not a phone person. |
| 14:07:40 | 24 | Q.      Now, let's talk about some of the stuff that |
| 14:07:42 | 25 | Curtis did during the time period you've been describing. |

14:07:47  1  During the weeks and months after the fair, did your

14:07:50  2  views on whether Curtis was actually making concrete

14:07:52  3  plans to do something about Muslims change?

14:07:55  4  **A.     Yes.**

14:07:57  5  Q.     While you were at home together, did he watch

14:08:00  6  YouTube videos?

14:08:01  7  **A.     Yes.**

14:08:01  8  Q.     Where would he watch videos?

14:08:03  9  **A.     Living room, on TV.**

14:08:06  10       MS. BERKOWER:  Now, if we could have Government's

14:08:09  11  Exhibit 4-013.  Please, and I think at that point that's

14:08:13  12  just for the witness, court, and counsel.

14:08:13  13  BY MS. BERKOWER:

14:08:20  14  Q.     Ms. Harris, do you recognize what's in this

14:08:23  15  exhibit?

14:08:24  16  **A.     Yes.  The living room with the television.**

14:08:27  17  Q.     Is it a photograph of your house?

14:08:28  18  **A.     Yes.**

14:08:28  19  Q.     The living area?

14:08:30  20  **A.     The living room, TV.**

14:08:31  21  Q.     Is that what it looked like at the time that you

14:08:33  22  lived there with him in 2016?

14:08:35  23  **A.     Yes.**

14:08:36  24       MS. BERKOWER:  Your Honor, I'd seek to admit this

14:08:38  25  exhibit.

14:08:39  1         MR. FEDERICO:  No objection, Your Honor.

14:08:40  2         MS. BERKOWER:  May we publish it to the jury?

14:08:42  3         THE COURT:  Hearing no objection, the exhibit will

14:08:44  4  be admitted and it may be published to the jury.

14:08:44  5  BY MS. BERKOWER:

14:08:49  6  Q.    So, Miss Harris, where in your house would Curtis

14:08:52  7  watch these videos?

14:08:53  8  **A.    He'd sit in the recliner.  You can't see it in the**

14:08:57  9  **photo, but it would be in -- his area would be right in**

14:09:00  10 **the right corner, bottom corner, about where his recliner**

14:09:05  11 **sat.**

14:09:05  12 Q.    And can you point on the photo sort of the area in

14:09:09  13 which his recliner is.  Did you touch that screen?

14:09:14  14 **A.    (Nods head.)**

14:09:17  15 Q.    And what device would he use to watch the videos?

14:09:21  16 **A.    Roku TV.**

14:09:24  17 Q.    Do you see the TV?  Can you point that out in the

14:09:27  18 photo?

14:09:28  19 **A.    Yes.**

14:09:28  20 Q.    Now, when he would watch these videos, where were

14:09:30  21 you in the house?

14:09:32  22 **A.    A lot of times we'd be finishing up dinner, I'd**

14:09:36  23 **still be in the room or making dinner in the kitchen.**

14:09:44  24 Q.    Where was the kitchen in your house, based on

14:09:46  25 where this photo is?

| | | |
|---|---|---|
| 14:09:49 | 1 | A.      The wall that you see there right behind, a little |
| 14:09:54 | 2 | kitchen is on the other side of that wall. |
| 14:09:55 | 3 | Q.      When the TV was on could you hear it in the |
| 14:09:58 | 4 | kitchen? |
| 14:09:58 | 5 | A.      Yes. |
| 14:09:58 | 6 | Q.      And at what volume would Curtis listen to these |
| 14:10:01 | 7 | videos? |
| 14:10:01 | 8 | A.      Pretty loud. |
| 14:10:02 | 9 | Q.      Now, did some of the videos he watched involve |
| 14:10:08 | 10 | making explosives? |
| 14:10:10 | 11 | A.      Yes. |
| 14:10:10 | 12 | Q.      How often would he watch that video? |
| 14:10:13 | 13 | A.      Every day. |
| 14:10:14 | 14 | Q.      And were there times where you saw that video, |
| 14:10:18 | 15 | too? |
| 14:10:19 | 16 | A.      Yes.  A lot of times we'd be eating dinner and he |
| 14:10:25 | 17 | would say he couldn't wait for him to watch -- I guess he |
| 14:10:28 | 18 | had thought of something, so he would get into that |
| 14:10:33 | 19 | video.  He would turn it on, like I said, after he got |
| 14:10:38 | 20 | finished eating.  I may not be finished eating, still |
| 14:10:43 | 21 | sitting there eating my food, and he'd turn it on. |
| 14:10:45 | 22 | Q.      How long was the video that you are thinking of? |
| 14:10:49 | 23 | A.      It was several parts, so I know each part lasted |
| 14:10:54 | 24 | several minutes. |
| 14:10:55 | 25 | Q.      And the number of times that you were around when |

14:10:58  1   he watched that video, did you feel like you came to know

14:11:01  2   what was in it?

14:11:02  3   A.      Bits and pieces.

14:11:04  4   Q.      So was the video in more than one part, you said?

14:11:07  5   A.      Yes.

14:11:07  6   Q.      What was part 1?

14:11:11  7   A.      From what I recall on that -- and Curtis took

14:11:15  8   notes every time he watched these.  Um, part 1 was the

14:11:20  9   ingredients you would need, the equipment you would need,

14:11:30  10  the established -- that it needed to be in a cool

14:11:34  11  environment, so it told you the temperature that you'd

14:11:37  12  have to have to make this.

14:11:38  13  Q.      Now, you mentioned the ingredients.  What

14:11:40  14  ingredients did the video talk about?

14:11:42  15  A.      The only ingredients that I remember is the

14:11:46  16  distilled water and the fuel tabs.

14:11:49  17  Q.      And what about equipment, what equipment did the

14:11:51  18  video talk about?

14:11:53  19  A.      You needed cheesecloth, you needed a mortar and

14:11:58  20  pestle, you needed a beaker, a burner, stir stick.

14:12:08  21  Q.      And you mentioned the necessary environment.  What

14:12:11  22  was that all about in the video?

14:12:14  23  A.      It had to be processed in a cool environment.

14:12:18  24  Q.      Did the video explain why?

14:12:21  25  A.      Just you couldn't cook it in the heat.

| | | |
|---|---|---|
| 14:12:24 | 1 | Q.      Why not? |
| 14:12:25 | 2 | A.      I don't really recall.  I just remember how much |
| 14:12:27 | 3 | it stressed that it had to be in a cool environment. |
| 14:12:31 | 4 | Q.      Now, what did part 2 of the video show? |
| 14:12:35 | 5 | A.      That after you had processed it, that you had to |
| 14:12:43 | 6 | cool it down, and then you had to wash it with the |
| 14:12:48 | 7 | cheesecloth and distilled water. |
| 14:12:50 | 8 | Q.      And part 3, what did that show? |
| 14:12:54 | 9 | A.      It actually told you drying technique and then |
| 14:13:01 | 10 | packaging technique. |
| 14:13:03 | 11 | Q.      Were there any other parts to the video? |
| 14:13:06 | 12 | A.      No. |
| 14:13:07 | 13 | Q.      Did the video give any precautions? |
| 14:13:10 | 14 | A.      Not to, well, of course, cook it in warm air, not |
| 14:13:16 | 15 | to store too much of it together or when you dried it or |
| 14:13:21 | 16 | it would become explosive and you could get blown up. |
| 14:13:29 | 17 | Q.      Based on what you saw in that video, what did you |
| 14:13:32 | 18 | understand it to show? |
| 14:13:34 | 19 | A.      That it was making explosives. |
| 14:13:37 | 20 | Q.      And based on the video, what did the substance |
| 14:13:40 | 21 | look like while it was being made? |
| 14:13:42 | 22 | A.      It was a thick white consist -- thick, I would say |
| 14:13:51 | 23 | a thick white -- |
| 14:13:56 | 24 | Q.      Was it a solid, a liquid, or a gas while it was |
| 14:13:59 | 25 | being made? |

| | | |
|---|---|---|
| 14:13:59 | 1 | **A.**      **It was a liquid.** |
| 14:14:00 | 2 | Q.      And after it was prepared, what did it look like? |
| 14:14:05 | 3 | **A.**      **A powder.** |
| 14:14:08 | 4 | Q.      And after it was prepared did it take time to set? |
| 14:14:11 | 5 | **A.**      **It took time to dry.** |
| 14:14:13 | 6 | Q.      Were there any precautions given in the video |
| 14:14:16 | 7 | about whether you could move it while it was drying? |
| 14:14:19 | 8 | **A.**      **If I recall it, but you shouldn't because, like I** |
| 14:14:24 | 9 | **said, it could become explosive.** |
| 14:14:27 | 10 | Q.      Now, you said Curtis watched these videos a number |
| 14:14:30 | 11 | of times? |
| 14:14:30 | 12 | **A.**      **Yes.  He took notes.** |
| 14:14:31 | 13 | Q.      What would he take notes on? |
| 14:14:33 | 14 | **A.**      **Notebook.** |
| 14:14:38 | 15 | Q.      Now, you mentioned ingredients in the video.  So |
| 14:14:41 | 16 | let's talk more about those now.  In the video you |
| 14:14:45 | 17 | mentioned fuel tabs? |
| 14:14:46 | 18 | **A.**      **Yes.** |
| 14:14:46 | 19 | Q.      Do you know what fuel tabs are? |
| 14:14:48 | 20 | **A.**      **Yes.** |
| 14:14:48 | 21 | Q.      How do you know what they are? |
| 14:14:50 | 22 | **A.**      **Because we've been camping and we were also** |
| 14:14:52 | 23 | **preppers.** |
| 14:14:54 | 24 | Q.      So we'll talk more about prepping in a minute, but |
| 14:14:58 | 25 | what are fuel tabs used for in camping? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

201

| | | |
|---|---|---|
| 14:15:00 | 1 | A.       To start a fire. |
| 14:15:02 | 2 | Q.       And did you have any in your house? |
| 14:15:05 | 3 | A.       We only had a couple packages that weren't packed |
| 14:15:09 | 4 | with the prepping equipment. |
| 14:15:10 | 5 | Q.       Where were they in your house? |
| 14:15:12 | 6 | A.       They were in Curtis' extra bedroom that was called |
| 14:15:16 | 7 | the "man cave." |
| 14:15:16 | 8 | Q.       And after watching the videos, did Curtis ask you |
| 14:15:19 | 9 | about them? |
| 14:15:20 | 10 | A.       Yes. |
| 14:15:20 | 11 | Q.       What did he ask you about? |
| 14:15:21 | 12 | A.       He asked me if I knew where they were at. |
| 14:15:23 | 13 | Q.       And what'd you tell him? |
| 14:15:25 | 14 | A.       I located a couple packs in the man cave, and that |
| 14:15:30 | 15 | was all that we had out there that wasn't packed in tubs. |
| 14:15:33 | 16 | Q.       What'd he do with them? |
| 14:15:35 | 17 | A.       Those I -- he needed quite a few packs, so it was |
| 14:15:39 | 18 | only a couple packs that we found. |
| 14:15:41 | 19 | Q.       So did you have enough packs to satisfy him? |
| 14:15:43 | 20 | A.       No.   He ordered more. |
| 14:15:44 | 21 | Q.       Where did he order more from? |
| 14:15:46 | 22 | A.       I don't know the company, but he ordered more |
| 14:15:49 | 23 | online. |
| 14:15:50 | 24 | Q.       Did he get them? |
| 14:15:51 | 25 | A.       Yes. |

14:15:51  1  Q.      What'd he do with them when he got them?

14:15:54  2  **A.      He took those to G & G.**

14:15:58  3  Q.      Now, for the equipment you mentioned a mortar and

14:16:01  4  pestle.  Do you remember saying that?

14:16:02  5  **A.      Yes.**

14:16:02  6  Q.      Did you have one of those?

14:16:04  7  **A.      No.**

14:16:04  8  Q.      Did Curtis to get one?

14:16:09  9  **A.      Curtis asked me where we'd seen those at in**

14:16:12  10 **Liberal, and I told him that we'd seen them at Ace**

14:16:17  11 **Hardware, and they were $27.99.**

14:16:19  12 Q.      Did he end up getting one?

14:16:20  13 **A.      No.**

14:16:22  14 Q.      Now, did the equipment mentioned in the video

14:16:25  15 require a beaker?

14:16:27  16 **A.      Yes.**

14:16:27  17 Q.      Did Curtis have a beaker?

14:16:29  18 **A.      No.**

14:16:29  19 Q.      And as far as you know, did anyone in -- did

14:16:35  20 anyone else get a beaker?

14:16:39  21 **A.      Pat -- or Gavin Wright.**

14:16:42  22 Q.      How did you know Gavin Wright got a beaker?

14:16:45  23 **A.      Well, at one time when they were having the Zello**

14:16:51  24 **call, they were getting ready to get off and Gavin had**

14:16:56  25 **said the rest of their order was in at the office.  And**

3-26-2018 USA v. ALLEN, et al, NO 16-10141          203

14:17:02   1   Curtis had told me that they were taking -- that they

14:17:06   2   were each putting in -- buying items, that not just one

14:17:12   3   person was just going to buy all the equipment.  That way

14:17:16   4   they wouldn't be red-flagged or looked at.

14:17:18   5   Q.     And you mentioned a stir rod as one of the pieces

14:17:21   6   of the equipment.  Do you remember talking about that?

14:17:22   7   A.     Yes.

14:17:23   8   Q.     Did Curtis have one of those?

14:17:24   9   A.     He ordered one.

14:17:26   10  Q.     How do you know that?

14:17:27   11  A.     Because the package came to the house and he

14:17:29   12  opened it in front of me.

14:17:30   13  Q.     And what did you see when he opened it?

14:17:32   14  A.     It was a clear stir stick, about at least a foot

14:17:38   15  long.  I don't know if it was glass or plastic, but it

14:17:41   16  was clear.

14:17:41   17  Q.     What did he do when he got that?

14:17:43   18  A.     He put it in his truck and went out to G & G.

14:17:46   19  Q.     How do you know he went to G & G?

14:17:49   20  A.     Because that's where he went every day, and he was

14:17:55   21  dressed to go as he was going to work.

14:17:59   22  Q.     Now, in addition to this, did Curtis start

14:18:01   23  bringing home materials to read in the evening?

14:18:04   24  A.     Yes.

14:18:04   25  Q.     What did he bring home?

3-26-2018 USA v. ALLEN, et al, NO 16-10141

204

| | | |
|---|---|---|
| 14:18:06 | 1 | A.      He brought home a milk carton-looking item, blue |
| 14:18:15 | 2 | plastic, that the crate was bought at a Walmart. |
| 14:18:19 | 3 | Q.      And what was inside the crate? |
| 14:18:21 | 4 | A.      Had four to five black binders that were thick. |
| 14:18:29 | 5 | Q.      What was in the binders? |
| 14:18:32 | 6 | A.      Recipes. |
| 14:18:33 | 7 | Q.      What were the recipes for? |
| 14:18:35 | 8 | A.      I guess for cooking explosives.  I never -- I just |
| 14:18:41 | 9 | asked Curt what they were, and he said they were recipes. |
| 14:18:44 | 10 | Q.      And where in the house did he read the binders? |
| 14:18:48 | 11 | A.      In his recliner in the living room. |
| 14:18:51 | 12 | Q.      Did he keep them at your house? |
| 14:18:53 | 13 | A.      No. |
| 14:18:53 | 14 | Q.      Where did he take 'em? |
| 14:18:55 | 15 | A.      He took 'em back up to Gavin. |
| 14:18:58 | 16 | Q.      And where had the binders come from? |
| 14:19:01 | 17 | A.      They had printed off all of the recipes off-line |
| 14:19:07 | 18 | and made the binders at G & G. |
| 14:19:10 | 19 | MS. SCHMIDT:  Your Honor, I object.  I don't |
| 14:19:12 | 20 | believe this witness has firsthand knowledge that they |
| 14:19:14 | 21 | did anything. |
| 14:19:14 | 22 | THE COURT:  Can you specify who we're talking |
| 14:19:16 | 23 | about and how the witness knows, Ms. Berkower? |
| 14:19:19 | 24 | MS. BERKOWER:  I can ask a few follow-up |
| 14:19:22 | 25 | questions, Your Honor. |

14:19:22  1  BY MS. BERKOWER:

14:19:22  2  Q.    Did Curtis tell you that he had been a part of

14:19:25  3  printing out binders at G & G?

14:19:26  4  **A.    Yes, him and Gavin.  And Gavin had also said that**

14:19:32  5  **whatever they need to print out, that they could run it**

14:19:36  6  **through the company, so that was said in front of me.**

14:19:40  7  Q.    When was that said in front of you?

14:19:44  8  **A.    I would say right after Curtis started up there**

14:19:49  9  **for training, 'cause I know they were looking at mines to**

14:19:56  10 **purchase.**

14:19:58  11      MS. SCHMIDT:  Your Honor, I'm going to object

14:19:59  12 again.  Unless she has firsthand knowledge that

14:20:02  13 Mr. Wright said it --

14:20:02  14      THE COURT:  She's testified that he said it in

14:20:05  15 front of her, so the objection's overruled.

14:20:08  16 **A.    Yes, Gavin said it could be ran through their**

14:20:13  17 **company.**

14:20:14  18      MS. BERKOWER:  Now, if we could have Government's

14:20:19  19 Exhibit 9-3 and 9-6.

14:20:19  20 BY MS. BERKOWER:

14:20:28  21 Q.    Ms. Harris, do you recognize -- well, let's go to

14:20:31  22 9-6.  Do you recognize anything in this photo?

14:20:42  23 **A.    Yes, the blue crate and the binders inside there,**

14:20:49  24 **and then it contains the box, so I guess it would be**

14:20:54  25 **Item No. 3.**

14:20:56    1   Q.      Where do you recognize that from?

14:20:59    2   **A.      From Curtis bringing the binders and the tote**

14:21:07    3   **home.**

14:21:07    4   Q.      Is that what the crate and the binders looked like

14:21:10    5   when you saw it?

14:21:11    6   **A.      Yes.**

14:21:11    7           MS. BERKOWER:  Your Honor, I'd seek admit

14:21:13    8   Government's Exhibit 9-6.

14:21:17    9           THE COURT:  Any objection?

14:21:18   10           MR. FEDERICO:  No objection, Your Honor.

14:21:20   11           MS. SCHMIDT:  No objection, Your Honor.

14:21:21   12           THE COURT:  Hearing no objection, 9-6 is admitted

14:21:23   13   and you may publish it to the jury.

14:21:25   14   BY MS. BERKOWER:

14:21:26   15   Q.      So, Ms. Harris, if you could explain for the jury

14:21:29   16   what's in this photo as far as the Item No. 3, please.

14:21:33   17   **A.      Item 3?**

14:21:35   18   Q.      Yes.  Could you point out what it was you were

14:21:37   19   talking about a moment ago.

14:21:39   20   **A.      Okay.  Item 3 has a blue tote, crate.  It has**

14:21:50   21   **binders in it with printed off recipes, that's what I was**

14:21:55   22   **told.  It also has a box in it that contains a scale.**

14:22:03   23   Q.      And is that the crate you saw Curtis bring into

14:22:06   24   your house and review in the evening?

14:22:08   25   **A.      Yes.**

| | | |
|---|---|---|
| 14:22:08 | 1 | MS. BERKOWER:  Now, Your Honor, I have a physical |
| 14:22:11 | 2 | exhibit, Government's Exhibit 104, 105, 106 and 107.  May |
| 14:22:14 | 3 | I approach the witness? |
| 14:22:15 | 4 | THE COURT:  You may. |
| 14:22:31 | 5 | BY MS. BERKOWER: |
| 14:22:31 | 6 | Q.    Ms. Harris, if you could look at the top item |
| 14:22:33 | 7 | there and open the bag and review what's inside. |
| 14:22:38 | 8 | **A.    Yes, this is a scale.** |
| 14:22:39 | 9 | Q.    And do you recognize Government's Exhibit 104?  I |
| 14:22:45 | 10 | think that's the bag you have in your hand. |
| 14:22:48 | 11 | **A.    This one?** |
| 14:22:49 | 12 | MS. BERKOWER:  May I approach again, Your Honor? |
| 14:22:50 | 13 | THE COURT:  You may. |
| 14:22:53 | 14 | **A.    104.  Oh.** |
| 14:23:13 | 15 | MS. BERKOWER:  And, actually -- |
| 14:23:28 | 16 | And, Your Honor, my apologies.  One of the items |
| 14:23:30 | 17 | should have had an exhibit sticker and it didn't.  So if |
| 14:23:33 | 18 | I could take that back to counsel table to get a label on |
| 14:23:36 | 19 | it. |
| 14:23:36 | 20 | THE COURT:  Certainly. |
| 14:23:37 | 21 | MS. BERKOWER:  Thank you. |
| 14:23:52 | 22 | BY MS. BERKOWER: |
| 14:23:52 | 23 | Q.    So, Miss Harris, if you can look at what's been |
| 14:23:55 | 24 | marked as Government's Exhibit 105 in front of you. |
| 14:23:57 | 25 | **A.    Okay.** |

| 14:23:58 | 1 | Q.     Do you recognize that, ma'am? |
| 14:24:01 | 2 | **A.     Yes.   That's the binder that he brought in the** |
| 14:24:07 | 3 | **little tote to the house.** |
| 14:24:09 | 4 | Q.     And if you could turn your attention to |
| 14:24:11 | 5 | Government's Exhibit 106 in front of you.  Do you |
| 14:24:15 | 6 | recognize what that is? |
| 14:24:16 | 7 | **A.     Yes, another binder.** |
| 14:24:18 | 8 | Q.     And if you could turn your attention to 107, |
| 14:24:21 | 9 | please.  Can you tell us what that is? |
| 14:24:23 | 10 | **A.     Another binder, one of the binders that was in the** |
| 14:24:26 | 11 | **crate as well.** |
| 14:24:27 | 12 |        MS. BERKOWER:  Your Honor, I would ask to admit |
| 14:24:29 | 13 | Government's Exhibit 105, 106, and 107. |
| 14:24:34 | 14 |        MR. FEDERICO:  Your Honor, we object on two |
| 14:24:36 | 15 | grounds:  one is foundation as to the content of the |
| 14:24:41 | 16 | binders, and secondarily to any of the paperwork besides |
| 14:24:45 | 17 | being potentially hearsay. |
| 14:24:45 | 18 |        THE COURT:  Well, I don't know that the witness -- |
| 14:24:47 | 19 | are you going to have this witness identify -- or, I'm |
| 14:24:50 | 20 | sorry, testify to the paperwork inside, other than just |
| 14:24:53 | 21 | identifying what she's saw? |
| 14:24:54 | 22 |        MS. BERKOWER:  Only identify as far as she's gone |
| 14:24:57 | 23 | so far, Your Honor; not testify to the content inside. |
| 14:25:00 | 24 |        THE COURT:  And with respect to the other |
| 14:25:02 | 25 | objection, I'm going to overrule it.  I'm going to admit |

14:25:04  1  104, 105 and 106 -- I'm sorry, 105, 106 and 107 is the

14:25:15  2  ones that you offered; correct?

14:25:16  3      MS. BERKOWER:  Yes, Your Honor.

14:25:18  4      MR. FEDERICO:  Your Honor, if I may just also to

14:25:19  5  preserve potentially for a future objection.  Obviously

14:25:22  6  we -- the content of the binders, we don't know how they

14:25:24  7  intended to offer that, but now that that exhibit's in

14:25:28  8  evidence they may send it back to the jury and argue from

14:25:31  9  it, and I don't believe, based on what I've heard

14:25:33  10  Government counsel proffer the purpose of the exhibit,

14:25:34  11  that may be appropriate so we'd just like to preserve an

14:25:37  12  objection.

14:25:37  13      THE COURT:  I think at this stage although I've

14:25:39  14  admitted the exhibits as they're marked, we would need

14:25:42  15  further testimony elicited to the contents of the binder

14:25:46  16  themselves, I'd agree, Mr. Federico.

14:25:49  17      MS. BERKOWER:  Well, Your Honor, I'd actually

14:25:49  18  oppose that in that this witness testified these are the

14:25:51  19  binders that she saw Mr. Allen come home to review.

14:25:53  20  We're not offering the content for the truth of what's

14:25:56  21  asserted in them but merely for the fact that these are

14:25:58  22  materials that Mr. Allen brought home and then did review

14:26:01  23  in the meeting with her.

14:26:02  24      THE COURT:  So how does that oppose my order?

14:26:04  25  I've admitted the exhibits but agreed with Mr. Federico

```
14:26:07   1   that until the material of the binders is testified to we
14:26:10   2   need more foundation.  And I understand you don't intend
14:26:12   3   to get into the contents of the binders with this
14:26:15   4   witness; is that correct?
14:26:15   5        MS. BERKOWER:  That's correct, Your Honor.
14:26:16   6        THE COURT:  All right.  I think we're in
14:26:18   7   agreement.
14:26:20   8   BY MS. BERKOWER:
14:26:20   9   Q.   And, Ms. Harris, I've now marked this as
14:26:23  10   Government's Exhibit 104.
14:26:24  11        MR. BERKOWER:  May I approach, Your Honor?
14:26:25  12        THE COURT:  You may.
14:26:52  13        MS. BERKOWER:  And, Your Honor, I think actually
14:26:54  14   there's confusion over the numbering.  If I can just move
14:26:57  15   on and take that physical exhibit back from the witness,
14:26:59  16   I think we actually have to figure out what the number
14:27:01  17   is.  I don't think it's actually supposed to be 104 as
14:27:04  18   marked on the exhibit list.
14:27:05  19        THE COURT:  All right.
14:27:06  20        MS. BERKOWER:  Sorry about that.
14:27:22  21   BY MS. BERKOWER:
14:27:23  22   Q.   Now, when you watched Mr. Allen read these binders
14:27:26  23   at home in the evening, did that indicate something to
14:27:35  24   you?
14:27:35  25   A.   I just knew that they had printed off all this
```

14:27:41  1  **information up there.  It was recipes, he told me, so it**

14:27:50  2  **didn't pertain to him working up there.**

14:27:53  3  Q.     And all the studying of the YouTube video you

14:27:58  4  described, did this indicate something to you?

14:28:00  5  **A.     Yes.**

14:28:01  6  Q.     What did it?

14:28:01  7  **A.     He was planning on making explosives.**

14:28:04  8  Q.     And all this ordering items that he was doing, did

14:28:06  9  this indicate something to you?

14:28:08  10  **A.     His intention to make explosives.**

14:28:12  11  Q.     And all of these things you've described, reading

14:28:14  12  the binders, watching the videos, and ordering the

14:28:16  13  equipment, where did that take place?

14:28:19  14  **A.     At the house in the living room.**

14:28:22  15  Q.     Anyone else there besides you and Curtis when this

14:28:25  16  was all happening?

14:28:25  17  **A.     No.**

14:28:26  18  Q.     Was Dan Day there taking part in any of this?

14:28:29  19  **A.     No.**

14:28:29  20  Q.     Was the FBI agent there taking part in any of

14:28:32  21  this?

14:28:32  22  **A.     No.**

14:28:33  23  Q.     Now, you mentioned earlier that Curtis said he had

14:28:35  24  become part of a smaller cell in KSF.

14:28:38  25  **A.     Right.**

3-26-2018 USA v. ALLEN, et al, NO 16-10141                212

| | | |
|---|---|---|
| 14:28:39 | 1 | Q.      Did he go to in-person meetings with that group? |
| 14:28:41 | 2 | A.      Yes. |
| 14:28:42 | 3 | Q.      Where were those meetings? |
| 14:28:43 | 4 | A.      They were held at G & G Mobile Home dealership or |
| 14:28:51 | 5 | in some later -- later on they started meeting at |
| 14:28:57 | 6 | Sublette they said. |
| 14:28:57 | 7 | Q.      How did you know they were meeting there? |
| 14:28:59 | 8 | A.      At G & G? |
| 14:29:00 | 9 | Q.      Yes. |
| 14:29:01 | 10 | A.      The first incident that I had with or finding out |
| 14:29:07 | 11 | that they were meeting there was I had called Curtis on a |
| 14:29:11 | 12 | Friday.  I had called Curtis, it's after 6:00 when they |
| 14:29:16 | 13 | closed, got no answer from him after several calls.  I |
| 14:29:20 | 14 | called Gavin Wright's phone number, got no answer from |
| 14:29:24 | 15 | him as well.  So I drove up there to G & G, saw Patrick |
| 14:29:32 | 16 | Stein's vehicle outside, Dan Day's vehicle outside, and |
| 14:29:41 | 17 | so I went up to the door.  It was locked.  I could hear |
| 14:29:44 | 18 | loud music playing.  Curtis come to the door and let me |
| 14:29:50 | 19 | in, and I asked him what was going on.  And he went and |
| 14:29:55 | 20 | turned the music off, said his phone was locked in the |
| 14:29:59 | 21 | office and nobody could hear, that they were having a |
| 14:30:01 | 22 | meeting.  I told him that was inappropriate to be doing |
| 14:30:06 | 23 | that during business hours.  I just felt that was very |
| 14:30:11 | 24 | inappropriate. |
| 14:30:12 | 25 | Q.      And so you said that Mr. Allen finally let you in |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

213

14:30:17    1   and turned off the music.  Who else was in the room when

14:30:19    2   that was happening?

14:30:20    3   **A.      After that I walked in.  Dan Day was seated,**

14:30:25    4   **Patrick Stein was seated, and Gavin was there.**

14:30:28    5   Q.      When you say they were seated, what part of the

14:30:31    6   room that you were in were they seated at?

14:30:33    7   **A.      The dining area.**

14:30:34    8   Q.      Now, G & G, you said that's a business that sells

14:30:37    9   mobile homes?

14:30:38   10   **A.      Yes.**

14:30:38   11   Q.      What kind of building is the business located in?

14:30:42   12   **A.      In a like a duplex or a double-wide mobile home**

14:30:48   13   **itself.**

14:30:48   14   Q.      And when you walk inside, is the layout the same

14:30:51   15   as a double-wide mobile home?

14:30:54   16   **A.      It would be, yes.**

14:30:55   17   Q.      So when you say they were in the dining area,

14:30:58   18   where were they in relation to where you were standing?

14:31:01   19   **A.      Straight ahead of me.**

14:31:03   20   Q.      And you mentioned that their phones had been in

14:31:08   21   another room?

14:31:09   22   **A.      Yes, they'd put them in Curtis' office and shut**

14:31:12   23   **the door so nobody could hear anything.**

14:31:14   24   Q.      Where was Curtis' office in relation to the dining

14:31:18   25   area you've just described?

14:31:20   1   A.      It was over to the left of me, quite a ways north

14:31:30   2   from the dining area.

14:31:31   3   Q.      And anyone else in the room when you were there

14:31:33   4   other than the people you've just described?

14:31:36   5   A.      No.

14:31:37   6   Q.      Now, you said that you told them it was

14:31:39   7   inappropriate to be meeting.  What was inappropriate, in

14:31:42   8   your view, of the meeting they were having?

14:31:44   9   A.      To just be having that kind of meeting when that's

14:31:51  10   supposed to be open and public coming, customers, you're

14:31:58  11   expecting customers to come.

14:32:00  12   Q.      When you say "that kind of meeting," what kind of

14:32:03  13   meeting are you talking about?

14:32:06  14   A.      Meeting of speaking about their plans on what they

14:32:12  15   were going to do with activity, the refugees and the

14:32:17  16   Muslims coming into town.

14:32:20  17          MS. SCHMIDT:  Your Honor, I'm going to object.  I

14:32:21  18   don't believe this witness has testified yet that she

14:32:24  19   heard any particular content.

14:32:26  20          THE COURT:  Can you a lay a foundation,

14:32:28  21   Ms. Berkower?

14:32:28  22          MS. BERKOWER:  I can, Your Honor.

14:32:29  23   BY MS. BERKOWER:

14:32:29  24   Q.      Ms. Harris, when Curtis went to those meetings,

14:32:32  25   did he tell you what he was going to be talking about

14:32:34   1   there?

14:32:35   2   A.      Yes.

14:32:36   3   Q.      What did he tell you he was going to be talked

14:32:38   4   about there?

14:32:40   5   **A.      There were plans on doing something.  Whether it**

14:32:46   6   **be running a pig through a mosque, gassing a mosque, or**

14:32:51   7   **doing something to a female and framing a Muslim, they**

14:33:00   8   **were going to do an attack of some sort.**

14:33:02   9   Q.      And did he tell you what the purpose of those

14:33:04   10  plans was?

14:33:06   11  **A.      It was so that it would actually wake people up**

14:33:13   12  **because they were going to put a sign on a government**

14:33:16   13  **facility, their doorway, that if stuff like -- or stuff**

14:33:22   14  **like this would keep happening if they kept bringing in**

14:33:26   15  **the refugees and the Muslims.**

14:33:27   16  Q.      So when you walked into the room that day, how did

14:33:31   17  you know that was what was going on that day?

14:33:33   18  **A.      Because they had the door locked, they had their**

14:33:39   19  **phones in another room so you couldn't contact them even**

14:33:47   20  **as a company, loud music.**

14:33:49   21  Q.      And when you walked in what was the mood like --

14:33:52   22          MS. SCHMIDT:  Your Honor, I'm going to object

14:33:54   23  again.  This witness has testified that she was looking

14:33:57   24  for Mr. Allen and could not find him.  She called, could

14:34:00   25  not find his phone -- he didn't answer.

3-26-2018 USA v. ALLEN, et al, NO 16-10141          216

```
14:34:01   1          THE COURT:  I heard the testimony.

14:34:03   2          MS. SCHMIDT:  But, Your Honor, she has not

14:34:05   3   testified as to anything that foundationally would let

14:34:08   4   her know, other than assuming things, that she had any

14:34:11   5   idea what the content of those conversations were.

14:34:12   6          THE COURT:  She's laid a basis for her belief as

14:34:15   7   to the source of the meeting and that's a basis that

14:34:18   8   certainly she can be cross-examined on, but I'm not going

14:34:21   9   to strike her testimony.  I'm going to allow it.

14:34:23   10         MS. SCHMIDT:  Your Honor, I don't believe she's

14:34:24   11   testified that she even knew there was going to be a

14:34:27   12   meeting.  What she knew was that she couldn't find

14:34:29   13   Curtis, and she went up there and they were together.

14:34:31   14   She has no idea what that meeting was about.

14:34:33   15         THE COURT:  That's the same objection you just

14:34:35   16   made and I'm making the same ruling.

14:34:40   17   BY MS. BERKOWER:

14:34:40   18   Q.     Ms. Harris, when you walked in the door that day,

14:34:42   19   what was the mood like in the room?

14:34:44   20   A.     Serious.

14:34:47   21   Q.     Did the conversation continue when you walked in?

14:34:51   22   A.     No.  I did approach Patrick Stein, and I asked him

14:34:57   23   how his friend with cancer was doing, and he come back in

14:35:02   24   a nasty, short, quick answer that she was dying.

14:35:10   25   Q.     And did you also give the group a piece of your
```

3-26-2018 USA v. ALLEN, et al, NO 16-10141                217

14:35:13  1  mind that day?

14:35:13  2  A.     I just told them it was inappropriate to have

14:35:16  3  meetings during business hours when it should be run as a

14:35:20  4  business.

14:35:28  5  Q.     Now, let's talk about something very specific you

14:35:33  6  saw a different time you went to G & G.  Did you ever

14:35:34  7  bring Curtis lunch there?

14:35:36  8  A.     Yes, almost every day.

14:35:37  9  Q.     One day when you went there, did you see something

14:35:40  10 unusual when you brought him lunch?

14:35:42  11 A.     Yes.

14:35:42  12 Q.     Without getting detail, what did you see that was

14:35:45  13 unusual?

14:35:46  14 A.     A explosive being cooked.

14:35:48  15 Q.     And let's talk now about the details of what you

14:35:52  16 saw.  When you first got to G & G that day, what did you

14:35:54  17 do?

14:35:57  18 A.     When I first got there, I had KFC.  I went over

14:36:05  19 to -- went straight in, went over to the dining area, put

14:36:08  20 the food on the table.  That day I brought enough for

14:36:13  21 Gavin to eat with us since he was there.  And I needed a

14:36:17  22 water, so I went around through the kitchen area.  It has

14:36:27  23 an island, so I went in between the island and the sink

14:36:31  24 kitchen area counters, and to the refrigerator and got

14:36:34  25 myself a water.

```
14:36:36   1  Q.      And when you walked over to the refrigerator to
14:36:40   2  get yourself a water, did you notice anything on the
14:36:43   3  counter, on the kitchen island?
14:36:44   4  A.      Not until I turned around and -- closed the door
14:36:47   5  and turned around, and in the middle of the island, the
14:36:51   6  lower shelf at the island there sat a burner with a
14:37:00   7  beaker on it, stir stick, a white substance in it.
14:37:05   8  Q.      When you saw that, what went through your mind?
14:37:09   9  A.      It rattled me, upset me.  They were cooking
14:37:14  10  explosives.
14:37:15  11  Q.      How did you know that?
14:37:17  12  A.      Because it looked just like what Curtis had been
14:37:20  13  watching over and over and over on video.
14:37:24  14  Q.      And where was Curtis when you saw this?
14:37:26  15  A.      Curtis came over by the kitchen sink area, and I
14:37:36  16  asked him what they were actually doing.  He really
14:37:40  17  didn't answer me.  He just went on to show me that -- and
14:37:47  18  describe the items that were on the counter.
14:37:51  19  Q.      And let me stop you there.  So did he actually
14:37:54  20  ever tell you, when you confronted him, what he was
14:37:57  21  doing?
14:37:58  22  A.      No.
14:37:58  23  Q.      And you said he started telling you about items on
14:38:01  24  the kitchen counter.  What items were on the kitchen
14:38:03  25  counter?
```

14:38:03  1  A.      There was a mortar and pestle, white set, and he

14:38:11  2  told me -- he's, like, Dan Day bought this set, Garden

14:38:15  3  City at Target.  Then picked up the cheesecloth and said

14:38:23  4  Gavin got it at Walmart.  So he just kind of boasted

14:38:28  5  about who was buying what.

14:38:30  6  Q.    And what was going through your mind at this

14:38:35  7  point?

14:38:35  8  A.      That this was getting serious.

14:38:39  9  Q.    Now, if we could -- what did you do after that?

14:38:44  10  A.      I don't remember staying there and eating lunch

14:38:50  11  with Curtis.  I think I left.  I mean, Gavin was in his

14:38:57  12  office talking on the phone, so I left before he even

14:39:02  13  came out.

14:39:06  14        MS. BERKOWER:  And if we could have Government's

14:39:09  15  Exhibit 8-24, 8-25, 8-26 and 8-28.

14:39:09  16  BY MS. BERKOWER:

14:39:19  17  Q.    If you could look at these photographs,

14:39:21  18  Ms. Harris, and they're being shown on the screen.  Do

14:39:23  19  you recognize this one?

14:39:25  20  A.      Yes.  That picture is a view from the front door.

14:39:30  21  Q.    Of what?

14:39:31  22  A.      The front door of G & G office, looking inward.

14:39:36  23  Q.    And is that what it looked like the day you went

14:39:39  24  in there?

14:39:40  25  A.      Yes.

| | | |
|---|---|---|
| 14:39:41 | 1 | MS. BERKOWER:  If we could have Government's |
| 14:39:42 | 2 | Exhibit 8-25. |
| 14:39:42 | 3 | BY MS. BERKOWER: |
| 14:39:49 | 4 | Q.    Do you recognize this? |
| 14:39:50 | 5 | A.    Yes. |
| 14:39:51 | 6 | Q.    What is that? |
| 14:39:52 | 7 | A.    That's also -- probably about a door angle, |
| 14:40:00 | 8 | looking towards the kitchen and more into the -- well, |
| 14:40:07 | 9 | the kitchen and the living room area. |
| 14:40:09 | 10 | MS. BERKOWER:  And if we could have Government's |
| 14:40:11 | 11 | Exhibit 8-26, please. |
| 14:40:11 | 12 | BY MS. BERKOWER: |
| 14:40:13 | 13 | Q.    What does that photo show? |
| 14:40:15 | 14 | A.    That picture shows the living room area, the door |
| 14:40:23 | 15 | and window of Curtis' office, and then the hall where the |
| 14:40:30 | 16 | bathroom and the other bedroom's located. |
| 14:40:33 | 17 | MS. BERKOWER:  Could we have Government's Exhibit |
| 14:40:34 | 18 | 8-28, please. |
| 14:40:34 | 19 | BY MS. BERKOWER: |
| 14:40:41 | 20 | Q.    Do you recognize this? |
| 14:40:42 | 21 | A.    Yes. |
| 14:40:42 | 22 | Q.    What's that? |
| 14:40:44 | 23 | A.    That's a view of the kitchen counter, sink on the |
| 14:40:51 | 24 | right, island on the left. |
| 14:40:55 | 25 | MS. BERKOWER:  And if we could have Government's |

14:40:58  1   Exhibit 8-34, please.

14:40:58  2   BY MS. BERKOWER:

14:41:02  3   Q.     What does this photo show?

14:41:04  4   **A.     That's the counter or the island.**

14:41:08  5   Q.     Are all of these photos you've just reviewed,

14:41:10  6   Government Exhibit 8-24, 8-25, 8-26, and 8-34, accurate

14:41:16  7   representations of the inside, portions of the inside, of

14:41:19  8   G & G mobile home?

14:41:20  9   **A.     Yes.**

14:41:20  10         MS. BERKOWER:  Your Honor, I'd ask to admit these

14:41:23  11  exhibits.

14:41:23  12         THE COURT:  You also showed the witness 8-28.  Is

14:41:27  13  that included in your motion?

14:41:28  14         MS. BERKOWER:  I'm sorry if I didn't say that,

14:41:29  15  yes.

14:41:30  16         THE COURT:  Any objection to those exhibits?

14:41:32  17         MR. FEDERICO:  No objection, Your Honor.

14:41:34  18         THE COURT:  Those photos are admitted.

14:41:38  19  BY MS. BERKOWER:

14:41:39  20  Q.     Now, Miss --

14:41:40  21         MS. BERKOWER:  If we could publish 8-34, please.

14:41:40  22  BY MS. BERKOWER:

14:41:43  23  Q.     Miss Harris, would you -- is this the -- what is

14:41:47  24  this?

14:41:49  25  **A.     That picture there is a picture of the island.**

3-26-2018 USA v. ALLEN, et al, NO 16-10141

222

14:41:51   1  Q.      Is that where you saw the beaker of white fluid?

14:41:56   2  **A.      Yes, front middle of that lower shelf there.   It**

14:41:59   3  **wasn't cluttered like that.**

14:42:00   4  Q.      Could you point out on the screen where you saw

14:42:02   5  the beaker.

14:42:04   6  **A.      (Witness indicates.)**

14:42:10   7          MS. BERKOWER:   And if we could have Government's

14:42:12   8  Exhibit 8-28.

14:42:12   9  BY MS. BERKOWER:

14:42:22   10 Q.      What does this photo show?

14:42:24   11 **A.      The cabinet side.**

14:42:31   12 Q.      Does this photo show parts of where you were in

14:42:34   13 the kitchen when you saw all this and had this exchange

14:42:37   14 with Curtis?

14:42:40   15 **A.      Yeah.**

14:42:40   16 Q.      Could you point out where you were standing when

14:42:42   17 you first saw the beaker?

14:42:44   18 **A.      Right there.**

14:42:44   19 Q.      And where was Curtis?

14:42:46   20 **A.      Curtis was over here by the sink area.**

14:42:49   21 Q.      And you mentioned a few items like a mortar and

14:42:52   22 pestle and cheesecloth and a stir rod that you saw.

14:42:55   23 Where were those items in this photo?

14:42:57   24 **A.      Well, the stir stick was in the beaker over by**

14:43:02   25 **where I was standing.   But the items, the mortar and**

3-26-2018 USA v. ALLEN, et al, NO 16-10141

223

14:43:07   1   **pestle and other items, were along the countertop there.**

14:43:13   2   Q.     What were they doing over there?

14:43:16   3   **A.     Maybe they were drying them out.  They were upside**

14:43:20   4   **down.  The mortar was.**

14:43:21   5   Q.     Did it look like they had been recently used?

14:43:25   6   **A.     Yes.**

14:43:28   7   Q.     Now, you said you didn't think that you had stayed

14:43:32   8   for lunch and you left after this exchange with Curtis?

14:43:34   9   **A.     Right.**

14:43:35   10  Q.     Let's talk for a minute about --

14:43:39   11         MS. BERKOWER:  You can take that down, please.

14:43:39   12  BY MS. BERKOWER:

14:43:40   13  Q.     Let's talk for a minute about what Gavin Wright

14:43:43   14  was doing while you were at G & G that day.  Was he

14:43:46   15  there?

14:43:46   16  **A.     Yes.**

14:43:47   17  Q.     And what was he doing when you first came in?

14:43:50   18  **A.     When I first came in, he was in his office on his**

14:43:54   19  **phone.**

14:43:54   20  Q.     And was his door open or shut?

14:43:56   21  **A.     Shut.**

14:43:58   22  Q.     Now, did you expect him to come out to the main

14:44:01   23  room while you were there?

14:44:03   24  **A.     Yes.**

14:44:03   25  Q.     Why?

| | | |
|---|---|---|
| 14:44:04 | 1 | A.      I brought in the food for him. |
| 14:44:07 | 2 | Q.      And when you opened the door to G & G, what |
| 14:44:11 | 3 | happens? |
| 14:44:11 | 4 | A.      It has an alarm installed there, and it will say |
| 14:44:17 | 5 | "open door."   It was also -- and it will also chime. |
| 14:44:20 | 6 | Q.      How loud is that notification of the chime when |
| 14:44:23 | 7 | the door opens? |
| 14:44:24 | 8 | A.      It's pretty loud.  It talks to you. |
| 14:44:26 | 9 | Q.      Did the bell go off that day when you walked in? |
| 14:44:29 | 10 | A.      Yes. |
| 14:44:29 | 11 | Q.      And while you were there, did Curtis do anything |
| 14:44:31 | 12 | to conceal the beaker of white liquid that you saw? |
| 14:44:34 | 13 | A.      No. |
| 14:44:35 | 14 | Q.      Based on what you knew from the YouTube videos, |
| 14:44:37 | 15 | was that even possible to do at that point? |
| 14:44:39 | 16 | A.      No. |
| 14:44:39 | 17 | Q.      How long did it need to be left alone? |
| 14:44:42 | 18 | A.      I'm assuming, to get to the right consistency, it |
| 14:44:45 | 19 | had to be cooked for a while. |
| 14:44:47 | 20 | Q.      And based on the videos, did the videos instruct |
| 14:44:51 | 21 | it needed to be left alone for a while? |
| 14:44:53 | 22 | A.      Yes, true. |
| 14:44:55 | 23 | Q.      Now, just to be clear, who else was at G & G that |
| 14:44:58 | 24 | day? |
| 14:44:58 | 25 | A.      Just Curtis, Gavin, and myself. |

14:45:02  1   Q.     Now, the day you saw this at G & G, did you talk

14:45:05  2   to Curtis more about it when you got home that night?

14:45:08  3   A.     Yes.

14:45:09  4   Q.     Did you ask him more about what you had seen that

14:45:12  5   day?

14:45:13  6   A.     Yes.  I asked him what he thought he was doing.

14:45:15  7   Q.     What did he say?

14:45:17  8   A.     He really didn't have an answer.

14:45:20  9   Q.     And did you ask him what they had done with the

14:45:23  10  liquid you had seen?

14:45:24  11  A.     I asked him.  I said, "Well, then what did you do

14:45:27  12  with it?"  It had a cool-off period, and that kind of

14:45:30  13  stuff.  He said he put it in the freezer there at G & G.

14:45:33  14  Q.     Was that consistent with the instructions in the

14:45:36  15  video?

14:45:36  16  A.     Yes, it had to stay cold.

14:45:40  17  Q.     And in the time you've known Curtis, has he had a

14:45:45  18  lot of new interests over the years?

14:45:47  19  A.     Yes.

14:45:48  20  Q.     Did does he always follow through with those

14:45:52  21  interests?

14:45:52  22  A.     Not all the time.

14:45:53  23  Q.     When you saw him at G & G that day with a beaker

14:45:56  24  of thick white liquid, what did you think about this

14:45:59  25  interest?

14:45:59    1   A.      That he was serious, that he was going to do

14:46:03    2   something to the refugee Muslim population that was

14:46:11    3   coming in.

14:46:12    4   Q.      Now, you just talked about seeing all this at G &

14:46:16    5   G, and you said you thought it was -- he was actually

14:46:19    6   going to do something; right?

14:46:20    7   A.      Uh-huh.

14:46:21    8   Q.      Did you ever report what you saw?

14:46:24    9   A.      No.

14:46:25   10   Q.      Did you report it at the time?

14:46:27   11   A.      No.

14:46:27   12   Q.      Did you report it at a later time?

14:46:29   13   A.      Yes, I did.

14:46:30   14   Q.      And is there a reason you didn't report it right

14:46:32   15   away the day you saw it?

14:46:36   16   A.      Partially denial of what was really going on

14:46:43   17   because we were still talking future, moving a mobile

14:46:49   18   home out to Gavin's property to live there.  But at the

14:46:58   19   time also I contacted my friend in Oklahoma and was

14:47:03   20   making arrangements to find out -- going and staying with

14:47:07   21   her.

14:47:07   22   Q.      Did you have any other place to go on hand if you

14:47:10   23   left this house in Liberal?

14:47:13   24   A.      I could have had several places.  I just, like I

14:47:16   25   said, called.

| | | |
|---|---|---|
| 14:47:17 | 1 | Q.    So you would have had to make arrangements? |
| 14:47:19 | 2 | **A.    Yes.** |
| 14:47:20 | 3 | Q.    Did your health factor into why you didn't report |
| 14:47:24 | 4 | it right away? |
| 14:47:26 | 5 | **A.    Yes.  I had doctors' appointments in the area that** |
| 14:47:30 | 6 | **I needed to go to.  And my scan was really important to** |
| 14:47:37 | 7 | **me because it was my first scan after cancer treatment,** |
| 14:47:42 | 8 | **and it would show if there was any hotspots, any active** |
| 14:47:46 | 9 | **cancer.** |
| 14:47:47 | 10 | Q.    So is it fair to say that you put yourself ahead |
| 14:47:52 | 11 | of reporting this? |
| 14:47:54 | 12 | **A.    Yes.** |
| 14:47:56 | 13 | Q.    Now, when you first saw the white liquid, did you |
| 14:47:58 | 14 | have any sense of what it was going to be used for? |
| 14:48:03 | 15 | **A.    Making an explosive for some of the Muslims, the** |
| 14:48:10 | 16 | **refugees they didn't like.** |
| 14:48:10 | 17 | Q.    Even so, did you ever know of a specific plan to |
| 14:48:13 | 18 | use the white liquid? |
| 14:48:16 | 19 | **A.    No.** |
| 14:48:17 | 20 | Q.    Did that also factor into why you didn't report |
| 14:48:19 | 21 | it? |
| 14:48:20 | 22 | **A.    Yes.** |
| 14:48:21 | 23 | Q.    Now, let's talk about a different conversation you |
| 14:48:23 | 24 | had with Curtis around this same time.  Around that time |
| 14:48:27 | 25 | did Curtis ask you to buy him some phones? |

| | | |
|---|---|---|
| 14:48:30 | 1 | A.    Yes. |
| 14:48:30 | 2 | Q.    What kind of phones did he ask you to buy? |
| 14:48:32 | 3 | A.    Well, I had a phone issue where my speaker went |
| 14:48:37 | 4 | out of my phone.  I talked to the company.  They said it |
| 14:48:40 | 5 | was on me to go buy my own phone.  The warranty was out, |
| 14:48:44 | 6 | had expired.  So I went into Walmart, talked with the |
| 14:48:49 | 7 | clerk.  She sold me a phone.  When I got home, opened it |
| 14:48:53 | 8 | up.  My phone took a SIM card.  The phone I purchased did |
| 14:48:58 | 9 | not.  So before I left to go get the phone, Curtis said |
| 14:49:04 | 10 | to me, "Can you buy me four or five throw-away phones |
| 14:49:09 | 11 | like that, burner phones?"   And I said, "Why would you |
| 14:49:15 | 12 | want that?" |
| 14:49:15 | 13 | Q.    Let me stop you there.  So did you actually buy |
| 14:49:19 | 14 | any phones? |
| 14:49:20 | 15 | A.    I purchased one phone. |
| 14:49:22 | 16 | Q.    And how many did he want you to get? |
| 14:49:24 | 17 | A.    He wanted four or five. |
| 14:49:25 | 18 | Q.    Did he give you an explanation for the phones he |
| 14:49:30 | 19 | wanted you to buy? |
| 14:49:30 | 20 | A.    He told me that the small group was going to start |
| 14:49:37 | 21 | using phones so that nobody could listen to them. |
| 14:49:40 | 22 | Q.    Did that explanation make sense to you? |
| 14:49:43 | 23 | A.    It did not make any sense to me because Curtis -- |
| 14:49:47 | 24 | that had came up several times by Patrick Stein.  He was |
| 14:49:51 | 25 | very concerned about people hearing him, so it came up |

14:49:54   1   several times over Zello.  And Curtis, time and time

14:49:58   2   again, told him that there was no application and no

14:50:03   3   device that they could be on that they could not be

14:50:06   4   traced or heard over.

14:50:08   5   Q.      So did you believe the explanation he gave you?

14:50:11   6   A.      No, I did not.

14:50:14   7   Q.      Was this before or after you saw the white liquid

14:50:18   8   at G & G?

14:50:18   9   A.      After.

14:50:19  10   Q.      Now, if we could --

14:50:21  11           MS. BERKOWER:  Show the witness Government's

14:50:23  12   Exhibit 8-134, please.

14:50:23  13   BY MS. HARRIS:

14:50:28  14   Q.      Now, Ms. Harris, do you recognize what's in this

14:50:30  15   photo?

14:50:30  16   A.      Yes, that's the phone that I purchased.

14:50:33  17   Q.      And is that a -- what it looked like when you

14:50:37  18   purchased it?

14:50:37  19   A.      Yes.

14:50:39  20           MS. BERKOWER:  Your Honor, I'd ask to admit

14:50:41  21   Government's Exhibit 8-134.

14:50:44  22           MR. FEDERICO:  No objection, Your Honor.

14:50:46  23           THE COURT:  Hearing no objection, 8-134 is

14:50:49  24   admitted.

14:50:50  25           MS. BERKOWER:  May we publish it?

14:50:51  1        THE COURT:  You may.

14:50:53  2   BY MS. BERKOWER:

14:50:54  3   Q.    Now, Ms. Harris, you said you bought one phone for

14:50:57  4   yourself.  Did you end up keeping that phone?

14:50:58  5   A.    No, I did not because my phone required a phone

14:51:05  6   that would take a SIM card, and this TracFone here would

14:51:11  7   not take a SIM card, so I boxed it back up like it was

14:51:16  8   when I purchased it and was going to take it back, but

14:51:20  9   Curtis said he would give me the 20 bucks for the phone

14:51:23  10  instead, so I gave him the phone.  I don't remember if he

14:51:27  11  gave me the 20 bucks but I gave him the phone.

14:51:29  12  Q.    And what did he do with the phone once you gave it

14:51:32  13  to him?

14:51:33  14  A.    Put it in his vehicle.

14:51:36  15  Q.    Now --

14:51:39  16        MS. BERKOWER:  You can take that down.

14:51:39  17  BY MS. BERKOWER:

14:51:40  18  Q.    Let's shift gears for a moment.  You mentioned

14:51:43  19  prepping earlier or preppers.

14:51:45  20  A.    Yes.

14:51:45  21  Q.    What is a prepper?

14:51:48  22  A.    A prepper is somebody that can almost be looked

14:51:57  23  like as a hoarder, but you gather large amounts of food

14:52:01  24  in bulk.  You can get supplies and you just stock up,

14:52:12  25  ammo, just things that you think you will need if there's

3-26-2018 USA v. ALLEN, et al, NO 16-10141

231

14:52:17  1  ever a catastrophe that happens, then you can have water

14:52:21  2  and food.

14:52:23  3  Q.      Are you a prepper?

14:52:25  4  A.      I was.  (Nods head.)

14:52:26  5  Q.      Is that something that Curtis did as well?

14:52:29  6  A.      Yes, we were.

14:52:30  7  Q.      And how long have you been a prepper?

14:52:32  8  A.      I would say right after I met Curt.  For about ten

14:52:36  9  years we would prep.

14:52:37  10 Q.      Now, as a -- do preppers pick fights with others?

14:52:41  11 A.      No.

14:52:41  12 Q.      Why not?

14:52:47  13 A.      Well, you want to get along with people.  I mean,

14:52:53  14 you wouldn't want to pick a fight or, let's say, have

14:52:59  15 explosion to give away your whereabouts but you do want

14:53:05  16 to make friends with people so that you can make a

14:53:08  17 bug-out location where people can get together and

14:53:15  18 actually survive together, have skills.

14:53:19  19 Q.      Is that the purpose of being a prepper, to

14:53:21  20 survive?

14:53:22  21 A.      Yes.

14:53:22  22 Q.      And as a prepper, do you want to maintain a low

14:53:26  23 profile if there is a catastrophic event?

14:53:28  24 A.      Yes.

14:53:28  25 Q.      Is that part of why you don't pick fights with

```
14:53:31   1   others?

14:53:31   2   A.      Yes.

14:53:31   3   Q.      Now, what kinds of things do you do for prepping?

14:53:35   4   A.      What kind of things?

14:53:36   5   Q.      Did you purchase food?

14:53:38   6   A.      Food, snares, ammo, change is a good trade.  You

14:53:47   7   wanted things that you could barter with as well, so you

14:53:53   8   bought seeds that you could grow.

14:53:56   9   Q.      Did you keep all of your prepper items at your

14:53:58  10   house?

14:54:01  11   A.      They were actually spread out.  They were at the

14:54:06  12   mobile home, some of his was at Dan Reever's because when

14:54:11  13   we had moved out to Liberal they were in a storage unit

14:54:14  14   at Space -- Space Station Storage, and Curtis moved that

14:54:20  15   stuff out to Dan Day's -- or Dan Reever's.

14:54:24  16   Q.      And let me stop you there.  Who's Dan Reever?

14:54:27  17   A.      One of his militia group friends.

14:54:29  18   Q.      And where did he live in relation to you?

14:54:31  19   A.      Where did he live?  About 12 miles outside I think

14:54:35  20   at Road 9 that you went down to get to his house.

14:54:39  21   Q.      So did he let you store some items at his house?

14:54:42  22   A.      Yes.  He had a silo that he allowed Curtis to turn

14:54:46  23   into a storage unit.

14:54:48  24   Q.      And when you purchased prepping supplies, who

14:54:51  25   would purchase them in your household?
```

3-26-2018 USA v. ALLEN, et al, NO 16-10141

233

| | | |
|---|---|---|
| 14:54:53 | 1 | **A.     Both of us.** |
| 14:54:54 | 2 | Q.     Would you talk about what you were buying ahead of |
| 14:54:58 | 3 | time? |
| 14:54:58 | 4 | **A.     Yes.** |
| 14:54:58 | 5 | Q.     Would you store them together? |
| 14:55:01 | 6 | **A.     Yes.** |
| 14:55:03 | 7 | Q.     And are you familiar with a chemical called |
| 14:55:08 | 8 | aluminum powder? |
| 14:55:09 | 9 | **A.     No.** |
| 14:55:09 | 10 | Q.     Is that part of prepping as far as you know? |
| 14:55:11 | 11 | **A.     No.** |
| 14:55:12 | 12 | Q.     Do you know if any of that was stored at your |
| 14:55:14 | 13 | house? |
| 14:55:14 | 14 | **A.     No.** |
| 14:55:20 | 15 | Q.     So when you bought prepper supplies, would you |
| 14:55:23 | 16 | tell Curtis about it? |
| 14:55:24 | 17 | **A.     Yes.** |
| 14:55:24 | 18 | Q.     And when he bought prepper supplies, would he tell |
| 14:55:26 | 19 | you about it? |
| 14:55:27 | 20 | **A.     Yes.** |
| 14:55:27 | 21 | Q.     Did Curtis ever tell you he bought aluminum powder |
| 14:55:30 | 22 | for prepping? |
| 14:55:31 | 23 | **A.     No.** |
| 14:55:32 | 24 | Q.     Now, is being in a militia part of prepping? |
| 14:55:36 | 25 | **A.     You don't have to be in a militia to prep.** |

14:55:38   1   Q.      Are there some aspects of being in a militia that

14:55:41   2   could be helpful for preppers?

14:55:43   3   **A.      Yes.**

14:55:43   4   Q.      What aspects of those?

14:55:46   5   **A.      That you could have different bug-out locations**

14:55:52   6   **that you could put your supplies at those locations that**

14:56:00   7   **you'd be interested in making a bug-out.  But it would**

14:56:03   8   **also bring other people together that would have other**

14:56:07   9   **skills, because you needed people of a variety of skills**

14:56:11   10  **to actually survive together.**

14:56:15   11  Q.      Now, from what you knew, were there members of KSF

14:56:18   12  who were preppers?

14:56:21   13  **A.      Yes.**

14:56:21   14  Q.      Was the smaller cell that Curtis told you about

14:56:25   15  and -- part of prepping?

14:56:28   16  **A.      Gavin had -- Gavin Wright had just started**

14:56:32   17  **prepping, and he closed off his dining room.  We took a**

14:56:37   18  **lot of our items out there.  We made several runs to**

14:56:43   19  **Garden City Sam's and we'd taken a lot of our stuff to**

14:56:50   20  **Gavin's.**

14:56:50   21  Q.      So you knew Gavin Wright to be involved in some

14:56:53   22  prepping?

14:56:53   23  **A.      Him and I talked about it, and talked about**

14:56:57   24  **supplies that were needed, and that really prompted him.**

14:57:01   25  **He said he had a lot of catching up to do.**

3-26-2018 USA v. ALLEN, et al, NO 16-10141                    235

| | | |
|---|---|---|
| 14:57:04 | 1 | Q.    When Curtis went to those meetings with his |
| 14:57:07 | 2 | smaller cell at G & G, was that part of prepping? |
| 14:57:11 | 3 | **A.    No.** |
| 14:57:11 | 4 | Q.    Why not? |
| 14:57:14 | 5 | **A.    Because you don't -- that had nothing to do with** |
| 14:57:18 | 6 | **what we were doing.** |
| 14:57:19 | 7 | Q.    Why not? |
| 14:57:20 | 8 | **A.    Because it --** |
| 14:57:25 | 9 | MS. SCHMIDT:  Your Honor, I'm going to object on |
| 14:57:27 | 10 | speculation again unless there's foundation for the fact |
| 14:57:29 | 11 | that she knows what was going on, she cannot testify |
| 14:57:33 | 12 | about what she believes might be going on. |
| 14:57:35 | 13 | THE COURT:  Can you lay a foundation as to how she |
| 14:57:38 | 14 | would know the answer to that question, Ms. Berkower? |
| 14:57:39 | 15 | MS. BERKOWER:  Yes, I can, Your Honor. |
| 14:57:41 | 16 | BY MS. BERKOWER: |
| 14:57:42 | 17 | Q.    Did Curtis tell you some things about what was |
| 14:57:44 | 18 | going on at G & G when he met with his smaller cell? |
| 14:57:47 | 19 | **A.    Yes.** |
| 14:57:47 | 20 | Q.    Did you see that beaker of white liquid that you |
| 14:57:51 | 21 | recognized as explosives at G & G? |
| 14:57:52 | 22 | **A.    Yes.** |
| 14:57:53 | 23 | Q.    And did you walk in on a meeting of the smaller |
| 14:57:55 | 24 | cell one time when you went up there and couldn't get |
| 14:57:58 | 25 | hold of Curtis? |

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

| 14:57:59 | 1 | A.      Yes. |

14:57:59  1  **A.      Yes.**

14:57:59  2  Q.      Based on what you knew from those experiences and

14:58:02  3  from hearing Curtis talk about it, was the smaller cell,

14:58:05  4  based on what you know, part of prepping?

14:58:08  5  **A.      No.**

14:58:08  6  Q.      Why not?

14:58:10  7  **A.      Because with their plans to do something to stop**

14:58:18  8  **refugee Muslims coming into the country has nothing to do**

14:58:22  9  **with prepping.**

14:58:24  10  Q.      Now, let's talk a little bit more about your

14:58:27  11  relationship with Curtis in the early fall of 2016.

14:58:30  12       THE COURT:  Ms. Berkower, can I ask you, are you

14:58:35  13  about finished with your examination or would this be a

14:58:37  14  good time for our afternoon recess?

14:58:40  15       MS. BERKOWER:  It might be a good time for the

14:58:41  16  afternoon recess, Your Honor.

14:58:42  17       THE COURT:  All right.  I was just watching the

14:58:44  18  clock and I know we've been here for over an hour and a

14:58:46  19  half.  I think we'll take our afternoon break, members of

14:58:49  20  the jury.  Why don't we come back at 3:20.  Remember the

14:58:53  21  admonition of the Court.  We're in recess until then.

14:58:57  22       JUROR 2:  What time?

14:58:58  23       THE COURT:  Oh, 3:20.  Am I not on?  Am I on?

14:59:05  24       THE REPORTER:  No.

14:59:06  25       THE COURT:  Well, my little green light's on.  So,

| | | |
|---|---|---|
| 14:59:13 | 1 | wow.  Apparently the powers that be have shut me down. |
| 14:59:17 | 2 | All right.  We'll be in recess until 3:20, members of the |
| 14:59:20 | 3 | jury.  Remember the admonition of the Court. |
| 14:59:22 | 4 | CLERK COOK:  All rise. |
| 14:59:24 | 5 | (The jury left the courtroom, after which the |
| 14:59:24 | 6 | following proceedings were had:) |
| 14:59:49 | 7 | THE COURT:  Ms. Harris, you may step down. |
| 14:59:55 | 8 | Counsel, I guess we're in recess. |
| 14:59:57 | 9 | (A recess was taken from 2:59 to 3:23 P.M.) |
| 14:59:57 | 10 | (The jury returned to the courtroom, after which |
| 15:23:47 | 11 | the following proceedings were had.) |
| 15:23:56 | 12 | THE COURT:  You may be seated. |
| 15:23:58 | 13 | Ms. Berkower, you may continue your examination. |
| 15:24:14 | 14 | MS. BERKOWER:  Thank you, Your Honor. |
| 15:24:16 | 15 | BY MS. BERKOWER: |
| 15:24:17 | 16 | Q.    Ms. Harris, let's talk now a little bit more about |
| 15:24:19 | 17 | your relationship with Curtis in the early summer and |
| 15:24:21 | 18 | fall of 2016.  And you said earlier, when you first moved |
| 15:24:26 | 19 | back to Liberal in June of 2016, things were good between |
| 15:24:29 | 20 | you? |
| 15:24:30 | 21 | **A.    Yes.** |
| 15:24:31 | 22 | Q.    And you considered rekindling your relationship? |
| 15:24:34 | 23 | **A.    Yes.** |
| 15:24:35 | 24 | Q.    Did that change over the summer of 2016 into the |
| 15:24:38 | 25 | fall? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

238

| | | |
|---|---|---|
| 15:24:39 | 1 | A.      Yes. |
| 15:24:39 | 2 | Q.      How did it change? |
| 15:24:43 | 3 | A.      Curtis was gone all the time.  He was moodier, |
| 15:24:51 | 4 | preoccupied.  He just really didn't spend any time at |
| 15:25:00 | 5 | home. |
| 15:25:00 | 6 | Q.      Based on what he told you, where was he spending |
| 15:25:02 | 7 | all of his time? |
| 15:25:04 | 8 | A.      G & G. |
| 15:25:06 | 9 | Q.      And by the early fall of 2016, what was your |
| 15:25:09 | 10 | relationship like? |
| 15:25:11 | 11 | A.      By the fall of 2016? |
| 15:25:13 | 12 | Q.      Yes. |
| 15:25:14 | 13 | A.      Not very well. |
| 15:25:16 | 14 | Q.      Were there issues between you at that point? |
| 15:25:19 | 15 | A.      Yes. |
| 15:25:19 | 16 | Q.      Was money one of those issues? |
| 15:25:21 | 17 | A.      Yes. |
| 15:25:22 | 18 | Q.      What was that about? |
| 15:25:25 | 19 | A.      I had paid -- or I had loaned him $2100 to pay his |
| 15:25:30 | 20 | lot rent when I first got there and he was paying me |
| 15:25:36 | 21 | back. |
| 15:25:37 | 22 | Q.      And was there this other conflict between you as |
| 15:25:40 | 23 | well? |
| 15:25:41 | 24 | A.      Yes.  There was people he was associating with |
| 15:25:47 | 25 | that were female.  That was a conflict of interest. |

| | | |
|---|---|---|
| 15:25:52 | 1 | Q. Did you consider breaking up? |
| 15:25:54 | 2 | A. Yes. |
| 15:25:56 | 3 | Q. And you mentioned earlier you had -- had you |
| 15:26:00 | 4 | looked for somewhere else to stay? |
| 15:26:01 | 5 | A. Yes, I contacted my friend. |
| 15:26:04 | 6 | Q. Now, on October 11th of 2016, did you call the |
| 15:26:08 | 7 | Liberal Police Department to report Curtis? |
| 15:26:11 | 8 | A. Yes. |
| 15:26:12 | 9 | Q. What did you call him -- what did you call them to |
| 15:26:14 | 10 | report him for? |
| 15:26:15 | 11 | A. Domestic violence. |
| 15:26:17 | 12 | Q. How much time about had passed since you had seen |
| 15:26:21 | 13 | the white liquid in the beaker at G & G? |
| 15:26:24 | 14 | A. Maybe a week or two. |
| 15:26:25 | 15 | Q. And did something happen between you and Curtis |
| 15:26:27 | 16 | that day that led to you calling the police? |
| 15:26:31 | 17 | A. Yes. |
| 15:26:31 | 18 | Q. Before you called the police, had you called |
| 15:26:34 | 19 | anyone else? |
| 15:26:35 | 20 | A. Gavin. |
| 15:26:36 | 21 | Q. And had this dispute started between you and |
| 15:26:41 | 22 | Curtis up at G & G? |
| 15:26:43 | 23 | A. Yes. I stopped by there and told him I needed to |
| 15:26:48 | 24 | talk to him at the house, he needed to come home. |
| 15:26:52 | 25 | Q. And did he -- did you get into an argument with |

Case 6:16-cr-10141-EFM   Document 539   Filed 04/12/19   Page 240 of 347
3-26-2018 USA v. ALLEN, et al, NO 16-10141
240

| | | |
|---|---|---|
| 15:26:56 | 1 | him in the parking lot of G & G? |
| 15:26:58 | 2 | A.    Well, it was inside of G & G.  I went in and I |
| 15:27:07 | 3 | told him he needed to come home, we needed to talk. |
| 15:27:09 | 4 | Q.    And did you want to talk to him about some of |
| 15:27:13 | 5 | these issues you just mentioned? |
| 15:27:14 | 6 | A.    Yes.  Yes, I did. |
| 15:27:15 | 7 | Q.    Did you -- did he end up leaving G & G? |
| 15:27:21 | 8 | A.    Yes.  First -- |
| 15:27:23 | 9 | Q.    What was his mood like when he left G & G? |
| 15:27:25 | 10 | A.    He was mad because he told me, he said, "Well |
| 15:27:29 | 11 | Gavin's got things to do."  I said, "Well, we've got |
| 15:27:31 | 12 | issues to work out."  I said, "I need rest.  I've got |
| 15:27:34 | 13 | this puppy all the time that you got and you're not |
| 15:27:38 | 14 | taking care of it, and I need a nap, we need to work some |
| 15:27:42 | 15 | things out."  He had told me he would just go outside, |
| 15:27:45 | 16 | kill the puppy, and headed out to my car.  I told him if |
| 15:27:51 | 17 | he killed the puppy, I'd call 911 on him then. |
| 15:27:55 | 18 | Q.    Okay.  Did this dispute lead to him smashing his |
| 15:27:58 | 19 | phone? |
| 15:27:58 | 20 | A.    Yes, he smashed his phone. |
| 15:27:59 | 21 | Q.    Did this argument then continue on later when you |
| 15:28:02 | 22 | got home? |
| 15:28:02 | 23 | A.    Yes. |
| 15:28:03 | 24 | Q.    When you got home, what was he doing? |
| 15:28:08 | 25 | A.    Well, he was at the house by the time I got there, |

15:28:11   1   and he'd already put some of my belongings on the front

15:28:17   2   seat.

15:28:18   3   Q.      And was he saying stuff to you as he was doing

15:28:20   4   that?

15:28:20   5   A.      I don't recall everything that was being said.  I

15:28:25   6   told him -- I said that wasn't all of my stuff.  I asked

15:28:30   7   him where my money was.  He said he'd called the bank and

15:28:37   8   made arrangements.  And I said, "Well, the stuff on the

15:28:42   9   loveseat's not all my stuff."  I headed back to the

15:28:45   10  bedroom.

15:28:46   11  Q.      Did the argument between you two continue to

15:28:48   12  escalate when you were in the house?

15:28:49   13  A.      Yes, it did.

15:28:50   14  Q.      And at some point did he put his hands on you?

15:28:57   15  A.      Yes.

15:28:57   16  Q.      What did he do specifically?

15:28:58   17  A.      When I was heading back to the bedroom, I had my

15:29:02   18  phone in one hand and my purse in the other hand.  He had

15:29:06   19  thrown all of my stuff that was on the loveseat all

15:29:11   20  across the dining room floor and across the weight bench.

15:29:19   21  So that made me mad.  I told him to pick it up.  I said

15:29:23   22  "If you don't, I'll call 911."  And he said, "You're

15:29:28   23  gonna need more than 911 today."  So he headed back

15:29:33   24  towards me.  We were kind of in the hallway.  He was

15:29:35   25  further in the bedroom.  He grabbed my purse out of my

15:29:38   1   hand.  He went after my phone, trying to get my phone out

15:29:41   2   of my left hand.  I wouldn't let go of it, so I had

15:29:45   3   several injury marks down my arm and my hand.

15:29:47   4   Q.     Did you end up going outside at some point?

15:29:50   5   A.     Yes.  I got past -- I turned around, got -- went

15:29:56   6   over all the stuff that was in the floor, got out the

15:29:59   7   front door, and went to his street.

15:30:03   8   Q.     And when you were outside, what was he doing?

15:30:07   9   A.     He came to the door, to the deck, and he told me,

15:30:15  10   he said, "If you call 911, I'll kill you and all your

15:30:20  11   family." So there were neighbors out working.  They were

15:30:24  12   kind of watching him --

15:30:26  13   Q.     And did he start doing something with firearms at

15:30:29  14   some point?

15:30:29  15   A.     Yes, he did.

15:30:29  16   Q.     What did he do?

15:30:31  17   A.     He started carrying firearms out to his vehicle

15:30:34  18   and putting them in his vehicle.

15:30:36  19   Q.     How many guns did he put in his car?

15:30:38  20   A.     I'd say six to eight.

15:30:39  21   Q.     And what did he do after he put them in his car?

15:30:42  22   A.     Well, he got one out of my console.  He got his

15:30:49  23   iPad.  He told me that he was leaving, he was going to

15:30:55  24   Cricket to get a new phone.

15:30:56  25   Q.     And do you know where he went after that?

```
15:31:00   1   A.       No, I don't.

15:31:01   2   Q.       Now, after that, did you make a phone call?

15:31:06   3   A.       Yes, I called 911, gave them the tag number.

15:31:08   4   Q.       Well, let's back up a minute.  You mentioned you

15:31:11   5   called Gavin Wright at some point?

15:31:13   6   A.       Well, I called Gavin while he was still there.

15:31:16   7   Q.       You called Gavin was Curtis was still at the

15:31:19   8   house?

15:31:19   9   A.       Yes.

15:31:19  10   Q.       What did you call Gavin for?

15:31:22  11   A.       Since it was about closing time, I thought maybe

15:31:25  12   he would come get Curtis, take him to have a beer, calm

15:31:29  13   him down so I could get all of my belongings out of the

15:31:32  14   house.

15:31:33  15   Q.       And what did Gavin tell you?

15:31:36  16   A.       Gavin said, "Well, he's just getting frustrated

15:31:39  17   with you."   And I said, "Well, I said something about

15:31:44  18   he's only supposed to be up there three days and now he's

15:31:47  19   up there all the time."  And he said, "Well, he's just

15:31:50  20   getting frustrated with you" and hung up on me.

15:31:52  21   Q.       After that, did you call 911?

15:31:56  22   A.       Yes, I did, after Curt left.

15:31:58  23   Q.       And did officers come to your house?

15:31:59  24   A.       Yes, they did.

15:32:01  25   Q.       When officers came to your house, did you tell
```

15:32:04   1    them about this dispute you just described between you

15:32:06   2    and Curtis?

15:32:06   3    **A.      Yes, I did.**

15:32:07   4    Q.      Did you also tell them about what you had seen at

15:32:10   5    G & G?

15:32:12   6    **A.      Yes.**

15:32:15   7    Q.      Now, when you told them about what you had seen at

15:32:19   8    G & G about one to two weeks earlier, did you know

15:32:23   9    whether or not there would still be any remnants of what

15:32:26   10   you had seen over at G & G?

15:32:28   11   **A.      No.**

15:32:29   12   Q.      And when you told the police officer about what

15:32:32   13   you had seen at G & G, did you have any idea whether or

15:32:36   14   not law enforcement knew about what was going on over

15:32:38   15   there at that point in time?

15:32:39   16   **A.      No, no.**

15:32:41   17   Q.      So as far as you knew, this was the first that law

15:32:44   18   enforcement was going to hear about this?

15:32:46   19   **A.      Yes.**

15:32:51   20   Q.      Now, as you were with the officers in your house,

15:32:53   21   did they start looking around the house?

15:32:54   22   **A.      Yes, they were going to do a search because I was**

15:32:56   23   **a resident of the house as well.**

15:33:00   24   Q.      And at some point did they get the FBI involved?

15:33:05   25   **A.      Yes.  Officer Ott came out of Curtis' man cave and**

15:33:12    1   asked -- he showed me a bullet and he said, Does he have

15:33:15    2   a gun that will shoot this .50 cal? And I said, "Yes, he

15:33:19    3   does," and I described it to him.  And so he said, "We

15:33:22    4   have to stop the search at this time.  This is above my

15:33:26    5   pay grade.  We'll need to go up downtown and talk to

15:33:30    6   somebody else."

15:33:30    7   Q.      And did you, in fact, know Curtis to have a gun

15:33:33    8   that would shoot a .50 caliber bullet?

15:33:35    9   A.      Yes, I did.

15:33:35   10   Q.      Where did he keep that gun?

15:33:37   11   A.      Originally he kept it at his father's in Oklahoma.

15:33:41   12   Q.      And at the time of the officer -- at the time the

15:33:44   13   officer was at your house that day, where was that gun

15:33:47   14   being kept?

15:33:49   15   A.      It wasn't at Curtis' house.  I knew that.  So it

15:33:56   16   had to be either at Gavin's, Dan Reever's, or Ken

15:34:03   17   Frauli's.

15:34:03   18   Q.      And what makes you think that it was at one of

15:34:06   19   those three places?

15:34:08   20   A.      Because --

15:34:11   21   Q.      Are those three places where Gavin -- where Curtis

15:34:14   22   had previously taken firearms to be stored?

15:34:16   23   A.      Yes.

15:34:23   24   Q.      Now, while the officers were in the living room,

15:34:25   25   did they also notice some handwritten materials?

3-26-2018 USA v. ALLEN, et al, NO 16-10141

246

| | | |
|---|---|---|
| 15:34:27 | 1 | A.      Yes. |
| 15:34:27 | 2 | Q.      What did they notice? |
| 15:34:28 | 3 | A.      We were -- |
| 15:34:29 | 4 | MR. FEDERICO:  I'm going to object at this point |
| 15:34:31 | 5 | as to speculation. |
| 15:34:35 | 6 | THE COURT:  Was the witness present when the |
| 15:34:38 | 7 | officers noticed them? |
| 15:34:39 | 8 | MS. BERKOWER:  I'll establish that, Your Honor. |
| 15:34:40 | 9 | THE COURT:  All right. |
| 15:34:41 | 10 | BY MS. BERKOWER: |
| 15:34:41 | 11 | Q.      When the officers were in your house, did you |
| 15:34:43 | 12 | stand in the living room for a time with one of the |
| 15:34:45 | 13 | officers? |
| 15:34:46 | 14 | A.      Yes. |
| 15:34:46 | 15 | Q.      While you were standing with him, did he ask you |
| 15:34:49 | 16 | about some handwritten materials located in the living |
| 15:34:53 | 17 | room? |
| 15:34:53 | 18 | A.      Yes.  He was originally asking me about what |
| 15:34:57 | 19 | videos had been watched on the television. |
| 15:35:02 | 20 | Q.      How did those come up? |
| 15:35:04 | 21 | A.      Well, they wanted to know -- |
| 15:35:07 | 22 | MR. FEDERICO;  Your Honor, objection.  Hearsay. |
| 15:35:11 | 23 | MS. BERKOWER:  I would ask for effect on a |
| 15:35:13 | 24 | listener.  She's explaining why she did something that |
| 15:35:16 | 25 | she did. |

15:35:16  1        THE COURT:  I'm going to allow her to answer that

15:35:18  2  question you asked.

15:35:21  3  **A.        There was -- they're wanting to know what type --**

15:35:26  4  **what type of television it was because there was also a**

15:35:28  5  **laptop laying there, there was also the Roku, and there**

15:35:37  6  **was an Xbox.**

15:35:38  7  BY MS. BERKOWER:

15:35:39  8  Q.     Well, let's take a step back a moment.  How did

15:35:40  9  this subject of videos come up while the officers were in

15:35:43  10  your house that day?

15:35:43  11  **A.     I told them that Curtis had been watching videos.**

15:35:47  12  Q.     What kind of videos?

15:35:49  13  **A.     To make explosives.**

15:35:50  14  Q.     And based on that did they ask you more questions

15:35:52  15  about that?

15:35:53  16  **A.     Yes.  They wanted to know if it had gone through**

15:35:56  17  **the Xbox or if it had gone through the laptop or how he**

15:36:02  18  **had been able to view those.  And I told him that he used**

15:36:05  19  **the Roku.  We're standing over there by the television**

15:36:12  20  **and there's notebooks laying out and they have Curtis'**

15:36:17  21  **handwriting on them.**

15:36:18  22  Q.     And let's back up a minute.  From the time you've

15:36:20  23  known Curtis, have you become familiar with his

15:36:22  24  handwriting?

15:36:23  25  **A.     Yes.**

| | | |
|---|---|---|
| 15:36:23 | 1 | Q.    Is that how you knew those notebooks had his |
| 15:36:26 | 2 | handwriting on it? |
| 15:36:26 | 3 | **A.    Yes.** |
| 15:36:26 | 4 | Q.    And what happened when the officer noticed the |
| 15:36:28 | 5 | notebooks? |
| 15:36:29 | 6 | **A.    He looked at it and it was to -- basically, "To** |
| 15:36:38 | 7 | **Whom It May Concern, we, the people."** |
| 15:36:45 | 8 | MR. FEDERICO:  Your Honor, objection.  Hearsay and |
| 15:36:47 | 9 | nonresponsive. |
| 15:36:47 | 10 | THE COURT:  Overruled.  This testimony is not for |
| 15:36:50 | 11 | the truth of the matter asserted by another declarant. |
| 15:36:52 | 12 | She's testifying as to what she saw and she's testifying |
| 15:36:55 | 13 | as to questions asked her.  It's not hearsay.  You may |
| 15:36:58 | 14 | proceed. |
| 15:37:00 | 15 | MS. BERKOWER:  I think I forgot the question so |
| 15:37:02 | 16 | I'll rephrase. |
| 15:37:03 | 17 | BY MS. BERKOWER: |
| 15:37:04 | 18 | Q.    When the officer saw the notebooks, did he ask you |
| 15:37:10 | 19 | questions about them? |
| 15:37:11 | 20 | **A.    He asked me if that was Curtis' handwriting.** |
| 15:37:13 | 21 | Q.    What did you tell him? |
| 15:37:15 | 22 | **A.    And I told him yes and he read on.  And he said** |
| 15:37:19 | 23 | **this is a manifesto.  And that was the first time I had** |
| 15:37:22 | 24 | **heard the word "manifesto."** |
| 15:37:24 | 25 | Q.    So did you -- were you familiar prior to that time |

15:37:28   1   what those notebooks contained?

15:37:30   2   A.       They contained what they were going to make

15:37:34   3   public.   Once they did an incident, they were going to

15:37:40   4   make a document -- as I've said in the past -- a document

15:37:44   5   and put it on a government door.

15:37:46   6   Q.    What was it -- what was your understanding of what

15:37:49   7   these handwritten notes were?

15:37:52   8   A.       It was telling them that if the instances kept

15:37:56   9   going on, they kept bringing in more Muslim refugees,

15:37:59   10  that more incidences like what had just happened would

15:38:03   11  happen again.

15:38:03   12  Q.    Now, have you actually read these materials before

15:38:06   13  that day?

15:38:07   14  A.       No, I had not.

15:38:08   15  Q.    So when you saw them, did you know the content of

15:38:11   16  what was inside?

15:38:12   17  A.       No, I did not.

15:38:13   18  Q.    So how did you know that this was the type of

15:38:17   19  document that was going to be posted on the government

15:38:19   20  building?

15:38:21   21  A.       The officer started reading, like I said.

15:38:25   22  Q.    Was he reading out loud or to himself?

15:38:28   23  A.       No, he was reading out loud and asked me about the

15:38:30   24  content of them.   And I also had known that Curtis was

15:38:36   25  going to make this document.   They weren't going to do it

3-26-2018 USA v. ALLEN, et al, NO 16-10141

250

| | | |
|---|---|---|
| 15:38:41 | 1 | handwritten.  They wanted to make a document that didn't |
| 15:38:45 | 2 | have their fingerprints or whatever else on it. |
| 15:38:48 | 3 | Q.    So let's talk more about it for a moment.  You |
| 15:38:51 | 4 | said you knew Curtis was going to write a document? |
| 15:38:53 | 5 | A.    Yes. |
| 15:38:53 | 6 | Q.    Handwritten.  How did you know that? |
| 15:38:55 | 7 | A.    Well, they didn't want it handwritten.  They |
| 15:38:58 | 8 | wanted to produce the document so that it couldn't be |
| 15:39:02 | 9 | traced back to them, any evidence.  So he was going to |
| 15:39:07 | 10 | use a small -- he'd taken a little small, silver tablet |
| 15:39:11 | 11 | up to G & G to -- that had Word process on it. |
| 15:39:17 | 12 | Q.    And the purpose of that was to do what? |
| 15:39:19 | 13 | A.    To make their document. |
| 15:39:21 | 14 | Q.    To type it up in some fashion? |
| 15:39:23 | 15 | A.    Yes. |
| 15:39:25 | 16 | Q.    So after the officer started reading through the |
| 15:39:28 | 17 | handwritten materials, what did he do next? |
| 15:39:31 | 18 | A.    What did he do next?  Like I said, about that time |
| 15:39:39 | 19 | is when they come out and shut the search down and said |
| 15:39:44 | 20 | I'd have to go downtown talk to somebody from a different |
| 15:39:49 | 21 | department, and they were going to have to file for a |
| 15:39:54 | 22 | search warrant through the court. |
| 15:39:55 | 23 | Q.    And was that when the officer said this was above |
| 15:39:58 | 24 | his pay grade? |
| 15:39:59 | 25 | A.    Yes, Officer Ott. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

251

| 15:40:05 | 1 | Q.     Now, after that time did you go down to the police |
| 15:40:09 | 2 | department? |
| 15:40:09 | 3 | A.     Yes, I did. |
| 15:40:10 | 4 | Q.     Did you meet with officers from other agencies? |
| 15:40:13 | 5 | A.     Yes, I did. |
| 15:40:15 | 6 | Q.     Who did you meet with? |
| 15:40:16 | 7 | A.     I met with Amy Kuhn from FBI, and I met with an |
| 15:40:24 | 8 | officer, I think his first name was Jason, from KBI. |
| 15:40:28 | 9 | Q.     And did you meet with them for an extended time? |
| 15:40:33 | 10 | A.     I was there until 2:00 A.M. |
| 15:40:35 | 11 | Q.     And what did you tell them? |
| 15:40:38 | 12 | A.     Everything. |
| 15:40:39 | 13 | Q.     Did you tell them about what you had seen at G & |
| 15:40:42 | 14 | G? |
| 15:40:42 | 15 | A.     Yes. |
| 15:40:42 | 16 | Q.     Did you tell them about the things that you |
| 15:40:44 | 17 | testified here today? |
| 15:40:45 | 18 | A.     Yes. |
| 15:40:49 | 19 | Q.     The next day, did you take the FBI to a particular |
| 15:40:53 | 20 | location? |
| 15:40:54 | 21 | A.     Yes. |
| 15:40:54 | 22 | Q.     Where did you take them? |
| 15:40:56 | 23 | A.     I took them out to Gavin Wright's home in |
| 15:41:00 | 24 | Oklahoma. |
| 15:41:01 | 25 | Q.     Why did you do that? |

15:41:02  1   A.      **So that they could get the coordinates correct.**

15:41:05  2   Q.      That's a place you'd been to before?

15:41:07  3   A.      **Yes.**

15:41:07  4   Q.      And so were you helping them locate that

15:41:10  5   residence?

15:41:11  6   A.      **Yes.**

15:41:16  7          MS. BERKOWER:  Now, if we could have what's been

15:41:17  8   marked as Government's Exhibit 4-13, please.  And I think

15:41:28  9   actually this one has already been admitted.  No?

15:41:34  10         THE COURT:  Well, unless it's admitted as a

15:41:37  11  defense exhibit, I don't show it was marked as an

15:41:40  12  exhibit -- admitted.

15:41:40  13  BY MS. BERKOWER:

15:41:41  14  Q.      Okay.  Ms. Harris, could you tell me what's in

15:41:46  15  Government's Exhibit 4-13?

15:41:51  16  A.      **It's a picture of the living room.**

15:41:54  17  Q.      Is that the living room in the house you lived in

15:41:56  18  with Mr. Allen?

15:41:57  19  A.      **Yes.**

15:41:57  20  Q.      Is that what it looked like when you lived there?

15:42:01  21  A.      **For the most part, yes.**

15:42:03  22         MS. BERKOWER:  Your Honor, I'd ask to have this

15:42:04  23  exhibit admitted into evidence.

15:42:06  24         MR. FEDERICO:  No objection, Your Honor.

15:42:09  25         THE COURT:  Exhibit 4-13 is admitted.

| | | |
|---|---|---|
| 15:42:13 | 1 | It probably parallels the Exhibit 9-12 that you |
| 15:42:16 | 2 | may have admitted earlier with the same witness, defense |
| 15:42:19 | 3 | exhibit. |
| 15:42:19 | 4 | MS. BERKOWER:  Thank you, Your Honor. |
| 15:42:20 | 5 | THE COURT:  But, nevertheless, 4-13 is admitted. |
| 15:42:24 | 6 | BY MS. BERKOWER: |
| 15:42:24 | 7 | Q.    Ms. Harris, you said you were in the living room |
| 15:42:26 | 8 | when you were with the officer and he's noticing the |
| 15:42:29 | 9 | notebooks? |
| 15:42:29 | 10 | A.    Yes. |
| 15:42:29 | 11 | Q.    Could you point on the screen where you were |
| 15:42:32 | 12 | standing? |
| 15:42:36 | 13 | A.    We'd moved the cage out of the way, so right about |
| 15:42:42 | 14 | in there. |
| 15:42:42 | 15 | Q.    Where was the officer standing? |
| 15:42:44 | 16 | A.    Next to me. |
| 15:42:46 | 17 | Q.    You said he noticed the notebooks as you were |
| 15:42:49 | 18 | looking at the TV? |
| 15:42:50 | 19 | A.    Yes.  They're right there. |
| 15:42:52 | 20 | Q.    That's where the notebooks were? |
| 15:42:57 | 21 | A.    Yeah. |
| 15:42:57 | 22 | Q.    And after he read you the notebooks, what did he |
| 15:43:01 | 23 | do with them? |
| 15:43:09 | 24 | A.    He kept 'em.  I mean, like I said, next thing I |
| 15:43:12 | 25 | know I was being told that they were going to have to |

15:43:14  1  shut down the consent I'd gave them for the search and

15:43:23  2  they would have to order or get a court order search for

15:43:28  3  the premises and I would have to go downtown and talk to

15:43:32  4  someone.

15:43:34  5  Q.     Now, after -- you said you stayed at the police

15:43:37  6  department and met with the FBI and KBI until about 2:00

15:43:41  7  A.M.?

15:43:41  8  A.     Yes.

15:43:41  9  Q.     After that, did you go back home that night?

15:43:44  10  A.     No.

15:43:44  11  Q.     What kind of a place did you go to?

15:43:46  12  A.     I went to a safe house.

15:43:48  13  Q.     And about a week later, did you receive money from

15:43:51  14  the FBI?

15:43:52  15  A.     Yes.

15:43:52  16  Q.     How much money did you receive?

15:43:54  17  A.     15,000.

15:43:56  18  Q.     Had anyone told you you were going to get that

15:43:58  19  money before they actually handed it to you?

15:44:00  20  A.     No.

15:44:01  21  Q.     Had you already told the police department and the

15:44:03  22  FBI what you knew before you were paid?

15:44:05  23  A.     Yes.

15:44:07  24  Q.     Did anyone ever tell you, before you met with the

15:44:10  25  FBI and the police department, that if you talked to them

15:44:12    1   you would be paid?

15:44:14    2   A.      No.

15:44:15    3   Q.      Anyone even hint at that?

15:44:17    4   A.      No.

15:44:18    5   Q.      Have you been paid since that day?

15:44:20    6   A.      No.

15:44:22    7   Q.      Have you been promised any future payment?

15:44:24    8   A.      No.

15:44:25    9   Q.      Even a hint of one?

15:44:26   10   A.      No.

15:44:28   11   Q.      Now, back in October 2016, when you got that

15:44:31   12   money, what did you use it for?

15:44:32   13   A.      I used it to relocate.

15:44:34   14          MR. FEDERICO:  Objection, Your Honor.  Relevance.

15:44:36   15          THE COURT:  Overruled.  You may answer the

15:44:39   16   question.

15:44:40   17   A.      I used the money to relocate.

15:44:44   18   BY MS. BERKOWER:

15:44:44   19   Q.      Why did you want to relocate?

15:44:46   20   A.      'Cause I didn't feel safe out in Liberal, and also

15:44:52   21   I had doctors' visits I needed to go to.

15:44:55   22   Q.      After you relocated, did someone working for

15:44:59   23   defendant Allen's lawyer track you down and find you at

15:45:01   24   your new location?

15:45:02   25   A.      Yes.

15:45:02  1  Q.      Did he ask you point blank how much money you got

15:45:05  2  from the FBI?

15:45:07  3  **A.      He did ask, yes.**

15:45:08  4  Q.      And what did you tell him?

15:45:11  5  **A.      I'd gotten 2500.**

15:45:13  6  Q.      Why did you tell him you only got 2500 instead of

15:45:16  7  15,000?

15:45:16  8  **A.      'Cause it was none of his business.**

15:45:18  9  Q.      And after you got the 15,000 payment did you --

15:45:22  10  $15,000 payment, did you, in fact, leave Liberal?

15:45:25  11  **A.      Yes, I did.**

15:45:27  12  Q.      When you left, did you leave with the mobile home

15:45:29  13  you had been living in with defendant Allen?

15:45:31  14  **A.      Yes.**

15:45:31  15  Q.      When you left with the mobile home, who had the

15:45:35  16  title to it?

15:45:35  17  **A.      I did.**

15:45:36  18  Q.      Had Curtis ever registered it with the county?

15:45:39  19  **A.      No.**

15:45:40  20  Q.      Had he ever paid taxes on it?

15:45:43  21  **A.      Not at the county.**

15:45:44  22  Q.      And had you put some of your own money into it

15:45:46  23  when you lived there?

15:45:47  24  **A.      Yes.**

15:45:49  25  Q.      When you moved in it with him in June 2016, did

15:45:52  1   you have any other home?

15:45:53  2   **A.      No.**

15:45:53  3   Q.      And if you had left the mobile home behind, what

15:45:56  4   was your understanding of what would have happened to it?

15:45:58  5   **A.      The mobile home park would have seized it for**

15:46:02  6   **abandonment and for nonpayment of lot rent.**

15:46:04  7   Q.      How far behind was the lot rent?

15:46:08  8   **A.      I know it was at least up-to-date in September.  I**

15:46:16  9   **don't know if October had been paid.  I did talk to say**

15:46:20  10  **Cezar [phonetic], the manager, and I told him I was going**

15:46:26  11  **to take the mobile home.  And he said that was fine with**

15:46:28  12  **him.  As long as it was removed by November 11th, no lot**

15:46:32  13  **monies would be due.**

15:46:34  14  Q.      Okay.  Now, you mentioned earlier that the day

15:46:41  15  that you called the police and Mr. Allen -- the day of

15:46:46  16  this domestic dispute, Mr. Allen had left your house and

15:46:50  17  he had taken some firearms with him?

15:46:52  18  **A.      Yes.**

15:46:53  19  Q.      And you also said that you knew him to keep some

15:46:56  20  firearms at Dan Reever's house?

15:46:59  21  **A.      Yes.**

15:47:01  22       MS. BERKOWER:  Now, if we could have Government's

15:47:04  23  Exhibit 177-00, please, without showing it.  Thank you.

15:47:04  24  BY MS. BERKOWER:

15:47:17  25  Q.      Miss Harris, do you recognize what's in this

| | | |
|---|---|---|
| 15:47:19 | 1 | photo? |
| 15:47:20 | 2 | A.      Yes. |
| 15:47:20 | 3 | Q.      What's in that photo? |
| 15:47:22 | 4 | A.      Some of Curtis' guns, some of Curtis' dad's guns, |
| 15:47:28 | 5 | older guns. |
| 15:47:29 | 6 | Q.      And is it your -- are those -- do you recognize |
| 15:47:32 | 7 | those to look like -- let me rephrase that. |
| 15:47:36 | 8 |         Is that an accurate representation of what the |
| 15:47:39 | 9 | guns looked like when you knew him to have them? |
| 15:47:43 | 10 | A.      Yes. |
| 15:47:43 | 11 |         MS. BERKOWER:  Your Honor, I'd ask to admit this |
| 15:47:47 | 12 | photo, Government's Exhibit 177-03. |
| 15:47:55 | 13 |         MR. FEDERICO:  No objection, Your Honor. |
| 15:47:57 | 14 |         MR. PRATT:  No objection, Your Honor. |
| 15:47:58 | 15 |         MS. SCHMIDT:  No objection, Your Honor. |
| 15:47:59 | 16 |         THE COURT:  177-03 is admitted. |
| 15:48:08 | 17 |         MS. BERKOWER:  And may we publish, Your Honor? |
| 15:48:10 | 18 |         THE COURT:  You may. |
| 15:48:10 | 19 |         MS. BERKOWER:  There it is.  Thank you. |
| 15:48:12 | 20 | BY MS. BERKOWER: |
| 15:48:13 | 21 | Q.      On the photos there's some older guns and some |
| 15:48:16 | 22 | newer guns? |
| 15:48:17 | 23 | A.      Yes. |
| 15:48:17 | 24 | Q.      Could you point out the newer ones in the photo. |
| 15:48:20 | 25 | A.      The two end guns. |

15:48:21  1   Q.      And are any of these the part of the set of guns

15:48:25  2   that Curtis loaded into his truck and took with him the

15:48:28  3   day that you called 911?

15:48:35  4   A.      **Maybe the one on the left [indicating].**

15:48:38  5   Q.      Could you point to the one that you're referring

15:48:40  6   to, please.  When you're saying "maybe," how sure are you

15:48:46  7   whether or not he took that gun out of your house and put

15:48:49  8   it in his truck that day?

15:48:53  9   A.      **I really can't see the whole -- he carried out one**

15:48:58 10   **that was completely camouflaged in three different**

15:49:01 11   **colors, so I can't tell if that one is just totally**

15:49:04 12   **black.**

15:49:06 13   Q.      Now, so do you remember the description of some of

15:49:09 14   the guns that he carried out with him from his house that

15:49:12 15   day?

15:49:12 16   A.      **Yes.**

15:49:12 17   Q.      How would you describe some of those?

15:49:15 18   A.      **Like I said, he carried out a totally camouflaged**

15:49:21 19   **gun.  He carried out at least three or four handguns.  He**

15:49:27 20   **got one out of my console in my car.**

15:49:33 21           MS. BERKOWER:  And if we could have Government's

15:49:35 22   Exhibit 177-01 and-02, please.

15:49:35 23   BY MS. BERKOWER:

15:49:53 24   Q.      Do you recognize what's in these photos?

15:49:57 25   A.      **Yes.**

| | | |
|---|---|---|
| 15:49:59 | 1 | MS. BERKOWER:  Could we have -01 and -02?  Thank |
| 15:50:03 | 2 | you. |
| 15:50:05 | 3 | BY MS BERKOWER: |
| 15:50:08 | 4 | Q.     What's in those photos? |
| 15:50:12 | 5 | **A.     That's a .50 cal that he had at his house.** |
| 15:50:18 | 6 | Q.     And is that the .50 caliber gun you referred to |
| 15:50:20 | 7 | earlier in your testimony? |
| 15:50:22 | 8 | **A.     Yes.** |
| 15:50:23 | 9 | Q.     Is that what it looked like in the time you knew |
| 15:50:25 | 10 | Curtis owned it? |
| 15:50:26 | 11 | **A.     Yes.** |
| 15:50:26 | 12 | MS. BERKOWER:  Your Honor, may we admit these |
| 15:50:28 | 13 | exhibits, Government's Exhibit 177-01 and 177-02? |
| 15:50:33 | 14 | THE COURT:  Any objection? |
| 15:50:36 | 15 | MR. FEDERICO:  No, Your Honor. |
| 15:50:37 | 16 | MR. PRATT:  No, Your Honor. |
| 15:50:38 | 17 | MS. SCHMIDT:  No, Your Honor. |
| 15:50:39 | 18 | THE COURT:  These exhibits are both admitted. |
| 15:50:42 | 19 | MS. BERKOWER:  May we publish, Your Honor. |
| 15:50:43 | 20 | THE COURT:  You may. |
| 15:50:53 | 21 | MS. BERKOWER:  Now, with the Court's brief |
| 15:50:56 | 22 | indulgence, Your Honor. |
| 15:51:19 | 23 | You can take that down, thank you. |
| 15:51:21 | 24 | BY MS. BERKOWER: |
| 15:51:21 | 25 | Q.     Now, you mentioned earlier in the time you've |

15:51:23  1  known Curtis you've become familiar with his handwriting?

15:51:26  2  **A.    Yes.**

15:51:29  3       MR. FEDERICO:  Your Honor, if I may, sorry to

15:51:30  4  interrupt.  There was an instruction that was supposed to

15:51:32  5  be given contemporaneous with firearms in this case

15:51:35  6  regarding Mr. Allen that we discussed pretrial.  We'd ask

15:51:39  7  it be given to the jurors about the legality of firearms.

15:51:42  8       THE COURT:  Certainly.  Thank you, Mr. Federico.

15:51:44  9       Ladies and gentlemen, you're going to hear a lot

15:51:47  10  of evidence about firearms in this case.  Some of the

15:51:51  11  charges in this case, which of course I'll remind you the

15:51:55  12  Government has the burden to prove, allege that certain

15:51:58  13  firearms were used perhaps in connection with other

15:52:00  14  charges.  But what I want to emphasize to you is that

15:52:04  15  although there are certain laws under certain conditions

15:52:09  16  that would deprive an individual of their right to own

15:52:11  17  firearms, none of those apply to any of these defendants

15:52:14  18  here.  That is to say, there's no allegation in this case

15:52:17  19  that any of the firearms, even the ones you've just seen

15:52:21  20  or that you will later see in this trial, were illegal

15:52:25  21  for these defendants to possess.  The Government's

15:52:28  22  charged that they were used illegally in connection with

15:52:31  23  other crimes, but I want you to understand, so that

15:52:34  24  there's no confusion, that their mere possession of these

15:52:37  25  firearms was not in any case illegal.

| | | |
|---|---|---|
| 15:52:39 | 1 | Is that satisfactory to defendants? |
| 15:52:41 | 2 | MR. FEDERICO: Yes, Your Honor.  Thank you. |
| 15:52:43 | 3 | MR. PRATT:  Yes, Your Honor.  Thank you. |
| 15:52:44 | 4 | MS. SCHMIDT:  Yes, Your Honor. |
| 15:52:45 | 5 | THE COURT:  Thank you, Counsel. |
| 15:52:46 | 6 | You may proceed, Ms. Berkower. |
| 15:52:47 | 7 | BY MS. BERKOWER: |
| 15:52:48 | 8 | Q.    And, Ms. Harris, just taking a step back to |
| 15:52:50 | 9 | something that we skipped over earlier but I put a pin |
| 15:52:57 | 10 | in. |
| 15:52:58 | 11 | MS. BERKOWER:  If we could have Government's |
| 15:53:11 | 12 | Exhibit 9-6, please, that's in evidence. |
| 15:53:11 | 13 | BY MS. HARRIS: |
| 15:53:19 | 14 | Q.    Ms. Harris, directing your attention to the item |
| 15:53:21 | 15 | we've marked with a 3 in this photo, do you remember |
| 15:53:25 | 16 | testifying that you saw that crate in your house? |
| 15:53:28 | 17 | A.    Yes. |
| 15:53:28 | 18 | Q.    Did you see all of the items in the crate in your |
| 15:53:31 | 19 | house? |
| 15:53:31 | 20 | A.    No.  The scale was up at G & G. |
| 15:53:34 | 21 | Q.    Is that something that you saw at G & G? |
| 15:53:36 | 22 | A.    Yes. |
| 15:53:37 | 23 | MS. BERKOWER:  And, Your Honor, I have what's been |
| 15:53:38 | 24 | marked as Government's Exhibit 304.  It's an addition to |
| 15:53:43 | 25 | our witness list.  It was previously overlooked for being |

15:53:46  1   marked, but we notified the defendants of this during the

15:53:48  2   break.

15:53:48  3          THE COURT:  All right.

15:53:50  4          MS. BERKOWER:  May I approach the witness with it?

15:53:50  5          THE COURT:  You can give it to the witness for

15:53:53  6   identification, then you may move to admit it at that

15:53:55  7   point.

15:53:55  8          MS. BERKOWER:  Thank you, Your Honor.  May I

15:53:57  9   approach?

15:53:57  10         THE COURT:  You may.

15:54:08  11  BY MS. BERKOWER:

15:54:08  12  Q.     Miss Harris, do you recognize what's been put

15:54:12  13  before you as Government's Exhibit 304?

15:54:14  14  **A.     Yes, a small scale.**

15:54:16  15  Q.     And where have you seen that scale?

15:54:18  16  **A.     Up at G & G.**

15:54:19  17  Q.     And is that the same scale that you see in the

15:54:22  18  photo, Government's Exhibit 9-6?

15:54:25  19  **A.     Yes, in that tote.**

15:54:26  20         MS. BERKOWER:  Your Honor, I'd seek to admit

15:54:28  21  Government's Exhibit 304.

15:54:29  22         THE COURT:  Any objection?

15:54:30  23         MR. FEDERICO:  No, Your Honor.

15:54:31  24         MR. PRATT:  No, Your Honor.

15:54:32  25         MS. SCHMIDT:  No, Your Honor.

| | | |
|---|---|---|
| 15:54:33 | 1 | THE COURT:  304 is admitted. |
| 15:54:42 | 2 | BY MS. BERKOWER: |
| 15:54:43 | 3 | Q.    Now, Ms. Harris, you testified that in the time |
| 15:54:46 | 4 | you've known Curtis you've come to recognize his |
| 15:54:48 | 5 | handwriting? |
| 15:54:48 | 6 | A.    Yes. |
| 15:54:49 | 7 | Q.    You're familiar with it? |
| 15:54:50 | 8 | A.    Yes. |
| 15:54:50 | 9 | Q.    And are you able to identify it? |
| 15:54:52 | 10 | A.    Yes. |
| 15:55:13 | 11 | MS. BERKOWER:  Your Honor, I've been informed by |
| 15:55:15 | 12 | the FBI agent I need to retrieve all this evidence before |
| 15:55:18 | 13 | I hand Ms. Harris any more evidence.  May I retrieve? |
| 15:55:21 | 14 | THE COURT:  All right.  Mr. Cook, I think I'm |
| 15:55:23 | 15 | going to ask you to take this monitor and keyboard and |
| 15:55:26 | 16 | kind of push them up against the side of your desk, and |
| 15:55:29 | 17 | then let's, to the extent we can, keep admitted evidence |
| 15:55:33 | 18 | over here on this side desk.  Kind of turn it sideways, |
| 15:55:39 | 19 | can you, to take less space 'cause I don't think we'll be |
| 15:55:42 | 20 | using that monitor during the rest of the trial.  And |
| 15:55:48 | 21 | then you may follow the good advice of removing that huge |
| 15:55:54 | 22 | stack of exhibits in front of the witness and let's start |
| 15:55:58 | 23 | accumulating admitted physical evidence -- I don't care |
| 15:56:00 | 24 | about photographs for that regard, but physical evidence |
| 15:56:04 | 25 | we can keep over here on the court's table.  Thank you, |

15:56:14  1    counsel.

15:56:15  2         MR. MATTIVI:  Yes, Your Honor.

15:56:21  3         MS. BERKOWER:  And, Your Honor, I'm not totally

15:56:22  4    sure how to handle this administrative matter, but I've

15:56:26  5    been told that these two items were cataloged with that

15:56:30  6    box of material and it needs to be kept together, even

15:56:32  7    though these two items have not actually been admitted by

15:56:35  8    Ms. Harris, but we expect to have them admitted through a

15:56:38  9    subsequent witness.

15:56:40  10        THE COURT:  Well, once they're admitted in court,

15:56:43  11   that's sort of supersedes your own management of

15:56:49  12   documents, it would seem to me, or rather your management

15:56:54  13   of exhibits or objects.

15:56:56  14        MR. MATTIVI:  We're fine with that, Your Honor.

15:56:57  15   Thank you.

15:56:58  16        THE COURT:  All right.

15:57:10  17   BY MS. BERKOWER:

15:57:11  18   Q.   Now, Ms. Harris, I have this item that's marked as

15:57:14  19   Government's Exhibit 66.

15:57:17  20        MS. BERKOWER:  May I approach?

15:57:18  21        THE COURT:  You may.

15:57:25  22   BY MS. BERKOWER:

15:57:26  23   Q.   Ms. Harris, do you recognize what's in

15:57:28  24   Government's Exhibit 66?

15:57:29  25   **A.     Yes.**

| | | |
|---|---|---|
| 15:57:30 | 1 | Q.      What is it? |
| 15:57:31 | 2 | **A.       The cell phone I purchased at Walmart.** |
| 15:57:33 | 3 | Q.      Is that the cell phone you testified about earlier |
| 15:57:35 | 4 | having resold to Mr. Allen? |
| 15:57:37 | 5 | **A.       Yes.** |
| 15:57:38 | 6 | MS. BERKOWER:  Your Honor, I'd seek to admit this |
| 15:57:39 | 7 | item into evidence, Government's Exhibit 66. |
| 15:57:43 | 8 | **A.       I gave the receipt to FBI Agent Amy Kuhn.** |
| 15:57:49 | 9 | MR. FEDERICO:  No objection, Your Honor. |
| 15:57:51 | 10 | MR. PRATT:  No objection. |
| 15:57:52 | 11 | MS. SCHMIDT:  No objection. |
| 15:57:53 | 12 | THE COURT:  Exhibit 66 is admitted. |
| 15:58:01 | 13 | BY MS. BERKOWER: |
| 15:58:02 | 14 | Q.      Now, Ms. Harris, I'm about to hand you what's been |
| 15:58:04 | 15 | marked as Government's Exhibit 100, 101, and 102. |
| 15:58:13 | 16 | MS. BERKOWER:  Your Honor, may I approach? |
| 15:58:14 | 17 | THE COURT:  You may. |
| 15:58:41 | 18 | BY MS. BERKOWER: |
| 15:58:42 | 19 | Q.      Ms. Harris, would you tell me what -- whose |
| 15:58:47 | 20 | handwriting is on Government's Exhibit 100? |
| 15:58:50 | 21 | **A.       This one?** |
| 15:58:51 | 22 | Q.      Is that 100? |
| 15:58:53 | 23 | **A.       Yes.** |
| 15:58:54 | 24 | Q.      Whose handwriting is on that? |
| 15:58:56 | 25 | **A.       Curtis Allen's.** |

15:58:57   1   Q.      And what is in that exhibit?  What does that

15:59:00   2   exhibit consist of?

15:59:02   3   **A.      It consists of information on his brother's email**

15:59:07   4   **address.   There's a PayPal payment of $220 for a gun that**

15:59:15   5   **he purchased that he picked up in El Dorado on**

15:59:17   6   **October 1st of 2016 for his brother.**

15:59:20   7   Q.      Is the exhibit itself, is that a Post-It Notes?

15:59:23   8   **A.      Yes.**

15:59:24   9   Q.      And do you recognize the handwriting on the

15:59:26  10   Post-It Notes to be Defendant Allen's?

15:59:29  11   **A.      Yes.**

15:59:29  12          MS. BERKOWER:  Your Honor, I'd ask to admit

15:59:31  13   Government's Exhibit 100.

15:59:33  14          MR. FEDERICO:  Your Honor, we object to this

15:59:35  15   exhibit on relevance grounds.  What his brother's email

15:59:37  16   address I don't think has any relevance to this case.

15:59:39  17          THE COURT:  Well, I've got a bit of a concern.

15:59:43  18   The defendant's been asked to identify the handwriting,

15:59:46  19   which she can, but to the extent that the exhibit is

15:59:48  20   testimonial, I don't know that we have a foundation laid

15:59:53  21   as to what the handwriting actually conveyed.  So can you

15:59:58  22   kind of help us all out here a bit, Ms. Berkower, and

16:00:01  23   tell us what the purpose for this exhibit is with respect

16:00:03  24   to counsel's relevance objection and also whether we're

16:00:08  25   going to need further foundation laid with respect to how

```
16:00:10   1   you intend to use this exhibit.

16:00:11   2        MS. BERKOWER:  Your Honor, I expect that this

16:00:14   3   exhibit will be admitted more for the -- by a subsequent

16:00:19   4   witness who is going to testify about a search that was

16:00:22   5   executed at a particular location in relation to this

16:00:24   6   case.

16:00:24   7        THE COURT:  And so at that point you'll establish

16:00:27   8   relevance.

16:00:27   9        MS. BERKOWER:  Yes, Your Honor.  I think this

16:00:29  10   witness -- we're about to ask her a series of questions

16:00:32  11   concerning whether -- primarily whether or not

16:00:35  12   Mr. Allen's handwriting appears or doesn't appear on

16:00:37  13   certain documents.

16:00:37  14        THE COURT:  I'm going to provisionally admit

16:00:39  15   document -- or, rather, Exhibit 100 as having been

16:00:42  16   identified as being in defendant Allen's handwriting, but

16:00:47  17   further admission for use of that exhibit will require

16:00:50  18   further foundation.

16:00:52  19        MS. BERKOWER:  Thank you, Your Honor.

16:00:54  20   BY MS. BERKOWER:

16:00:55  21   Q.    Now, Ms. Harris, if you could look at Government's

16:00:59  22   Exhibit 101.

16:00:59  23   A.    Yes.

16:00:59  24   Q.    Do you recognize what that is?

16:01:01  25   A.    Yes.
```

| | | |
|---|---|---|
| 16:01:01 | 1 | Q.      What is it? |
| 16:01:03 | 2 | **A.      It says --** |
| 16:01:05 | 3 | Q.      Well, not what it says, but what is it? |
| 16:01:07 | 4 | **A.      It's Curtis' manifest.** |
| 16:01:14 | 5 | Q.      Okay.  What is that?  What you are holding in your |
| 16:01:17 | 6 | hand?  Are you holding a notebook in your hand? |
| 16:01:19 | 7 | **A.      Yes, red-and-white spiral notebook.** |
| 16:01:21 | 8 | Q.      Is there handwriting inside the notebook? |
| 16:01:24 | 9 | **A.      Yes.** |
| 16:01:24 | 10 | Q.      Do you recognize that handwriting? |
| 16:01:26 | 11 | **A.      Yes.  The handwriting is Curtis'.** |
| 16:01:29 | 12 | Q.      If I could have you turn your attention to |
| 16:01:32 | 13 | Government's Exhibit 102. |
| 16:01:38 | 14 | **A.      Yes.** |
| 16:01:39 | 15 | Q.      Can you tell me what that is earnings? |
| 16:01:43 | 16 | **A.      It says on the front AP/Alder Service, so it's** |
| 16:01:48 | 17 | **Curtis' service.** |
| 16:01:50 | 18 | Q.      Is it also a notebook? |
| 16:01:53 | 19 | **A.      It's a notebook, yes.** |
| 16:01:54 | 20 | Q.      Is it a spiral-bound notebook? |
| 16:01:56 | 21 | **A.      It's a spiral notebook.** |
| 16:01:57 | 22 | Q.      And is there handwriting inside that exhibit? |
| 16:01:59 | 23 | **A.      Yes.** |
| 16:01:59 | 24 | Q.      Whose handwriting is in there? |
| 16:02:01 | 25 | **A.      Curtis Allen's.** |

| | | |
|---|---|---|
| 16:02:02 | 1 | MS. BERKOWER:  Your Honor, I would ask to |
| 16:02:04 | 2 | conditionally admit Government's Exhibit 101 and 102. |
| 16:02:08 | 3 | MR. FEDERICO:  Your Honor, we'd have the same |
| 16:02:09 | 4 | objection.  We have notebooks full of writings and, |
| 16:02:12 | 5 | again, until a focus foundation is laid as to whether any |
| 16:02:15 | 6 | of these writings were relevant to the case, obviously |
| 16:02:18 | 7 | the witness has identified the handwriting, we don't |
| 16:02:20 | 8 | dispute that, but until some foundation for relevance, |
| 16:02:24 | 9 | we'd ask the court not to admit them until a foundation |
| 16:02:27 | 10 | can be established. |
| 16:02:27 | 11 | THE COURT:  Well, I'm going to provisionally admit |
| 16:02:30 | 12 | them only to the extent that they've been identified as |
| 16:02:32 | 13 | being in the handwriting of defendant Allen.  But any |
| 16:02:36 | 14 | testimony as to the substance of those documents or |
| 16:02:38 | 15 | what's written in there is going to require further |
| 16:02:42 | 16 | foundation. |
| 16:02:42 | 17 | BY MS. BERKOWER: |
| 16:02:45 | 18 | Q.     And with regard -- okay.  N. |
| 16:02:51 | 19 | Ow, do you have Government's Exhibit 103 in there, |
| 16:02:53 | 20 | Ms. Harris? |
| 16:03:07 | 21 | MS. BERKOWER:  I'm sorry, I have Government's |
| 16:03:09 | 22 | Exhibit 103. |
| 16:03:09 | 23 | Your Honor, may I approach with it? |
| 16:03:11 | 24 | THE COURT:  You may. |
| 16:03:32 | 25 | BY MS. BERKOWER: |

| | | |
|---|---|---|
| 16:03:33 | 1 | Q.    Now, Ms. Harris, do you have Government's Exhibit |
| 16:03:34 | 2 | 103 in there? |
| 16:03:36 | 3 | **A.    Yes.** |
| 16:03:37 | 4 | Q.    Do you recognize it? |
| 16:03:39 | 5 | **A.    Yes.** |
| 16:03:40 | 6 | Q.    What is it? |
| 16:03:41 | 7 | **A.    It's *The Anarchist Cookbook*.** |
| 16:03:44 | 8 | Q.    And where do you recognize that exhibit from? |
| 16:03:47 | 9 | **A.    Curtis used to own it.  It was on the shelf at** |
| 16:03:50 | 10 | **his --** |
| 16:03:51 | 11 | Q.    When you say "it was on the shelf," where was it |
| 16:03:53 | 12 | on the shelf? |
| 16:03:54 | 13 | **A.    On the bookshelf in the living room.** |
| 16:03:56 | 14 | Q.    At your house? |
| 16:03:57 | 15 | **A.    Yes.** |
| 16:03:57 | 16 | Q.    You recognize it from that location? |
| 16:03:59 | 17 | **A.    Yes.** |
| 16:04:00 | 18 | Q.    And if you could turn to the last page of that |
| 16:04:03 | 19 | exhibit. |
| 16:04:06 | 20 | **A.    (The witness complies.)** |
| 16:04:07 | 21 | Q.    Is there any handwriting that you recognize on the |
| 16:04:10 | 22 | last page? |
| 16:04:14 | 23 | **A.    Yes.** |
| 16:04:14 | 24 | Q.    Whose handwriting is on there? |
| 16:04:17 | 25 | **A.    It looks like Curtis'.** |

| | | |
|---|---|---|
| 16:04:20 | 1 | MS. BERKOWER:  Your Honor, I'd actually ask to |
| 16:04:22 | 2 | fully admit Government's Exhibit 103, since the witness |
| 16:04:24 | 3 | has identified it as having been in her home at the time |
| 16:04:27 | 4 | she lived with Mr. Allen and it containing his |
| 16:04:31 | 5 | handwriting. |
| 16:04:31 | 6 | MR. FEDERICO:  Your Honor, may we take a moment to |
| 16:04:35 | 7 | actually view the exhibit?  It seems to be different than |
| 16:04:39 | 8 | what we were provided. |
| 16:04:39 | 9 | THE COURT:  Of course, Mr. Federico. |
| 16:04:41 | 10 | MR. FEDERICO:  If I may approach the witness? |
| 16:04:42 | 11 | THE COURT:  You may. |
| 16:04:43 | 12 | Ms. Harris, Mr. Federico's going to look at that |
| 16:04:46 | 13 | exhibit that you're holding.  If you would hand it to |
| 16:04:48 | 14 | him, please. |
| 16:04:49 | 15 | MR. FEDERICO:  Thank you. |
| 16:04:50 | 16 | THE COURT:  I understand the exhibit to include |
| 16:04:53 | 17 | the entire document, just so you're clear, Mr. Federico, |
| 16:04:56 | 18 | and not just the page you're looking at. |
| 16:05:07 | 19 | MR. FEDERICO:  Thank you. |
| 16:05:13 | 20 | (Whereupon, a sotto voce discussion was had among |
| 16:05:16 | 21 | Mr. Federico, Ms. Brannon, and defendant Allen.) |
| 16:05:19 | 22 | **A.      Do you want me to read the recipe off it?** |
| 16:05:23 | 23 | MS. BERKOWER:  Hold on just a moment, Ms. Harris. |
| 16:05:30 | 24 | MR. FEDERICO:  Your Honor, we do have an objection |
| 16:05:32 | 25 | as to foundation of this.  And I don't know if we want to |

16:05:35  1  voir dire the witness to settle it because I have some

16:05:37  2  questions about what she just testified in terms of her

16:05:40  3  recognition of what the last page in the handwritten

16:05:43  4  notes.

16:05:44  5         THE COURT:  I'm going to let you voir dire the

16:05:45  6  witness.  And before I do that I want to inquire of

16:05:49  7  Ms. Berkower.  I know you asked to admit it fully because

16:05:52  8  the witness testified that she saw it on Mr. Allen's

16:05:56  9  bookshelf.  I don't know if you intend to offer evidence

16:06:01  10 at this time or later as to the substance of the

16:06:04  11 materials that are contained in that notebook.

16:06:06  12        MS. BERKOWER:  I think we do, Your Honor.  I guess

16:06:09  13 I can ask her a few more questions that might establish

16:06:11  14 her knowledge of some of the substance, based on --

16:06:14  15        THE COURT:  So far she's only identified it as a

16:06:16  16 book that she's seen, but not a book whose content or

16:06:19  17 subject matter she's familiar with.  Why don't you see

16:06:22  18 you can lay that foundation, and as to the extent

16:06:25  19 Mr. Federico still has questions to voir dire with

16:06:28  20 respect to the exhibit, I'm going to let him do that.

16:06:30  21 BY MS. BERKOWER:

16:06:30  22 Q.     Ms. Harris, did you ever read that book?

16:06:34  23 **A.     No.  I know what *The Anarchist Cookbook* -- there's**

16:06:38  24 **also a CD that we have that.**

16:06:43  25 Q.     And did you -- did you know if Curtis read this

16:06:47  1   book?

16:06:48  2   **A.     I'm not sure if he read it back to back but I know**

16:06:52  3   **he knows what's in it.**

16:06:54  4   Q.     How do you know that?

16:06:54  5   **A.     Because we've listened to the CD before.**

16:06:57  6   Q.     Oh, okay.  So if I'm understanding you correctly,

16:07:01  7   is there a CD that goes along with that book?

16:07:04  8   **A.     Well doesn't go with the book but it's the same --**

16:07:08  9   **it's either audio or written.**

16:07:10  10  Q.     And did you have the CD for that in your house?

16:07:14  11  **A.     Yes.**

16:07:14  12         MS. BERKOWER:  Your Honor, may I approach?

16:07:16  13         THE COURT:  You may.

16:07:19  14  **A.     They weren't sold together.**

16:07:21  15  BY MS. BERKOWER:

16:07:21  16  Q.     I'm showing you what's been marked as Government's

16:07:23  17  Exhibit 77.

16:07:25  18  **A.     Yes.**

16:07:25  19  Q.     Do you recognize that?

16:07:26  20  **A.     Yes.**

16:07:27  21  Q.     What is that?

16:07:27  22  **A.     It's *The Anarchist Cookbook*.**

16:07:32  23  Q.     That's the disc that went along with that book?

16:07:35  24  **A.     Yes.  It's the same book.**

16:07:37  25  Q.     Is that the book -- is that the CD that you

16:07:39  1   listened to?

16:07:40  2   **A.      Yes.**

16:07:40  3   Q.      And so as a result, do you know what's in that

16:07:43  4   book?

16:07:43  5   **A.      Bits and pieces, yes.**

16:07:43  6   Q.      What's in that book?

16:07:46  7   **A.      It's how to make explosives.**

16:07:50  8           MS. BERKOWER:  Your Honor, given that the witness

16:07:52  9   does have knowledge --

16:07:53  10  BY MS. BERKOWER:

16:07:53  11  Q.      And did you listen to that CD with Mr. Allen?

16:07:57  12  **A.      Yeah, I think that we kinda tried to.  There's**

16:08:01  13  **some scratching on it, so just kind of bits and pieces of**

16:08:09  14  **it.**

16:08:10  15          MS. BERKOWER:  Your Honor, I would ask to admit

16:08:12  16  both items at this time.

16:08:13  17          THE COURT:  Let me first address Exhibit 77, the

16:08:17  18  CD which the witness has just testified to.  Is there any

16:08:21  19  objection to the admission of Exhibit 77?

16:08:25  20          (Whereupon, a sotto voce discussion was had

16:08:26  21  between Mr. Federico and Ms. Brannon.)

16:08:32  22          MR. FEDERICO:  Your Honor, as to the physical

16:08:35  23  object, no, we don't have an objection.  But as to the

16:08:38  24  content of what may be on that CD, yes, we think it may

16:08:42  25  be hearsay.  And even so, we haven't established actually

16:08:45    1    the content of that particular disc.  And then lastly I

16:08:49    2    think what would likely arise if we did, we'd have a

16:08:51    3    number of objections as to relevance and 403.

16:08:54    4         THE COURT:  Well, the witness has testified that

16:08:56    5    she's listened to the CD.  Certainly to the extent items

16:09:01    6    on the CD are going to be offered for the truth of the

16:09:03    7    matter asserted, the hearsay objection would be viable.

16:09:06    8    I doubt that that's actually going to be the use the

16:09:09    9    Government wants to make of that CD, that is to say the

16:09:11    10   truth of the matter asserted, rather than that

16:09:14    11   individuals listened to the CD and what the subject

16:09:16    12   matter was.

16:09:17    13        Given that she's testified that she listened to

16:09:22    14   the CD, I am going to admit 77 and that includes the

16:09:28    15   contents of it but not of course that that content

16:09:32    16   actively describes whatever that purports to do, merely

16:09:35    17   that she's familiar with it.

16:09:37    18        With respect to the book, Ms. Berkower, the

16:09:40    19   witness has not testified how she knows that the item

16:09:44    20   contained on the CD in Exhibit 77 is the same material

16:09:49    21   contained in the book at Exhibit 103.

16:09:53    22        MS. BERKOWER:  Your Honor, may I ask a few more

16:09:55    23   questions?

16:09:56    24        THE COURT:  I'm sorry, and that's what I meant to

16:09:58    25   infer --

| | | |
|---|---|---|
| 16:09:58 | 1 | MS. BERKOWER:  Okay. |
| 16:09:59 | 2 | THE COURT:  -- if you would maybe see if you can |
| 16:10:00 | 3 | lay a foundation for that. |
| 16:10:01 | 4 | BY MS. BERKOWER: |
| 16:10:01 | 5 | Q.    Ms. Harris, are you familiar with what's inside |
| 16:10:03 | 6 | that book? |
| 16:10:06 | 7 | **A.    No.  I assume that the book has the same** |
| 16:10:09 | 8 | **identical -- that it's written or you can get the** |
| 16:10:16 | 9 | **Anarchist -- I can't speak -- Cookbook on a disc or you** |
| 16:10:19 | 10 | **can have it in written.** |
| 16:10:20 | 11 | Q.    Have you ever gone through the book yourself? |
| 16:10:23 | 12 | **A.    No.** |
| 16:10:23 | 13 | MS. BERKOWER:  Okay.  At this time, Your Honor, I |
| 16:10:25 | 14 | guess I'll seek to conditionally admit the book that has |
| 16:10:28 | 15 | Mr. Allen's writing in it, subject to further foundation |
| 16:10:31 | 16 | from another witness. |
| 16:10:32 | 17 | THE COURT:  All right.  Do you want to voir dire |
| 16:10:33 | 18 | in that regard, Mr. Federico? |
| 16:10:34 | 19 | MR. FEDERICO:  Yes, Your Honor, if I may. |
| 16:10:35 | 20 | THE COURT:  You may do so at this time. |
| 16:10:37 | 21 | MR. FEDERICO:  Thank you, Your Honor. |
| 16:10:37 | 22 | VOIR DIRE EXAMINATION |
| 16:10:37 | 23 | BY MR. FEDERICO: |
| 16:10:48 | 24 | Q.    Good afternoon, Ms. Harris.  That book that was in |
| 16:10:51 | 25 | front of you, on the last page you were just asked by the |

16:10:54   1   prosecutor about a handwritten note.  If I could refer

16:10:56   2   you to that, please.

16:11:00   3   **A.      Yes.**

16:11:01   4   Q.    Okay.  She asked about the handwriting and you

16:11:04   5   said, "I think it's Curtis'"?

16:11:06   6   **A.      Yeah.**

16:11:06   7   Q.    So you compared that to the other books that were

16:11:09   8   before you, like the notebooks, for example; right?  And

16:11:13   9   is it your testimony that that handwriting is the same or

16:11:15  10   made by the same person on that note as those notebooks?

16:11:19  11   **A.      It looks a lot like Curtis'.  Because he does use**

16:11:27  12   **the bigger -- he uses capitals in the middle of a**

16:11:35  13   **sentence -- or Word, so it is similar.**

16:11:37  14   Q.    Similar or the same?

16:11:39  15   **A.      Well, he can write real neat when he wants to,**

16:11:43  16   **like this is written very neat for somebody.  I mean, I**

16:11:47  17   **view -- it seems like you had a hard time reading it,**

16:11:50  18   **where I don't.  But it's neater than most of his**

16:11:54  19   **scribble.**

16:11:54  20   Q.    Okay.  So you would say that it looks different

16:11:57  21   than what you just observed in the notebooks, but

16:11:58  22   similar?  You're not sure if it's the same; is that

16:12:01  23   accurate?

16:12:02  24   **A.      Like I said, he could have still written it and I**

16:12:05  25   **do think that he wrote it because, like I said, he can be**

16:12:11  1  **neat when he wants to be and that looks like chicken**

16:12:14  2  **scratch, I mean if you look from page to page, it varies**

16:12:16  3  **on how Curtis writes it down.**

16:12:18  4  Q.    And then also with regards to this book, I believe

16:12:21  5  you testified this was located on the top shelf in the

16:12:23  6  trailer where you lived?

16:12:24  7  **A.    No, I said it was on the bookshelf.**

16:12:26  8  Q.    On the bookshelf, excuse me.

16:12:27  9  **A.    I'd seen it on the bookshelf at one time.**

16:12:29  10  Q.    And it was there the whole time that you're aware

16:12:32  11  of while you lived there?

16:12:32  12  **A.    No, I'd seen it at least one time while I was**

16:12:35  13  **there.**

16:12:35  14  Q.    Okay.  So you don't know if it was that same exact

16:12:38  15  book, you just know there was a book --

16:12:40  16  **A.    Yeah.**

16:12:40  17  Q.    -- of the same title there?

16:12:43  18  **A.    Right.  It was bound at that time.**

16:12:45  19      MR. FEDERICO:  Okay.  Your Honor, we continue to

16:12:49  20  object on the foundation, that it's not square enough to

16:12:53  21  say just similar to the handwriting.  We dispute it's the

16:12:55  22  same handwriting.  I don't think the witness has crossed

16:12:58  23  the line, even though recognizing foundation for

16:13:01  24  authenticity is a fairly low bar, and likewise, we'd

16:13:05  25  object to the book, the contents of the book, that

16:13:08   1   foundation hasn't been laid as to this particular

16:13:10   2   physical item and to demonstrate that the FBI has found

16:13:16   3   it was found at a different location than even this

16:13:18   4   witness testified to.

16:13:19   5          THE COURT:  Ms. Harris, let me ask you just a

16:13:21   6   couple questions about that if I may.  First of all

16:13:23   7   Mr. Federico asked you some questions about the

16:13:25   8   handwriting, and you said that the handwriting on that

16:13:28   9   back cover was different from Curtis' -- from Mr. Allen's

16:13:32  10   other handwriting.  I think what we want to know is are

16:13:36  11   you saying that the handwriting on the back cover of that

16:13:40  12   book, you think, could be his handwriting or is it your

16:13:46  13   testimony that you believe it is his handwriting?

16:13:47  14          THE WITNESS:  It could be because he can -- if you

16:13:52  15   look from page to page, it really depends on what he's

16:13:55  16   trying to do.  Like this is a recipe card.  And in his

16:14:02  17   work notebook, it's just scribbled all up.

16:14:06  18          THE COURT:  Okay.

16:14:06  19          THE WITNESS:  So it varies on what he -- like

16:14:10  20   anybody wants -- if you're in a hurry, if you're trying

16:14:14  21   to be precise, but I don't have any trouble reading it.

16:14:18  22          THE COURT:  Right.  And then my second question is

16:14:20  23   you testified that you saw this book on a bookshelf in

16:14:24  24   the trailer, and so my question is did you see a book

16:14:27  25   with this title on the bookshelf, or is it your testimony

16:14:32  1  that the design and the color of that book -- or you did

16:14:37  2  testify it was actually bound then.  But other than the

16:14:39  3  fact it was bound is it your testimony that you recognize

16:14:41  4  that book itself and the color and the design when it was

16:14:45  5  on your shelf?

16:14:47  6       THE WITNESS:  Yes, on the bookshelf one time.

16:14:50  7       THE COURT:  So more than just the title, you

16:14:51  8  recognize the book itself?

16:14:52  9       THE WITNESS:  Yes.

16:14:52  10      THE COURT:  What I'm going to do is I'm going to

16:14:54  11  admit this exhibit very provisionally.  I think the

16:14:58  12  witness has testified that she saw this book in the

16:15:03  13  trailer house, the trailer park -- trailer house.  I'm

16:15:08  14  not going to admit it based on the handwriting being

16:15:12  15  Mr. Allen's because her testimony is that it could be his

16:15:14  16  but I think that lacks the definitiveness, even though

16:15:18  17  it's a low bar, that it is his handwriting and certainly

16:15:20  18  she's testified she's unfamiliar with the contents of

16:15:22  19  that notebook, so I'm admitting it provisionally with

16:15:25  20  respect to this witness' testimony solely that she saw

16:15:29  21  this book in the trailer and nothing further.

16:15:33  22      MS. BERKOWER:  Thank you, Your Honor.

16:15:34  23      THE COURT:  And that's Exhibit 103.

16:15:38  24  BY MS. BERKOWER:

16:15:39  25  Q.   Ms. Harris, do you have Exhibit 72 up there with

| | | |
|---|---|---|
| 16:15:48 | 1 | you? |
| 16:15:48 | 2 | **A.      72?** |
| 16:15:53 | 3 | Q.     Well, before I ask you about that -- is 72 up |
| 16:15:56 | 4 | there? |
| 16:16:04 | 5 | **A.     No, this pertains to these items.** |
| 16:16:10 | 6 | MS. BERKOWER:  Your Honor, I have Government's |
| 16:16:11 | 7 | Exhibit 35, 36, and 37, if I may approach the witness, |
| 16:16:14 | 8 | please. |
| 16:16:14 | 9 | THE COURT:  Are we not doing 72? |
| 16:16:17 | 10 | MS. BERKOWER:  I'm sorry, Your Honor, no, not 72. |
| 16:16:19 | 11 | THE COURT:  Okay.  I thought you identified 72. |
| 16:16:23 | 12 | MS. BERKOWER:  I did, but I should have said -- |
| 16:16:25 | 13 | THE COURT:  Very well.  We'll move to 35 whatever, |
| 16:16:27 | 14 | and you may approach the witness. |
| 16:16:28 | 15 | MS. BERKOWER:  Thank you. |
| 16:16:43 | 16 | BY MS. BERKOWER: |
| 16:16:43 | 17 | Q.     Miss Harris, would you please open up Government's |
| 16:16:49 | 18 | Exhibit 35. |
| 16:16:53 | 19 | **A.     (The witness complies.)** |
| 16:17:01 | 20 | Q.     What is Government's Exhibit 35? |
| 16:17:06 | 21 | **A.     There seems to be a sheet that my writing is on in** |
| 16:17:17 | 22 | **there.  There is also a paper that could go as well, as** |
| 16:17:32 | 23 | **part of a manifesto.** |
| 16:17:34 | 24 | Q.     Well, let me ask you this:  are there -- is there |
| 16:17:37 | 25 | a composition book in Government's Exhibit 35? |

| | | |
|---|---|---|
| 16:17:39 | 1 | A.       Yes. |
| 16:17:40 | 2 | Q.       And there are also loose-leaf pages in |
| 16:17:42 | 3 | Government's Exhibit 35? |
| 16:17:45 | 4 | A.       Yes, there's pages and people's names in there. |
| 16:17:48 | 5 | Q.       Are there torn-out pages in Government's Exhibit |
| 16:17:50 | 6 | 35 as well, pages you were just handling? |
| 16:17:53 | 7 | A.       Just the one page. |
| 16:17:55 | 8 | Q.       And on the loose-leaf page that you have in your |
| 16:17:59 | 9 | hand, whose handwriting is on that page? |
| 16:18:01 | 10 | A.       Curtis'. |
| 16:18:02 | 11 | Q.       And in the composition book, whose handwriting is |
| 16:18:05 | 12 | in the book? |
| 16:18:06 | 13 | A.       Curtis'. |
| 16:18:08 | 14 | Q.       And you said there was also a page of your |
| 16:18:10 | 15 | handwriting.  Could you point out which page that is. |
| 16:18:13 | 16 | A.       Yes (indicating). |
| 16:18:14 | 17 | Q.       What is written on the page that you wrote? |
| 16:18:16 | 18 | A.       "Daniel Reever is Sir Dan.  4 a meet.  That's XO |
| 16:18:23 | 19 | Patrick Stein - Dodge City/Wright.  Dan Day - Garden |
| 16:18:27 | 20 | City; Ciare; Gavin Wright - Liberal; Sparky; police chief |
| 16:18:33 | 21 | in Pratt." [As read.] |
| 16:18:34 | 22 | Q.       What do you recognize that page to be? |
| 16:18:38 | 23 | A.       When I was being questioned. |
| 16:18:42 | 24 | Q.       Questioned by whom? |
| 16:18:43 | 25 | A.       Questioned maybe by FBI, that I was explaining who |

16:18:49   1   **these people were on Zello as Daniel Reever, Sir Dan, had**

16:18:55   2   **property of Curtis'.**

16:18:57   3   Q.      So does this page relate to notes you were making

16:19:00   4   when you were speaking with the FBI agents the day that

16:19:02   5   you called the police to come to your house?

16:19:03   6   A.      Yes.

16:19:03   7   Q.      And the rest of that exhibit, is that all stuff

16:19:07   8   with Curtis' handwriting on it?

16:19:08   9   A.      Yes.

16:19:08   10          MS. BERKOWER:  Your Honor, I would ask to admit

16:19:10   11   Government's Exhibit 35.

16:19:22   12          MR. FEDERICO:  May we have a moment, Your Honor?

16:19:30   13          (Brief pause.)

16:19:42   14          MR. FEDERICO:  No objection.

16:19:43   15          THE COURT:  35's admitted.

16:19:46   16   BY MS. BERKOWER:

16:19:46   17   Q.      And, Ms. Harris, if you could direct your

16:19:48   18   attention to Government's Exhibit 36, please.  What's

16:19:58   19   inside Government's Exhibit -- what is Government's

16:20:00   20   Exhibit 36?

16:20:01   21   A.      **It's a purple spiral notebook.**

16:20:03   22   Q.      And is there handwritten material inside the

16:20:06   23   notebook?

16:20:07   24   A.      Yes.

16:20:07   25   Q.      Whose handwriting is that?

| | | |
|---|---|---|
| 16:20:09 | 1 | A.       Curtis'. |
| 16:20:10 | 2 | MS. BERKOWER:  Your Honor, I would ask to |
| 16:20:12 | 3 | provisionally admit Government's Exhibit 36. |
| 16:20:18 | 4 | MR. FEDERICO:  May I have a moment, Your Honor? |
| 16:20:22 | 5 | THE COURT:  Certainly. |
| 16:20:22 | 6 | (Whereupon, a sotto voce discussion was had |
| 16:20:32 | 7 | between Mr. Federico and Mr. Pratt.) |
| 16:21:00 | 8 | MR. FEDERICO:  No objection, Your Honor. |
| 16:21:01 | 9 | THE COURT:  36 is admitted. |
| 16:21:07 | 10 | BY MS. BERKOWER: |
| 16:21:07 | 11 | Q.    And, Ms. Harris, would you please look at |
| 16:21:09 | 12 | Government's Exhibit 37 in front of you. |
| 16:21:14 | 13 | A.       Yes, it's a -- |
| 16:21:30 | 14 | Q.    What do you recognize that to be, or do you know |
| 16:21:32 | 15 | what that is? |
| 16:21:33 | 16 | A.       It's an index card.  It's Curtis'. |
| 16:21:38 | 17 | Q.    How do you know it's Curtis'? |
| 16:21:40 | 18 | A.       Well, by the writing and the scribbling in it with |
| 16:21:50 | 19 | the crayons and the pens.  It's my grandchildren's. |
| 16:21:54 | 20 | Q.    So the crayons in there, is that something your |
| 16:21:57 | 21 | grandchildren, you think, wrote? |
| 16:21:58 | 22 | A.       Yes. |
| 16:21:58 | 23 | Q.    But the handwritten material in there, who wrote |
| 16:22:02 | 24 | that? |
| 16:22:02 | 25 | A.       That is Curtis'. |

| | | |
|---|---|---|
| 16:22:03 | 1 | MS. BERKOWER:  Your Honor, I'd ask to |
| 16:22:05 | 2 | provisionally admit Government's Exhibit 36.  Sorry, 37. |
| 16:22:12 | 3 | MR. FEDERICO:  No objection to 37, Your Honor. |
| 16:22:14 | 4 | THE COURT:  And I understand, Ms. Berkower, that |
| 16:22:15 | 5 | for now we're admitting these Exhibits 35, 36, and 37 |
| 16:22:18 | 6 | solely with regard to handwriting? |
| 16:22:21 | 7 | MS. BERKOWER:  Yes, Your Honor. |
| 16:22:21 | 8 | THE COURT:  Without regard to substance? |
| 16:22:23 | 9 | MS. BERKOWER:  Yes. |
| 16:22:23 | 10 | THE COURT:  All right.  37 is also admitted. |
| 16:22:38 | 11 | MS. BERKOWER:  And, Your Honor, the last exhibit I |
| 16:22:40 | 12 | have actually is 72.  May I approach the witness? |
| 16:22:41 | 13 | THE COURT:  You may. |
| 16:22:52 | 14 | BY MS. BERKOWER: |
| 16:22:52 | 15 | Q.    Ms. Harris, what is Government's Exhibit 72? |
| 16:22:57 | 16 | A.    Looks like a pad, a writing pad. |
| 16:23:08 | 17 | Q.    And whose handwriting is on the pad?  You can take |
| 16:23:11 | 18 | that out if you -- |
| 16:23:13 | 19 | A.    Okay, I'll take it out.  Oh, there it is.  Some of |
| 16:23:28 | 20 | it does look like Curtis' writing and some of it doesn't. |
| 16:23:36 | 21 | Q.    Could you tell us which pages of the exhibit look |
| 16:23:38 | 22 | like Curtis' writing. |
| 16:23:43 | 23 | A.    The one that -- I guess I'll take the clip off. |
| 16:23:54 | 24 | The one that has, it's about three pages over, it says, |
| 16:23:59 | 25 | "1g = No. 10 blasting cap." |

16:24:03  1  Q.      That's the page that has what you recognize to be

16:24:06  2  Mr. Allen's handwriting?

16:24:08  3  **A.      Yeah, that pretty much looks like Curtis'.**

16:24:11  4       THE COURT:  Do you plan to use several pages of

16:24:15  5  this, Ms. Berkower?  It seems to me that we're getting to

16:24:21  6  a point where it may be difficult to identify on the

16:24:21  7  record what we're using.

16:24:22  8       Are there just certain pages of this that you can

16:24:24  9  mark somehow for the witness is testifying?

16:24:27  10       MS. BERKOWER:  I can mark that, Your Honor.  I

16:24:34  11  think I can.

16:24:41  12       And, Your Honor, maybe the best way to do this if

16:24:44  13  we can have Mr. Moore pull up 72a.  That is an electronic

16:24:47  14  version of this document.  And that way those are all

16:24:50  15  marked with page numbers.  I think if the witness can

16:24:52  16  review those, she can say which pages for the record are

16:24:56  17  ones she recognizes.

16:24:57  18       THE COURT:  All right.  That sounds good.

16:25:02  19  BY MS. BERKOWER:

16:25:03  20  Q.      Ms. Harris, do you recognize that page as

16:25:06  21  Mr. Allen's handwriting?

16:25:07  22  **A.      Do what?**

16:25:08  23  Q.      If you can look at the screen, is that one of the

16:25:10  24  pages of Mr. Allen's writing?

16:25:18  25  **A.      Yeah, that looks like more Curtis' writing.**

16:25:22  1  Q.      And what about the next page, is that his writing?

16:25:28  2  **A.      No.**

16:25:28  3  Q.      What about the following page?

16:25:31  4  **A.      That's what I was looking at.  I don't -- I don't**

16:25:35  5  **believe that is.  It's too much cursive.**

16:25:38  6  Q.      So the first page of this Exhibit 72a you

16:25:41  7  recognize to be his handwriting?

16:25:43  8  **A.      Yes.**

16:25:45  9          MS. BERKOWER:  And, Mr. Moore, if you could flip

16:25:47  10  through the other pages.

16:25:47  11  BY MS. BERKOWER:

16:25:48  12  Q.      And, Ms. Harris, tell us if you see other writing

16:25:51  13  by Mr. Allen in this.

16:25:53  14          MR. MOORE:  I can blow it up if you'd like.

16:25:56  15          MS. BERKOWER:  Sure.

16:26:02  16  BY MS. BERKOWER:

16:26:02  17  Q.      Ms. Harris, if you can look at the screen in front

16:26:04  18  of you.  Is that his handwriting?

16:26:08  19  **A.      I'm just looking at that.  No.**

16:26:16  20  Q.      What about the next page?

16:26:25  21  **A.      Too much cursive.  I don't think so.**

16:26:39  22          (Whereupon, a sotto voce discussion was had among

16:26:40  23  Ms. Berkower, Ms. Hahn, and Mr. Moore.)

16:26:48  24  BY MS. BERKOWER:

16:26:48  25  Q.      All right.  So, Ms. Harris, if you could look

16:26:50  1  through the notepad you have in your hand, tell me which

16:26:54  2  pages of the pages you have in your hand are Mr. Allen's

16:26:56  3  writing, then we'll match it up with the electronic

16:26:59  4  version to make this more efficient.

16:27:00  5      THE COURT:  Can you give her something to mark

16:27:03  6  those pages with so she can come back and -- just a

16:27:09  7  Post-It or something.

16:27:50  8      MS. BERKOWER:  I think Mr. Moore may have actually

16:27:52  9  solved the problem for us.  He has photocopies with

16:27:55  10 numbers already on it, apparently.

16:27:57  11     THE COURT:  All right.

16:27:57  12     MS. BERKOWER:  All right.

16:27:58  13     THE COURT:  Wonderful.

16:27:58  14 BY MS. BERKOWER:

16:28:21  15 Q.    All right, Ms. Harris, do you see little numbers

16:28:23  16 at the bottom of each of those printout pages, a page

16:28:31  17 number?

16:28:32  18 **A.    Well, on the first page, it says 72a, and then the**

16:28:38  19 **rest of the pages do not have numbers.**

16:28:41  20 Q.    (Indicating.)

16:28:42  21 **A.    Oh, it goes 72a-002, gotcha.**

16:28:47  22 Q.    Ms. Harris, if you can tell us which pages in that

16:28:50  23 exhibit are the ones where you recognize Mr. Allen's

16:28:52  24 handwriting, please.

16:28:54  25 **A.    I would say that 72a-001 is the only one that I**

| | | |
|---|---|---|
| 16:29:06 | 1 | see that would be Mr. Allen's. |
| 16:29:12 | 2 | MS. BERKOWER:  Then, Your Honor, I would ask to |
| 16:29:15 | 3 | provisionally admit the first page of Government's |
| 16:29:18 | 4 | Exhibit 72 and 72a as identifying -- the witness has |
| 16:29:24 | 5 | identified that page to contain Mr. Allen's handwriting. |
| 16:29:27 | 6 | THE COURT:  Objection? |
| 16:29:29 | 7 | MR. FEDERICO:  No, Your Honor. |
| 16:29:31 | 8 | THE COURT:  All right.  Page 1 of 72a and 72 will |
| 16:29:37 | 9 | be provisionally admitted with respect to them becoming |
| 16:29:41 | 10 | identified as defendant Allen's handwriting. |
| 16:30:05 | 11 | MS. BERKOWER:  And, Your Honor, I would just note |
| 16:30:06 | 12 | for the record that for each of these exhibits, 35, 36, |
| 16:30:09 | 13 | 37, 77, 100, 101, 102, and 103, the Government has |
| 16:30:16 | 14 | provided electronic versions that copy every page of |
| 16:30:20 | 15 | these exhibits to the defense, and they are marked as |
| 16:30:25 | 16 | 35a, 36a, 37a, 72a, 77a, 100a, 101a, and 102a.  And we |
| 16:30:36 | 17 | would ask for those to be provisionally admitted for the |
| 16:30:38 | 18 | same reasons since they're just photocopies of the |
| 16:30:42 | 19 | exhibits that have already been conditionally admitted |
| 16:30:44 | 20 | for that reason. |
| 16:30:49 | 21 | And if I've just confused everyone, my apologies |
| 16:30:52 | 22 | to the Court.  I can explain more clearly. |
| 16:30:54 | 23 | THE COURT:  I think I understand what you're doing |
| 16:30:55 | 24 | but I'm going to have you repeat the numbers.  But first |
| 16:30:58 | 25 | let me see if we have an issue with these.  In other |

16:31:01   1   words, I guess what you're wanting to do is have them

16:31:03   2   available as a substitute exhibit.

16:31:05   3         MS. BERKOWER:  Yes, Your Honor.  They're

16:31:08   4   electronic copies of the physical --

16:31:09   5         THE COURT:  Right, on the same grounds that I've

16:31:11   6   admitted the tangible items themselves.

16:31:15   7         MS. BERKOWER:  Yes.

16:31:17   8         MR. FEDERICO:  Yeah, Your Honor, to the extent

16:31:19   9   that the physical items or notebooks have been admitted,

16:31:22   10  conditionally or otherwise, we'd have no objection to a

16:31:25   11  photograph of that same exhibit being included in the

16:31:28   12  record.

16:31:28   13        THE COURT:  All right.  So that's 35a, 36a, 37a,

16:31:40   14  72a, and 100a, 101a, 102a, 103a; is that correct?  Or was

16:31:55   15  103a offered?

16:31:59   16        MS. BERKOWER:  I meant to include 103a, yes, Your

16:32:03   17  Honor.  103a is a photograph exhibit of Exhibit 103.

16:32:09   18        THE COURT:  All right.  Those are all admitted on

16:32:13   19  the same conditions as the tangible items.

16:32:15   20        MS. BERKOWER:  And, Your Honor, for the same

16:32:17   21  reason I also would seek to admit Government's Exhibit

16:32:19   22  105a, 106a, and 107a, which are photocopies of the

16:32:25   23  binders that Ms. Harris testified about earlier.  And

16:32:28   24  it's not just a picture of the front; it is the whole

16:32:30   25  content of the binder.

16:32:43    1        THE COURT:  Those will also be admitted.

16:32:46    2        MR. FEDERICO:  Your Honor, on those -- I think

16:32:48    3  those are qualitatively different because we did object

16:32:50    4  to the contents of the binder.  And I don't think the

16:32:53    5  Court admitted those even provisionally because there was

16:32:55    6  no foundation laid.  Those were not handwritten notes

16:32:58    7  within those binders; those were something different.

16:33:02    8        THE COURT:  I believe Mr. Federico's correct, that

16:33:07    9  she testified, and I admitted them, as to items that she

16:33:11   10  recognized as being in the house or could identify but

16:33:17   11  not as to the substance of them.  And I'm not clear again

16:33:20   12  to the extent to which you intend to testify or solicit

16:33:23   13  testimony regarding the actual content of those.

16:33:26   14        MS. BERKOWER:  Yes, Your Honor.  I think there

16:33:28   15  will be more evidence through later witnesses about the

16:33:31   16  content, and also where those binders were located and

16:33:34   17  how they were seized.  However, to the extent this

16:33:37   18  witness has identified the binders as something that were

16:33:41   19  in her house and were being reviewed by Mr. Allen while

16:33:45   20  she was present in the room with him, she can -- the

16:33:49   21  exhibit can be admitted.  It's the same binder.  We're

16:33:53   22  not seeking to admit it for its truth.

16:33:54   23        THE COURT:  All right.  Well, those three exhibits

16:33:56   24  are admitted as to items that this witness has identified

16:33:59   25  as having been in defendant Allen's trailer.

16:34:02   1          MS. BERKOWER:  Thank you, Your Honor.

16:34:05   2   BY MS. BERKOWER:

16:34:05   3   Q.      Now, Ms. Harris, before we finish, let's talk now

16:34:09   4   about a very specific conversation you actually had with

16:34:12   5   Mr. Stein, Patrick Stein.  Did you ever have a

16:34:16   6   conversation with him that related to your throat cancer?

16:34:23   7   **A.      Yes.  Curtis had gotten a phone call from Patrick**

16:34:26   8   **Stein and was talking to him.  We were doing something**

16:34:33   9   **that day but we were listening to music.  There was a**

16:34:36   10  **knock on the door.  It was Patrick Slattery, so Curtis**

16:34:41   11  **stepped outside and he told Patrick Stein over the phone,**

16:34:45   12  **"Well, you can just talk to Donnette."  So he set the**

16:34:49   13  **phone down in front of me, and whatever song was playing,**

16:34:54   14  **Patrick Stein mentioned the name of it and I said yeah.**

16:35:04   15  **So he asked me, he said, if my cancer scan that didn't**

16:35:13   16  **come back good, if I was willing to do something good for**

16:35:16   17  **the country and until become a suicide bomber.  And he**

16:35:25   18  **had already asked his friend who had cancer to be a**

16:35:28   19  **suicide bomber.  I told --**

16:35:29   20          MR. PRATT:  Objection, Your Honor.  There's no

16:35:34   21  foundation for that last statement.

16:35:37   22          MS. BERKOWER:  And maybe I can clarify with this

16:35:39   23  witness, Your Honor.

16:35:40   24          THE COURT:  All right, with respect to the last

16:35:42   25  statement.

3-26-2018 USA v. ALLEN, et al, NO 16-10141

294

16:35:42   1          MS. BERKOWER:  Yes, Your Honor.

16:35:43   2   BY MS. BERKOWER:

16:35:43   3   Q.      Did Mr. Stein tell you during that conversation he

16:35:46   4   had asked a friend of his to -- who also had serious

16:35:50   5   cancer -- to be as suicide bomber?

16:35:52   6   **A.      Yes.  Her name was Jennifer.  She had breast**

16:35:55   7   **cancer.  She had six months to live.**

16:35:57   8   Q.      And when he asked you to be a suicide bomber, what

16:36:03   9   was your reaction?

16:36:05   10  **A.      None.  That my scans were going to come back good.**

16:36:10   11  **I was a warrior.  I didn't have any doubt in how my scans**

16:36:16   12  **would come back.**

16:36:16   13  Q.      Okay.  And even if your scans had been bad, would

16:36:19   14  you have agreed to do it?

16:36:19   15  **A.      No, 'cause that's not doing something good for**

16:36:23   16  **your country.**

16:36:26   17          MS. BERKOWER:  Your Honor, no further questions.

16:36:29   18          THE COURT:  All right.  Thank you, Ms. Berkower.

16:36:31   19          Cross-examination on behalf of Mr. Allen.

16:36:33   20          MR. FEDERICO:  Yes, Your Honor.  Thank you.

16:36:34   21          MS. BERKOWER:  And, Your Honor, may I clean up

16:36:36   22  some of these exhibits?

16:36:37   23          THE COURT:  That would probably be a very good

16:36:38   24  idea.

16:36:55   25                    CROSS-EXAMINATION

3-26-2018 USA v. ALLEN, et al, NO 16-10141

295

16:36:56   1  BY MR. FEDERICO:

16:37:20   2  Q.      Good afternoon again, Ms. Harris.  Do you recall

16:37:41   3  in January of this year that you had a conversation with

16:37:46   4  Anthony Scognamillo from my office?

16:37:49   5  **A.      Okay, Anthony.**

16:37:51   6  Q.      I'm sorry?

16:37:52   7  **A.      Anthony, yes.**

16:37:53   8  Q.      You know Anthony, you've talked with him on

16:37:56   9  several occasions?

16:37:56  10  **A.      Right.**

16:37:57  11  Q.      And in January, actually I was present there as

16:38:00  12  well?

16:38:01  13  **A.      In January this year.**

16:38:02  14  Q.      Yes.

16:38:03  15  **A.      Yes, you did come out.**

16:38:04  16  Q.      Okay.  And the prosecutor referenced this meeting

16:38:07  17  on direct examination as the time where you weren't

16:38:10  18  truthful about the amount of money you paid, and we'll

16:38:13  19  talk about that in a minute.  But what I want to ask

16:38:15  20  about is the day after we met with you, you called the

16:38:18  21  FBI, didn't you?

16:38:19  22  **A.      Yes, I did.**

16:38:20  23  Q.      You called Special Agent Robin Smith?

16:38:26  24  **A.      I don't think so.**

16:38:27  25  Q.      You didn't talk with -- you talked with the FBI

3-26-2018 USA v. ALLEN, et al, NO 16-10141

296

16:38:30    1  but you don't remember if it was Special Agent Smith?

16:38:32    2  **A.      No, it was not.**

16:38:33    3  Q.      Okay.  So you talked to the FBI, though, the next

16:38:35    4  day?

16:38:36    5  **A.      Yes.**

16:38:36    6  Q.      And you called them because you wanted to talk

16:38:39    7  with them about us coming by to talk with you?

16:38:46    8  **A.      In a sense, yes.  I wanted to find out, because**

16:38:53    9  **you had mentioned that -- or Anthony had mentioned to me**

16:39:00   10  **that my address might come up, and that concerned me**

16:39:07   11  **because I've been a victim of all three of these guys.**

16:39:11   12  Q.      So you called the FBI the day after we visited

16:39:14   13  you, yes?

16:39:15   14  **A.      Yes.**

16:39:15   15  Q.      Okay.  Ms. Harris, now, on -- during that

16:39:18   16  conversation with the FBI, you also told them about a

16:39:22   17  therapist that you were seeing?

16:39:25   18  **A.      That very day?**

16:39:27   19  Q.      I'm sorry, no.

16:39:28   20  **A.      That one time?  Yeah, I've told them about a**

16:39:31   21  **therapist that I've seen, yes.**

16:39:32   22  Q.      And you discussed with them a technique that your

16:39:36   23  therapist was going to use with you potentially for your

16:39:39   24  testimony here today; is that right?

16:39:41   25  **A.      It was brought up that it could be used to help**

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

16:39:48  1   me --

16:39:48  2   Q.    Okay.  And that technique is called EMDR?  Does

16:39:52  3   that sound right?

16:39:53  4   A.    Yes.

16:39:53  5   Q.    And I believe you described it to the FBI as being

16:39:56  6   similar to hypnosis?

16:39:59  7   A.    In a way it is.  A lot of people don't understand

16:40:01  8   it, but if you've read up on my therapist, that's what

16:40:06  9   she practices.

16:40:07  10  Q.    And when you called the FBI that day, you said

16:40:10  11  that if you underwent this sort of hypnosis technique,

16:40:14  12  that when you testified you would appear to be "cool and

16:40:19  13  callous."  Do you remember saying that to the FBI?

16:40:21  14  A.    No, I did not say that on that day that I called

16:40:26  15  and talked to anyone at the FBI, because I didn't get

16:40:29  16  through to anyone on the FBI.  I was waiting for a call

16:40:32  17  back.  So --

16:40:34  18  Q.    So your testimony, just to be clear, you didn't

16:40:36  19  tell the FBI that this technique would make you appear to

16:40:40  20  be cool and callous on the witness stand when you

16:40:43  21  testified?

16:40:44  22  A.    That was one of the -- yes, one of the -- it would

16:40:49  23  take the emotion out of the memory.

16:40:52  24  Q.    Okay.  So you did tell them that?

16:40:55  25  A.    Yes, that it would take the emotion out of the --

| | | |
|---|---|---|
| 16:40:58 | 1 | out of the memory. |
| 16:40:59 | 2 | Q.    And then this morning we were notified by the |
| 16:41:03 | 3 | Government that, in fact, you did undergo that technique |
| 16:41:06 | 4 | recently; right? |
| 16:41:07 | 5 | A.    I went through one step of that one procedure, |
| 16:41:12 | 6 | yes, because I was having a very difficult time.  I |
| 16:41:20 | 7 | didn't think that -- I mean, when I thought of Curtis, I |
| 16:41:23 | 8 | became very emotional.  I didn't think I could make it |
| 16:41:26 | 9 | through being in the same courtroom after a year and a |
| 16:41:33 | 10 | half. |
| 16:41:33 | 11 | Q.    So you went through this hypnosis-like technique |
| 16:41:36 | 12 | recently to deal with your testimony here today; is that |
| 16:41:38 | 13 | right? |
| 16:41:38 | 14 | A.    I went through it probably about three or four |
| 16:41:43 | 15 | weeks ago, one session of it, for just a few minutes, ten |
| 16:41:49 | 16 | minutes, with my therapist.  That's not enough to make me |
| 16:41:54 | 17 | cold or callous. |
| 16:41:56 | 18 | Q.    So, Ms. Harris, can I assume, as you testified |
| 16:41:59 | 19 | here on the witness stand today, that you're not under |
| 16:42:01 | 20 | hypnosis? |
| 16:42:02 | 21 | A.    No. |
| 16:42:02 | 22 | Q.    I also noticed that when you walked in you brought |
| 16:42:05 | 23 | a bag of what looks to be prescription medication; is |
| 16:42:08 | 24 | that right? |
| 16:42:08 | 25 | A.    Yes, it is. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

299

| | | |
|---|---|---|
| 16:42:08 | 1 | Q.     Did you take any of that medication before you |
| 16:42:11 | 2 | testified here today? |
| 16:42:11 | 3 | **A.     Yes, I did.  I took my anxiety medication.  I have** |
| 16:42:17 | 4 | **used the --** |
| 16:42:19 | 5 | Q.     Just the anxiety medication? |
| 16:42:22 | 6 | **A.     I've also used a nose spray.  Everybody saw me use** |
| 16:42:26 | 7 | **the nose spray to put some moisture in.  I've used some** |
| 16:42:30 | 8 | **of the mouth spray as well today.** |
| 16:42:34 | 9 | Q.     Then the anxiety medication, did you take that |
| 16:42:37 | 10 | before you started your direct testimony? |
| 16:42:39 | 11 | **A.     Yeah, I take it morning and afternoon if I need it** |
| 16:42:43 | 12 | **and --** |
| 16:42:44 | 13 | Q.     I'm not asking when you generally take it.  I'm |
| 16:42:46 | 14 | asking about today.  Did you take it before you took the |
| 16:42:48 | 15 | witness stand for the first time? |
| 16:42:50 | 16 | **A.     I took it this morning at home when I ate my** |
| 16:42:53 | 17 | **breakfast.** |
| 16:42:53 | 18 | Q.     Okay.  Did you take more during the afternoon |
| 16:42:55 | 19 | break? |
| 16:42:56 | 20 | **A.     No.** |
| 16:42:58 | 21 | Q.     All right.  Ms. Harris, let's talk about your time |
| 16:43:01 | 22 | when you returned to Liberal in 2016.  If I heard you |
| 16:43:06 | 23 | correctly on direct, you testified that you had lived |
| 16:43:09 | 24 | with Mr. Allen in Liberal, I believe you said, from |
| 16:43:12 | 25 | January 2014 to the end of 2015.  Does that sound right? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

300

16:43:17  1   A.      That's correct.

16:43:19  2   Q.      And then in January of 2015 you left the Liberal

16:43:21  3   area, but Curtis remained there?

16:43:23  4   A.      Yes.

16:43:23  5   Q.      As far as you know, the entire time that he

16:43:26  6   remained in Liberal he lived in that same trailer on

16:43:31  7   Bluebell Lane?

16:43:32  8   A.      Yes.

16:43:32  9   Q.      And I think you testified on direct that you

16:43:34  10  returned to Liberal in June 2016?

16:43:37  11  A.      Yes.

16:43:37  12  Q.      And the purpose of that was to house-sit for

16:43:39  13  Curtis?

16:43:40  14  A.      Basically.  That's what he was going from township

16:43:45  15  to township doing the restoration of the Constitution.

16:43:47  16  Q.      So he was out in different communities.  Were

16:43:50  17  those in Kansas primarily?

16:43:52  18  A.      Yes, they were going to go throughout the whole

16:43:55  19  state of Kansas.

16:43:55  20  Q.      Was that for the Liberty Restoration Committee?

16:43:58  21  A.      Yes.

16:43:58  22  Q.      And the purpose of that was to engage in political

16:44:01  23  activity, you talk about the Constitution?

16:44:03  24  A.      I'm not real depth of it.  It's to -- what he told

16:44:08  25  me was to get the Constitution changed and the

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

16:44:14    1   **Constitution look back at what it really meant.**

16:44:17    2   Q.      So to engage in political activity and talk about

16:44:20    3   the Constitution; right?

16:44:21    4   **A.      However you want to look at it.**

16:44:23    5   Q.      All right.  And when you returned to Liberal in

16:44:26    6   June 2016, you noticed a change in Mr. Allen; right?

16:44:31    7   **A.      A change in him?**

16:44:32    8   Q.      Yes, from when you lived there previously.

16:44:39    9   **A.      Not that first day.**

16:44:41   10   Q.      But just generally, not necessarily the moment you

16:44:43   11   walked through the door, but when you returned to Liberal

16:44:46   12   and started living with Mr. Allen again in June --

16:44:48   13   **A.      Yes.**

16:44:48   14   Q.      -- generally you noticed a change in him?  Is that

16:44:52   15   a "yes"?

16:44:52   16   **A.      Yes.**

16:44:52   17   Q.      So I believe you told us previously that you

16:44:54   18   believed there could have been a couple reasons for that

16:44:56   19   change.  For example, you thought he was still sort of

16:44:59   20   grieving the loss of his own mother; is that right?

16:45:01   21          MS. BERKOWER:  Objection, Your Honor.

16:45:05   22          Objection, Your Honor.  I don't think this witness

16:45:08   23   testified to anything of that sort on direct.

16:45:10   24          THE COURT:  I don't believe she did, Mr. Federico.

16:45:14   25          MR. FEDERICO:  I don't disagree with that, Your

16:45:15   1   Honor.  I was -- sorry, if I said when -- before I can be

16:45:20   2   more clear, I was speaking about when she talked to my

16:45:23   3   office prior to her testimony.

16:45:24   4        THE COURT:  All right.  I'm going to sustain the

16:45:26   5   objection and let you reask the question to lay more

16:45:29   6   foundation.

16:45:30   7   BY MR. FEDERICO:

16:45:30   8   Q.    Miss Harris, you believe one of the changes in

16:45:32   9   Mr. Allen, in terms of his demeanor, was due to the loss

16:45:34  10   of his mother and he was still grieving that?

16:45:37  11   A.    No.

16:45:37  12   Q.    Okay.  Do you remember talking to an investigator

16:45:40  13   in my office, Anthony Scognamillo, on the 30th of January

16:45:43  14   of this year?

16:45:45  15   A.    Okay.  But Curtis had lost --

16:45:48  16   Q.    I said do you remember talking to Anthony on the

16:45:50  17   30th of January of this year.

16:45:52  18   A.    I never talked to him.

16:45:54  19   Q.    Okay.  And obviously you talked to him many times

16:45:56  20   before, so you knew he was an investigator with the

16:45:59  21   Federal Public Defender; right?

16:46:00  22   A.    Exactly.

16:46:01  23   Q.    And you knew that he was there to ask you

16:46:02  24   questions on behalf of Mr. Allen?

16:46:04  25   A.    Right.

16:46:05   1   Q.      And you knew because you'd interacted with him

16:46:09   2   before, that he was doing so to gather information that

16:46:12   3   would be relevant to this case; right?

16:46:13   4   A.      Right.

16:46:13   5   Q.      Okay.  So you knew that he was going to rely upon

16:46:18   6   information that you provided to him; right?

16:46:20   7   A.      Okay.

16:46:20   8   Q.      And on that day on the 30th of January, you said

16:46:24   9   to Mr. Scognamillo that you believe one of the reasons

16:46:26   10  for the change in Mr. Allen when you returned to Liberal

16:46:30   11  in June 2016 was because he was still grieving the loss

16:46:32   12  of his mother; right?

16:46:34   13  A.      No.

16:46:34   14  Q.      Okay.  And you said that he also suffered from

16:46:37   15  trauma you believe based on your cancer treatments; is

16:46:40   16  that accurate?

16:46:41   17  A.      Do I know he had -- go ahead and repeat that

16:46:45   18  again.

16:46:46   19  Q.      Sure.  You told -- or isn't it true that you

16:46:49   20  believed that Mr. Allen, in terms of that change in his

16:46:52   21  demeanor in June 2016 when you returned, was also due in

16:46:56   22  part because of some trauma he suffered sort of helping

16:46:59   23  you or going through your cancer treatments?

16:47:02   24  A.      No.  I basically said that Mr. Allen had went and

16:47:06   25  got life insurance and, you know, that might have -- he

16:47:14   1   might have been looking at his own immortality [sic] at

16:47:20   2   that time because I had cancer, you know, I'm 52, I'd

16:47:26   3   gotten it at 50, he lost his mother when he was 27 so I

16:47:30   4   don't know exactly her age but she was fairly young when

16:47:33   5   he lost his mother.  But --

16:47:39   6   Q.     Ms. Harris --

16:47:40   7   A.     -- the only reference --

16:47:41   8   Q.     And I won't go through that whole interview again

16:47:44   9   with Mr. Scognamillo, but is it your testimony that you

16:47:46   10  did not tell Mr. Scognamillo on the 30th of January 2018

16:47:50   11  that you believed Mr. Allen was also suffering from

16:47:52   12  trauma from your cancer treatments?

16:47:54   13  A.     No.

16:47:55   14  Q.     All right.  And also you noticed when you returned

16:47:58   15  to Liberal in June 2016 that Mr. Allen was also watching

16:48:03   16  a show or an Internet platform called Info Wars.  Is that

16:48:06   17  accurate?

16:48:07   18  A.     Yes, Alex Jones.

16:48:10   19  Q.     And I believe you testified on direct that it was

16:48:12   20  clear to you in the summer of 2016 that Mr. Allen was

16:48:16   21  concerned about the way the country was being run by our

16:48:19   22  government.  Is that accurate?

16:48:20   23  A.     Yes.

16:48:20   24  Q.     Is it fair to say he had strong views about the

16:48:23   25  2016 presidential election?

16:48:25  1  **A.        Yes.**

16:48:25  2  Q.     Is it fair to say that he didn't care so much for

16:48:28  3  the Obama administration and how it was running the

16:48:30  4  government?

16:48:31  5  **A.        Exactly, yes.**

16:48:32  6  Q.     And I believe you may have mentioned this on

16:48:36  7  direct, but Mr. Allen also believed that there was a

16:48:40  8  possibility that President Obama wasn't going to leave

16:48:43  9  office at all after the election that year; is that

16:48:44  10 right?

16:48:44  11 **A.        Martial law, yes.**

16:48:47  12 Q.     So you thought or it was clear to you, because

16:48:50  13 Mr. Allen will talk about it, that President Obama would

16:48:53  14 declare what you said martial law; right?

16:48:55  15 **A.        Yes.**

16:48:55  16 Q.     And by "martial law," do you mean that to be that

16:48:58  17 the government would seize a greater control or force its

16:49:02  18 rule against the American people in a more sort of

16:49:07  19 strong-handed way?

16:49:08  20 **A.        Yes, he'd tried to do it on several occasions.  He**

16:49:11  21 **didn't make any secrets of it.  He wanted to be the last**

16:49:13  22 **president.  He even tried to get to be able to run for a**

16:49:16  23 **third term.  So Obama, yes, was trying to be our last**

16:49:24  24 **president.**

16:49:25  25 Q.     So also during the summer of 2016 is it fair to

16:49:28  1  say that Mr. Allen was concerned that, regardless of the

16:49:32  2  election results, that there was no way that Donald Trump

16:49:35  3  would ever be allowed to be president by President Obama?

16:49:38  4  **A.      He was concerned that Hillary would win because a**

16:49:45  5  **lot of the Mexicans, which is full of what we've got in**

16:49:50  6  **Western Kansas, that the Mexicans would be allowed to**

16:49:53  7  **vote, and that they would vote for Hillary because**

16:50:00  8  **illegal people weren't going to vote for Trump.**

16:50:05  9  Q.      I'm sorry, did you say the "legal people"?

16:50:06  10  **A.      Illegal people.  Because Trump didn't want them**

16:50:12  11  **here.  And there's a lot of family members.  They might**

16:50:16  12  **be one legal person from Mexico in house, and then have**

16:50:21  13  **five illegals in with them.**

16:50:23  14  Q.      Okay, Ms. Harris, when you returned to Liberal in

16:50:25  15  June of 2016, I believe also Mr. Allen was having some

16:50:30  16  difficulty paying the rent for the lot.

16:50:32  17  **A.      His lot rent.**

16:50:33  18  Q.      Is that a "yes"?

16:50:35  19  **A.      Yes.**

16:50:35  20  Q.      All right.  So you paid it for him?

16:50:38  21  **A.      I loaned him the $2100, yes.**

16:50:41  22  Q.      Okay.  And that was -- I think you paid it to a

16:50:44  23  man named Cezar?

16:50:45  24  **A.      Cezar is the manager.**

16:50:47  25  Q.      And also when you returned to Liberal in that June

16:50:51   1   of 2016, Mr. Allen was much more into prepping at that

16:50:55   2   time, wasn't it?

16:50:57   3   **A.        Yeah, he thought that something might happen.   And**

16:51:00   4   **I was there and we got right back into buying up and**

16:51:09   5   **prepping.**

16:51:09   6   Q.   And on direct I believe you testified that

16:51:12   7   prepping is sort of "like a hoarder"; is that right?

16:51:17   8   **A.        Yes.**

16:51:17   9   Q.   Is it also your understanding that prepper means

16:51:20   10  that you are making sort of active preparations for a

16:51:23   11  possible sort of catastrophic disaster or emergency,

16:51:26   12  something like that?

16:51:27   13  **A.        Yes.**

16:51:27   14  Q.   So you lived in that trailer with him at various

16:51:31   15  times but also in 2016, so can I assume that you're

16:51:35   16  familiar with some of the items in the prepping gear and

16:51:38   17  the supplies that he had?

16:51:40   18  **A.        Yes, that we had.**

16:51:44   19  Q.   All right, Ms. Harris, let's take a look at some

16:51:48   20  of these items.

16:52:37   21       CLERK COOK:  Is it completely black on your

16:52:39   22  screen?

16:52:40   23       MR. FEDERICO:  It's a white screen.

16:52:48   24       CLERK COOK:  I apologize.

16:52:49   25  BY MR. FEDERICO:

3-26-2018 USA v. ALLEN, et al, NO 16-10141                308

| | | |
|---|---|---|
| 16:52:50 | 1 | Q.    Okay.  Now, Ms. Harris, this has already been |
| 16:52:53 | 2 | admitted as Defense Exhibit 912-a, but this is obviously |
| 16:52:55 | 3 | the trailer where you were living? |
| 16:52:55 | 4 | **A.    Yeah.** |
| 16:52:57 | 5 | Q.    And then again the front door with the American |
| 16:53:00 | 6 | flag, you recognize that, too; right? |
| 16:53:02 | 7 | **A.    Yeah.** |
| 16:53:02 | 8 | Q.    Okay.  I'm going to show you -- for the witness |
| 16:53:05 | 9 | only, please -- what has been marked as 912-e or "echo." |
| 16:53:11 | 10 | Ms. Harris, do you recognize this photograph? |
| 16:53:12 | 11 | **A.    Yes.** |
| 16:53:13 | 12 | Q.    What is it? |
| 16:53:15 | 13 | **A.    It's a photograph of the master bathroom.  That is** |
| 16:53:20 | 14 | **the shelf next to the cabinet sink that has food on it.** |
| 16:53:28 | 15 | Q.    So these were supplies that you and Mr. Allen had |
| 16:53:32 | 16 | acquired for prepping? |
| 16:53:33 | 17 | **A.    Yes.** |
| 16:53:33 | 18 | MR. FEDERICO:  Your Honor, I'd move to admit |
| 16:53:36 | 19 | 912-e. |
| 16:53:39 | 20 | THE COURT:  Ms. Berkower? |
| 16:53:40 | 21 | MS. BERKOWER:  Oh, no objection, sorry. |
| 16:53:41 | 22 | THE COURT:  912-e is admitted. |
| 16:53:44 | 23 | MR. FEDERICO:  And may I publish it to the jurors. |
| 16:53:47 | 24 | THE COURT:  You may. |
| 16:53:49 | 25 | BY MR. FEDERICO: |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

309

| | | |
|---|---|---|
| 16:53:49 | 1 | Q.     So again, so that now that the jurors can see it, |
| 16:53:52 | 2 | Ms. Harris, these are food items, you say, on the shelf. |
| 16:53:55 | 3 | **A.     Yes.** |
| 16:53:55 | 4 | Q.     And where was this located in the trailer? |
| 16:53:57 | 5 | **A.     In the back master bathroom.** |
| 16:54:05 | 6 | MR. FEDERICO:  And for the witness only, if I can |
| 16:54:07 | 7 | please show 912-h. |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 16:54:07 | 1 | BY MR. FEDERICO: |
| 16:54:11 | 2 | Q.     And, Ms. Harris, do you recognize this exhibit? |
| 16:54:13 | 3 | A.     **Yes.** |
| 16:54:13 | 4 | Q.     What is it? |
| 16:54:15 | 5 | A.     **It's pictures of a lot of powder, Country Time** |
| 16:54:24 | 6 | **drink.** |
| 16:54:24 | 7 | Q.     And is that something that you and Mr. Allen |
| 16:54:27 | 8 | purchased together in bulk? |
| 16:54:29 | 9 | A.     **I actually purchased that and brought it to** |
| 16:54:35 | 10 | **Liberal because it was a dollar a can.** |
| 16:54:41 | 11 | Q.     So that was the reason you buy in bulk? |
| 16:54:44 | 12 | A.     **Yes.** |
| 16:54:44 | 13 | Q.     Okay.  Then I'm also going to show you what has |
| 16:54:48 | 14 | been marked 912-i. |
| 16:54:50 | 15 |        Ms. Harris, do you recognize this photograph? |
| 16:54:52 | 16 | A.     **Yes, I do.** |
| 16:54:52 | 17 | Q.     What is it? |
| 16:54:54 | 18 | A.     **It is -- the bottom containers are five-gallon** |
| 16:55:00 | 19 | **buckets that are packed full of either medical supply or** |
| 16:55:07 | 20 | **food.  The top one is -- the top bucket is a herb, like** |
| 16:55:20 | 21 | **green sprouts that you can make kit.  And then the** |
| 16:55:25 | 22 | **square-looking container is full of rices and powdered** |
| 16:55:32 | 23 | **individual drinks.** |
| 16:55:33 | 24 | Q.     These are items that were stored at Bluebell Lane, |
| 16:55:37 | 25 | at the trailer at Bluebell Lane? |

| | | |
|---|---|---|
| 16:55:39 | 1 | A.        Yes. |
| 16:55:39 | 2 | Q.        Now, I'm going to show you 912-k.  And, |
| 16:55:45 | 3 | Ms. Harris, do you recognize this photograph? |
| 16:55:46 | 4 | A.        Yes. |
| 16:55:46 | 5 | Q.        What is it? |
| 16:55:48 | 6 | A.        That is the shower in the front of the mobile |
| 16:55:56 | 7 | home. |
| 16:55:56 | 8 | Q.        Of the one that was in the dwelling? |
| 16:55:59 | 9 | A.        Yes. |
| 16:55:59 | 10 | Q.        So I see, for example, various items.  You see, |
| 16:56:02 | 11 | you know, like toilet paper, for example.  Is that |
| 16:56:05 | 12 | accurate? |
| 16:56:06 | 13 | A.        Well, that was basically toilet paper that was an |
| 16:56:10 | 14 | overflow, but it was for that bathroom.  As you look in |
| 16:56:15 | 15 | there, that is not prepping stuff.  That is Curtis' items |
| 16:56:27 | 16 | that -- |
| 16:56:27 | 17 | Q.        Just items he was storing? |
| 16:56:29 | 18 | A.        That he didn't have a place to go. |
| 16:56:31 | 19 |         MR. FEDERICO:  I'd like to move at this time admit |
| 16:56:33 | 20 | Exhibits 912-h, -i, and -k. |
| 16:56:37 | 21 |         MS. BERKOWER:  No objection. |
| 16:56:38 | 22 |         THE COURT:  h, i, and k are admitted. |
| 16:56:41 | 23 |         MR. FEDERICO:  And if I may publish them to the |
| 16:56:43 | 24 | jurors, please. |
| 16:56:44 | 25 |         THE COURT:  You may. |

| | | |
|---|---|---|
| 16:56:46 | 1 | BY MR. FEDERICO: |
| 16:56:46 | 2 | Q.    And, again, just to orient the jurors, Ms. Harris, |
| 16:56:50 | 3 | this was the sort of bulk powder drink that you purchased |
| 16:56:54 | 4 | and was kept in the mobile home; is that accurate? |
| 16:56:56 | 5 | **A.    Yes.** |
| 16:56:57 | 6 | Q.    In 912-i here we have utility buckets, these are |
| 16:57:01 | 7 | what you referenced as being full of supplies at the |
| 16:57:04 | 8 | bathroom there in the mobile home? |
| 16:57:05 | 9 | **A.    Yes.** |
| 16:57:05 | 10 | Q.    And 912-k here we have, as you said, Mr. Allen's |
| 16:57:09 | 11 | various supplies or just items, including the overflow |
| 16:57:14 | 12 | toilet paper; is that right? |
| 16:57:15 | 13 | **A.    Yes, toilet paper for that restroom and then just** |
| 16:57:18 | 14 | **items we didn't use that, we had it taped off.  We'd had** |
| 16:57:24 | 15 | **a plumbing issue before, so we just taped the bottom of** |
| 16:57:27 | 16 | **it off, put all of his stuff in there that he didn't have** |
| 16:57:30 | 17 | **anyplace for it to go.** |
| 16:57:31 | 18 | Q.    Okay.  Now, Ms. Harris, you also testified on |
| 16:57:34 | 19 | direct obviously you are aware that Mr. Allen was a |
| 16:57:37 | 20 | member of the Kansas Security Force; right? |
| 16:57:38 | 21 | **A.    Yes.** |
| 16:57:39 | 22 | Q.    So he had, is it fair to say, various items |
| 16:57:43 | 23 | related to Kansas Security Force also in the trailer |
| 16:57:45 | 24 | there on Bluebell Lane? |
| 16:57:48 | 25 | **A.    Yes.** |

16:57:48  1   Q.      Okay.  For the witness only, please, I'm going to

16:57:51  2   show you what has been marked as Exhibit 912-c.

16:57:55  3   Ms. Harris, do you recognize these?

16:58:00  4   A.      Yes.

16:58:00  5   Q.      What are they?

16:58:01  6   A.      It's a ZERT patch, it's a 3 percent patch, and

16:58:06  7   it's a KSF patch.

16:58:10  8   Q.      And are these items that were in Bluebell Lane

16:58:13  9   where you lived with Mr. Allen?

16:58:15  10  A.      Yes.

16:58:16  11  Q.      I'm also going to show you now what is marked as

16:58:19  12  Exhibit 912-g.  Ms. Harris, do you recognize this --

16:58:23  13  what's in this photograph?

16:58:26  14  A.      Yes, a green T-shirt, KSF.

16:58:29  15  Q.      Is this a green KSF T-shirt that you saw Mr. Allen

16:58:33  16  possess or wear?

16:58:36  17  A.      I just -- it looks like the back of the shirt.  I

16:58:48  18  had seen the front of the shirts.

16:58:49  19  Q.      So you don't know whether or not this is a T-shirt

16:58:51  20  Mr. Allen ever wore or possessed?

16:58:53  21  A.      I know he had some Kansas Security Force shirts.

16:58:58  22  But like I said, I don't -- I don't recall the -- when

16:59:06  23  tyranny becomes law, resistance becomes duty."

16:59:08  24  Q.      Okay.  So, yes or no, you recognize the shirt?

16:59:12  25  A.      Yes.

3-26-2018 USA v. ALLEN, et al, NO 16-10141          314

| | | |
|---|---|---|
| 16:59:12 | 1 | Q.      Okay.  So you recognize this as a shirt Mr. Allen |
| 16:59:18 | 2 | owned and possessed? |
| 16:59:19 | 3 | **A.      Yes.** |
| 16:59:20 | 4 | MR. FEDERICO:  Your Honor, at this time I'd like |
| 16:59:21 | 5 | to move to admit Exhibits 912-c and 912-j into evidence. |
| 16:59:25 | 6 | MS. BERKOWER:  No objection. |
| 16:59:26 | 7 | THE COURT:  -c and -j are admitted. |
| 16:59:31 | 8 | MR. FEDERICO:  If I may now for the jury publish |
| 16:59:34 | 9 | 912-g. |
| 16:59:34 | 10 | BY MR. FEDERICO: |
| 16:59:35 | 11 | Q.      So again, Ms. Harris, these are the three patches |
| 16:59:37 | 12 | that we have in the photograph that you previously |
| 16:59:39 | 13 | identified as being those that were possessed by |
| 16:59:41 | 14 | Mr. Allen.  Is that accurate? |
| 16:59:43 | 15 | **A.      Yes.** |
| 16:59:44 | 16 | Q.      And here is that T-shirt that we just described in |
| 16:59:47 | 17 | 912-g that is the Kansas Security Force; is that right? |
| 16:59:50 | 18 | **A.      Yes, back of it.** |
| 16:59:52 | 19 | Q.      All right.  Now, Ms. Harris, as you know, |
| 16:59:56 | 20 | Mr. Allen also was engaged in other activities in 2016 |
| 17:00:00 | 21 | regarding some businesses he wanted to start up; is that |
| 17:00:03 | 22 | right? |
| 17:00:03 | 23 | **A.      Yes.  He, with Kevin Frauli, he was wanting to** |
| 17:00:09 | 24 | **open an ammunition company.** |
| 17:00:13 | 25 | Q.      They were going to call it C & K Industries? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141          315

17:00:18   1   **A.      That sounds about right.**

17:00:19   2   Q.      C for Curtis, K for Kevin.  And that would be

17:00:22   3   Kevin Frauli; is that right?

17:00:23   4   **A.      Yes.**

17:00:23   5   Q.      And the whole purpose of this business was going

17:00:25   6   to be to essentially make bullets or ammunition and then

17:00:28   7   sell it; right?

17:00:29   8   **A.      Right.**

17:00:32   9   Q.      For the witness only, please.  Ms. Harris, I'm

17:00:39   10  showing you a photograph marked as 912-d.  Do you

17:00:42   11  recognize what's in this photograph?

17:00:44   12  **A.      Yes.   That was the business layout of their plan.**

17:00:51   13  Q.      The business plan?

17:00:53   14  **A.      Yes.**

17:00:53   15  Q.      Is that the business plan for C & K Industries?

17:00:57   16  **A.      Yes.**

17:00:57   17       MR. FEDERICO:  Your Honor move to -- excuse me,

17:01:00   18  admit 912-d.

17:01:01   19       MS. BERKOWER:  No objection.

17:01:02   20       THE COURT:  912-d is admitted.

17:01:07   21       MR. FEDERICO:  If I may now publish that to the

17:01:11   22  jurors.

17:01:11   23  BY MR. FEDERICO:

17:01:16   24  Q.      So, again, Ms. Harris, this is the business plan

17:01:19   25  that was there at Bluebell Lane for C & K Industries,

| | | |
|---|---|---|
| 17:01:25 | 1 | that ammunition company, for Mr. Allen? |
| 17:01:29 | 2 | **A.** **Yes.** |
| 17:01:31 | 3 | Q. You also mentioned, I think on direct, that |
| 17:01:34 | 4 | Mr. Allen worked for a security alarm system company; is |
| 17:01:38 | 5 | that accurate? |
| 17:01:38 | 6 | **A.** **Yes.** |
| 17:01:38 | 7 | Q. And part of his job was to not just install |
| 17:01:44 | 8 | security alarm but to sell them? |
| 17:01:47 | 9 | **A.** **Yes.** |
| 17:01:47 | 10 | Q. So did you -- or Mr. Allen, I should say, consider |
| 17:01:48 | 11 | himself a salesman? |
| 17:01:49 | 12 | **A.** **Yes.** |
| 17:01:50 | 13 | Q. And for the witness only, please. Showing the |
| 17:01:56 | 14 | witness what we've marked 912-j. Ms. Harris, do you |
| 17:02:00 | 15 | recognize this photograph, what's in this photograph? |
| 17:02:03 | 16 | **A.** **No.** |
| 17:02:03 | 17 | Q. Okay. So you don't recognize this at all? |
| 17:02:06 | 18 | **A.** **No.** |
| 17:02:06 | 19 | Q. Okay. Fair enough. And what about 912-f, do you |
| 17:02:12 | 20 | recognize that book? |
| 17:02:13 | 21 | **A.** **Yes.** |
| 17:02:14 | 22 | Q. And what is it? |
| 17:02:18 | 23 | **A.** **The power of what hydrogen peroxide can do, as far** |
| 17:02:24 | 24 | **as how to use it in your body.** |
| 17:02:27 | 25 | Q. Is this a book that was kept at Bluebell Lane when |

| | | |
|---|---|---|
| 17:02:30 | 1 | you resided there with Mr. Allen? |
| 17:02:31 | 2 | **A.        As far as I know.** |
| 17:02:32 | 3 | Q.        So, yes, it was? |
| 17:02:34 | 4 | **A.        Yes.** |
| 17:02:34 | 5 | Q.        All right. |
| 17:02:35 | 6 | MR. FEDERICO:  Your Honor, I move to admit 912-f. |
| 17:02:38 | 7 | MS. BERKOWER:  No objection. |
| 17:02:39 | 8 | THE COURT:  912-f is admitted. |
| 17:02:41 | 9 | MR. FEDERICO:  If I may now publish that to the |
| 17:02:43 | 10 | jurors. |
| 17:02:44 | 11 | THE COURT:  You may.  Can I ask you a question, |
| 17:02:55 | 12 | Mr. Federico? |
| 17:02:55 | 13 | MR. FEDERICO:  Yes, Your Honor. |
| 17:02:56 | 14 | THE COURT:  I show that you admitted earlier |
| 17:03:00 | 15 | 912-j, but I have a feeling that instead you admitted |
| 17:03:03 | 16 | 912-g. |
| 17:03:07 | 17 | MR. FEDERICO:  I think that's right, Your Honor. |
| 17:03:09 | 18 | I have my notes wrong here.  I wrote it down incorrectly |
| 17:03:12 | 19 | and I think that's why I probably misspoke. |
| 17:03:14 | 20 | THE COURT:  I may have misheard, I don't know, but |
| 17:03:16 | 21 | just to clear the record, 912-g is admitted; 912-j is |
| 17:03:21 | 22 | not. |
| 17:03:21 | 23 | MR. FEDERICO:  I agree, Your Honor.  Thank you. |
| 17:03:22 | 24 | THE COURT:  All right.  You may proceed. |
| 17:03:35 | 25 | BY MR. FEDERICO: |

17:03:35  1  Q.    All right.  Ms. Harris, regarding the prepping

17:03:39  2  activities, wasn't one of the ideas also that you and

17:03:44  3  Mr. Allen were looking into acquiring a military bunker

17:03:47  4  in the state of Colorado?

17:03:51  5  **A.    They were considering, Gavin and Curtis, were**

17:03:58  6  **talking and viewing locations in Colorado that also had**

17:04:06  7  **mines and what you could and could not do upon leasing**

17:04:12  8  **these item -- or these locations.**

17:04:14  9  Q.    So part of the purpose of having the mines or

17:04:18  10  those locations was to sort of get off the grid in the

17:04:21  11  event of something happening; is that accurate?

17:04:23  12  **A.    If something happened, plus you could also -- what**

17:04:27  13  **they were looking at was some of those mines had gold**

17:04:32  14  **benefits to them as well.**

17:04:35  15  Q.    So they were exploring the idea of acquiring some

17:04:38  16  land or to use for gold mining in Colorado?

17:04:42  17  **A.    Yes.**

17:04:43  18  Q.    There was even discussion, though -- this is again

17:04:47  19  sort of another purpose would be to be a potential what

17:04:50  20  you call the bug-out location as well?

17:04:52  21  **A.    Yes.**

17:04:52  22  Q.    And, again, the bug-out location is just a place

17:04:56  23  you would go in the event that sort of any type of

17:05:00  24  catastrophe would ever occur; is that accurate?

17:05:03  25  **A.    Right.**

3-26-2018 USA v. ALLEN, et al, NO 16-10141          319

17:05:11   1   Q.      Speaking of some items of catastrophe, for the

17:05:15   2   witness only, please.  Ms. Harris I'm showing you another

17:05:22   3   photograph, this one is marked 916-c.  Do you recognize

17:05:25   4   this photo?

17:05:26   5   **A.      It's the back seat of his Denali.**

17:05:29   6   Q.      Of Mr. Allen's vehicle?

17:05:30   7   **A.      Yes.**

17:05:30   8   Q.      And some of the items in vehicle, do you recognize

17:05:34   9   any of those?

17:05:37   10  **A.      Well, there's water, there's -- pretty messy.**

17:05:44   11  **There's a camouflage hat.**

17:05:52   12  Q.      Do you recognize that item in particular?

17:06:03   13  **A.      That looks like a gas mask.  I'm not really sure.**

17:06:07   14  Q.      Do you regular generally though this is a

17:06:11   15  photograph from the back seat of Mr. Allen's vehicle

17:06:14   16  including some of the supplies you recognize, is that

17:06:16   17  right?

17:06:16   18  **A.      Yes.**

17:06:17   19          MR. FEDERICO:  Your Honor, I move to admit 916-c.

17:06:20   20          MS. BERKOWER:  No objection.

17:06:21   21          THE COURT:  It's admitted.

17:06:22   22          MR. FEDERICO:  Ask to publish that to the jurors

17:06:24   23  at this time.

17:06:30   24  BY MR. FEDERICO:

17:06:30   25  Q.      So, Ms. Harris, you were talking about the, for

17:06:33   1   example, the camouflage hat that you see there as well;

17:06:35   2   is that accurate?

17:06:37   3   **A.      Right, yes.**

17:06:39   4   Q.      And what appears to be a gas mask there; is that

17:06:44   5   accurate?

17:06:45   6   **A.      Oh, I mean, that's what it looks like, but I can't**

17:06:48   7   **really be 100 percent but I'm pretty sure it's a gas**

17:06:52   8   **mask.**

17:06:52   9   Q.      Regarding Mr. Allen's participation in the Kansas

17:06:55   10  Security Forces, you're also aware, I believe you

17:06:57   11  testified, that he was a Commander; is that right?

17:07:01   12  **A.      Yes.**

17:07:01   13  Q.      And Kansas Security Force was -- had actually

17:07:05   14  divided the state of Kansas into three divisions?

17:07:07   15  **A.      Yes.**

17:07:07   16  Q.      And so he was what was called the First Division

17:07:10   17  Commander; right?

17:07:11   18  **A.      Right.**

17:07:11   19  Q.      And the first division was for western Kansas?

17:07:14   20  **A.      Yes.**

17:07:15   21  Q.      And if I could just for the witness only, please.

17:07:21   22  Ms. Harris, did you ever see what is depicted here in

17:07:24   23  916-b?

17:07:26   24  **A.      It's a KSF recruiting mail card.**

17:07:32   25  Q.      Yeah.  And it has whose name on it?

3-26-2018 USA v. ALLEN, et al, NO 16-10141          321

| | | |
|---|---|---|
| 17:07:34 | 1 | **A.**        **Curtis Allen.** |
| 17:07:35 | 2 | Q.      And what about the phone number? |
| 17:07:37 | 3 | **A.**        **316-992-4253, his number.** |
| 17:07:41 | 4 | Q.      So you recognize that also? |
| 17:07:44 | 5 | **A.**        **Yeah.** |
| 17:07:44 | 6 | MR. FEDERICO:  Your Honor, I move to admit 916-b. |
| 17:07:49 | 7 | MS. BERKOWER:  Your Honor, I don't know this |
| 17:07:50 | 8 | witness says she's ever seen this particular item before. |
| 17:07:55 | 9 | THE COURT:  Ms. Harris, is this an item you've |
| 17:07:57 | 10 | seen before?  I know you read it off, but I guess the |
| 17:07:59 | 11 | question is -- |
| 17:08:00 | 12 | THE WITNESS:  He had business cards for |
| 17:08:02 | 13 | everything. |
| 17:08:02 | 14 | THE COURT:  So you're familiar with this? |
| 17:08:05 | 15 | THE WITNESS:  I mean, if he'd get his name put on |
| 17:08:08 | 16 | it, it was going on it. |
| 17:08:09 | 17 | THE COURT:  Objection? |
| 17:08:12 | 18 | MS. BERKOWER:  I'm not clear that the witness has |
| 17:08:14 | 19 | ever seen this particular item before, Your Honor. |
| 17:08:17 | 20 | THE WITNESS:  It's a business card, yeah, so -- |
| 17:08:20 | 21 | THE COURT:  I'm going to admit the item.  What |
| 17:08:25 | 22 | number was it again, Mr. Federico? |
| 17:08:26 | 23 | MR. FEDERICO:  Your Honor, that was 916-b. |
| 17:08:29 | 24 | THE COURT:  Thank you.  It's admitted. |
| 17:08:31 | 25 | MR. FEDERICO:  If I may publish that to the jurors |

| | | |
|---|---|---|
| 17:08:33 | 1 | at this time. |
| 17:08:33 | 2 | THE COURT:  916-b? |
| 17:08:35 | 3 | MR. FEDERICO:  Yes, Your Honor. |
| 17:08:38 | 4 | THE COURT:  You have it identified differently in |
| 17:08:41 | 5 | your list. |
| 17:08:56 | 6 | MR. FEDERICO:  Yes, Your Honor, that description |
| 17:08:58 | 7 | is obviously in error. |
| 17:08:59 | 8 | THE COURT:  All right. |
| 17:09:08 | 9 | BY MR. FEDERICO: |
| 17:09:09 | 10 | Q.    All right.  Ms. Harris, on direct you testified |
| 17:09:12 | 11 | that obviously the prosecution had you identify a lot of |
| 17:09:15 | 12 | notebooks; is that accurate? |
| 17:09:17 | 13 | **A.    Yes.** |
| 17:09:18 | 14 | Q.    So Mr. Allen would keep a lot of notebooks; right? |
| 17:09:22 | 15 | **A.    Yes.** |
| 17:09:22 | 16 | Q.    And you're aware that one of the reasons he kept |
| 17:09:25 | 17 | notebooks was sort of part of this prepping idea that you |
| 17:09:28 | 18 | needed things written down in case there was no electric? |
| 17:09:34 | 19 | **A.    No.** |
| 17:09:34 | 20 | Q.    No, that's not -- you're not aware of that? |
| 17:09:37 | 21 | **A.    We didn't write things down.  We started making a** |
| 17:09:41 | 22 | **list to -- because we'd taken items out to Gavin Wright's** |
| 17:09:48 | 23 | **that we purchased, and we wanted to keep a running list** |
| 17:09:52 | 24 | **of what we'd taken to his house.** |
| 17:09:55 | 25 | Q.    Okay. |

| | | |
|---|---|---|
| 17:09:56 | 1 | A.      **It was the only time that we ever made a list of** |
| 17:09:58 | 2 | **it.** |
| 17:09:58 | 3 | Q.      But you're also aware that Mr. Allen had memory |
| 17:10:01 | 4 | problems, too; right? |
| 17:10:03 | 5 | A.      **Yes.** |
| 17:10:03 | 6 | Q.      So he wrote things down because he couldn't |
| 17:10:06 | 7 | remember? |
| 17:10:08 | 8 | A.      **Curtis had a short-term, is what he told me.** |
| 17:10:16 | 9 | Q.      I'm sorry, did you say Curtis said he had a |
| 17:10:19 | 10 | short-term? |
| 17:10:19 | 11 | A.      **He had a short-term.** |
| 17:10:21 | 12 | Q.      You're referring to a short-term memory issue? |
| 17:10:24 | 13 | A.      **Yes.** |
| 17:10:24 | 14 | Q.      And, for example, you knew he served in the |
| 17:10:27 | 15 | military; right? |
| 17:10:28 | 16 | A.      **Yes.** |
| 17:10:28 | 17 | Q.      So he was a marine in the 1980s for about four |
| 17:10:34 | 18 | years? |
| 17:10:34 | 19 | A.      **Yes.** |
| 17:10:36 | 20 | Q.      In fact, on October 11th -- if I could show this |
| 17:10:39 | 21 | just to the witness only, please -- when you were there |
| 17:10:46 | 22 | with Liberal Police Department and they were searching |
| 17:10:48 | 23 | through the home, they took this photograph.  Do you |
| 17:10:51 | 24 | recognize this? |
| 17:10:55 | 25 | A.      **This is -- has completed a course prescribed by** |

17:11:00  1  the --

17:11:01  2  Q.     Ms. Harris, have you ever seen this before?

17:11:03  3  A.     Rifleman.  Yeah, I've seen his DD214, some of his

17:11:10  4  medical record, his certificates.

17:11:11  5  Q.     So you've seen this certificate before now?

17:11:14  6  A.     Yeah.  I've seen this stuff before.  I had no

17:11:16  7  doubt that he was in the military.

17:11:17  8         MR. FEDERICO:  Okay, Your Honor, I move to admit

17:11:20  9  912-1.

17:11:20  10        THE COURT:  912-1 is the exhibit?

17:11:22  11        MR. FEDERICO:  Yes, Your Honor.

17:11:23  12        MS. BERKOWER:  No objection.

17:11:24  13        THE COURT:  It's admitted.

17:11:26  14        MR. FEDERICO:  If I could show it to the jurors.

17:11:28  15        THE COURT:  You may.

17:11:28  16  BY MR. FEDERICO:

17:11:29  17  Q.     All right.  Again, Ms. Harris, this is a

17:11:31  18  certificate from the United States Marine Corps

17:11:36  19  indicating that Curtis Allen had completed his initial

17:11:43  20  course for his MOS or Military Occupational Specialty as

17:11:43  21  a rifleman; is that accurate?

17:11:44  22  A.     Okay.

17:11:46  23  Q.     Is that a "yes"?

17:11:46  24  A.     That's what it says, yes.

17:11:48  25  Q.     You're also aware Mr. Allen, after he was

17:11:52  1  discharged from the Marine Corps, he served in the army,

17:11:54  2  too; right?

17:11:56  3  **A.      A little bit in the army and then a little bit in**

17:11:59  4  **the Army National Guards, yes.**

17:12:00  5  Q.      In the Kansas National Guard; right.  Okay.

17:12:03  6          MR. FEDERICO:  If I could show only the witness,

17:12:05  7  please, marked as 916-a.

17:12:05  8  BY MR. FEDERICO:

17:12:12  9  Q.      Ms. Harris, do you recognize the items in this

17:12:14  10  photograph?

17:12:16  11  **A.      I've seen them.**

17:12:17  12  Q.      Okay.  Where have you seen them before?

17:12:19  13  **A.      At his house.**

17:12:20  14  Q.      So you recognized these as being items that

17:12:23  15  belonged to Mr. Allen?

17:12:24  16  **A.      Yes.**

17:12:25  17          MR. FEDERICO:  Your Honor, I'd move to admit

17:12:27  18  916-a.

17:12:27  19          MS. BERKOWER:  No objection.

17:12:28  20          THE COURT:  It's admitted.

17:12:30  21          MR. FEDERICO:  If I could show it to the jurors,

17:12:31  22  please.

17:12:31  23  BY MR. FEDERICO:

17:12:34  24  Q.      So again, Ms. Harris, these are items that you

17:12:37  25  recognized as belonging to Mr. Allen from his days in the

3-26-2018 USA v. ALLEN, et al, NO 16-10141

326

| | | |
|---|---|---|
| 17:12:41 | 1 | military? |
| 17:12:42 | 2 | **A.       Yes.** |
| 17:12:43 | 3 | Q.      All right.  Ms. Harris, you testified a moment ago |
| 17:12:47 | 4 | that Mr. Allen had represented to you that he had |
| 17:12:49 | 5 | short-term memory issues; right? |
| 17:12:50 | 6 | **A.       Right.** |
| 17:12:51 | 7 | Q.      And you're aware that some of these memory |
| 17:12:54 | 8 | problems particularly were developed after he returned |
| 17:12:57 | 9 | from his deployment to Iraq; right? |
| 17:13:01 | 10 | **A.       Right.** |
| 17:13:01 | 11 | Q.      And that occurred before he moved to Liberal? |
| 17:13:05 | 12 | **A.       Yes.  He got back from duty 2005, December of** |
| 17:13:13 | 13 | **2005.** |
| 17:13:18 | 14 | Q.      Now, Ms. Harris, I want to go back to something |
| 17:13:22 | 15 | you testified about on direct testimony.  I believe you |
| 17:13:24 | 16 | said that Mr. Allen was watching videos of explosives |
| 17:13:28 | 17 | every day.  Is that accurate? |
| 17:13:32 | 18 | **A.       Yes, at certain points he got to come home, he'd** |
| 17:13:38 | 19 | **come home from Gavin's, G & G, and he would watch this** |
| 17:13:42 | 20 | **video over and over and over.** |
| 17:13:43 | 21 | Q.      He was watching it through, I think you showed -- |
| 17:13:47 | 22 | the prosecution showed you a picture and you identified a |
| 17:13:50 | 23 | television where he'd watch that; is that right? |
| 17:13:52 | 24 | **A.       Yes.** |
| 17:13:52 | 25 | Q.      But you didn't have cable service at the trailer |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

327

| | | |
|---|---|---|
| 17:13:55 | 1 | on Bluebell Lane, did you? |
| 17:13:57 | 2 | **A.      No, he used Roku.** |
| 17:13:59 | 3 | Q.     So he was observing -- or he was using Roku to |
| 17:14:03 | 4 | basically stream something from the Internet onto the TV; |
| 17:14:06 | 5 | is that right? |
| 17:14:06 | 6 | **A.      Exactly.** |
| 17:14:07 | 7 | Q.     So he used, I think you said, like the iPad, for |
| 17:14:11 | 8 | example to stream onto that television? |
| 17:14:14 | 9 | **A.      No, he didn't use the iPad or the -- I guess it** |
| 17:14:19 | 10 | **was a notepad.  It was bigger.  He had an iPad.  But the** |
| 17:14:27 | 11 | **notepad or whatever they're called now, laptop.** |
| 17:14:31 | 12 | Q.     Okay.  So he was using a computer then to stream |
| 17:14:34 | 13 | content on the TV? |
| 17:14:36 | 14 | **A.      No, he just used the Roku.** |
| 17:14:37 | 15 | Q.     So he was using the computer via the Roku to |
| 17:14:40 | 16 | stream items on the TV; right? |
| 17:14:44 | 17 | **A.      No.** |
| 17:14:44 | 18 | Q.     I'm sorry is that a "yes"? |
| 17:14:46 | 19 | **A.      No.  He could go through Roku.** |
| 17:14:50 | 20 | Q.     Okay.  So you didn't have cable television, did |
| 17:14:53 | 21 | you, Ms. Harris? |
| 17:14:54 | 22 | **A.      No, we did not.** |
| 17:14:54 | 23 | Q.     And you did not have satellite? |
| 17:14:56 | 24 | **A.      We had Internet.** |
| 17:14:57 | 25 | Q.     So all the things that were being viewed on the TV |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

17:14:59  1  were coming from the Internet; is that accurate?

17:15:01  2  **A.      Yes.**

17:15:02  3  Q.      All right, Ms. Harris, does Curtis Allen ever talk

17:15:06  4  to you about wanting to make his own fireworks?

17:15:08  5  **A.      His own fireworks?**

17:15:11  6  Q.      Yes.

17:15:13  7  **A.      No.   We didn't even do Fourth of July.**

17:15:15  8  Q.      All right, Ms. Harris, let's talk about also what

17:15:18  9  you said on direct about the difference in Mr. Allen in

17:15:24  10  2016.   You were asked by the prosecutor about whether

17:15:27  11  Mr. Allen would routinely maybe start big projects and

17:15:31  12  whether he finished them, and I believe you testified,

17:15:33  13  "Not all the time," in terms of his new interest.   Is

17:15:36  14  that accurate?

17:15:37  15  **A.      I think she was referring to the --**

17:15:40  16  Q.      Ms. Harris, is that an accurate statement that you

17:15:42  17  testified on direct that, regarding his new interest that

17:15:44  18  he did not finish them all the time?

17:15:47  19  **A.      Yes.**

17:15:47  20  Q.      If I heard your testimony correctly, you were

17:15:49  21  saying, though, that this time, 2016, seemed to be

17:15:52  22  different; right?

17:15:55  23  **A.      Looked like it.**

17:15:57  24  Q.      Are you aware of any time prior to 2016 where

17:16:01  25  Mr. Allen's life had been infiltrated by an agent of the

17:16:05    1   FBI?

17:16:06    2   **A.      No.**

17:16:07    3   Q.      And so Mr. Allen devoted a lot of time to the

17:16:11    4   Kansas Security Forces, didn't he?

17:16:17    5   **A.      Do what?**

17:16:18    6   Q.      Mr. Allen devoted a lot of time to the Kansas

17:16:20    7   Security Forces, didn't he?

17:16:22    8   **A.      Did he devote a lot of time?**

17:16:24    9   Q.      Did he devote a lot of time to the Kansas Security

17:16:30   10   Forces?

17:16:30   11   **A.      Zello.  I mean, while I was out there, Zello.  I'd**

17:16:34   12   **known of one meeting that he went to while I was not**

17:16:42   13   **there, while I was living in El Dorado.**

17:16:45   14   Q.      So, for example, on Zello -- you describe Zello as

17:16:49   15   being an Internet app that's like a walkie-talkie; right?

17:16:52   16   **A.      It's over the phone.  It's an application over the**

17:16:54   17   **phone.**

17:16:55   18   Q.      Okay.  In that -- Zello -- they had Zello calls

17:17:00   19   every night, didn't they?

17:17:01   20   **A.      Yes, they were supposed to sign on at 9:30 and the**

17:17:05   21   **reason for that was the group signed on at 9:30, they**

17:17:12   22   **would tell who they were, any news that they had in their**

17:17:16   23   **area, and if anything was going on, if they had heard of**

17:17:24   24   **any activity going on.**

17:17:25   25   Q.      All right.  So this was for members of the first

3-26-2018 USA v. ALLEN, et al, NO 16-10141

330

| | | |
|---|---|---|
| 17:17:27 | 1 | division of Kansas Security Force to essentially sign on |
| 17:17:31 | 2 | at 9:30 at night every night on Zello? |
| 17:17:34 | 3 | **A.      Exactly.** |
| 17:17:34 | 4 | Q.      And you would hear them talk because it would come |
| 17:17:37 | 5 | over, I believe you said, over the phone where you were |
| 17:17:39 | 6 | residing; right? |
| 17:17:41 | 7 | **A.      Yes.  A lot of times --** |
| 17:17:42 | 8 | Q.      And you would hear -- I'm sorry, you would hear |
| 17:17:45 | 9 | Mr. Stein's voice? |
| 17:17:47 | 10 | **A.      Yes.** |
| 17:17:48 | 11 | Q.      And you knew him to be called what's -- |
| 17:17:49 | 12 | **A.      He's XO.** |
| 17:17:50 | 13 | Q.      XO.  All right.  For executive officer? |
| 17:17:54 | 14 | **A.      Yes, he was second in command.** |
| 17:17:55 | 15 | Q.      I believe, regarding Mr. Stein, you testified on |
| 17:17:58 | 16 | direct that you first met him at IHOP in Dodge City? |
| 17:18:04 | 17 | **A.      Yes.** |
| 17:18:04 | 18 | Q.      And you said that he was very focused? |
| 17:18:10 | 19 | **A.      Yes.** |
| 17:18:10 | 20 | Q.      Would it be accurate to say that your impression |
| 17:18:13 | 21 | of Mr. Stein was also that he was fueled with poison? |
| 17:18:18 | 22 | **A.      His -- I mean, most things that come out of him** |
| 17:18:23 | 23 | **were poisoned.  I mean, when you ask him a question, when** |
| 17:18:26 | 24 | **you have a conversation with him, when you're standing in** |
| 17:18:30 | 25 | **line to get dinner and he says, "nigger in the White** |

17:18:35    1    House," and you're at a fair and you've got ahead of you

17:18:39    2    just a few black people, I mean, he just -- it was poison

17:18:44    3    all the time.   Nothing nice.

17:18:47    4    Q.    From your observation, Ms. Harris, Mr. Allen would

17:18:50    5    change a little bit when he was talking with Mr. Stein;

17:18:52    6    is that right?

17:18:54    7    A.    Yes.

17:18:54    8    Q.    So Mr. Stein had sort of the ability to make

17:18:57    9    Mr. Allen aggravated?

17:18:59   10    A.    Yes.

17:18:59   11    Q.    And sort of get him pumped up, so to speak?

17:19:03   12    A.    Yes.

17:19:04   13    Q.    And I believe you testified on direct, Ms. Harris,

17:19:06   14    that when you were at the IHOP in Dodge City with

17:19:10   15    Mr. Stein and Mr. Allen you said that they were

17:19:12   16    discussing targets; is that accurate?

17:19:14   17    A.    Yes, they brought a notebook.  There was a

17:19:18   18    meeting -- there was a point to this meeting.  They

17:19:20   19    weren't just there to B.S.  Stein had wanted to talk to

17:19:27   20    Curtis.  He wanted to have a face to face.  So --

17:19:30   21    Q.    It was just the three of you were present?

17:19:32   22    A.    Well, basically the meeting that they -- or the

17:19:35   23    time that they had -- I was a smoker at the time, so I

17:19:38   24    went and paid the bill after we ate and --

17:19:43   25    Q.    So but while you were having a meal at the IHOP,

17:19:46  1  it was you --

17:19:46  2  **A.      It was myself --**

17:19:47  3  Q.      -- Mr. Allen, and Mr. Stein?

17:19:51  4  **A.      Yes.**

17:19:51  5  Q.      All right.  And you weren't necessarily supposed

17:19:53  6  to be part of that meeting; is that your testimony, but

17:19:55  7  you were just there with Mr. Allen?

17:19:57  8  **A.      Yes.   We went on service calls and that's how it**

17:20:01  9  **worked out.**

17:20:02  10  Q.      All right.  Ms. Harris, you also testified that --

17:20:05  11  about some interaction you had before the Kearney County

17:20:09  12  Fair in Lincoln in July of 2016.  And I believe on direct

17:20:13  13  that prior to going to the fair that you were in a

17:20:15  14  vehicle with Mr. Allen to go there; is that right?

17:20:17  15  **A.      Yes.**

17:20:17  16  Q.      And that's when he said that he was part of a what

17:20:22  17  you describe as a smaller cell within the Kansas Security

17:20:25  18  Force; is that right?

17:20:26  19  **A.      He told me that there would be members there, that**

17:20:32  20  **they were going to be meeting later on just a few of**

17:20:36  21  **them, yes.  But he told me who he expected to be there.**

17:20:41  22  **He told me Dan Day would be there, not to mention the**

17:20:46  23  **mines.**

17:20:46  24  Q.      So, Ms. Harris, he told you he was part of what

17:20:49  25  you described as a smaller cell; right?

| | | |
|---|---|---|
| 17:20:51 | 1 | A.      A smaller group had gotten together, yes. |
| 17:20:53 | 2 | Q.      Now, Ms. Harris, prior to coming in to courtroom |
| 17:20:57 | 3 | today, you've talked to the FBI on a number of occasions; |
| 17:20:59 | 4 | right? |
| 17:21:00 | 5 | A.      Yeah. |
| 17:21:00 | 6 | Q.      I mean, we heard about the one on October 11th, |
| 17:21:03 | 7 | 2016, at the Liberal Police Department where you talked |
| 17:21:05 | 8 | to the FBI; right? |
| 17:21:06 | 9 | A.      Yeah, that's who came in to talk to me.  I had no |
| 17:21:09 | 10 | idea who was coming to see me. |
| 17:21:10 | 11 | Q.      And then you said that the day after you took the |
| 17:21:13 | 12 | FBI down to Oklahoma to Mr. Wright's property? |
| 17:21:15 | 13 | A.      Yes. |
| 17:21:17 | 14 | Q.      And then even after that you've talked to the FBI |
| 17:21:20 | 15 | by phone on a number of occasions; right? |
| 17:21:22 | 16 | A.      Yes. |
| 17:21:22 | 17 | Q.      You testified in front of the grand jury on |
| 17:21:24 | 18 | December 14th, 2016, didn't you? |
| 17:21:26 | 19 | A.      Yes, I did. |
| 17:21:27 | 20 | Q.      And at that time you were under oath just like you |
| 17:21:29 | 21 | are today; right? |
| 17:21:30 | 22 | A.      Yes. |
| 17:21:30 | 23 | Q.      And you knew that you were going to be testifying |
| 17:21:32 | 24 | about matters related to this case? |
| 17:21:34 | 25 | A.      Yes. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

334

| | | |
|---|---|---|
| 17:21:34 | 1 | Q.     And you knew before the grand jury that your |
| 17:21:36 | 2 | testimony was going to be recorded; right? |
| 17:21:39 | 3 | **A.     Yes.** |
| 17:21:39 | 4 | Q.     And you knew that what you said had to be |
| 17:21:42 | 5 | truthful; right? |
| 17:21:42 | 6 | **A.     Yes.** |
| 17:21:42 | 7 | Q.     And you were asked all these questions similar to |
| 17:21:45 | 8 | the way you were today about conversation you had with |
| 17:21:48 | 9 | Mr. Allen; is that right? |
| 17:21:49 | 10 | **A.     Yes.** |
| 17:21:50 | 11 | Q.     And even since December 2016, and some we'll get |
| 17:21:54 | 12 | into, you had a number of conversations with the FBI |
| 17:21:56 | 13 | since then, too; right? |
| 17:21:58 | 14 | **A.     Yes.** |
| 17:21:58 | 15 | Q.     And even prior to your testimony here, just two |
| 17:22:02 | 16 | days ago on Saturday, March 24th, you met with the FBI |
| 17:22:05 | 17 | again; right, to prep this testimony? |
| 17:22:07 | 18 | **A.     To go over, yes.** |
| 17:22:09 | 19 | Q.     All right.  So they wanted to talk with you about |
| 17:22:12 | 20 | what you were going to say when you testified; right? |
| 17:22:14 | 21 | **A.     Right.** |
| 17:22:15 | 22 | Q.     And the prosecutor was there, too? |
| 17:22:17 | 23 | **A.     Yes.** |
| 17:22:18 | 24 | Q.     And so is it fair to say that on the 24th of |
| 17:22:22 | 25 | March, two days ago, that was the first time, from your |

17:22:27   1   grand jury testimony, from your time talking to the FBI

17:22:30   2   on that first day back in Liberal in October 2016, to all

17:22:35   3   the other subsequent conversations, it was the first time

17:22:37   4   you ever mentioned this conversation with Mr. Allen on

17:22:41   5   your way to the Kearney County Fair when he was part of

17:22:43   6   the smaller cell?

17:22:44   7   A.      No.

17:22:45   8   Q.      You're telling us that you mentioned that to the

17:22:47   9   FBI before?

17:22:52  10   A.      I -- no, I hadn't, because we'd been doing service

17:22:56  11   calls on the way up there, so yes, it was mentioned.  And

17:23:03  12   I mentioned about the --

17:23:05  13   Q.      So if the Government notified us otherwise, they

17:23:09  14   wouldn't be being truthful, is that what you're saying?

17:23:14  15   A.      Like I said, it was just -- I remember, like I

17:23:22  16   said, telling them what we talked about.

17:23:27  17   Q.      All right, Ms. Harris, you also talked about

17:23:30  18   somebody else who's at Kearney County Fair that day by --

17:23:33  19   his -- his name is Dan Day; right?

17:23:35  20   A.      Yes.

17:23:35  21   Q.      So he was also a member of the Kansas Security

17:23:38  22   Force?

17:23:38  23   A.      Yes.

17:23:38  24   Q.      And at the Kearney County Fair in Lincoln, that

17:23:41  25   was the first time you met him?

3-26-2018 USA v. ALLEN, et al, NO 16-10141

336

| | | |
|---|---|---|
| 17:23:42 | 1 | **A.      Yes.** |
| 17:23:43 | 2 | Q.      And that was there at the Kansas Security Force |
| 17:23:44 | 3 | booth? |
| 17:23:45 | 4 | **A.      Yes.** |
| 17:23:45 | 5 | Q.      And the purpose of that booth again was to promote |
| 17:23:49 | 6 | their organization? |
| 17:23:50 | 7 | **A.      Yes.** |
| 17:23:51 | 8 | Q.      They were talking about matters relating to the |
| 17:23:52 | 9 | Constitution? |
| 17:23:54 | 10 | **A.      I can't remember if that was there.  Like I said,** |
| 17:23:59 | 11 | **I knew that I'd seen pictures of what they had done,** |
| 17:24:02 | 12 | **helping out with the tornado that had just went through** |
| 17:24:06 | 13 | **Eureka and torn it up, and some of the workers had went** |
| 17:24:10 | 14 | **out to Eureka to help.** |
| 17:24:12 | 15 | Q.      Some of the workers from Kansas Security Force? |
| 17:24:14 | 16 | **A.      Yes.** |
| 17:24:14 | 17 | Q.      So they were using that event to promote their |
| 17:24:17 | 18 | organization? |
| 17:24:17 | 19 | **A.      Yes.** |
| 17:24:17 | 20 | Q.      All right.  Prior to you leaving Liberal or, |
| 17:24:23 | 21 | excuse me, before you returned to Liberal, June 2016, you |
| 17:24:27 | 22 | didn't know Dan Day; right? |
| 17:24:29 | 23 | **A.      No, sir.** |
| 17:24:29 | 24 | Q.      And as far as you know, Mr. Allen didn't know him |
| 17:24:33 | 25 | when you lived in Liberal before; right? |

| | | |
|---|---|---|
| 17:24:35 | 1 | A.      No. |
| 17:24:35 | 2 | Q.      And so you don't know when Mr. Allen met Dan Day? |
| 17:24:39 | 3 | A.      Do I know when? |
| 17:24:40 | 4 | Q.      Yes. |
| 17:24:42 | 5 | A.      I know it was back -- he told me back in a |
| 17:24:50 | 6 | training that they had done, seemed like March, they had |
| 17:24:53 | 7 | this training, the first time that he'd been introduced, |
| 17:24:58 | 8 | brought out to, and he had to be hauled away in an |
| 17:25:02 | 9 | ambulance or ambulance was called out because he had |
| 17:25:04 | 10 | dehydrated, and during that day of the fair Dan Day also |
| 17:25:11 | 11 | sat there and laughed and told me about that incident, |
| 17:25:14 | 12 | that he felt so bad. |
| 17:25:15 | 13 | Q.      So it was your understanding it was sometime in |
| 17:25:18 | 14 | 2016 when Mr. Allen met Mr. Day? |
| 17:25:21 | 15 | A.      Yeah, around March. |
| 17:25:22 | 16 | Q.      Okay.  So when you met Mr. Day at the Kearney |
| 17:25:27 | 17 | County Fair, he didn't tell you he was actually a paid |
| 17:25:29 | 18 | informant for the FBI, did he? |
| 17:25:31 | 19 | A.      No. |
| 17:25:31 | 20 | Q.      He didn't tell you anything about his code name of |
| 17:25:35 | 21 | Minuteman? |
| 17:25:35 | 22 | A.      No, he did not. |
| 17:25:36 | 23 | Q.      Is it fair to say that in 2016 Mr. Day was very |
| 17:25:39 | 24 | involved sort of with Mr. Allen and the others regarding |
| 17:25:42 | 25 | Kansas Security Force matters? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

338

| | | |
|---|---|---|
| 17:25:44 | 1 | **A.       Yes.** |
| 17:25:44 | 2 | Q.     So on this -- for example, the Zello calls that |
| 17:25:47 | 3 | happened nightly, Mr. Day would regularly participate in |
| 17:25:51 | 4 | those too; right? |
| 17:25:51 | 5 | **A.       Yes, they were all supposed to sign in.** |
| 17:25:54 | 6 | Q.     Okay.  And is it also fair to say that Mr. Day was |
| 17:25:58 | 7 | telling Mr. Allen and the others things he was learning |
| 17:26:00 | 8 | about Muslims in Garden City? |
| 17:26:03 | 9 | **A.       Yes.  I think that some -- he had more contact** |
| 17:26:11 | 10 | **with XO Patrick Stein than he had with what I recall of** |
| 17:26:17 | 11 | **Curtis.  He did not have one-on-ones with Curtis that** |
| 17:26:21 | 12 | **much on the phone.** |
| 17:26:22 | 13 | Q.     So, for example, it was Mr. Day, though, who |
| 17:26:25 | 14 | communicated to Mr. Allen and Mr. Stein and the others |
| 17:26:29 | 15 | about this apartment complex in Garden City where there |
| 17:26:31 | 16 | was Somali refugees; is that right? |
| 17:26:32 | 17 | MS. BERKOWER:  Objection, Your Honor.  No |
| 17:26:33 | 18 | foundation for that. |
| 17:26:35 | 19 | THE COURT:  Can you lay a foundation for that |
| 17:26:36 | 20 | question? |
| 17:26:39 | 21 | MR. FEDERICO:  Yes, Your Honor. |
| 17:26:39 | 22 | BY MR. FEDERICO: |
| 17:26:40 | 23 | Q.     Ms. Harris, you said you were familiar with the |
| 17:26:41 | 24 | content of things that Mr. Day was communicating to |
| 17:26:45 | 25 | Mr. Allen and the others; right? |

17:26:46    1   A.      Yes.

17:26:46    2   Q.      All right.  So did he communicate to Mr. Allen and

17:26:50    3   Mr. Stein and the others about this apartment complex in

17:26:53    4   Garden City?

17:26:56    5   A.      He'd apparently -- what I know about this phone

17:27:02    6   call is apparently Dan and Stein had had a phone

17:27:09    7   conversation about this complex.

17:27:12    8           MS. BERKOWER:  Your Honor, I'm going to object to

17:27:15    9   hearsay.  The witness is now relaying a conversation that

17:27:19   10   she heard about between two people who are not --

17:27:21   11           THE COURT:  I think the witness' testimony so far

17:27:23   12   is all right.  I'm going to let her proceed.

17:27:29   13   A.      So Dan Day had contacted Mr. Stein.  Mr. Stein

17:27:35   14   made a phone call to Curtis, which was on speakerphone,

17:27:41   15   as always, and Stein was relaying to him that there was

17:27:49   16   an apartment complex that Day drove by every day to go to

17:27:56   17   work at this CAIR facility.  One day he drives by it, and

17:28:00   18   it's got normal, just average white, all kinds of

17:28:06   19   races -- just normal families living there.  The second

17:28:12   20   day that Mr. Day drives by this facility on his way to

17:28:17   21   work, it is vacated, it's completely emptied out.  On the

17:28:24   22   third day that Mr. Day drives by this apartment complex,

17:28:31   23   it has been filled with Muslim refugees or the Somali

17:28:37   24   refugees that they had brought over.

17:28:39   25           And so upon Curtis hearing that, he got very

3-26-2018 USA v. ALLEN, et al, NO 16-10141

340

| | | |
|---|---|---|
| 17:28:44 | 1 | agitated, wound very tight, loud.  I called him down on |
| 17:28:53 | 2 | that several times and said, Curtis, Curtis, you have to |
| 17:28:55 | 3 | come back to earth."  I interrupted their conversation |
| 17:29:00 | 4 | and said, "Look, have Dan Day get the address, find out |
| 17:29:05 | 5 | more information about that, and you guys go investigate |
| 17:29:09 | 6 | this.  Do not believe what someone else is saying." |
| 17:29:12 | 7 | BY MR. FEDERICO: |
| 17:29:12 | 8 | Q.     All right.  So, Ms. Harris, just to unpack that a |
| 17:29:15 | 9 | little bit.  If I'm understanding you correctly, this |
| 17:29:17 | 10 | idea about the apartment complex being sort of filled |
| 17:29:20 | 11 | with people one day and then vacated for refugees to move |
| 17:29:25 | 12 | in, that was communicated to Mr. Allen, as far as you |
| 17:29:28 | 13 | understand it, through Mr. Day?  He originated that |
| 17:29:33 | 14 | story? |
| 17:29:33 | 15 | A.     I don't know.  I mean, it came from Stein.  Stein |
| 17:29:36 | 16 | said that Dan Day had told him that.  But I know for sure |
| 17:29:40 | 17 | that Stein said that information to Curtis.  I overheard |
| 17:29:43 | 18 | that phone conversation. |
| 17:29:44 | 19 | Q.     Then you know then that the reaction Mr. Allen had |
| 17:29:47 | 20 | to that was to be very agitated? |
| 17:29:49 | 21 | A.     Yes. |
| 17:29:49 | 22 | Q.     So this whole idea of sort of kicking people out |
| 17:29:53 | 23 | of an apartment complex to make room for refugees to move |
| 17:29:57 | 24 | in was upsetting to Mr. Allen; right? |
| 17:29:59 | 25 | A.     That's true. |

3-26-2018 USA v. ALLEN, et al, NO 16-10141                341

| | | |
|---|---|---|
| 17:30:00 | 1 | Q.     I believe in your view also is it fair to say that |
| 17:30:04 | 2 | you thought that Mr. Allen was getting played by Dan Day |
| 17:30:07 | 3 | over this? |
| 17:30:09 | 4 |      MS. BERKOWER:  Objection.  No foundation for that |
| 17:30:11 | 5 | either. |
| 17:30:12 | 6 |      THE COURT:  Overruled. |
| 17:30:17 | 7 | **A.     Over that incident right there?** |
| 17:30:19 | 8 | BY MR. FEDERICO: |
| 17:30:20 | 9 | Q.     Yes. |
| 17:30:21 | 10 | **A.     I just felt that Stein had taken it -- I mean, if** |
| 17:30:27 | 11 | **Dan Day had said it, then Stein had taken it at word** |
| 17:30:31 | 12 | **only, at face value.  Curtis was taking it at face value,** |
| 17:30:36 | 13 | **someone else's saying something instead of it being** |
| 17:30:42 | 14 | **investigated and then reported.** |
| 17:30:45 | 15 | Q.     All right.  Ms. Harris, do you recall talking to |
| 17:30:47 | 16 | Anthony Scognamillo from my office in February of 2017? |
| 17:30:52 | 17 | This was a phone call.  I think this was the first time |
| 17:30:54 | 18 | you spoke with him.  Does that sound right? |
| 17:30:57 | 19 | **A.     Okay.** |
| 17:30:57 | 20 | Q.     Is that a "yes"? |
| 17:30:58 | 21 | **A.     Sure, it sounds about right 'cause he had knocked** |
| 17:31:01 | 22 | **on my door and slammed it, you know, then I talked to** |
| 17:31:04 | 23 | **him.** |
| 17:31:04 | 24 | Q.     Yeah, then you talked by phone like a week later, |
| 17:31:07 | 25 | give or take? |

3-26-2018 USA v. ALLEN, et al, NO 16-10141

342

| | | |
|---|---|---|
| 17:31:08 | 1 | A.      Okay. |
| 17:31:08 | 2 | Q.      Is that a "yes"? |
| 17:31:09 | 3 | A.      Sounds about right. |
| 17:31:10 | 4 | Q.      All right.  And that was sort of a lengthier |
| 17:31:12 | 5 | conversation, wasn't it? |
| 17:31:13 | 6 | A.      Yes. |
| 17:31:14 | 7 | Q.      All right.  And you remember maybe during that |
| 17:31:17 | 8 | call that Mr. Scognamillo actually asked you about this |
| 17:31:22 | 9 | incident of Dan Day and the apartment complex.  Do you |
| 17:31:27 | 10 | recall that? |
| 17:31:27 | 11 | A.      It had to been the same story I just told.  I told |
| 17:31:31 | 12 | it over and over. |
| 17:31:31 | 13 | Q.      And so you knew it by the way because he'd come to |
| 17:31:34 | 14 | the house and given a business card that he was an |
| 17:31:37 | 15 | investigator for the federal public defender; right? |
| 17:31:40 | 16 | A.      He gave me a card? |
| 17:31:41 | 17 | Q.      I'm asking did you know who he was when you talked |
| 17:31:44 | 18 | with him on the phone? |
| 17:31:45 | 19 | A.      Yes.  But when he came to my door, he just told |
| 17:31:47 | 20 | me.  He didn't give me a card until I shut the door in |
| 17:31:51 | 21 | his face. |
| 17:31:51 | 22 | Q.      But you were aware when you were talking on the |
| 17:31:53 | 23 | phone? |
| 17:31:53 | 24 | A.      Yes, of who he was. |
| 17:31:54 | 25 | Q.      And you knew that he worked on behalf of |

| | | |
|---|---|---|
| 17:31:57 | 1 | Mr. Allen; right? |
| 17:31:57 | 2 | **A.     Okay.** |
| 17:31:58 | 3 | Q.     Is that a "yes"? |
| 17:31:59 | 4 | **A.     Yes.** |
| 17:31:59 | 5 | Q.     Okay.  Then in regard to that conversation and him |
| 17:32:02 | 6 | asking you about Mr. Dan Day, in particular about whether |
| 17:32:08 | 7 | Mr. Allen's getting played, you told him that Mr. Allen's |
| 17:32:11 | 8 | getting played by Dan Day, didn't you? |
| 17:32:14 | 9 | **A.     I wouldn't say that I said anything like that in** |
| 17:32:17 | 10 | **those words.** |
| 17:32:17 | 11 | Q.     Okay.  I'll tell you what, let's listen to your |
| 17:32:20 | 12 | words.  Then we'll see for ourselves. |
| 17:32:26 | 13 |        (Playing audio.) |
| 17:32:29 | 14 | Q.     First of all, do you recognize that voice? |
| 17:32:35 | 15 |        (Continuing to play audio.) |
| 17:32:45 | 16 | Q.     Did you recognize your voice? |
| 17:32:47 | 17 | **A.     Yes.** |
| 17:32:47 | 18 | Q.     Did that sound like Anthony in the first part of |
| 17:32:50 | 19 | that call? |
| 17:32:51 | 20 | **A.     Okay.** |
| 17:32:51 | 21 | Q.     Is that a "yes"? |
| 17:32:52 | 22 | **A.     Yes.** |
| 17:32:52 | 23 | Q.     You looked like you had some trouble hearing it, |
| 17:32:54 | 24 | so tell you what, we'll go ahead and play it again.  I |
| 17:32:56 | 25 | want to make sure you can have a chance to recognize that |

| | | |
|---|---|---|
| 17:32:59 | 1 | voice. |
| 17:33:02 | 2 | (Replaying audio.) |
| 17:33:16 | 3 | So that was your voice? |
| 17:33:18 | 4 | **A.    Okay.** |
| 17:33:18 | 5 | Q.    Is that a "yes"? |
| 17:33:19 | 6 | **A.    Yes.** |
| 17:33:19 | 7 | Q.    All right.  And that was Mr. Skognamillo's voice, |
| 17:33:22 | 8 | too; right? |
| 17:33:24 | 9 | **A.    Yes, as far as I recall.** |
| 17:33:27 | 10 | Q.    And on another occasion at the Kearney County |
| 17:33:31 | 11 | Fair -- |
| 17:33:31 | 12 | THE COURT:  Before we get to another occasion, |
| 17:33:34 | 13 | Counsel, maybe we should take our evening recess.  You |
| 17:33:37 | 14 | looked like you're moving into a new topic. |
| 17:33:40 | 15 | MR. FEDERICO:  I think that would be wise, Your |
| 17:33:43 | 16 | Honor.  I have several more topics to go. |
| 17:33:46 | 17 | THE COURT:  I assumed that you did.  All right, |
| 17:33:47 | 18 | ladies and gentlemen, we're going to take our evening |
| 17:33:49 | 19 | recess.  We'll be in recess until 8:30 tomorrow morning. |
| 17:33:52 | 20 | Overnight remember the admonition of the Court:  Don't |
| 17:33:54 | 21 | talk about this case with anyone, don't listen to any |
| 17:33:57 | 22 | news accounts on it, and I'll see you tomorrow morning at |
| 17:34:00 | 23 | 8:30.  We're in recess. |
| 17:34:02 | 24 | CLERK COOK:  All rise. |
| 17:34:03 | 25 | (The jury left the courtroom, after which the |

17:34:43   1   following proceedings were had:)

17:34:43   2        THE COURT:  Counsel, we're going to take a brief

17:34:46   3   recess and then we're going to do whatever round it is of

17:34:49   4   our *James* hearing.  In the past we've -- I'm speaking to

17:34:54   5   defense counsel here -- we've had your clients present

17:34:57   6   for this.  And, of course, they're certainly entitled to

17:34:59   7   be here.  I don't know how long we'll go tonight.  But is

17:35:03   8   it your request that your clients be present as well

17:35:06   9   tonight, or do you want us to have the marshals arrange

17:35:12   10  for them to be transported back?

17:35:13   11       MS. BRANNON:  Can we have just one moment, Your

17:35:18   12  Honor.

17:35:18   13       (Whereupon, a sotto voce discussion was had

17:35:19   14  between defense counsel and their clients.)

17:35:23   15       MS. SCHMIDT:  Your Honor, Mr. Wright would like to

17:35:25   16  be present this evening.

17:35:26   17       MR. PRATT:  Your Honor, Mr. Stein would like to be

17:35:29   18  present.

17:35:30   19       MS. BRANNON:  Mr. Allen would like to stay.

17:35:31   20       THE COURT:  All right.  Well, they're certainly

17:35:34   21  entitled to do so.  I just wanted to make sure we weren't

17:35:36   22  unduly elongating their evening, so if they preferred not

17:35:41   23  to.

17:35:41   24       Let's take -- let's try to do 15 minutes.

17:35:45   25  Obviously, I know the marshals have to take the

17:35:47   1   defendants down the hall, but let's try to come back here

17:35:51   2   at 5:50 and we'll continue with our *James* hearing.  We're

17:35:57   3   in recess until that time.

17:35:56   4        (Whereupon, the proceedings were adjourned at 5:35

17:35:57   5   P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

          I, Johanna L. Wilkinson, United States Court Reporter

in and for the District of Kansas, do hereby certify:

          That the above and foregoing proceedings were taken

by me at said time and place in stenotype;

          That thereafter said proceedings were transcribed

under my direction and supervision by means of computer-aided

transcription, and that the above and foregoing constitutes a

full, true and correct transcript of said proceedings;

          That I am a disinterested person to the said

action.

          IN WITNESS WHEREOF, I hereto set my hand on this the

12th day of April, 2019.


                    s/ Johanna L. Wilkinson
                    Johanna L. Wilkinson, CSR, CRR, RMR
                    United States Court Reporter